## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff - Appellee

v.

STATE OF TEXAS,
Defendant - Appellee

STUDENTS FOR AFFORDABLE TUITION; LA UNION DEL PUEBLO ENTERO;
AUSTIN COMMUNITY COLLEGE; OSCAR SILVA
Movants - Appellants

On Appeal from the United States District Court for the Northern District of
Texas, No. 7:25-cv-00055
The Hon. Reed O'Connor, U.S. District Judge

## OPENING BRIEF OF APPELLANTS LA UNIÓN DEL PUEBLO ENTERO, AUSTIN COMMUNITY COLLEGE, AND OSCAR SILVA

Andrés Correa
LYNN PINKER HURST &
SCHWEGMANN, LLP
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Tel.: (214) 981-3800
Fax: (214) 981-3839
acorrea@lynnllp.com

No. 25-10898, *United States v. Students*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

ACLU Foundation of Texas

ACLU of Texas

Austin Community College

Bernie, Andrew

Berroa Rodriguez, Marlene Nathalie

Brewer, Simon Christopher

Broder, Tanya

Corning, Sarah

Correa, Andres

Democracy Forward Foundation

Desai, Yaman

Dolling, Zachary

Donatti, David A.

Ensign, Drew C.

Fascett, Lauren

Fleming, Angel

Gardner, Kyle Aaron

Gonzalez, Kassandra

Hatoum, Daniel

Johnson, Wade Allen

La Unión del Pueblo Entero

Lynn Pinker Hurst & Schwegmann

Kambli, Abhishek

Kercher, Ryan

Molina, Ralph Michael

National Immigration Law Center

Netter, Brian David

Olivares, Efren Carlos

Patton, Christopher W.

Perez, Elianis N.

Perryman, Skye L.

Petchenik, Molly

Pinon, Adriana Cecilia

Saldivar, Edgar

Salzman, Joshua Marc

Silva, Oscar

Skedzielewski, Sean

Students for Affordable Tuition

Tenny, Daniel

Texas Civil Rights Project

Walters, Ryan David

Wolfson, Paul

Woodward, Daniel

Xu, Zhenmain

/s/ Andrés Correa
*Attorney of record for Movant-Appellants LUPE, ACC, and Oscar Silva*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES ........................................................i

TABLE OF CONTENTS........................................................................... iii

TABLE OF AUTHORITIES ......................................................................v

STATEMENT REGARDING ORAL ARGUMENT ...............................1

INTRODUCTION ...................................................................................2

STATEMENT OF JURISDICTION.........................................................4

STATEMENT OF THE ISSUES...............................................................5

PERTINENT STATUTES.........................................................................6

STATEMENT OF THE CASE...................................................................6

    A.    Statutory Background........................................................6

    B.    Factual and Procedural History .......................................8

SUMMARY OF ARGUMENT ...............................................................12

STANDARD OF REVIEW .....................................................................15

ARGUMENT ..........................................................................................15

I.    The District Court Erred in Denying Intervention ........................15

    A.    LUPE Intervenors Were Entitled To Intervene As Of Right.............15

        1.    The Motion Was Timely.........................................16

        2.    LUPE Intervenors Have Substantial Interests At Stake ..........20

        3.    The Denial of Intervention Harms LUPE Intervenors.............21

        4.    The Parties Do Not Represent LUPE Intervenors' Interests ....22

    B.    The District Court's Futility Analysis is Fundamentally Flawed .......23

II.    The Consent Judgment Should Be Vacated ...............................29

A. The District Court Lacked Subject Matter Jurisdiction .......................29

B. The Judgment Was Entered Without Due Process .............................33

C. Surprise to LUPE Intervenors Justifies Vacatur .................................35

D. Extraordinary Circumstances Require Vacatur....................................36

III. The United States And Texas Failed To Show That the Dream Act Is Preempted ...................................................................................................38

A. The Plain Text Of Section 1623(a) Can And Should Be Read As Consistent With The Dream Act .........................................................38

B. Federalism Principles Reinforce the Textual Limits of Section 1623(a) ...................................................................................................48

CONCLUSION ......................................................................................................53

CERTIFICATE OF COMPLIANCE....................................................................56

CORPORATE DISCLOSURE STATEMENT ....................................................57

CERTIFICATE OF SERVICE ............................................................................58

# TABLE OF AUTHORITIES

**Cases**

*Altria Grp. v. Good*, 555 U.S. 70 (2008) ................................................41

*Anderson v. City of New Orleans*, 38 F.4th 472 (5th Cir. 2022) ............................14

*Arizona v. United States*, 567 U.S. 387 (2012).........................................52

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610 (2020) .........................46

*Berger v. N.C. State Conference of the NAACP*, 597 U.S. 179 (2022) ............ 23, 28

*Bituminous Cas. Corp. v. Garcia*, 223 F.R.D. 308 (N.D. Tex. 2004) .............. 34, 35

*Bond v. United States*, 564 U.S. 211 (2011) ............................................51

*Brumfield v. Dodd*, 749 F.3d 339 (5th Cir. 2014)...................................... 20, 22, 24

*Brumfield v. Louisiana State Bd. of Educ.*, 806 F.3d 289 (5th Cir. 2015)........ 29, 32

*Bullard v. Estelle*, 708 F.2d 1020 (5th Cir. 1983) ....................................30

*Cameron v. EMW Women's Surgical Center, Inc.*, 595 U.S. 267 (2022) ........ 19, 26

*Ceres Gulf v. Cooper*, 957 F.2d 1199 (5th Cir. 1992)..............................17

*Chicago & Grand Trunk Ry. Co. v. Wellman*, 143 U.S. 339 (1892)......................29

*City of Houston v. Am. Traffic Solutions, Inc.*, 668 F.3d 291 (5th Cir. 2012) .................................................... 20, 21

*Day v. Bond,* No. 07-1193, 2008 WL 2151696 (U.S. May 19, 2008)....................27

*Edwards v. City of Houston*, 78 F.3d 983 (5th Cir. 1996)......................... 18, 21, 28

*Epic Sys. Corp. v. Lewis*, 584 U.S. 497 (2018).........................................49

*Equal Access Educ. v. Merten*, 305 F. Supp. 2d 585 (E.D. Va. 2004) ...................50

*Flast v. Cohen*, 392 U.S. 83 (1968) .......................................................35

*Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928 (N.D. Tex. 2019)....................22

*Franks Inv. Co. v. Union Pac. R.R. Co.*, 593 F.3d 404 (5th Cir. 2010) ..................14

*Greenwich Ins. Co. v. Miss. Windstorm Underwriting Ass'n*, 808 F.3d 652 (5th Cir. 2015) ............................................................. 47, 48

*Grove City Coll. v. Bell*, 465 U.S. 555 (1984)........................................................43

*Harris v. Hahn*, 827 F.3d 359 (5th Cir. 2016)........................................................43

*Hopwood v. Texas*, 21 F.3d 603 (5th Cir. 1994)....................................................21

*Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501 (1986)....................32

*La Unión del Pueblo Entero v. Abbott*, 29 F.4th 299 (5th Cir. 2022) ....................20

*League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831 (5th Cir. 1993) .............................................................2, 33

*League of United Latin Am. Citizens, Dist. 19 v. City of Boerne* 659 F.3d 421 (5th Cir. 2011) ............................................................. 16, 21

*Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847 (1988)........... 35, 36, 37

*Lower Colorado River Auth. v. Papalote Creek II, L.L.C.*, 858 F.3d 916 (5th Cir. 2017) ............................................................. 29, 31

*Martinez v. Regents of Univ. of California*, 50 Cal. 4th 1277 (2010) ........ 27, 40, 47

*McDonald v. E.J. Lavino Co.*, 430 F.2d 1065 (5th Cir. 1970) ...............................17

*Missouri v. U.S. Food & Drug Admin.*, 2025 WL 1223581 (N.D. Tex. Apr. 28, 2025)........................................................................22

*Moore v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 47 (1971) .....................29

*Mullane v. Central Hanover Bank*, 339 U.S. 306 (1950)................................. 32, 33

*Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018).................... 51, 52

*Muskrat v. United States*, 219 U.S. 346 (1911) ....................................................29

*Nelson v. Adams USA, Inc.*, 529 U.S. 460 (2000) .................................................23

*New York v. United States*, 505 U.S. 144 (1992)....................................................52

*NLRB v. Constellium Rolled Prods. Ravenswood, LLC*, 43 F.4th 395 (4th Cir. 2022) ...................................................................................31

*Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744 (5th Cir. 2006) ..................14

*Pin v. Texaco*, 793 F.2d 1448 (5th Cir. 1986) .........................................24

*Pool v. City of Houston*, 87 F.4th 733, (5th Cir. 2023) ......................................3, 30

*Reid v. Gen. Motors Corp.*, 240 F.R.D. 257  (E.D. Tex. 2006)...........................22

*Rhode Island Federation of Teachers, AFL-CIO v. Norberg,* 630 F.2d 850 (1st Cir. 1980) ...............................................................................24

*Rumsfeld v. Padilla*, 542 U.S. 426 (2004) .............................................................40

*Saavedra v. Murphy Oil U.S.A., Inc.*, 930 F.2d 1104 (5th Cir. 1991) ....................24

*Saldano v. Roach*, 363 F.3d 545 (5th Cir. 2004) ....................................................15

*Sierra Club v. Espy*, 18 F.3d 1202 (5th Cir. 1994) ............................... 15, 16, 18, 20

*Spatt v. State of N. Y.*, 361 F. Supp. 1048 (E.D.N.Y. 1973) ....................................43

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ..........................................................29

*Stallworth v. Monsanto Co.*, 558 F.2d 257 (5th Cir. 1977) ................. 16, 17, 18, 19

*Starns v. Malkerson*, 326 F. Supp. 234 (D. Minn. 1970), *aff'd*, 401 U.S. 985 (1971)...............................................................................................43

*Texas v. United States*, 805 F.3d 653 (5th Cir. 2015).................................... 14, 15

*Thompson v. Am. Home Assurance Co.*, 95 F.3d 4293 (6th Cir. 1996) .................34

*United Airlines, Inc. v. McDonald*, 432 U.S. 385 (1977) .......................................16

*United States ex rel Hernandez v. Team Fin., L.L.C.*, 80 F.4th 571 (5th Cir. 2023) ...............................................................................................22

*United States v. City of Miami*, 664 F.2d 435 (5th Cir. 1981)................................33

*United States v. Hansen*, 599 U.S. 762 (2023) .......................................................50

*United States v. Johnson*, 319 U.S. 302 (1943) ......................................................29

*United States v. Lopez*, 514 U.S. 549 (1995) .............................................................. 48

*United States v. Windsor*, 570 U.S. 744 (2013) ........................................................ 31

*Villegas v. Noem*, 149 F.4th 554 (5th Cir. 2025) ................................................ 26, 41

*Vlandis v. Kline*, 412 U.S. 441 (1973) ....................................................................... 48

*Williams v. Wingrove*, --- F.4th ---, 2025 WL 2447453 (5th Cir. 2025) ................ 47

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ...................................... 25

*WundaFormer, LLC v. Flex Studios, Inc.*, 680 F. App'x 925 (Fed. Cir. 2017) .................................................................................................................................. 44

*Young Conservatives of Texas Found. v. Smatresk*, 73 F.4th 304 (5th Cir. 2023) ............................................................................................................................ 26, 41

**Statutes**

20 U.S.C. § 1015d ................................................................................................... 42, 51

28 U.S.C. § 1291 ............................................................................................................. 4

28 U.S.C. § 1331 ............................................................................................................. 3

28 U.S.C. § 1345 ............................................................................................................. 3

8 U.S.C. § 1101(a)(33) ........................................................................................... 39, 40

8 U.S.C. § 1621(a) ................................................................................................... 42, 49

8 U.S.C. § 1623(a) ...................................................................................... 1, 7, 13, 37

Minn. Stat. § 135A.043(a) ......................................................................................... 47

Tex. Educ. Code § 54.003 ........................................................................................... 51

Tex. Educ. Code § 54.051 ........................................................................................ 6, 51

Tex. Educ. Code § 54.052(a) ........................................................................... 5, 38, 39, 40

Tex. Educ. Code § 54.053(3)(B) .................................................................................. 6

Tex. Educ. Code § 54.206 ........................................................................................... 45

Tex. Educ. Code § 54.211-212 .................................................................45

Tex. Educ. Code § 54.213-214 .................................................................45

Tex. Educ. Code § 54.221 .........................................................................45

Tex. Educ. Code § 54.222 .........................................................................45

Tex. Educ. Code § 54.223 .........................................................................45

Tex. Educ. Code § 54.231 ................................................................... 44, 45

Tex. Educ. Code § 54.233 .........................................................................45

Tex. Educ. Code § 54.241 .........................................................................45

Tex. Educ. Code § 54.251 .........................................................................45

Tex. Educ. Code § 54.369 .........................................................................45

Tex. Gov't Code § 311.032 ......................................................................46

**Rules**

Fed. R. App. P. 4(a)(1)(B) .........................................................................4

Fed. R. Civ. P. 59(e) ..................................................................... 28, 29, 32

Fed. R. Civ. P. 60(b) .............................................................. 28, 29, 32, 34

**STATEMENT REGARDING ORAL ARGUMENT**

The district court enjoined a longstanding Texas statute, thereby depriving thousands of Texas students of access to in-state tuition. Given the importance and complexity of the issues, movant-appellants respectfully submit that oral argument will be of assistance to the Court.

**INTRODUCTION**

For more than twenty years, the Texas Dream Act has enabled certain graduates of Texas high schools to pay in-state tuition at Texas public colleges and universities, without regard to their immigration status. Days after legislative repeal attempts failed, the United States and Texas collaborated to have the Dream Act judicially enjoined.

The United States sued, alleging that key provisions of the Dream Act are preempted by a federal statute, 8 U.S.C. § 1623(a). Within hours, the Texas Attorney General waived service and co-signed a Joint Motion for Entry of Consent Judgment. That same day, the district court, without the benefit of any adversarial briefing, accepted Texas's coordinated capitulation and entered final judgment enjoining Texas and its employees from applying the Dream Act to students without lawful presence.

The Texas Attorney General publicly boasted about working hand-in-hand with the federal government to achieve this result, describing the order enjoining a democratically enacted Texas statute as a "major victory." ROA.339. The Attorney General therefore explicitly and improperly pursued "his own policy preferences" by enlisting "the injunctive power of the federal court to achieve a result that the Attorney General and plaintiff[] were not able to achieve through the political

process." *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 840, 845 (5th Cir. 1993).

Given the Attorney General's abdication of his duty to defend the Dream Act, a group collectively referred to in this litigation as LUPE Intervenors, promptly moved to intervene in the district court. LUPE Intervenors are a student, a Texas college, and an organization that have each been adversely affected by the consent judgment. Concurrently with their intervention motion, LUPE Intervenors also filed motions to stay and for relief from the consent judgment, explaining that the absence of adversity between the United States and Texas meant the consent judgment had been issued without jurisdiction and that, in any case, the Dream Act is not preempted.

The district court tabled the motions to stay and for relief from judgment and then denied intervention. In doing so, it never even addressed whether the intervenors satisfied the requirements for intervention under Federal Rule of Civil Procedure 24. Instead, the court put the cart before the horse—summarily pre-determining without the benefit of merits briefing that the Dream Act was preempted and an adversarial process would be "futile."[1] Having denied

_____

[1] The court concurrently denied an intervention motion by a separately represented organization, movant-appellant Students for Affordable Tuition, on the same ground.

intervention, the court denied the motions to stay and vacate, which it never addressed, as moot.

The people of Texas are entitled to genuine litigation before a federal court invalidates their democratically enacted statute. And LUPE Intervenors—who directly suffer the consequences of the consent judgment—are proper parties to provide a defense of the Dream Act that is otherwise wholly absent from the collusive parties. They are entitled to intervene as of right.

The trial court should have granted intervention, vacated the judgment, and dismissed the case for lack of jurisdiction. Although the incorrect denial of intervention is alone a sufficient basis for reversing the consent judgment and remanding for further proceedings, the motion seeking relief from judgment was also meritorious. This "faux" litigation could not produce a valid judgment under Article III. *See Pool v. City of Houston*, 87 F.4th 733, 733–34 (5th Cir. 2023). And the district court's preemption ruling relies on an incorrect statutory analysis and an improperly expansive interpretation of federal law as intruding into core domains of state sovereignty.

## STATEMENT OF JURISDICTION

The United States invoked the district court's jurisdiction under 28 U.S.C. §§ 1331§, 1345. ROA.25. For the reasons set forth below, the district court lacked

subject-matter jurisdiction because there was no case or controversy within the meaning of Article III.

The district court entered the final consent judgment on June 4, 2025. ROA.52. On August 4, 2025, LUPE Intervenors filed a timely protective notice of appeal from the consent judgment. ROA.708; *see* Fed. R. App. P. 4(a)(1)(B). The district court denied LUPE Intervenors' intervention motion on August 15, 2025 (ROA.733), and their motions to stay and for relief from judgment on August 18, 2025 (ROA.753). On August 19, 2025, LUPE Intervenors filed a timely notice of appeal from the denials of their motions to intervene, for relief from judgment, and to stay. Dkt. No. 92. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether LUPE Intervenors' motion for intervention should have been granted.

2. Whether the consent judgment should be vacated either as a direct consequence of the reversal of the denial of intervention or, alternatively, because LUPE Intervenors' motion for relief from judgment should have been granted.

3. If the Court chooses to reach the question, whether the district court erred in concluding without adversarial briefing that the Dream Act is preempted by Section 1623(a), either because the district court misconstrued Section 1623(a) and

the Texas Education Code, or alternatively, because Section 1623(a) as construed by the district court would violate the Tenth Amendment.

## PERTINENT STATUTES

Relevant statutory provisions are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory Background

Like many States, Texas offers a lower "in-state" tuition rate at its colleges and universities to certain qualifying students. In 2001, Governor Rick Perry signed a law commonly known as the Texas Dream Act, H.B. 1403, 77th Leg. Reg. Sess. (Tex. 2001), which allowed eligible graduates of Texas high schools to pay in-state tuition. The statute extends eligibility to all qualifying graduates of Texas high schools without imposing any exclusions based on federal immigration status. The Dream Act was a landmark law passed with overwhelming bipartisan support, and its vision for accessible education was exemplary. Since then, more than twenty states have followed suit and passed similar laws. ROA.245.

The Dream Act allows students to qualify for in-state tuition if they (1) graduated from a Texas high school; (2) maintained a residence in Texas for at least three years prior to their high-school graduation; and (3) maintained a residence in Texas for the year preceding enrollment in a higher education institution. Tex. Educ. Code § 54.052(a)(3). In addition, a person who is not already a permanent resident or a citizen of the United States must submit an

"affidavit stating that the person will apply to become a permanent resident of the United States as soon as the person becomes eligible to apply." *Id*. § 54.053(3)(B). Students not permitted to pay resident tuition under the Dream Act or other provisions of the Texas Education Code must pay tuition at the non-resident rate. *Id*. § 54.051(m).

The Dream Act has been a boon to the Texas economy. Colleges and universities have significantly benefited from the increased revenue from tuition payments and fees as a result of increased enrollment through the Dream Act. ROA.321. Thousands of students have relied on the statute to access higher education, and have gone on to expand the Texas workforce and contribute millions of dollars to the state in tax revenue. ROA.321. It has been estimated that a repeal of the Dream Act will result in an annual economic loss for Texas in the range of hundreds of millions of dollars, including through substantial reduction in wages, earnings, and consumer spending. ROA.226.

The Texas Legislature has repeatedly rebuffed efforts to repeal the statute. During the most recent legislative session, repeal bills elicited an outpouring of public support for the Dream Act. ROA.246. As it had done for over a decade, the Texas Legislature rejected repeal efforts. ROA.244.

## B.    Factual and Procedural History

**1.** On June 4, 2025, merely two days after the Texas legislative session ended with the Dream Act in place, the United States sued Texas, alleging that the Texas Dream Act is preempted by a federal statute, 8 U.S.C. § 1623(a). Section 1623(a) provides:

> [A]n alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident.

*Id.*

Within hours of the lawsuit being filed, Texas waived service, and the parties filed a Joint Motion for Entry of Consent Judgment seeking to enjoin the Dream Act. ROA.44–48. The Joint Motion made no effort to demonstrate entitlement to an injunction. Yet six hours after the lawsuit was filed, without awaiting opposition from any affected third party, the district court entered the consent judgment as requested and closed the case. ROA.52, 434–35.

In the immediate wake of the consent judgment, the United States and the Texas Attorney General acknowledged having worked in concert to achieve a jointly desired outcome. The day of the consent judgment, Texas Attorney General Ken Paxton issued a press release trumpeting his work in "[s]uccessfully [s]trik[ing] [d]own" the Dream Act, emphasizing that his office had "entered a

joint motion with the Trump Administration" to achieve "a major victory for Texas." ROA.339. He separately described his role in the litigation as "stand[ing] with Attorney General Bondi and the Trump Administration to stop" the Dream Act. ROA.350. The United States Department of Justice correspondingly "commend[ed]" Attorney General Paxton "for swiftly working with us" in the litigation. *Id.* In a speech made shortly after the consent judgment, a senior Justice Department official elaborated that the United States and Attorney General Paxton had "talk[ed] in advance" to eliminate "a statute that's been a problem for the state." ROA.435.

Defenses were available to Texas. For example, the Texas Attorney General has since acknowledged that he disagrees with at least one substantive concession made in the hastily submitted joint motion for entry of the consent decree, that the district court has the "authority" to enjoin the Dream Act under the Supremacy Clause as an exercise of "its inherent equitable powers." ROA.47. He has since told this Court that Texas "strenuously disagrees" with the jurisdictional premise. Tex. Stay Opp'n at 13 (5th Cir. Sept. 8, 2025) (ECF 77). Such a question is not merely trivial.

**2.** Less than three weeks after the filing of the complaint and the entry of the consent judgment, Appellants La Unión del Pueblo Entero (LUPE), Oscar Silva, and Austin Community College filed emergency motions to intervene (ROA.115),

to vacate the consent judgment (ROA.150), and to stay the consent judgment (ROA.183). In these filings, LUPE Intervenors explained how they were each adversely affected by the consent judgment.

Silva is a 24-year-old graduate student who has lived in Texas since he was one year old. ROA.355. He graduated from a Texas high school and is currently a student nearing graduation in a joint bachelor's and master's program at the University of North Texas (UNT). *Id.* Silva qualified for in-state tuition because of the Dream Act. *Id.* The consent judgment has upended his classification because, if UNT asked him to provide documentation showing lawful status, Silva would be unable to do so. ROA.653. Silva has an interest in retaining his status, accessing his education, and graduating next Spring. ROA.356–357.

Austin Community College (ACC) is one of the largest community college systems in the country and provides access to high-quality education to develop and enrich communities in Central Texas, especially for individuals from historically underrepresented and economically disadvantaged backgrounds. ROA.359. Like most community colleges, ACC's budget relies heavily on predictable tuition income. *Id.* ACC estimates that the consent judgment affects about 440 of its students. ROA.359–60. The consent judgment caused and continues to cause irreparable harm to its finances, campus community, and mission. ROA.360–62.

LUPE is a membership organization founded in 1989 that advocates for and provides services to low-income communities called colonias in Texas's Rio Grande Valley. ROA.329–30. The organization runs programming to help undocumented students seeking higher education and staff at local high schools who support them. ROA.332–33. Since the consent judgment, LUPE staff have had to divert resources to better serve students. ROA.334–36. At the time LUPE sought to intervene, at least six of its members had reached out to LUPE because they "are anxious and uncertain about their college futures." ROA.336.

LUPE Intervenors' emergency motions explained not only that they were interested parties entitled to intervene under Federal Rule of Civil Procedure 24, but also that the consent judgment was procedurally and substantively flawed. They argued that because there had never been adversity in the litigation between the United States and Texas, the court was without jurisdiction to enter the consent judgment. ROA.165–67. They further argued that, in any case, the Dream Act is not preempted by Section 1623(a), particularly because the statute must be construed in light of the significant federalism concerns created by a federal law dictating to a state the tuition it must charge to particular students at the state's own universities. ROA.636–38. LUPE Intervenors also explained that the federal government lacks authority under the Tenth Amendment to compel Texas to act as the injunction requires. ROA.637–38.

**3.** The district court ordered briefing on the emergency motion to intervene, but stayed briefing on the motions for stay and vacatur. ROA.486. The court then denied intervention. ROA.735. The court did not address whether LUPE Intervenors had satisfied the standard four-factor test for intervention of right under Federal Rule of Civil Procedure 24(a) or the considerations generally applicable to permissive intervention. Instead, the court rested its holding entirely on its conclusion that intervention would be "futile" because it concluded that the Dream Act is preempted by Section 1623(a). ROA.740–45. The court subsequently denied the motions to stay and for relief from judgment as moot. ROA.753.

**4.** LUPE Intervenors timely noticed appeals from the consent judgment, ROA.708, and from the denial of the motions to intervene, to stay, and for relief from the judgment, Dkt. 92. LUPE Intervenors then sought a stay pending appeal from this Court, which remains pending.

## SUMMARY OF ARGUMENT

I.     The district court erred in denying LUPE Intervenors' motion to intervene as of right. LUPE Intervenors satisfied each relevant factor: their motion was timely, their interests were legally protectible, substantial harm would result from the denial of intervention, and the parties had expressly disclaimed any intent to represent their interests. Accordingly, LUPE Intervenors were entitled to be heard on this case's merits.

Instead of considering those well-established factors, the district court offered what it called a "futility" analysis where it opined that, if there had been adversarial proceedings, it would have reached the same result as the consent judgment. That conclusion is replete with errors. The court purported to apply a motion to dismiss standard, but LUPE Intervenors sought to intervene to defend the law, not to state a claim against it. That aside, the court failed to appreciate the strength of LUPE Intervenors' arguments against holding the Dream Act preempted. And the court overlooked several other meritorious arguments that LUPE Intervenors raised, including that the court lacked Article III jurisdiction and that the court's interpretation of federal law violates the Tenth Amendment.

II.     The consent judgment should be vacated. That result is required because the district court wrongly denied intervention. Even if that were not sufficient, the extraordinary circumstances of this case also require vacatur on several other grounds. As a threshold matter, the consent judgment was entered without a genuine case or controversy, as all the parties agreed on the result and desired the same ends. Article III therefore requires vacatur and dismissal. The judgment was also entered without any notice to affected individuals and entities, let alone a meaningful opportunity to participate. That, too, requires vacatur.

III.     Should the Court reach the merits, it should reverse the consent judgment because the parties failed to show that federal law preempts the Dream

Act. The Dream Act can be read consistently with the federal statute invoked by the United States. That federal statute indicates that a person not lawfully present in the United States is not eligible "on the basis of residence within a State" for "any postsecondary education benefit" unless "a citizen or national" of the United States is eligible without regard to whether that person is such a resident. 8 U.S.C. § 1623(a). The parties failed to establish preemption because the Dream Act does not make in-state tuition available "on the basis of residence"; in-state tuition is not a "postsecondary education benefit"; and the Dream Act makes available the same tuition rate to "a citizen or national" regardless of whether that person is a resident of Texas.

Core federalism principles reinforce the textual limits of federal law in this area. States have always been the primary sovereigns in the field of education, so the presumption against preemption counsels strongly in favor of a narrow reading of any federal law that would intrude on their traditional prerogatives. And if the district court were correct that federal law dictated how states may set their own laws regarding in-state tuition rates, that would render the federal law unconstitutional, as Congress cannot dictate the contents of state law.

For these reasons, the consent judgment should be vacated and the case dismissed for want of jurisdiction or, in the alternative, remanded for further proceedings with LUPE Intervenors' full participation.

## STANDARD OF REVIEW

Denial of a motion to intervene as of right is reviewed de novo. *Texas v. United States*, 805 F.3d 653, 656 (5th Cir. 2015). The district court's legal conclusions regarding the interpretation and constitutionality of a federal statute are reviewed de novo, *see Franks Inv. Co. v. Union Pac. R.R. Co.*, 593 F.3d 404, 407 (5th Cir. 2010), whether reviewed on appeal from a final judgment or from the denial of a post-judgment motion under Federal Rule of Civil Procedure 59 or 60, *see Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 749 (5th Cir. 2006); *Anderson v. City of New Orleans*, 38 F.4th 472, 479 (5th Cir. 2022).

## ARGUMENT

### I.    The District Court Erred in Denying Intervention

The district court erred in denying LUPE Intervenors' motion to intervene. The court declined to apply the established framework of Federal Rule of Civil Procedure 24, instead denying intervention based solely on its view that any intervention would be futile. This procedural shortcut violated LUPE Intervenors' rights to be heard and to mount a robust defense of the Texas Dream Act based on a premature and incomplete view of the merits, which the district court formulated without the benefit of full adversarial briefing.

### A.    LUPE Intervenors Were Entitled To Intervene As Of Right

LUPE Intervenors were entitled to intervene under Federal Rule of Civil Procedure 24(a). That rule requires district courts to allow intervention when: (1)

the application is "timely"; (2) the movant has "an interest relating to the property or transaction that is the subject of the action"; (3) the case's disposition "may, as a practical matter, impair or impede its ability to protect its interest"; and (4) the existing parties "inadequately represent[]" the movant's interest. *Sierra Club v. Espy*, 18 F.3d 1202, 1204–05 (5th Cir. 1994). Those factors broadly allow intervention "where no one would be hurt and the greater justice could be attained." *Texas v. United States*, 805 F.3d 653, 657 (5th Cir. 2015); *see also Saldano v. Roach*, 363 F.3d 545, 555 (5th Cir. 2004).

In denying intervention, the district court did not suggest that LUPE Intervenors failed to satisfy any of these factors. *See* ROA.739–746. Individually, each factor favors intervention; taken together, they require it.

### 1. The Motion Was Timely

LUPE Intervenors timely moved for intervention. The motion was filed less than three weeks after the case began, well before any prejudice could arise and while meaningful participation remained possible. This Court evaluates timeliness based on four subfactors: (1) how long the prospective intervenor knew or should have "known of his interest in the case before" seeking intervention; (2) prejudice to the existing parties resulting from "the would-be intervenor's failure to apply for intervention as soon as he actually knew or reasonably should have known of his interest"; (3) prejudice to the prospective intervenor from the denial of

intervention; and (4) any "unusual circumstances" bearing on timeliness. *Stallworth v. Monsanto Co.*, 558 F.2d 257, 264–66 (5th Cir. 1977). Those factors uniformly favor LUPE Intervenors.

**A.** LUPE Intervenors moved to intervene expeditiously—within twenty days of learning their interests were at stake. *See* ROA.52 (entering a consent judgment the same day the case was filed); ROA.115–48 (emergency motion to intervene filed 20 days later). There is no way LUPE Intervenors could have learned of their interest any earlier. It is therefore unsurprising that the district court acknowledged that LUPE Intervenors moved to intervene "[s]oon after" the initiation of the litigation and the entry of the consent judgment. ROA.737.

This timeline easily satisfies the first *Stallworth* factor. In *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne* 659 F.3d 421, 434 (5th Cir. 2011) (hereinafter "*LULAC*"), this Court held that four weeks was a "fairly short period of time for a person to obtain counsel, explore his legal options, and file a motion to intervene." Other cases approved even longer timelines. *See, e.g., Stallworth*, 558 F.2d at 267 (motion filed one month after consent judgment); *Espy*, 18 F.3d at 1205 (two months). And, importantly, LUPE Intervenors moved swiftly enough to file timely post-judgment motions under Rules 59 and 60, as well as to appeal the consent judgment. *Cf. United Airlines, Inc. v. McDonald*, 432 U.S. 385, 390 (1977) (motion timely when filed within 30-day period for appeal).

**B.** The existing parties would suffer no prejudice from intervention. "[T]he relevant issue is not how much prejudice would result from allowing intervention, but rather how much prejudice would result from the would-be intervenor's failure to request intervention as soon as he knew or should have known of his interest." *Stallworth*, 558 F.2d at 267. The parties can claim no prejudice arising from the 20-day period between the entry of judgment and the intervention motion.

First, as explained above, any delay was minimal in absolute terms. Second, the case's procedural posture was materially unchanged. The parties had not engaged in any discovery or otherwise taken any actions such that intervention would be prejudicial. *See McDonald*, 432 U.S. at 393 n.14 (no prejudice from post-judgment intervention absent reason to believe a party "discarded evidence or was otherwise prejudiced"). Indeed, numerous decisions have authorized post-judgment intervention. *See Stallworth*, 558 F.2d at 267; *McDonald v. E.J. Lavino Co.*, 430 F.2d 1065, 1072–73 (5th Cir. 1970) (post-judgment intervention was "[a]t the most" a "minor inconvenience"); *see also Ceres Gulf v. Cooper*, 957 F.2d 1199, 1203 (5th Cir. 1992) (whether intervention is sought before or after final judgment is "of limited significance").

**C.** In stark contrast, LUPE Intervenors face severe and irreversible prejudice if denied intervention—harm the district court entirely failed to consider. Procedurally, the denial of intervention costs them the "legal rights associated with

formal intervention, namely briefing of issues, presentation of evidence, and ability to appeal." *Espy*, 18 F.3d at 1207. Substantively, the consent judgment works immediate and irreparable harm on LUPE Intervenors every day it remains in effect. *See supra* pp. 20.

Those harms are directly attributable to the denial of intervention because no party represents LUPE Intervenors' interests. *See Edwards v. City of Houston*, 78 F.3d 983, 1005–06 (5th Cir. 1996) (en banc). Neither the United States nor Texas has suggested it will advocate for Silva's educational access, ACC's institutional concerns, or LUPE's organizational interests. Quite the contrary: both parties support the consent judgment that impairs those interests.

**D.** The final *Stallworth* factor strongly favors intervention due to the extraordinary and irregular circumstances surrounding this litigation. The parties colluded to circumvent the State's democratic process. The United States filed suit just two days after the Texas Legislature declined to repeal the 24-year-old Dream Act—legislation on which thousands of Texas students depend. Published statements reveal, and the parties do not meaningfully dispute, that the parties coordinated in advance to arrange the outcome. ROA.434–37. This was not genuine adversarial litigation, but a collaboration to achieve a jointly desired goal masquerading as a lawsuit.

Worse yet, the parties engineered the faux suit in an attempt to evade meaningful judicial review. Within hours, the United States filed its complaint, Texas waived service, and the parties jointly moved for a consent judgment. By entering the consent judgment later the same day, the district court failed to offer affected stakeholders an opportunity to mount a bona fide defense of this democratically enacted legislation.

These circumstances are even more "unusual" than the circumstances justifying intervention in *Cameron v. EMW Women's Surgical Center*, 595 U.S. 267, 278 (2022) (reversing the denial of intervention), where a state official declined to seek rehearing en banc after pressing a losing defense of a state law in district court and before the court of appeals. This Court should not allow the United States and Texas to benefit from their deliberate attempt to insulate their gambit from judicial review. After all, a party cannot benefit from its own gamesmanship regarding the litigation's progress. *Cf. Stallworth*, 558 F.2d at 267 (parties who make intervention difficult forfeit right to contest timeliness).

## 2. LUPE Intervenors Have Substantial Interests At Stake

As noted, LUPE Intervenors have weighty interests at stake in the resolution of this case, including diminished access to educational opportunities, direct financial harms, and organizational disruption. *See* ROA. 334–36, 356–57, 359–62, 653 . Those interests fall comfortably within the range of interests this Court has

recognized as supporting intervention. *See, e.g.*, *Brumfield v. Dodd*, 749 F.3d 339, 344 (5th Cir. 2014) (educational access); *see also City of Houston v. Am. Traffic Solutions, Inc.*, 668 F.3d 291, 294 (5th Cir. 2012) (interest in avoiding having "money and time" spent to promote and defend a charter amendment "spent in vain").

### 3.    The Denial of Intervention Harms LUPE Intervenors

The consent judgment directly and practically impairs LUPE Intervenors' ability to protect their substantial interests—a consequence the district court also ignored. The standard is lenient: intervenors need only show "there is a possibility that their interest could be impaired or impeded." *La Unión del Pueblo Entero v. Abbott*, 29 F.4th 299, 307 (5th Cir. 2022). This Court considers both substantive and procedural interests in evaluating this factor. For example, in *Espy*, 18 F.3d at 1207, the Court acknowledged an impairment where the inability to participate in litigation could have "precedential effect" on the intervenor's interests.

Here, the consent judgment has already triggered the very harms that LUPE Intervenors sought to prevent, and those harms continue every day the consent judgment remains in effect. *See* ROA. 334–36, 356–57, 359–62, 653 . Silva faces uncertainty as to whether increased tuition will prevent him from graduating, ACC is losing talented applicants (and revenue), and LUPE is forced to devote resources to address the fallout from the consent judgment and to counsel members.

### 4. The Parties Do Not Represent LUPE Intervenors' Interests

No existing party represents or will represent LUPE Intervenors' interests, satisfying the final factor for intervention. Although governmental bodies are ordinarily presumed to adequately represent their constituents' interest, *Edwards*, 78 F.3d at 1005, the extraordinary circumstances of this litigation conclusively refute that presumption, *see Hopwood v. Texas*, 21 F.3d 603, 605 (5th Cir. 1994).

This Court's decision in *American Traffic Solutions* demonstrates the inadequacy of Texas's representation in this suit. The Court reversed the denial of intervention where factual circumstances raised "substantial doubts about the City's motives and conduct" in defending a charter amendment—specifically noting that "the City might well be inclined to settle . . . on terms that preserve the adverse ruling" to which the prospective intervenors objected. *Am. Traffic Solutions, Inc.*, 668 F.3d at 294. There, the mere possibility of an adverse settlement rendered the City's representation inadequate; here, the Texas Attorney General has affirmatively assented to the consent judgment that harms LUPE Intervenors. And in a complete abdication of his duty to defend Texas law, his office has opposed the prospective intervenors' attempts to obtain relief from the consent judgment. That is patently inadequate representation. *See LULAC*, 659 F.3d at 435 (existing parties who "oppose the relief that [the intervenor] seeks . . . do not adequately represent his interest").

Even if Texas could demonstrate some shared interest with LUPE

Intervenors as a purported basis for adequate representation, "[t]he lack of unity in

all objectives, combined with real and legitimate additional or contrary [merits]

arguments, is sufficient to demonstrate that the representation may be inadequate."

*Brumfield*, 749 F.3d at 346. No more is required to intervene by right.[2]

### B.    The District Court's Futility Analysis is Fundamentally Flawed

Having satisfied the applicable Rule 24 factors, LUPE Intervenors were

entitled to intervene. The district court then should have proceeded by vacating the

consent judgment and dismissing the case for lack of jurisdiction, or at minimum

allowing LUPE Intervenors to defend the Dream Act. But the court short-circuited

the ordinary course of litigation by denying intervention based on its view that the

prospective intervenors could not mount a meritorious defense. ROA.745. In doing

---

[2] For substantially the same reasons, permissive intervention was also warranted under Federal Rule of Civil Procedure 24(b). Rule 24(b) requires only that a motion for permissive intervention: (1) is timely, (2) contains claims or defenses with questions of fact or law in common with the action, and (3) does not cause delay or prejudice. *See Missouri v. U.S. Food & Drug Admin.*, 2025 WL 1223581, at *1 (N.D. Tex. Apr. 28, 2025). Denial of permissive intervention is reviewed for abuse of discretion. *See United States ex rel Hernandez v. Team Fin., L.L.C.*, 80 F.4th 571, 579 (5th Cir. 2023) (reversing denial of permissive intervention). LUPE Intervenors have met each factor. *See Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928, 940 (N.D. Tex. 2019) ("Even if Putative Intervenors could not establish that they are entitled to intervene as of right, the Court would allow them to intervene permissively").

so, the court misapplied precedent and improperly denied LUPE Intervenors a hearing on the merits.

As the Supreme Cout has recognized, intervention promotes the "full and fair adversarial testing" of arguments. *Berger v. N.C. State Conference of the NAACP*, 597 U.S. 179, 192 (2022). That function is particularly important in circumstances where a plaintiff has selected state defendants "most inclined to settle favorably and quickly," resulting in "hobbled litigation" that risks "setting aside duly enacted state law based on an incomplete understanding" of the relevant interests and arguments. *Id.* The district court's decision highlights those dangers. In accepting the parties' consent judgment—and then refusing to allow intervention—the district court adjudicated the validity of a longstanding and consequential state law without jurisdiction, let alone full adversarial briefing on the merits.

The district court therefore got things backwards. It embarked on a "futility" analysis as part of its intervention decision, seemingly expecting prospective intervenors to prove (despite staying briefing of the stay and vacatur motions) that they have a winning argument on the merits before allowing them to participate in the litigation to make that very argument. *See Nelson v. Adams USA, Inc.*, 529 U.S. 460, 471 (2000) ("Judicial predictions about the outcome of hypothesized litigation cannot substitute for the actual opportunity to defend that due process affords.").

Intervention motions are not designed to preview the full merits of a case. Instead, intervention "allow[s] interested parties to air their views so that a court may consider them before making potentially adverse decisions." *Brumfield*, 806 F.3d at 301.

Thus, to the extent that "futility" properly plays a role in an intervention decision, any such role is far more limited than the district court assumed. Indeed, the cases on which the district court and the parties relied (ROA.740–45; U.S. Stay Opp'n at 16–17; Tex. Stay Opp'n at 7–8) illustrate the point. In *Rhode Island Federation of Teachers, AFL-CIO v. Norberg* , for example, the First Circuit affirmed the denial of intervention where the proposed interventors failed to demonstrate even a "colorable defense" of the statute they supported. 630 F.2d 850, 855 (1st Cir. 1980). Similarly, in *Pin v. Texaco* , this Court affirmed the denial of intervention where a proposed plaintiff's claims were so "patent[ly] insufficien[t]" that Rule 11 sanctions were proper. 793 F.2d 1448, 1455 (5th Cir. 1986). That is a far cry from the scenario here.[3]

---

[3] *Saavedra v. Murphy Oil U.S.A., Inc.*, 930 F.2d 1104 (5th Cir. 1991), is even further afield. There, the district court granted intervention but simultaneously dismissed both the underlying suit and the intervention claim, which was "wholly derivative of" the dismissed action. *Id.* at 1109. On appeal, this Court affirmed and noted that a party had a "valid reason" for declining to consent to intervention given the weaknesses in the putative intervenor's complaint—far from the case here. *See id.*

Instead, the district court purported to conduct a merits analysis as the justification for denying the motion to intervene. But its reasoning demonstrates the problems of deciding the merits before granting intervention.

To start, the court employed an inapplicable standard. It invoked the motion-to-dismiss standard under Rule 12(b)(6), concluding that LUPE Intervenors had failed to state a cognizable claim and would not be able to file a viable amended complaint. ROA.741. But LUPE Intervenors sought to intervene as *defendants* to challenge jurisdiction and, if necessary, defend the Dream Act—not to state any affirmative claim against any party. This distinction is no mere technicality: LUPE Intervenors' first argument, that the district court lacked jurisdiction to enter the consent judgment, would never be asserted in an amended complaint, and thus would never be subject to review under Rule 12(b)(6). To the contrary, this argument provides a basis for vacating the district court's order and dismissing the case, which the district court ignored.[4]

That aside, the court's futility analysis contained significant gaps and errors. Through their motions to intervene, stay, and vacate, LUPE Intervenors identified at least three arguments they would offer if allowed to intervene: (1) the court lacked Article III jurisdiction to enter the consent judgment because the United

---

[4]Additionally, as LUPE Intervenors noted, the parties failed to make any showing of the four factors required to enter an injunction. The court did not address this omission. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008).

States and Texas were not adverse and there was never a controversy between them (ROA.634); (2) Section 1623(a) does not preempt the challenged provisions of the Dream Act (ROA.636–37); and (3) to the extent that Section 1623 were held to preempt the Dream Act, it would be inconsistent with the Tenth Amendment (ROA.637–38). Yet the district court considered only the second argument (ROA.740–46), ignoring the other independent and potentially dispositive arguments. That oversight is particularly troubling given the "deeper, constitutional considerations" at stake when a federal court invalidates a state law. *Cameron*, 595 U.S. at 277.

The district court's futility analysis was deficient even as to the one issue it did consider. The court viewed further briefing of the preemption issue as unnecessary in view of a passage in *Young Conservatives of Texas Found. v. Smatresk*, 73 F.4th 304 (5th Cir. 2023), that observed that the challenged provisions of the Dream Act "seem[]" to be preempted by Section 1623(a). *Id.* at 314. But the court acknowledged that the passage was "dicta." ROA.744. *Cf. Villegas v. Noem*, 149 F.4th 554, 564 (5th Cir. 2025) (explaining that dictum is "nonbinding"). And, as explained further below, the Dream Act is best read as consistent with Section 1623(a). *See infra* pp. 37–47.

At minimum, the preemption issues are nuanced and warrant adversarial briefing. When then-Texas Attorney General Greg Abbott was asked to opine on

whether Section 1623(a) preempts the Dream Act, he seemingly agreed, and was

unable to offer a confident prediction on how courts would resolve the question.

*See* Office of the Att'y Gen. of Tex., Opinion No. GA-0732 (July 23, 2009),

https://perma.cc/7DHB-MUKH.

Further refuting the suggestion that the Dream Act cannot even be colorably

defended is the fact that since Section 1623(a) was enacted, more than twenty

States have adopted analogues to the Texas Dream Act. ROA.245. One such

statute has been upheld by a state supreme court, which determined that the plain

language of Section 1623 does not preempt a statute similar to Texas's Dream Act.

*See Martinez v. Regents of Univ. of Cal.*, 50 Cal. 4th 1277, 1292–94 (2010). And

other States, unlike Texas, have defended their statutes against Section 1623(a)

challenges. *See* Br. in Opp'n, *Day v. Bond,* No. 07-1193, 2008 WL 2151696, at

*35 (U.S. May 19, 2008) ("The State of Kansas firmly believes that it has obeyed

the law—that its statute fully comports with 8 U.S.C. § 1623."); Mem. of Law in

Support of Mot. to Dismiss, *United States v. Walz*, No. 25-cv-02668 (D. Minn.

July 23, 2025) (defending Minnesota analogue to the Dream Act and arguing that

"[t]he United States's reading of the [Section 1623(a)]—that no state may provide

any postsecondary education benefit to any undocumented student unless it

provides this benefit to all U.S. citizens—not only contravenes the statutory

language but also raises serious Tenth Amendment concerns").

At bottom, the district court's denial of intervention precluded "full and fair adversarial testing" of the Texas Dream Act. *Berger*, 597 U.S. at 192. Texans deserved at least that much before a federal court invalidated a two-decade-old law democratically adopted by the State legislature.

## II.     The Consent Judgment Should Be Vacated

Under this Court's precedent, reversal of the denial of intervention alone is sufficient basis for vacating the consent decree before remanding for further proceedings. *See Edwards*, 78 F.3d at 1006 (reversing denial of intervention and "in conjunction therewith" vacating a district court judgment approving a consent decree). But to the extent that any further showing is required, LUPE Intervenors' motion for relief from judgment (ROA.150–80), which the district court denied as moot (ROA.753), demonstrated that the consent judgment cannot be permitted to stand. Vacatur is warranted on several independent grounds: the judgment is void for lack of subject-matter jurisdiction; was entered without the requisite notice and opportunity to be heard by affected parties; and was the product of extraordinary circumstances given the parties' collusive settlement. *See* Fed. R. Civ. P. 59(e), 60(b)(1), (4), (6) ).

### A.     The District Court Lacked Subject Matter Jurisdiction

**1.** One threshold flaw in the consent judgment is that it was issued without jurisdiction, rendering it void. *See Brumfield*, 806 F.3d at 298 (judgment is void

when the court that rendered it "lacked jurisdiction of the subject matter, or of the parties, or [when] it acted in a manner inconsistent with due process of law"); *see* Fed. R. Civ. P. 60(b)(4); 59(e).

Under bedrock Article III principles, a court is without jurisdiction absent a "case or controversy." *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); U.S. Const. Art. III, § 2; *see also Lower Colorado River Auth. v. Papalote Creek II, L.L.C.*, 858 F.3d 916, 927 (5th Cir. 2017) (Because "there was no Article III 'case' or 'controversy'[] at the time the district court entered judgment in the case, the district court's judgment is void for lack of subject matter jurisdiction and is vacated."). A true case or controversy requires parties with adverse legal interests who pursue "an honest and actual antagonistic assertion of rights" against each other. *Muskrat v. United States*, 219 U.S. 346, 359 (1911); *Chicago & Grand Trunk Ry. Co. v. Wellman*, 143 U.S. 339, 345 (1892). This controversy must be "real, earnest, and vital." *Id.* "[B]y means of a friendly suit, a party beaten in the legislature [cannot] transfer to the courts an inquiry as to the constitutionality of the legislative act." *Id.*

When "both litigants desire precisely the same result," there is no case or controversy. *Moore v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 47, 48 (1971); *see also United States v. Johnson*, 319 U.S. 302, 305 (1943) ("Such a suit is collusive because it is not in any real sense adversary. It does not assume the

'honest and actual antagonistic assertion of rights' to be adjudicated—a safeguard essential to the integrity of the judicial process, and one which we have held to be indispensable to adjudication of constitutional questions by this Court."). This Court has consistently and recently applied this principle, holding jurisdiction lacking where "all parties have agreed from the beginning of this case that [the challenged] statutory provision [is] unconstitutional," *Pool*, 87 F.4th at 733–34, or where both parties "affirmatively desire the same result," *Bullard v. Estelle*, 708 F.2d 1020, 1023 (5th Cir. 1983) (citations omitted).

In *Pool*, this Court considered a challenge to certain voter registration provisions in the Houston City Charter. The City "repeatedly and consistently emphasized its agreement with the plaintiffs throughout th[e] suit" and disclaimed any intent to enforce the challenged provisions. 87 F.4th at 734. When the plaintiffs appealed the specific wording of the resulting declaratory judgment entered by the district court, this Court refused to consider the issue on the merits and instead dismissed the suit for want of jurisdiction. *Id.* Such "faux disputes" do not belong in federal court. *Id.*

**2.** The events of June 4, 2025 compel the conclusion that no case or controversy existed between the United States and Texas. To the contrary, the Parties seemingly choreographed this lawsuit before it was even filed, as a DOJ official later confirmed. ROA.434–37. In addition to waiving service and joining a

proposed judgment, the Attorney General issued a press release the same day the consent judgment was entered, hailing it as a "major victory." ROA.339. This collusion deprived the district court of subject matter jurisdiction, necessitating vacatur. *See Papalote Creek II*, 858 F.3d at 927 (Because "there was no Article III 'case' or 'controversy'[] at the time the district court entered judgment in the case, the district court's judgment is void for lack of subject matter jurisdiction and is vacated.").

The parties do not meaningfully deny their collaboration. The United States has instead argued that sufficient adversity nonetheless existed as a result of "Texas's continued enforcement of the Dream Act prior to the judgment." U.S. Stay Opp'n at 14. But Texas disclaims any enforcement role, emphasizing "the tuition rules are not enforced by the Attorney General, but the public universities who charge and collect those funds." Tex. Stay Opp'n at 12. Texas's absence in enforcement renders the parties' reliance on *United States v. Windsor*, 570 U.S. 744 (2013), inapplicable. *See NLRB v. Constellium Rolled Prods. Ravenswood, LLC*, 43 F.4th 395, 402 (4th Cir. 2022) (noting *Windsor* applies only when the defendant is withholding a remedy sought by the plaintiff). On Texas's own telling, to the extent that adversity is premised on purported continuing enforcement of the Dream Act, the United States is not adverse to the State itself— although it may be adverse to unrepresented public universities that provide in-

state tuition to all students who satisfy Dream Act requirements (without regard to immigration status).

The lack of a genuine case or controversy deprives the district court of subject matter jurisdiction and mandates vacatur. *See Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 525 (1986) ("[A] consent decree must spring from and serve to resolve a dispute within the court's subject-matter jurisdiction.").

### B.     The Judgment Was Entered Without Due Process

The consent judgment is void not only because it was issued without adversity, but also because no notice was given to affected parties, breaching basic due process requirements and separately necessitating vacatur. *See Brumfield,* 806 F.3d at 298; *see also* Fed. R. Civ. P. 60(b)(4); 59(e). Notice is an "elementary and fundamental" requirement of due process; it must be "reasonably calculated . . . to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank*, 339 U.S. 306, 314 (1950). Notice "must afford a reasonable time for those interested to make their appearance." *Id*. The right to notice and an opportunity to be heard "must be granted at a meaningful time and in a meaningful manner." *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (citing *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

These foundational protections apply with particular force where a court's decree carries severe practical consequences for affected nonparties. A district court must do far more than offer "perfunctory approval" of a consent judgment. *United States v. City of Miami*, 664 F.2d 435, 441 (5th Cir. 1981) (en banc) (Rubin, J., concurring). Instead, it must determine, based on an evidentiary record, that the decree is "fair" and that it "does not put the court's sanction on . . . a decree that violates Constitution, statute, or jurisprudence," especially "[i]f the decree also affects third parties." *League of United Latin Am. Citizens, Council No. 4434*, 999 F.2d at 846 (quoting *Miami*, 664 F.2d at 441 (Rubin, J., concurring)). Those principles obligate the district court to "give[] reasonable notice" such that affected parties' objections may be "heard and considered." *Miami*, 664 F.2d at 441 n.13 (Rubin, J., concurring) (citation omitted).

Here, the United States and Texas lodged a proposed decree and secured its entry the same day—without any notice to the students, institutions, and organizations whose interests the consent judgment affects, and without any hearing, evidentiary showing, or opportunity for response or opposition. The consent judgment exhibits precisely the pitfalls courts have repeatedly condemned: it adversely affects third-parties' interests through "secret, one-sided" proceedings that lack basic elements of due process. See *Mullane*, 339 U.S. at 314; *Goss*, 419 U.S. at 580; *Miami*, 664 F.2d at 441.

### C.    Surprise to LUPE Intervenors Justifies Vacatur

Surprise to Appellants also warrants vacatur. *See* Fed. R. Civ. P. Rule 60(b)(1). Courts have found surprise where parties or intervenors lack actual notice of a suit before entry of judgment. *See Bituminous Cas. Corp. v. Garcia*, 223 F.R.D. 308, 313 (N.D. Tex. 2004) ("Intervenors' discovery of the pendency of this action and a default judgment against them surely was a surprise . . . [and] the claim fits within the ambit of Rule 60(b)(1)."*); see also Thompson v. Am. Home Assurance Co.*, 95 F.3d 429, 433 (6th Cir. 1996) (affirming decision to set aside a default judgment under Rule 60(b) since defendant had not received actual notice of lawsuit prior to time default judgment was entered).

Here, the consent judgment was entered just six hours after the Complaint was filed—speed a senior DOJ official later bragged about when crediting coordination with Texas Attorney General Ken Paxton. ROA.434–35. LUPE Intervenors "were deprived of a valuable interest without notice or an opportunity to be heard" before the judgment was entered. *Garcia,* 223 F.R.D. at 314. Indeed, just days earlier, the Texas Legislature had refused to repeal the Texas Dream Act, ROA.244–25, seemingly assuring the public that the law would remain in place.

That surprise inflicted significant prejudice. With no ability to protect significant interests, LUPE's mission to support higher education for undocumented students is frustrated, ROA.332–37, ACC anticipates revenue loss,

administrative burdens, and negative impacts on programs and services, ROA.359–62, and Oscar Silva risks losing access to affordable tuition, jeopardizing his education. ROA.355–57, 653. Under such circumstances, "applying principles of equity, [a district court] cannot in good conscience exercise its discretion any differently than [] in favor of full and fair, adversarial resolution on the merits with the participation of all affected parties." *Garcia*, 223 F.R.D. at 314.

### D. Extraordinary Circumstances Require Vacatur

The district court also abused its discretion by denying relief under Rule 60(b)(6), which allows vacatur for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). The "extraordinary circumstances" here warranted vacatur of the consent judgment "to accomplish justice." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988).

*First*, the consent judgment undermines "the public's confidence in the judicial process." *Id*. The judiciary must resolve genuine disputes, not facilitate collusive agreements between executive branches. The consent judgment, declaring a state law invalid without a real case or controversy, exceeds constitutional authority and violates the separation of powers. *See Flast v. Cohen*, 392 U.S. 83, 96 (1968) (advisory opinion rule enforces separation of powers).

*Second*, upholding the consent judgment risks injustice in future cases. *See Liljeberg*, 486 U.S. at 864. It encourages collusive suits, allowing parties to bypass legislatures and secure judicial rulings without genuine opposition.

*Third*, the equities support vacatur. The Dream Act has opened higher education to more than 57,000 Texas students. ROA.325. The consent judgment, entered days after the Texas Legislature declined to repeal the law, threatens students' aspirations, Texas's public higher education institutions' mission and programs, and LUPE Intervenors' education and operations. Indeed, at the time of the law's enactment, its authors noted: "The state should recover this valuable economic and intellectual resource that currently is being discarded and help these students gain the tools they need to be successful, independent, and productive members of society" H. Research Org., Bill Analysis, H.B. 1403, 77 Leg., Reg. Sess., at 3–4 (Tex. 2001). The Texas Attorney General's failure to defend this law, combined with the parties' collusion to secure an injunction without notice, constitutes extraordinary circumstances requiring vacatur to prevent manifest injustice.

Conversely, vacating the consent judgment poses no injustice to the parties. The United States and Texas jointly sought the order without a true controversy. ROA.46–48. Vacatur would place them in the same position as every litigant: they may bring a claim where an actual case or controversy exists. Critically, justice

must "satisfy the appearance of justice." *Liljeberg*, 486 U.S. at 864 (citing *In re Murchison*, 349 U.S. 133, 136 (1955)). The consent judgment, entered without notice to affected parties or defense of the law, fails this test and erodes public trust in a case with significant statewide impact.

## III.    The United States And Texas Failed To Show That the Dream Act Is Preempted

For the reasons explained above, the Court need not decide the ultimate preemption question to conclude that LUPE Intervenors were entitled to intervene and that the consent judgment should be vacated on that basis. But, in any case, the parties failed to show that the Dream Act is preempted.

### A.    The Plain Text Of Section 1623(a) Can And Should Be Read As Consistent With The Dream Act

The United States alleges that the Texas Education Code is preempted by Section 1623(a), which specifies that a person not lawfully present in the United States is not eligible "on the basis of residence within a State" for "any postsecondary education benefit" unless "a citizen or national" of the United States is eligible without regard to whether that person is such a resident. 8 U.S.C. § 1623(a). The challenged provisions of Texas law share none, let alone all, of these features: the Dream Act does not provide in-state tuition "on the basis of residence" as that term is defined under federal law; in-state tuition is not a

38

"postsecondary education benefit"; and "a citizen or national" can obtain in-state tuition in Texas without regard to residency.

**1.** No provision of Texas law grants persons without lawful presence access to in-state tuition on "the basis of residence within" Texas. Section 54.052(a) of the Texas Education Code specifies certain groups of individuals that "are considered residents" of Texas "for purposes" of the Education Code. One such group includes those who: (1) graduated from a Texas high school, (2) maintained a residence in Texas for the three years prior to graduating high school, and (3) maintained a residence in Texas for the year preceding enrollment in a higher education institution. Tex. Educ. Code § 54.052(a)(3). If the person is not a citizen or permanent resident, they must also submit an "affidavit stating that the person will apply to become a permanent resident of the United States as soon as the person becomes eligible." *Id.* § 54.053(3)(B) ).

Nothing in the provision references unlawfully present immigrants, let alone singles them out for preferential treatment. *See* Texas Higher Education Coordinating Board, "A Higher Education Brief: Residency and In-state Tuition," at 2 (April 2007), https://www.sos.state.tx.us/border/forms/reports-07/thecb-april2007.pdf (explaining that the provision allows "all persons whether international, US Citizens or Permanent Residents, to establish an independent claim to residency based on graduation from high school or the completion of its

equivalent after residing in the state for at least 36 months" and thus provides no "preferential treatment"). The United States nonetheless contends that this facially neutral provision is preempted to the extent that it does not affirmatively exclude unlawfully present individuals. The district court agreed, accepting the premise that Section 1623(a) is triggered when in-state tuition is made available based on satisfaction of a standard that the State describes as a residency standard. ROA.742–45.

This reasoning is flawed. It looks to state law to determine whether benefits are being provided on the basis of "residence," ignoring the relevant definition of "residence" under federal law. Specifically, for purposes of Section 1623(a), a "residence" is "the place of general abode," meaning "principal, actual dwelling place in fact, without regard to intent." 8 U.S.C. § 1101(a)(33); *see also* 8 U.S.C. § 1641(a) (adopting that definition for purposes of the chapter containing Section 1623(a)). It is thus beside the point whether Texas provides in-state tuition to individuals that it "consider[s]" to be residents "for purposes" of the Education Code. Tex. Educ. Code § 54.052(a). What matters for preemption purposes is whether Texas provides post-secondary education benefits based on "residence" as defined in federal law. And it does not.

The Texas Education Code does not employ the federal definition of "residence" or provide in-state tuition to individuals without lawful presence on

"the basis" of satisfaction of that standard. Rather, Section 54.052(a)(3) provides

eligibility for in-state tuition to individuals who graduated from a Texas high

school and meet certain other criteria. Those criteria include maintaining "a

residence" continuously for the three years preceding high school graduation and

the year preceding enrollment. Tex. Educ. Code § 54.052(a)(3)(B). But the term

"residence" as used in Texas law is broader than the federal definition and includes

"a person's home or other dwelling place." *Id.* § 54.0501(6). Unlike federal law,

the Texas Education Code does not specify that the residence must be a "principal,

actual" dwelling "in fact". *Compare id.*, *with* 8 U.S.C. § 1101(a)(33).

Even setting that discrepancy aside, Texas does not provide in-state tuition

on "the basis" of residence. As noted, maintenance of "a residence" in Texas

during certain specified time periods is just one of several requirements that a

student must satisfy to qualify for in-state tuition under Section 54.052(a)(3).

Indeed, the threshold requirement is that the person have graduated from a Texas

high school. Therefore, residence under any definition is not "the basis"—rather

than merely one of several criteria—for eligibility for in-state tuition under Section

54.052(a)(3). *See Rumsfeld v. Padilla*, 542 U.S. 426, 434 (2004) (holding that the

"use of the definite article" indicates a single referent); *see also Martinez v.

Regents of Univ. of California*, 50 Cal. 4th 1277, 1292 (2010) (upholding

California analogue to Texas Dream Act and interpreting Section 1623(a) consistent with its plain language).

The district court refused to engage with this point on the merits (ROA.745), expressing the view that analysis was unnecessary in light of *dicta* in *Young Conservatives of Texas Found. v. Smatresk*, 73 F.4th 304 (5th Cir. 2023), which suggested that Section 1623(a) would be applicable to the Texas Education Code. But the cited discussion in *Young Conservatives*, which addressed an issue not briefed by the parties and which was entirely ancillary to the Court's holding, establishes no binding precedent. *See Villegas v. Noem*, 149 F.4th 554, 563–64 (5th Cir. 2025). And under basic principles of statutory construction, the courts should not adopt a needlessly expansive construction of a statute so as to preempt state law, especially where doing so raises serious constitutional questions. *See Altria Grp. v. Good*, 555 U.S. 70, 77 (2008) (recognizing "when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption'"); *see also infra* pp. 47–50.

**2.** The district court also erred in concluding that eligibility for in-state tuition qualifies as a "postsecondary education benefit."[5] While that term is not defined in Section 1623(a), a neighboring provision of the United States Code

---

[5] In *Young Conservatives*, the Court merely "assume[d]" without deciding that in-state tuition constitute a postsecondary education benefit. 73 F.4th at 313 n.3.

defines a "State or local public benefit" as including "postsecondary education . . . or any other similar benefit for which payments or assistance are provided to an individual . . . by an agency of a State." 8 U.S.C. § 1621(c)(1)(B). Properly construed, then, a "postsecondary education benefit" must involve "payments" or similar "assistance" by the State. *Cf.* 20 U.S.C. ch. 28, subchapter IV (providing for "Student Assistance" in the form of grants and loans for postsecondary education). Section 1623(a)'s own text further supports this reading, as it indicates that postsecondary education benefits have "an amount, duration, and scope." *Id.* § 1623(a). Those terms can only sensibly be applied to monetary and other similar forms of assistance.

Eligibility for in-state tuition does not fit within that definition. It is nothing more than a status that enables an individual who satisfies all other requirements for admission to a Texas college or university to pay a particular tuition rate. All payments are made by the student, not the State. That does not fit the mold of other government "payments" or "assistance" in education. And Congress does not use such language when it intends to legislate regarding in-state tuition rates. *See, e.g.*, 20 U.S.C. § 1015d (providing for certain individuals in federal service to qualify for in-state tuition rates based on their federal duty station).

Furthermore, in-state tuition is not a form of public assistance; the interests and goals at issue differ. *See Grove City Coll. v. Bell*, 465 U.S. 555, 565 n. 13

(1984) (distinguishing "general assistance programs" such as "food stamps, Social Security benefits, [and] welfare payments" from higher education "student aid programs," in part because student aid programs "assist colleges and universities"); *Spatt v. State of N. Y.*, 361 F. Supp. 1048, 1054 (E.D.N.Y. 1973), *aff'd sub nom. Spatt v. New York*, 414 U.S. 1058 (1973) ("reduced tuition systems, repeatedly withstanding equal protection attack by out-of-state students, have been upheld as contributing to the state's economy and as a means of reasonably attempting to achieve partial equalization of school financing costs between in-state students . . . and out-of-state students") (overruled by statute on other grounds); *Starns v. Malkerson*, 326 F. Supp. 234, 241 (D. Minn. 1970), *aff'd*, 401 U.S. 985 (1971) (explaining that in-state tuition rates are justified by a state interest in furthering the education of students with an "intention of remaining" in the State and who "by reason of that education, will be prepared to make a greater contribution to the state's economy and future"); *cf. Harris v. Hahn*, 827 F.3d 359, 372 (5th Cir. 2016). And a spokesperson for Governor Perry characterized support for the Dream Act, not as public assistance or benefits, but instead as an "economic decision" that "allows these young people to become productive, contributing members of society." Alexandra Jaffe, *Perry in spotlight as Texas DREAM Act*

*scrutinized*, CNN (Apr. 6, 2015), https://www.cnn.com/2015/04/06/politics/perry-texas-immigration-dream-act.

**3.** The district court was also incorrect to conclude that "a citizen or national of the United States" is not "eligible for such a benefit" without regard to residency. The district court proceeded on the assumption that this requirement is unmet unless in-state tuition is "available to *all* U.S. citizens regardless of residency." ROA.744 (emphasis added). But that construction rewrites the statute, which says that "a" citizen or national—not "all" citizens and nationals—must be eligible for in-state tuition without regard to Texas residency. The distinction carries great significance because "the indefinite article 'a' is" often "interpreted to carry the meaning of 'one or more.'" *WundaFormer, LLC v. Flex Studios, Inc.*, 680 F. App'x 925, 931 (Fed. Cir. 2017) (citing cases).

The Texas Education Code creates multiple avenues for out-of-state U.S. citizens to be entitled to pay the in-state rate, regardless of their residency, consistent with section 1623(a). In fact, Chapter 54 of the Education Code contains twelve provisions that extend the resident tuition rate to out-of-state, nonresident American citizens. For example:

- Residents of counties or parishes in Arkansas, Louisiana, New Mexico, or Oklahoma that border Texas are eligible for in-state tuition, provided the student's home state offers reciprocal treatment to Texas residents. Tex. Educ. Code § 54.231(g);

- Employees, and their dependents, of national laboratories or laboratory operators that have entered into agreements with the Texas A&M University System are "entitled to pay tuition and fees at the rates provided for Texas residents". *Id.* § 54.369;

- Nonresident students participating in the Academic Common Market and enrolled in certain designated programs are charged the resident student rate. *Id.* § 54.233.[6]

Chapter 54 of the Education Code, read as a whole, thus provides out-of-state U.S. citizens access to in-state tuition, regardless of residence, and does not conflict with section 1623(a). The Texas Education Code grants many, varied groups of students—some residents, some not—access to the resident tuition rate at Texas institutions.

The Dream Act provides just one mechanism of accessing this in-state tuition rate, including for some out-of-state students, to U.S. citizens and noncitizens alike. And just as the Dream Act provides resident and nonresident students with access to reduced tuition at Texas institutions, many other states offer corresponding tuition reductions at their own schools. That Texas extends this

---

[6] *See also* Tex. Educ. Code § 54.206 (foreign service officers), §§ 54.213–214 (competitive scholarship recipients), § 54.221 (employees, and their family members, of entities with certain agreements with the University of Texas System), § 54.222 (employees, and their dependents, of companies participating in state-approved economic development programs relocating to Texas), § 54.223 (Olympic athletes training in approved programs enrolled at certain institutions), § 54.251 (registered nurses in postgraduate programs who intend to teach in Texas), § 54.231(a) (residents of states bordering Texas enrolled in certain institutions),§§ 54.211–212 (faculty, teaching or research assistants, and their dependents), § 54.241 (military personnel, veterans, and their dependents).

reduced tuition to some noncitizens does not undermine the coexisting entitlement of non-resident citizens to the same tuition rate, nor of U.S. citizens across the nation to in-state tuition in their respective states. Accordingly, Section 1623(a) does not preempt the Texas Dream Act.

**4.** Even if the Court were to conclude that the Dream Act provisions that require maintenance of a Texas residence during certain specified windows runs afoul of Section 1623(a), the United States still failed to show that it was entitled to an injunction that runs against Section 54.052(a)(3) in its entirety. Section 54.052(a)(3) has two subsections. Subsection A, which addresses high school graduation, and subsection B, which identifies the time periods during which an individual must maintain a residence to be eligible. If only the latter provision is problematic, only that provision should be enjoined. *See* Tex. Gov't Code § 311.032 (specifying that in the absence of a non-severability clause, the invalidity of one provision "does not affect other provisions or applications of the statute that can be given effect without the invalid provision or application"); *cf. Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 627 (2020) (explaining that severance respects the "legislative role by keeping courts from unnecessarily disturbing a law apart from invalidating the provision that is unconstitutional").

Subsection 54.052(a)(3)(A)—which confers eligibility for in-state tuition on high school graduates—can be given effect independent of subsection (B). Indeed,

many states have enacted Dream Act analogues that focus only on in-state high school attendance and graduation without regard to maintenance of a residence. *See, e.g.*, *Martinez*, 50 Cal.4th at 1284 (describing and then upholding California's statute); Minn. Stat. § 135A.043(a). Yet, the district court did not even consider a more tailored injunction that better respected the will of the Texas Legislature.

## B.     Federalism Principles Reinforce the Textual Limits of Section 1623(a)

Core federalism principles—the presumption against preemption and the anti-commandeering principle embodied in the Tenth Amendment—reinforce the textual limitations on Section 1623(a)'s scope. The district court never so much as mentioned these weighty considerations in denying intervention.

**1.** As noted above, the presumption against preemption supports a narrow construction of Section 1623(a). *See, e.g.*, *Greenwich Ins. Co. v. Miss. Windstorm Underwriting Ass'n*, 808 F.3d 652, 656 (5th Cir. 2015) ("When the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily accept the reading that disfavors pre-emption." (internal quotation marks and brackets omitted)); *see also Williams v. Wingrove*, --- F.4th ---, 2025 WL 2447453, at *4 (5th Cir. 2025) (starting "with the basic assumption that Congress *did not* intend to displace state law" when "identify[ing] the domain expressly preempted" in a preemption clause (internal quotation marks omitted)). That presumption is "particularly important" here because a broad reading would "encroach[] on a field

which the States have traditionally occupied." *Greenwich*, 808 F.3d at 656

(internal quotation marks omitted); *see United States v. Lopez*, 514 U.S. 549, 564

(1995) (recognizing that "States historically have been sovereign" in the field of

"education"). Traditional state prerogatives in this area include the setting of

tuition prices for all students attending public universities. *See, e.g.*, *Vlandis v.*

*Kline*, 412 U.S. 441, 452–53 (1973).

The district court's construction of Section 1623(a) runs afoul of that

principle by restricting how states may establish tuition schedules for their public

colleges and universities. The presumption thus supports a narrower construction

that minimizes the disruption to states' democratically enacted legislation. As

explained above, the text of Section 1623(a) supports several narrower

constructions, any of which would be more consistent with the presumption against

preemption than the reading adopted by the district court. For example, properly

construing the law to cover situations in which residence—as defined by the

federal law—is "the" sole basis for offering in-state tuition would broadly preserve

states' discretion to offer in-state tuition based on other criteria, as Texas has.

Similarly, narrowly construing "postsecondary education benefit" to exclude

eligible status for in-state tuition would minimize the federal government's

intrusion into core state decisions regarding education policy.

More broadly, the federal statute can fairly be read to preserve states' ability to choose whether and how to offer in-state tuition to undocumented students. Several textual features suggest that Congress did not intend to foreclose state legislative choices such as Texas's. Had Congress intended to simply bar students without lawful presence from receiving in-state tuition, it could have straightforwardly said so. Instead, Section 1623(a) imposed only a conditional limitation by using the word "unless," which indicates that Congress intended States to be able to offer affordable postsecondary education to undocumented immigrants subject to the specified condition. That condition cannot be that every United States citizen and national is eligible for in-state tuition, as the district court suggested. Such an interpretation would lead to absurd results.

In addition to being inconsistent with the statute's use of the indefinite article "a," *see supra* pp. 44, that reading would effectively mean that a state could not offer an in-state tuition rate to anyone. A tuition rate offered to everyone "without regard" to whether the person "is such a resident" would not be an in-state tuition rate at all.

Conversely, a narrower reading would harmonize Section 1623 with Section 1621. *See Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502 (2018). The latter provision also addresses undocumented immigrants' eligibility for "postsecondary education" benefits, 8 U.S.C. § 1621(a), (c)(1)(B), but expressly preserves state

authority to offer those benefits through subsequent legislative enactments, *id.* § 1621(d). The Texas Dream Act is a state law enacted "after August 22, 1996, which affirmatively provides for such eligibility." *Id.* Thus, even if Section 1623(a) covers in-state tuition eligibility as a "benefit," it should not be read to prohibit states from making the very decision that Section 1621(d) explicitly permits.

Interpreted properly, Section 1623(a) can advance the interest of federalism. For instance, Congress could have been concerned about a scenario in which students would sue a state that has chosen not to expand postsecondary education access in an effort to obtain such access. *Cf. Equal Access Educ. v. Merten*, 305 F. Supp. 2d 585 (E.D. Va. 2004) (challenging a Virginia law denying undocumented students admission to public universities). In such a scenario, the state defendant could invoke Section 1623(a) as part of its defense that no federal law compels it to furnish such access. Section 1623(a) would thus promote federalism principles rather than derogate from them.

**2.** Section 1623(a) would also be unconstitutional under the Tenth Amendment if the district court's interpretation were correct. The constitutional-avoidance canon therefore counsels against reading Section 1623(a) as preempting the Texas Dream Act. *See, e.g.*, *United States v. Hansen*, 599 U.S. 762, 781 (2023). But if this Court were to conclude otherwise, then LUPE Intervenors would be entitled to demonstrate that the statute, so construed, exceeds the Congress's

authority in our federal system. *See Bond v. United States*, 564 U.S. 211, 220 (2011).

The Tenth Amendment prohibits Congress from dictating whom a state legislature may treat as an in-state resident for purposes of tuition at public colleges and universities. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 471 (2018) (explaining that Congress may not "issue direct orders to the governments of the States"). As the Supreme Court has repeatedly explained, this principle serves multiple purposes, including protecting individual liberty and promoting political accountability. *Id.* at 473–74.

Consistent with States' paramount role in education, tuition rates for public universities are set by Texas state law. *See* Tex. Educ. Code §§ 54.003, 54.051. Congress has no role "dictat[ing] what a state legislature may and may not do" in the formulation of state law. *Murphy*, 584 U.S. at 474. And reading Section 1623(a) in that manner is particularly implausible because it is unclear what enumerated constitutional authority would permit Congress to dictate the tuition rates of public universities. After all, Congress has no freestanding authority to enact preemption laws absent an enumerated power. *Id.* at 477 ("[T]he Supremacy Clause . . . is not an independent grant of legislative power to Congress."). As a result, federal statutes regarding public education typically have relied on Congress's spending powers. *See, e.g.*, 20 U.S.C. § 1015d(a). But Section 1623(a)

lacks any nexus to federal education spending. And Congress could not premise a regulation of states on its immigration power, which permits it to regulate only immigrants themselves. *See Murphy*, 584 U.S. at 479 (explaining that *Arizona v. United States*, 567 U.S. 387 (2012), held preempted a state statute that conflicted with "a federal right" conferred on immigrants by federal law).

Under these principles, the district court's reading of Section 1623(a) must be rejected, lest the federal statute be read so as to render it unconstitutional. *See New York v. United States*, 505 U.S. 144, 170 (1992). A proper understanding of Section 1623(a) thus must be limited in at least one of the ways discussed above. For example, narrowly construing "postsecondary education benefit" as limited to monetary or similar payments to immigrants would avoid this Tenth Amendment defect. That is because such a prohibition could be understood to operate directly on immigrants over whom Congress may exercise authority—by regulating their receipt or acceptance of certain public benefits—rather dictating the permissible content of state law.

At an absolute minimum, the district court should have considered the constitutional implications its decision would have before permanently enjoining a duly enacted state law. Federalism principles demand no less.

## CONCLUSION

For the forgoing reasons, the denial of intervention should be reversed, the

district court's consent judgment should be vacated, and the district court directed to dismiss the case for lack of jurisdiction. Should the Court not dismiss the case, the consent judgment should nevertheless be vacated and the case remanded for further proceedings.

Dated: September 29, 2025

Respectfully submitted,

*/s/ Andrés Correa*

David Donatti
Adriana Pinon
Edgar Saldivar
**ACLU FOUNDATION OF TEXAS**
P.O. Box 8306
Houston, TX 77288
(713) 942-8146
ddonatti@aclutx.org

Kassandra Gonzalez
Zachary Dolling
Molly Petchenik
**TEXAS CIVIL RIGHTS PROJECT**
P.O. Box 17757
Austin, TX 78760
(512) 474-5073 ext. 182 Telephone
kassandra@texascivilrightsproject.org

Daniel Hatoum
**TEXAS CIVIL RIGHTS PROJECT**
1017 W. Hackberry Ave.
Alamo, TX 78516
(512) 474-5073 ext. 182 Telephone
daniel@texascivilrightsproject.org

Efrén C. Olivares
Marlene Berroa Rodriguez
**NATIONAL IMMIGRATION LAW CENTER**
P.O. Box 34573
Washington, DC 20005-9997
(213) 674-2817 Telephone
olivares@nilc.org
berroa@nilc.org

Andrés Correa
Christopher Patton
Yaman Desai
Kyle A. Gardner
Zhenmian Xu
**LYNN PINKER HURST & SCHWEGMANN, LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
(214) 981-3800 Telephone
(214) 981-3839 Facsimile
acorrea@lynnllp.com

Tanya Broder
**NATIONAL IMMIGRATION LAW CENTER**
3450 Wilshire Blvd.
Los Angeles, CA 90010
510-663-8282
broder@nilc.org

Joshua M. Salzman
Brian D. Netter
Paul R.Q. Wolfson
Skye L. Perryman
Simon C. Brewer*
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, D.C. 20043
Tel: (202) 448-9090
jsalzman@democracyforward.org

*Not admitted to practice law in the District of Columbia; practicing under the supervision of Democracy Forward lawyers who are members of the D.C. Bar.

**ATTORNEYS FOR MOVANT-APPELLANTS LA UNIÓN DEL PUEBLO ENTERO, AUSTIN COMMUNITY COLLEGE, AND OSCAR SILVA**

**CERTIFICATE OF COMPLIANCE**

This brief complies with the typeface and type-volume limitations in Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 12,056 words, excluding the accompanying documents authorized by Federal Rule of Appellate Procedure 27(a)(2)(B) and the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: September 29, 2025                    */s/ Andrés Correa*
                                              Andrés Correa

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, I state that no Plaintiffs have any parent company and that no publicly held company has a 10% or greater ownership interest in any Plaintiffs.

Dated: September 29, 2025                    */s/ Andres Correa*

## CERTIFICATE OF SERVICE

I certify that on September 29, 2025, a true and correct copy of this Brief was filed with the Clerk for the United States Court of Appeals for the Fifth Circuit via the Court's electronic filing system, which will forward a copy to all counsel of record. I certify that I separately served Defendants' counsel of record via email.

Dated: September 29, 2025

*/s/ Andrés Correa*
Andrés Correa

# ADDENDUM

KeyCite Red Flag

Unconstitutional or PreemptedRecognized as Unconstitutional by Quito-Guachichulca v. Garland, 8th Cir., Dec. 09, 2024

KeyCite Yellow Flag

Proposed Legislation

United States Code Annotated
    Title 8. Aliens and Nationality (Refs & Annos)
        Chapter 12. Immigration and Nationality (Refs & Annos)
            Subchapter I. General Provisions (Refs & Annos)

8 U.S.C.A. § 1101

## § 1101. Definitions

Currentness

**(a)** As used in this chapter--

**(1)** The term "administrator" means the official designated by the Secretary of State pursuant to section 1104(b) of this title.

**(2)** The term "advocates" includes, but is not limited to, advises, recommends, furthers by overt act, and admits belief in.

**(3)** The term "alien" means any person not a citizen or national of the United States.

**(4)** The term "application for admission" has reference to the application for admission into the United States and not to the application for the issuance of an immigrant or nonimmigrant visa.

**(5)** The term "Attorney General" means the Attorney General of the United States.

**(6)** The term "border crossing identification card" means a document of identity bearing that designation issued to an alien who is lawfully admitted for permanent residence, or to an alien who is a resident in foreign contiguous territory, by a consular officer or an immigration officer for the purpose of crossing over the borders between the United States and foreign contiguous territory in accordance with such conditions for its issuance and use as may be prescribed by regulations. Such regulations shall provide that (A) each such document include a biometric identifier (such as the fingerprint or handprint of the alien) that is machine readable and (B) an alien presenting a border crossing identification card is not permitted to cross over the border into the United States unless the biometric identifier contained on the card matches the appropriate biometric characteristic of the alien.

**(7)** The term "clerk of court" means a clerk of a naturalization court.

**(8)** The terms "Commissioner" and "Deputy Commissioner" mean the Commissioner of Immigration and Naturalization and a Deputy Commissioner of Immigration and Naturalization, respectively.

**(9)** The term "consular officer" means any consular, diplomatic, or other officer or employee of the United States designated under regulations prescribed under authority contained in this chapter, for the purpose of issuing immigrant or nonimmigrant visas or, when used in subchapter III, for the purpose of adjudicating nationality.

**(10)** The term "crewman" means a person serving in any capacity on board a vessel or aircraft.

**(11)** The term "diplomatic visa" means a nonimmigrant visa bearing that title and issued to a nonimmigrant in accordance with such regulations as the Secretary of State may prescribe.

**(12)** The term "doctrine" includes, but is not limited to, policies, practices, purposes, aims, or procedures.

**(13)(A)** The terms "admission" and "admitted" mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer.

**(B)** An alien who is paroled under section 1182(d)(5) of this title or permitted to land temporarily as an alien crewman shall not be considered to have been admitted.

**(C)** An alien lawfully admitted for permanent residence in the United States shall not be regarded as seeking an admission into the United States for purposes of the immigration laws unless the alien--

**(i)** has abandoned or relinquished that status,

**(ii)** has been absent from the United States for a continuous period in excess of 180 days,

**(iii)** has engaged in illegal activity after having departed the United States,

**(iv)** has departed from the United States while under legal process seeking removal of the alien from the United States, including removal proceedings under this chapter and extradition proceedings,

**(v)** has committed an offense identified in section 1182(a)(2) of this title, unless since such offense the alien has been granted relief under section 1182(h) or 1229b(a) of this title, or

**(vi)** is attempting to enter at a time or place other than as designated by immigration officers or has not been admitted to the United States after inspection and authorization by an immigration officer.

**(14)** The term "foreign state" includes outlying possessions of a foreign state, but self-governing dominions or territories under mandate or trusteeship shall be regarded as separate foreign states.

**(15)** The term "immigrant" means every alien except an alien who is within one of the following classes of nonimmigrant aliens--

**(A)(i)** an ambassador, public minister, or career diplomatic or consular officer who has been accredited by a foreign government, recognized de jure by the United States and who is accepted by the President or by the Secretary of State, and the members of the alien's immediate family;

**(ii)** upon a basis of reciprocity, other officials and employees who have been accredited by a foreign government recognized de jure by the United States, who are accepted by the Secretary of State, and the members of their immediate families; and

**(iii)** upon a basis of reciprocity, attendants, servants, personal employees, and members of their immediate families, of the officials and employees who have a nonimmigrant status under (i) and (ii) above;

**(B)** an alien (other than one coming for the purpose of study or of performing skilled or unskilled labor or as a representative of foreign press, radio, film, or other foreign information media coming to engage in such vocation) having a residence in a foreign country which he has no intention of abandoning and who is visiting the United States temporarily for business or temporarily for pleasure;

**(C)(i)** an alien in immediate and continuous transit through the United States, for a period not to exceed 29 days;

**(ii)** an alien who qualifies as a person entitled to pass in transit to and from the United Nations Headquarters District (as defined in section 4309a(e) of Title 22) and foreign countries, under the provisions of paragraphs (3), (4), and (5) of section 11 of the Agreement regarding the Headquarters of the United Nations, done at Lake Success June 26, 1947 (61 Stat. 758); or

**(iii)** an alien passing in transit through the United States to board a vessel on which the alien will perform, or to disembark from a vessel on which the alien performed, ship-to-ship liquid cargo transfer operations to or from another vessel engaged in foreign trade, for a period not to exceed 180 days;

**(D)(i)** an alien crewman serving in good faith as such in a capacity required for normal operation and service on board a vessel, as defined in section 1288(a) of this title (other than a fishing vessel having its home port or an operating base in the United States), or aircraft, who intends to land temporarily and solely in pursuit of his calling as a crewman and to depart from the United States with the vessel or aircraft on which he arrived or some other vessel or aircraft;

**(ii)** an alien crewman serving in good faith as such in any capacity required for normal operations and service aboard a fishing vessel having its home port or an operating base in the United States who intends to land temporarily in Guam or the Commonwealth of the Northern Mariana Islands and solely in pursuit of his calling as a crewman and to depart from Guam or the Commonwealth of the Northern Mariana Islands with the vessel on which he arrived; or

**(iii)** an alien crewman performing ship-to-ship liquid cargo transfer operations to or from another vessel engaged in foreign trade, who intends to land temporarily solely in pursuit of the alien's responsibilities as a crewman and to depart from the United States on the vessel on which the alien arrived or on another vessel or aircraft, for a period not to exceed 180 days;

**(E)** an alien entitled to enter the United States under and in pursuance of the provisions of a treaty of commerce and navigation between the United States and the foreign state of which the alien is a national (or, in the case of an alien who acquired the relevant nationality through a financial investment and who has not previously been granted status under this subparagraph, the foreign state of which the alien is a national and in which the alien has been domiciled for a continuous period of not less than 3 years at any point before applying for a nonimmigrant visa under this subparagraph), and the spouse and children of any such alien if accompanying or following to join such alien; (i) solely to carry on substantial trade, including trade in services or trade in technology, principally between the United States and the foreign state of which the alien is a national; (ii) solely to develop and direct the operations of an enterprise in which the alien has invested, or of an enterprise in which the alien is actively in the process of investing, a substantial amount of capital; or (iii) solely to perform services in a specialty occupation in the United States if the alien is a national of the Commonwealth of Australia and with respect to whom the Secretary of Labor determines and certifies to the Secretary of Homeland Security and the Secretary of State that the intending employer has filed with the Secretary of Labor an attestation under section 1182(t)(1) of this title;

**(F)(i)** an alien having a residence in a foreign country which he has no intention of abandoning, who is a bona fide student qualified to pursue a full course of study and who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study consistent with section 1184(l) of this title at an established college, university, seminary, conservatory, academic high school, elementary school, or other academic institution or in an accredited language training program in the United States, particularly designated by him and approved by the Attorney General after consultation with the Secretary of Education, which institution or place of study shall have agreed to report to the Attorney General the termination of attendance of each nonimmigrant student, and if any such institution of learning or place of study fails to make reports promptly the approval shall be withdrawn, (ii) the alien spouse and minor children of any alien described in clause (i) if accompanying or following to join such an alien, and (iii) an alien who is a national of Canada or Mexico, who maintains actual residence and place of abode in the country of nationality, who is described in clause (i) except that the alien's qualifications for and actual course of study may be full or part-time, and who commutes to the United States institution or place of study from Canada or Mexico;

**(G)(i)** a designated principal resident representative of a foreign government recognized de jure by the United States, which foreign government is a member of an international organization entitled to enjoy privileges, exemptions, and immunities as an international organization under the International Organizations Immunities Act (59 Stat. 669), accredited resident members of the staff of such representatives, and members of his or their immediate family;

**(ii)** other accredited representatives of such a foreign government to such international organizations, and the members of their immediate families;

**(iii)** an alien able to qualify under (i) or (ii) above except for the fact that the government of which such alien is an accredited representative is not recognized de jure by the United States, or that the government of which he is an accredited representative is not a member of such international organization; and the members of his immediate family;

**(iv)** officers, or employees of such international organizations, and the members of their immediate families;

**(v)** attendants, servants, and personal employees of any such representative, officer, or employee, and the members of the immediate families of such attendants, servants, and personal employees;

**(H)** an alien (i)(a) [Repealed. Pub.L. 106-95, § 2(c), Nov. 12, 1999, 113 Stat. 1316] (b) subject to section 1182(j)(2) of this title, who is coming temporarily to the United States to perform services (other than services described in subclause (a) during the period in which such subclause applies and other than services described in subclause (ii)(a) or in subparagraph (O) or (P)) in a specialty occupation described in section 1184(i)(1) of this title or as a fashion model, who meets the requirements for the occupation specified in section 1184(i)(2) of this title or, in the case of a fashion model, is of distinguished merit and ability, and with respect to whom the Secretary of Labor determines and certifies to the Attorney General that the intending employer has filed with the Secretary an application under section 1182(n)(1) of this title, or (b1) who is entitled to enter the United States under and in pursuance of the provisions of an agreement listed in section 1184(g) (8)(A) of this title, who is engaged in a specialty occupation described in section 1184(i)(3) of this title, and with respect to whom the Secretary of Labor determines and certifies to the Secretary of Homeland Security and the Secretary of State that the intending employer has filed with the Secretary of Labor an attestation under section 1182(t)(1) of this title, or (c) who is coming temporarily to the United States to perform services as a registered nurse, who meets the qualifications described in section 1182(m)(1) of this title, and with respect to whom the Secretary of Labor determines and certifies to the Attorney General that an unexpired attestation is on file and in effect under section 1182(m)(2) of this title for the facility (as defined in section 1182(m)(6) of this title) for which the alien will perform the services; or (ii)(a) having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform agricultural labor or services, as defined by the Secretary of Labor in regulations and including agricultural labor defined in section 3121(g) of Title 26, agriculture as defined in section 203(f) of Title 29, and the pressing of apples for cider on a farm, of a temporary or seasonal nature, or (b) having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States to perform other temporary service or labor if unemployed persons capable of performing such service or labor cannot be found in this country, but this clause shall not apply to graduates of medical schools coming to the United States to perform services as members of the medical profession; or (iii) having a residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States as a trainee, other than to receive graduate medical education or training, in a training program that is not designed primarily to provide productive employment; and the alien spouse and minor children of any such alien specified in this paragraph if accompanying him or following to join him;

**(I)** upon a basis of reciprocity, an alien who is a bona fide representative of foreign press, radio, film, or other foreign information media, who seeks to enter the United States solely to engage in such vocation, and the spouse and children of such a representative, if accompanying or following to join him;

**(J)** an alien having a residence in a foreign country which he has no intention of abandoning who is a bona fide student, scholar, trainee, teacher, professor, research assistant, specialist, or leader in a field of specialized knowledge or skill, or other person of similar description, who is coming temporarily to the United States as a participant in a program designated by the Director of the United States Information Agency, for the purpose of teaching, instructing or lecturing, studying, observing, conducting research, consulting, demonstrating special skills, or receiving training and who, if he is coming to the United States to participate in a program under which he will receive graduate medical education or training, also meets the requirements of section 1182(j) of this title, and the alien spouse and minor children of any such alien if accompanying him or following to join him;

**(K)** subject to subsections (d) and (p) of section 1184 of this title, an alien who--

**(i)** is the fiancee or fiance of a citizen of the United States (other than a citizen described in section 1154(a)(1)(A)(viii)(I) of this title) and who seeks to enter the United States solely to conclude a valid marriage with the petitioner within ninety days after admission;

**(ii)** has concluded a valid marriage with a citizen of the United States (other than a citizen described in section 1154(a)(1)(A)(viii)(I) of this title) who is the petitioner, is the beneficiary of a petition to accord a status under section 1151(b)(2)(A)(i) of this title that was filed under section 1154 of this title by the petitioner, and seeks to enter the United States to await the approval of such petition and the availability to the alien of an immigrant visa; or

**(iii)** is the minor child of an alien described in clause (i) or (ii) and is accompanying, or following to join, the alien;

**(L)** subject to section 1184(c)(2) of this title, an alien who, within 3 years preceding the time of his application for admission into the United States, has been employed continuously for one year by a firm or corporation or other legal entity or an affiliate or subsidiary thereof and who seeks to enter the United States temporarily in order to continue to render his services to the same employer or a subsidiary or affiliate thereof in a capacity that is managerial, executive, or involves specialized knowledge, and the alien spouse and minor children of any such alien if accompanying him or following to join him;

**(M)(i)** an alien having a residence in a foreign country which he has no intention of abandoning who seeks to enter the United States temporarily and solely for the purpose of pursuing a full course of study at an established vocational or other recognized nonacademic institution (other than in a language training program) in the United States particularly designated by him and approved by the Attorney General, after consultation with the Secretary of Education, which institution shall have agreed to report to the Attorney General the termination of attendance of each nonimmigrant nonacademic student and if any such institution fails to make reports promptly the approval shall be withdrawn, (ii) the alien spouse and minor children of any alien described in clause (i) if accompanying or following to join such an alien, and (iii) an alien who is a national of Canada or Mexico, who maintains actual residence and place of abode in the country of nationality, who is described in clause (i) except that the alien's course of study may be full or part-time, and who commutes to the United States institution or place of study from Canada or Mexico;

**(N)(i)** the parent of an alien accorded the status of special immigrant under paragraph (27)(I)(i) (or under analogous authority under paragraph (27)(L)), but only if and while the alien is a child, or

**(ii)** a child of such parent or of an alien accorded the status of a special immigrant under clause (ii), (iii), or (iv) of paragraph (27)(I) (or under analogous authority under paragraph (27)(L));

**(O)** an alien who--

**(i)** has extraordinary ability in the sciences, arts, education, business, or athletics which has been demonstrated by sustained national or international acclaim or, with regard to motion picture and television productions a demonstrated record of extraordinary achievement, and whose achievements have been recognized in the field through extensive documentation, and seeks to enter the United States to continue work in the area of extraordinary ability; or

**(ii)(I)** seeks to enter the United States temporarily and solely for the purpose of accompanying and assisting in the artistic or athletic performance by an alien who is admitted under clause (i) for a specific event or events,

**(II)** is an integral part of such actual performance,

**(III)(a)** has critical skills and experience with such alien which are not of a general nature and which cannot be performed by other individuals, or (b) in the case of a motion picture or television production, has skills and experience with such alien which are not of a general nature and which are critical either based on a pre-existing longstanding working relationship or, with respect to the specific production, because significant production (including pre- and post-production work) will take place both inside and outside the United States and the continuing participation of the alien is essential to the successful completion of the production, and

**(IV)** has a foreign residence which the alien has no intention of abandoning; or

**(iii)** is the alien spouse or child of an alien described in clause (i) or (ii) and is accompanying, or following to join, the alien;

**(P)** an alien having a foreign residence which the alien has no intention of abandoning who--

**(i)**(a) is described in section 1184(c)(4)(A) of this title (relating to athletes), or (b) is described in section 1184(c)(4)(B) of this title (relating to entertainment groups);

**(ii)(I)** performs as an artist or entertainer, individually or as part of a group, or is an integral part of the performance of such a group, and

**(II)** seeks to enter the United States temporarily and solely for the purpose of performing as such an artist or entertainer or with such a group under a reciprocal exchange program which is between an organization or organizations in the United States and an organization or organizations in one or more foreign states and which provides for the temporary exchange of artists and entertainers, or groups of artists and entertainers;

**(iii)(I)** performs as an artist or entertainer, individually or as part of a group, or is an integral part of the performance of such a group, and

**(II)** seeks to enter the United States temporarily and solely to perform, teach, or coach as such an artist or entertainer or with such a group under a commercial or noncommercial program that is culturally unique; or

**(iv)** is the spouse or child of an alien described in clause (i), (ii), or (iii) and is accompanying, or following to join, the alien;

**(Q)** an alien having a residence in a foreign country which he has no intention of abandoning who is coming temporarily (for a period not to exceed 15 months) to the United States as a participant in an international cultural exchange program approved by the Secretary of Homeland Security for the purpose of providing practical training, employment, and the sharing of the history, culture, and traditions of the country of the alien's nationality and who will be employed under the same wages and working conditions as domestic workers;

**(R)** an alien, and the spouse and children of the alien if accompanying or following to join the alien, who--

**(i)** for the 2 years immediately preceding the time of application for admission, has been a member of a religious denomination having a bona fide nonprofit, religious organization in the United States; and

**(ii)** seeks to enter the United States for a period not to exceed 5 years to perform the work described in subclause (I), (II), or (III) of paragraph (27)(C)(ii);

**(S)** subject to section 1184(k) of this title, an alien--

**(i)** who the Attorney General determines--

**(I)** is in possession of critical reliable information concerning a criminal organization or enterprise;

**(II)** is willing to supply or has supplied such information to Federal or State law enforcement authorities or a Federal or State court; and

**(III)** whose presence in the United States the Attorney General determines is essential to the success of an authorized criminal investigation or the successful prosecution of an individual involved in the criminal organization or enterprise; or

**(ii)** who the Secretary of State and the Attorney General jointly determine--

**(I)** is in possession of critical reliable information concerning a terrorist organization, enterprise, or operation;

**(II)** is willing to supply or has supplied such information to Federal law enforcement authorities or a Federal court;

**(III)** will be or has been placed in danger as a result of providing such information; and

**(IV)** is eligible to receive a reward under section 2708(a) of Title 22,

and, if the Attorney General (or with respect to clause (ii), the Secretary of State and the Attorney General jointly) considers it to be appropriate, the spouse, married and unmarried sons and daughters, and parents of an alien described in clause (i) or (ii) if accompanying, or following to join, the alien;

**(T)(i)** subject to section 1184(o) of this title, an alien who the Secretary of Homeland Security, or in the case of subclause (III)(aa) the Secretary of Homeland Security, in consultation with the Attorney General, determines--

   **(I)** is or has been a victim of a severe form of trafficking in persons, as defined in section 7102 of Title 22;

   **(II)** is physically present in the United States, American Samoa, or the Commonwealth of the Northern Mariana Islands, or at a port of entry thereto, on account of such trafficking, including physical presence on account of the alien having been allowed entry into the United States for participation in investigative or judicial processes associated with an act or a perpetrator of trafficking;

   **(III)(aa)** has complied with any reasonable request for assistance in the Federal, State, or local investigation or prosecution of acts of trafficking or the investigation of crime where acts of trafficking are at least one central reason for the commission of that crime;

   **(bb)** in consultation with the Attorney General, as appropriate, is unable to cooperate with a request described in item (aa) due to physical or psychological trauma; or

   **(cc)** has not attained 18 years of age; and

   **(IV)** the alien[1] would suffer extreme hardship involving unusual and severe harm upon removal; and

**(ii)** if accompanying, or following to join, the alien described in clause (i)--

   **(I)** in the case of an alien described in clause (i) who is under 21 years of age, the spouse, children, unmarried siblings under 18 years of age on the date on which such alien applied for status under such clause, and parents of such alien;

   **(II)** in the case of an alien described in clause (i) who is 21 years of age or older, the spouse and children of such alien; or

   **(III)** any parent or unmarried sibling under 18 years of age, or any adult or minor children of a derivative beneficiary of the alien, as of an alien described in subclause (I) or (II) who the Secretary of Homeland Security, in consultation with the law enforcement officer investigating a severe form of trafficking, determines faces a present danger of retaliation as a result of the alien's escape from the severe form of trafficking or cooperation with law enforcement.

**(U)(i)** subject to section 1184(p) of this title, an alien who files a petition for status under this subparagraph, if the Secretary of Homeland Security determines that--

**(I)** the alien has suffered substantial physical or mental abuse as a result of having been a victim of criminal activity described in clause (iii);

**(II)** the alien (or in the case of an alien child under the age of 16, the parent, guardian, or next friend of the alien) possesses information concerning criminal activity described in clause (iii);

**(III)** the alien (or in the case of an alien child under the age of 16, the parent, guardian, or next friend of the alien) has been helpful, is being helpful, or is likely to be helpful to a Federal, State, or local law enforcement official, to a Federal, State, or local prosecutor, to a Federal or State judge, to the Service, or to other Federal, State, or local authorities investigating or prosecuting criminal activity described in clause (iii); and

**(IV)** the criminal activity described in clause (iii) violated the laws of the United States or occurred in the United States (including in Indian country and military installations) or the territories and possessions of the United States;

**(ii)** if accompanying, or following to join, the alien described in clause (i)--

**(I)** in the case of an alien described in clause (i) who is under 21 years of age, the spouse, children, unmarried siblings under 18 years of age on the date on which such alien applied for status under such clause, and parents of such alien; or

**(II)** in the case of an alien described in clause (i) who is 21 years of age or older, the spouse and children of such alien; and

**(iii)** the criminal activity referred to in this clause is that involving one or more of the following or any similar activity in violation of Federal, State, or local criminal law: rape; torture; trafficking; incest; domestic violence; sexual assault; abusive sexual contact; prostitution; sexual exploitation; stalking; female genital mutilation; being held hostage; peonage; involuntary servitude; slave trade; kidnapping; abduction; unlawful criminal restraint; false imprisonment; blackmail; extortion; manslaughter; murder; felonious assault; witness tampering; obstruction of justice; perjury; fraud in foreign labor contracting (as defined in section 1351 of Title 18); or attempt, conspiracy, or solicitation to commit any of the above mentioned crimes; or

**(V)** subject to section 1184(q) of this title, an alien who is the beneficiary (including a child of the principal alien, if eligible to receive a visa under section 1153(d) of this title) of a petition to accord a status under section 1153(a)(2)(A) of this title that was filed with the Attorney General under section 1154 of this title on or before December 21, 2000, if--

**(i)** such petition has been pending for 3 years or more; or

**(ii)** such petition has been approved, 3 years or more have elapsed since such filing date, and--

**(I)** an immigrant visa is not immediately available to the alien because of a waiting list of applicants for visas under section 1153(a)(2)(A) of this title; or

**(II)** the alien's application for an immigrant visa, or the alien's application for adjustment of status under section 1255 of this title, pursuant to the approval of such petition, remains pending.

**(16)** The term "immigrant visa" means an immigrant visa required by this chapter and properly issued by a consular officer at his office outside of the United States to an eligible immigrant under the provisions of this chapter.

**(17)** The term "immigration laws" includes this chapter and all laws, conventions, and treaties of the United States relating to the immigration, exclusion, deportation, expulsion, or removal of aliens.

**(18)** The term "immigration officer" means any employee or class of employees of the Service or of the United States designated by the Attorney General, individually or by regulation, to perform the functions of an immigration officer specified by this chapter or any section of this title.

**(19)** The term "ineligible to citizenship," when used in reference to any individual, means, notwithstanding the provisions of any treaty relating to military service, an individual who is, or was at any time permanently debarred from becoming a citizen of the United States under section 3(a) of the Selective Training and Service Act of 1940, as amended (54 Stat. 885; 55 Stat. 844), or under section 4(a) of the Selective Service Act of 1948, as amended (62 Stat. 605; 65 Stat. 76), or under any section of this chapter, or any other Act, or under any law amendatory of, supplementary to, or in substitution for, any of such sections or Acts.

**(20)** The term "lawfully admitted for permanent residence" means the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed.

**(21)** The term "national" means a person owing permanent allegiance to a state.

**(22)** The term "national of the United States" means (A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States.

**(23)** The term "naturalization" means the conferring of nationality of a state upon a person after birth, by any means whatsoever.

**(24)** Repealed. Pub.L. 102-232, Title III, § 305(m)(1), Dec. 12, 1991, 105 Stat. 1750.

**(25)** The term "noncombatant service" shall not include service in which the individual is not subject to military discipline, court martial, or does not wear the uniform of any branch of the armed forces.

**(26)** The term "nonimmigrant visa" means a visa properly issued to an alien as an eligible nonimmigrant by a competent officer as provided in this chapter.

**(27)** The term "special immigrant" means--

**(A)** an immigrant, lawfully admitted for permanent residence, who is returning from a temporary visit abroad;

**(B)** an immigrant who was a citizen of the United States and may, under section 1435(a) or 1438 of this title, apply for reacquisition of citizenship;

**(C)** an immigrant, and the immigrant's spouse and children if accompanying or following to join the immigrant, who--

**(i)** for at least 2 years immediately preceding the time of application for admission, has been a member of a religious denomination having a bona fide nonprofit, religious organization in the United States;

**(ii)** seeks to enter the United States--

**(I)** solely for the purpose of carrying on the vocation of a minister of that religious denomination,

**(II)** before September 30, 2015, in order to work for the organization at the request of the organization in a professional capacity in a religious vocation or occupation, or

**(III)** before September 30, 2015, in order to work for the organization (or for a bona fide organization which is affiliated with the religious denomination and is exempt from taxation as an organization described in section 501(c)(3) of Title 26) at the request of the organization in a religious vocation or occupation; and

**(iii)** has been carrying on such vocation, professional work, or other work continuously for at least the 2-year period described in clause (i);

**(D)** an immigrant who--

**(i)** is an employee, or an honorably retired former employee, of the United States Government abroad, or of the American Institute in Taiwan, and who has performed faithful service for a total of fifteen years, or more, and his accompanying spouse and children: *Provided*, That the principal officer of a Foreign Service establishment (or, in the case of the American Institute in Taiwan, the Director thereof), in his discretion, shall have recommended the granting of special immigrant status to such alien in exceptional circumstances and the Secretary of State approves such recommendation and finds that it is in the national interest to grant such status; or

**(ii)** is the surviving spouse or child of an employee of the United States Government abroad: *Provided*, That the employee performed faithful service for a total of not less than 15 years or was killed in the line of duty;

**(E)** an immigrant, and his accompanying spouse and children, who is or has been an employee of the Panama Canal Company or Canal Zone Government before the date on which the Panama Canal Treaty of 1977 (as described in section 3602(a)(1) of Title 22) enters into force, has who was resident in the Canal Zone on the effective date of the exchange of instruments of ratification of such Treaty, and who has performed faithful service as such an employee for one year or more;

**(F)** an immigrant, and his accompanying spouse and children, who is a Panamanian national and (i) who, before the date on which such Panama Canal Treaty of 1977 enters into force, has been honorably retired from United States Government employment in the Canal Zone with a total of 15 years or more of faithful service, or (ii) who, on the date on which such Treaty enters into force, has been employed by the United States Government in the Canal Zone with a total of 15 years or more of faithful service and who subsequently is honorably retired from such employment or continues to be employed by the United States Government in an area of the former Canal Zone;

**(G)** an immigrant, and his accompanying spouse and children, who was an employee of the Panama Canal Company or Canal Zone Government on the effective date of the exchange of instruments of ratification of such Panama Canal Treaty of 1977, who has performed faithful service for five years or more as such an employee, and whose personal safety, or the personal safety of whose spouse or children, as a direct result of such Treaty, is reasonably placed in danger because of the special nature of any of that employment;

**(H)** an immigrant, and his accompanying spouse and children, who--

**(i)** has graduated from a medical school or has qualified to practice medicine in a foreign state,

**(ii)** was fully and permanently licensed to practice medicine in a State on January 9, 1978, and was practicing medicine in a State on that date,

**(iii)** entered the United States as a nonimmigrant under subsection (a)(15)(H) or (a)(15)(J) before January 10, 1978, and

**(iv)** has been continuously present in the United States in the practice or study of medicine since the date of such entry;

**(I)(i)** an immigrant who is the unmarried son or daughter of an officer or employee, or of a former officer or employee, of an international organization described in paragraph (15)(G)(i), and who (I) while maintaining the status of a nonimmigrant under paragraph (15)(G)(iv) or paragraph (15)(N), has resided and been physically present in the United States for periods totaling at least one-half of the seven years before the date of application for a visa or for adjustment of status to a status under this subparagraph and for a period or periods aggregating at least seven years between the ages of five and 21 years, and (II) applies for a visa or adjustment of status under this subparagraph no later than his twenty-fifth birthday or six months after October 24, 1988, whichever is later;

**(ii)** an immigrant who is the surviving spouse of a deceased officer or employee of such an international organization, and who (I) while maintaining the status of a nonimmigrant under paragraph (15)(G)(iv) or paragraph (15)(N), has resided and been physically present in the United States for periods totaling at least one-half of the seven years before the date of application for a visa or for adjustment of status to a status under this subparagraph and for a period or periods aggregating

at least 15 years before the date of the death of such officer or employee, and (II) files a petition for status under this subparagraph no later than six months after the date of such death or six months after October 24, 1988, whichever is later;

**(iii)** an immigrant who is a retired officer or employee of such an international organization, and who (I) while maintaining the status of a nonimmigrant under paragraph (15)(G)(iv), has resided and been physically present in the United States for periods totaling at least one-half of the seven years before the date of application for a visa or for adjustment of status to a status under this subparagraph and for a period or periods aggregating at least 15 years before the date of the officer or employee's retirement from any such international organization, and (II) files a petition for status under this subparagraph no later than six months after the date of such retirement or six months after October 25, 1994, whichever is later; or

**(iv)** an immigrant who is the spouse of a retired officer or employee accorded the status of special immigrant under clause (iii), accompanying or following to join such retired officer or employee as a member of his immediate family;

**(J)** an immigrant who is present in the United States--

**(i)** who has been declared dependent on a juvenile court located in the United States or whom such a court has legally committed to, or placed under the custody of, an agency or department of a State, or an individual or entity appointed by a State or juvenile court located in the United States, and whose reunification with 1 or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law;

**(ii)** for whom it has been determined in administrative or judicial proceedings that it would not be in the alien's best interest to be returned to the alien's or parent's previous country of nationality or country of last habitual residence; and

**(iii)** in whose case the Secretary of Homeland Security consents to the grant of special immigrant juvenile status, except that--

**(I)** no juvenile court has jurisdiction to determine the custody status or placement of an alien in the custody of the Secretary of Health and Human Services unless the Secretary of Health and Human Services specifically consents to such jurisdiction; and

**(II)** no natural parent or prior adoptive parent of any alien provided special immigrant status under this subparagraph shall thereafter, by virtue of such parentage, be accorded any right, privilege, or status under this chapter;

**(K)** an immigrant who has served honorably on active duty in the Armed Forces of the United States after October 15, 1978, and after original lawful enlistment outside the United States (under a treaty or agreement in effect on October 1, 1991) for a period or periods aggregating--

**(i)** 12 years and who, if separated from such service, was never separated except under honorable conditions, or

**(ii)** 6 years, in the case of an immigrant who is on active duty at the time of seeking special immigrant status under this subparagraph and who has reenlisted to incur a total active duty service obligation of at least 12 years,

and the spouse or child of any such immigrant if accompanying or following to join the immigrant, but only if the executive department under which the immigrant serves or served recommends the granting of special immigrant status to the immigrant;

**(L)** an immigrant who would be described in clause (i), (ii), (iii), or (iv) of subparagraph (I) if any reference in such a clause--

**(i)** to an international organization described in paragraph (15)(G)(i) were treated as a reference to the North Atlantic Treaty Organization (NATO);

**(ii)** to a nonimmigrant under paragraph (15)(G)(iv) were treated as a reference to a nonimmigrant classifiable under NATO-6 (as a member of a civilian component accompanying a force entering in accordance with the provisions of the NATO Status-of-Forces Agreement, a member of a civilian component attached to or employed by an Allied Headquarters under the "Protocol on the Status of International Military Headquarters" set up pursuant to the North Atlantic Treaty, or as a dependent); and

**(iii)** to the Immigration Technical Corrections Act of 1988 or to the Immigration and Nationality Technical Corrections Act of 1994 were a reference to the American Competitiveness and Workforce Improvement Act of 1998[2]

**(M)** subject to the numerical limitations of section 1153(b)(4) of this title, an immigrant who seeks to enter the United States to work as a broadcaster in the United States for the International Broadcasting Bureau of the Broadcasting Board of Governors, or for a grantee of the Broadcasting Board of Governors, and the immigrant's accompanying spouse and children.

**(28)** The term "organization" means, but is not limited to, an organization, corporation, company, partnership, association, trust, foundation or fund; and includes a group of persons, whether or not incorporated, permanently or temporarily associated together with joint action on any subject or subjects.

**(29)** The term "outlying possessions of the United States" means American Samoa and Swains Island.

**(30)** The term "passport" means any travel document issued by competent authority showing the bearer's origin, identity, and nationality if any, which is valid for the admission of the bearer into a foreign country.

**(31)** The term "permanent" means a relationship of continuing or lasting nature, as distinguished from temporary, but a relationship may be permanent even though it is one that may be dissolved eventually at the instance either of the United States or of the individual, in accordance with law.

**(32)** The term "profession" shall include but not be limited to architects, engineers, lawyers, physicians, surgeons, and teachers in elementary or secondary schools, colleges, academies, or seminaries.

**(33)** The term "residence" means the place of general abode; the place of general abode of a person means his principal, actual dwelling place in fact, without regard to intent.

**(34)** The term "Service" means the Immigration and Naturalization Service of the Department of Justice.

**(35)** The term "spouse", "wife", or "husband" do not include a spouse, wife, or husband by reason of any marriage ceremony where the contracting parties thereto are not physically present in the presence of each other, unless the marriage shall have been consummated.

**(36)** The term "State" includes the District of Columbia, Puerto Rico, Guam, the Virgin Islands of the United States, and the Commonwealth of the Northern Mariana Islands.

**(37)** The term "totalitarian party" means an organization which advocates the establishment in the United States of a totalitarian dictatorship or totalitarianism. The terms "totalitarian dictatorship" and "totalitarianism" mean and refer to systems of government not representative in fact, characterized by (A) the existence of a single political party, organized on a dictatorial basis, with so close an identity between such party and its policies and the governmental policies of the country in which it exists, that the party and the government constitute an indistinguishable unit, and (B) the forcible suppression of opposition to such party.

**(38)** The term "United States", except as otherwise specifically herein provided, when used in a geographical sense, means the continental United States, Alaska, Hawaii, Puerto Rico, Guam, the Virgin Islands of the United States, and the Commonwealth of the Northern Mariana Islands.

**(39)** The term "unmarried", when used in reference to any individual as of any time, means an individual who at such time is not married, whether or not previously married.

**(40)** The term "world communism" means a revolutionary movement, the purpose of which is to establish eventually a Communist totalitarian dictatorship in any or all the countries of the world through the medium of an internationally coordinated Communist political movement.

**(41)** The term "graduates of a medical school" means aliens who have graduated from a medical school or who have qualified to practice medicine in a foreign state, other than such aliens who are of national or international renown in the field of medicine.

**(42)** The term "refugee" means (A) any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion, or (B) in such special circumstances as the President after appropriate consultation (as defined in section 1157(e) of this title) may specify, any person who is within the country of such person's nationality or, in the case of a person having no nationality, within the country in which such person is habitually residing, and who is persecuted or who has a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or

political opinion. The term "refugee" does not include any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion. For purposes of determinations under this chapter, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

**(43)** The term "aggravated felony" means--

**(A)** murder, rape, or sexual abuse of a minor;

**(B)** illicit trafficking in a controlled substance (as defined in section 802 of Title 21), including a drug trafficking crime (as defined in section 924(c) of Title 18);

**(C)** illicit trafficking in firearms or destructive devices (as defined in section 921 of Title 18) or in explosive materials (as defined in section 841(c) of that title);

**(D)** an offense described in section 1956 of Title 18 (relating to laundering of monetary instruments) or section 1957 of that title (relating to engaging in monetary transactions in property derived from specific unlawful activity) if the amount of the funds exceeded $10,000;

**(E)** an offense described in--

**(i)** section 842(h) or (i) of Title 18, or section 844(d), (e), (f), (g), (h), or (i) of that title (relating to explosive materials offenses);

**(ii)** section 922(g)(1), (2), (3), (4), or (5), (j), (n), (o), (p), or (r) or 924(b) or (h) of Title 18 (relating to firearms offenses); or

**(iii)** section 5861 of Title 26 (relating to firearms offenses);

**(F)** a crime of violence (as defined in section 16 of Title 18, but not including a purely political offense) for which the term of imprisonment at[3] least one year;

**(G)** a theft offense (including receipt of stolen property) or burglary offense for which the term of imprisonment at[3] least one year;

**(H)** an offense described in section 875, 876, 877, or 1202 of Title 18 (relating to the demand for or receipt of ransom);

**(I)** an offense described in section 2251, 2251A, or 2252 of Title 18 (relating to child pornography);

**(J)** an offense described in section 1962 of Title 18 (relating to racketeer influenced corrupt organizations), or an offense described in section 1084 (if it is a second or subsequent offense) or 1955 of that title (relating to gambling offenses), for which a sentence of one year imprisonment or more may be imposed;

**(K)** an offense that--

    **(i)** relates to the owning, controlling, managing, or supervising of a prostitution business;

    **(ii)** is described in section 2421, 2422, or 2423 of Title 18 (relating to transportation for the purpose of prostitution) if committed for commercial advantage; or

    **(iii)** is described in any of sections 1581-1585 or 1588-1591 of Title 18 (relating to peonage, slavery, involuntary servitude, and trafficking in persons);

**(L)** an offense described in--

    **(i)** section 793 (relating to gathering or transmitting national defense information), 798 (relating to disclosure of classified information), 2153 (relating to sabotage) or 2381 or 2382 (relating to treason) of Title 18;

    **(ii)** section 3121 of Title 50 (relating to protecting the identity of undercover intelligence agents); or

    **(iii)** section 3121 of Title 50 (relating to protecting the identity of undercover agents);

**(M)** an offense that--

    **(i)** involves fraud or deceit in which the loss to the victim or victims exceeds $10,000; or

    **(ii)** is described in section 7201 of Title 26 (relating to tax evasion) in which the revenue loss to the Government exceeds $10,000;

**(N)** an offense described in paragraph (1)(A) or (2) of section 1324(a) of this title (relating to alien smuggling), except in the case of a first offense for which the alien has affirmatively shown that the alien committed the offense for the purpose of assisting, abetting, or aiding only the alien's spouse, child, or parent (and no other individual) to violate a provision of this chapter[4]

**(O)** an offense described in section 1325(a) or 1326 of this title committed by an alien who was previously deported on the basis of a conviction for an offense described in another subparagraph of this paragraph;

**(P)** an offense (i) which either is falsely making, forging, counterfeiting, mutilating, or altering a passport or instrument in violation of section 1543 of Title 18 or is described in section 1546(a) of such title (relating to document fraud) and (ii) for which the term of imprisonment is at least 12 months, except in the case of a first offense for which the alien has affirmatively shown that the alien committed the offense for the purpose of assisting, abetting, or aiding only the alien's spouse, child, or parent (and no other individual) to violate a provision of this chapter;

**(Q)** an offense relating to a failure to appear by a defendant for service of sentence if the underlying offense is punishable by imprisonment for a term of 5 years or more;

**(R)** an offense relating to commercial bribery, counterfeiting, forgery, or trafficking in vehicles the identification numbers of which have been altered for which the term of imprisonment is at least one year;

**(S)** an offense relating to obstruction of justice, perjury or subornation of perjury, or bribery of a witness, for which the term of imprisonment is at least one year;

**(T)** an offense relating to a failure to appear before a court pursuant to a court order to answer to or dispose of a charge of a felony for which a sentence of 2 years' imprisonment or more may be imposed; and

**(U)** an attempt or conspiracy to commit an offense described in this paragraph.

The term applies to an offense described in this paragraph whether in violation of Federal or State law and applies to such an offense in violation of the law of a foreign country for which the term of imprisonment was completed within the previous 15 years. Notwithstanding any other provision of law (including any effective date), the term applies regardless of whether the conviction was entered before, on, or after September 30, 1996.

**(44)(A)** The term "managerial capacity" means an assignment within an organization in which the employee primarily--

**(i)** manages the organization, or a department, subdivision, function, or component of the organization;

**(ii)** supervises and controls the work of other supervisory, professional, or managerial employees, or manages an essential function within the organization, or a department or subdivision of the organization;

**(iii)** if another employee or other employees are directly supervised, has the authority to hire and fire or recommend those as well as other personnel actions (such as promotion and leave authorization) or, if no other employee is directly supervised, functions at a senior level within the organizational hierarchy or with respect to the function managed; and

**(iv)** exercises discretion over the day-to-day operations of the activity or function for which the employee has authority.

A first-line supervisor is not considered to be acting in a managerial capacity merely by virtue of the supervisor's supervisory duties unless the employees supervised are professional.

**(B)** The term "executive capacity" means an assignment within an organization in which the employee primarily--

**(i)** directs the management of the organization or a major component or function of the organization;

**(ii)** establishes the goals and policies of the organization, component, or function;

**(iii)** exercises wide latitude in discretionary decision-making; and

**(iv)** receives only general supervision or direction from higher level executives, the board of directors, or stockholders of the organization.

**(C)** If staffing levels are used as a factor in determining whether an individual is acting in a managerial or executive capacity, the Attorney General shall take into account the reasonable needs of the organization, component, or function in light of the overall purpose and stage of development of the organization, component, or function. An individual shall not be considered to be acting in a managerial or executive capacity (as previously defined) merely on the basis of the number of employees that the individual supervises or has supervised or directs or has directed.

**(45)** The term "substantial" means, for purposes of paragraph (15)(E) with reference to trade or capital, such an amount of trade or capital as is established by the Secretary of State, after consultation with appropriate agencies of Government.

**(46)** The term "extraordinary ability" means, for purposes of subsection (a)(15)(O)(i), in the case of the arts, distinction.

**(47)(A)** The term "order of deportation" means the order of the special inquiry officer, or other such administrative officer to whom the Attorney General has delegated the responsibility for determining whether an alien is deportable, concluding that the alien is deportable or ordering deportation.

**(B)** The order described under subparagraph (A) shall become final upon the earlier of--

**(i)** a determination by the Board of Immigration Appeals affirming such order; or

**(ii)** the expiration of the period in which the alien is permitted to seek review of such order by the Board of Immigration Appeals.

**(48)(A)** The term "conviction" means, with respect to an alien, a formal judgment of guilt of the alien entered by a court or, if adjudication of guilt has been withheld, where--

**(i)** a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and

**(ii)** the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.

**(B)** Any reference to a term of imprisonment or a sentence with respect to an offense is deemed to include the period of incarceration or confinement ordered by a court of law regardless of any suspension of the imposition or execution of that imprisonment or sentence in whole or in part.

**(49)** The term "stowaway" means any alien who obtains transportation without the consent of the owner, charterer, master or person in command of any vessel or aircraft through concealment aboard such vessel or aircraft. A passenger who boards with a valid ticket is not to be considered a stowaway.

**(50)** The term "intended spouse" means any alien who meets the criteria set forth in section 1154(a)(1)(A)(iii)(II)(aa)(BB), 1154(a)(1)(B)(ii)(II)(aa)(BB), or 1229b(b)(2)(A)(i)(III) of this title.

**(51)** The term "VAWA self-petitioner" means an alien, or a child of the alien, who qualifies for relief under--

**(A)** clause (iii), (iv), or (vii) of section 1154(a)(1)(A) of this title;

**(B)** clause (ii) or (iii) of section 1154(a)(1)(B) of this title;

**(C)** section 1186a(c)(4)(C) of this title;

**(D)** the first section of Public Law 89-732 (8 U.S.C. 1255 note) (commonly known as the Cuban Adjustment Act) as a child or spouse who has been battered or subjected to extreme cruelty;

**(E)** section 902(d)(1)(B) of the Haitian Refugee Immigration Fairness Act of 1998 (8 U.S.C. 1255 note);

**(F)** section 202(d)(1) of the Nicaraguan Adjustment and Central American Relief Act; or

**(G)** section 309 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (division C of Public Law 104-208).

**(52)** The term "accredited language training program" means a language training program that is accredited by an accrediting agency recognized by the Secretary of Education.

**(b)** As used in subchapters I and II--

**(1)** The term "child" means an unmarried person under twenty-one years of age who is--

**(A)** a child born in wedlock;

**(B)** a stepchild, whether or not born out of wedlock, provided the child had not reached the age of eighteen years at the time the marriage creating the status of stepchild occurred;

**(C)** a child legitimated under the law of the child's residence or domicile, or under the law of the father's residence or domicile, whether in or outside the United States, if such legitimation takes place before the child reaches the age of eighteen years and the child is in the legal custody of the legitimating parent or parents at the time of such legitimation;

**(D)** a child born out of wedlock, by, through whom, or on whose behalf a status, privilege, or benefit is sought by virtue of the relationship of the child to its natural mother or to its natural father if the father has or had a bona fide parent-child relationship with the person;

**(E)(i)** a child adopted while under the age of sixteen years if the child has been in the legal custody of, and has resided with, the adopting parent or parents for at least two years or if the child has been battered or subject to extreme cruelty by the adopting parent or by a family member of the adopting parent residing in the same household: *Provided*, That no natural parent of any such adopted child shall thereafter, by virtue of such parentage, be accorded any right, privilege, or status under this chapter; or

**(ii)** subject to the same proviso as in clause (i), a child who: (I) is a natural sibling of a child described in clause (i) or subparagraph (F)(i); (II) was adopted by the adoptive parent or parents of the sibling described in such clause or subparagraph; and (III) is otherwise described in clause (i), except that the child was adopted while under the age of 18 years;

**(F)(i)** a child, under the age of sixteen at the time a petition is filed in his behalf to accord a classification as an immediate relative under section 1151(b) of this title, who is an orphan because of the death or disappearance of, abandonment or desertion by, or separation or loss from, both parents, or for whom the sole or surviving parent is incapable of providing the proper care and has in writing irrevocably released the child for emigration and adoption; who has been adopted abroad by a United States citizen and spouse jointly, or by an unmarried United States citizen who is at least 25 years of age, at least 1 of whom personally saw and observed the child before or during the adoption proceedings; or who is coming to the United States for adoption by a United States citizen and spouse jointly, or by an unmarried United States citizen at least twenty-five years of age, who have or has complied with the preadoption requirements, if any, of the child's proposed residence; *Provided*, That the Attorney General is satisfied that proper care will be furnished the child if admitted to the United States: *Provided further*, That no natural parent or prior adoptive parent of any such child shall thereafter, by virtue of such parentage, be accorded any right, privilege, or status under this chapter; or

**(ii)** subject to the same provisos as in clause (i), a child who: (I) is a natural sibling of a child described in clause (i) or subparagraph (E)(i); (II) has been adopted abroad, or is coming to the United States for adoption, by the adoptive parent (or prospective adoptive parent) or parents of the sibling described in such clause or subparagraph; and (III) is otherwise

described in clause (i), except that the child is under the age of 18 at the time a petition is filed in his or her behalf to accord a classification as an immediate relative under section 1151(b) of this title; or

**(G)(i)** a child, younger than 16 years of age at the time a petition is filed on the child's behalf to accord a classification as an immediate relative under section 1151(b) of this title, who has been adopted in a foreign state that is a party to the Convention on Protection of Children and Co-operation in Respect of Intercountry Adoption, done at The Hague on May 29, 1993, or who is emigrating from such a foreign state to be adopted in the United States by a United States citizen and spouse jointly or by an unmarried United States citizen who is at least 25 years of age, Provided, That--

**(I)** the Secretary of Homeland Security is satisfied that proper care will be furnished the child if admitted to the United States;

**(II)** the child's natural parents (or parent, in the case of a child who has one sole or surviving parent because of the death or disappearance of, abandonment or desertion by, the other parent), or other persons or institutions that retain legal custody of the child, have freely given their written irrevocable consent to the termination of their legal relationship with the child, and to the child's emigration and adoption;

**(III)** in the case of a child having two living natural parents, the natural parents are incapable of providing proper care for the child;

**(IV)** the Secretary of Homeland Security is satisfied that the purpose of the adoption is to form a bona fide parent-child relationship, and the parent-child relationship of the child and the natural parents has been terminated (and in carrying out both obligations under this subclause the Secretary of Homeland Security may consider whether there is a petition pending to confer immigrant status on one or both of such natural parents); and

**(V)** in the case of a child who has not been adopted--

**(aa)** the competent authority of the foreign state has approved the child's emigration to the United States for the purpose of adoption by the prospective adoptive parent or parents; and

**(bb)** the prospective adoptive parent or parents has or have complied with any pre-adoption requirements of the child's proposed residence; and

**(ii)** except that no natural parent or prior adoptive parent of any such child shall thereafter, by virtue of such parentage, be accorded any right, privilege, or status under this chapter; or

**(iii)** subject to the same provisos as in clauses (i) and (ii), a child who--

**(I)** is a natural sibling of a child described in clause (i), subparagraph (E)(i), or subparagraph (F)(i);

**(II)** was adopted abroad, or is coming to the United States for adoption, by the adoptive parent (or prospective adoptive parent) or parents of the sibling described in clause (i), subparagraph (E)(i), or subparagraph (F)(i); and

**(III)** is otherwise described in clause (i), except that the child is younger than 18 years of age at the time a petition is filed on his or her behalf for classification as an immediate relative under section 1151(b) of this title.

**(2)** The terms "parent", "father", or "mother" mean a parent, father, or mother only where the relationship exists by reason of any of the circumstances set forth in subdivision (1) of this subsection, except that, for purposes of paragraph (1)(F) (other than the second proviso therein) and paragraph (1)(G)(i) in the case of a child born out of wedlock described in paragraph (1) (D) (and not described in paragraph (1)(C)), the term "parent" does not include the natural father of the child if the father has disappeared or abandoned or deserted the child or if the father has in writing irrevocably released the child for emigration and adoption.

**(3)** The term "person" means an individual or an organization.

**(4)** The term "immigration judge" means an attorney whom the Attorney General appoints as an administrative judge within the Executive Office for Immigration Review, qualified to conduct specified classes of proceedings, including a hearing under section 1229a of this title. An immigration judge shall be subject to such supervision and shall perform such duties as the Attorney General shall prescribe, but shall not be employed by the Immigration and Naturalization Service.

**(5)** The term "adjacent islands" includes Saint Pierre, Miquelon, Cuba, the Dominican Republic, Haiti, Bermuda, the Bahamas, Barbados, Jamaica, the Windward and Leeward Islands, Trinidad, Martinique, and other British, French, and Netherlands territory or possessions in or bordering on the Caribbean Sea.

**(c)** As used in subchapter III--

**(1)** The term "child" means an unmarried person under twenty-one years of age and includes a child legitimated under the law of the child's residence or domicile, or under the law of the father's residence or domicile, whether in the United States or elsewhere, and, except as otherwise provided in sections 1431 and 1432 of this title, a child adopted in the United States, if such legitimation or adoption takes place before the child reaches the age of 16 years (except to the extent that the child is described in subparagraph (E)(ii) or (F)(ii) of subsection (b)(1)), and the child is in the legal custody of the legitimating or adopting parent or parents at the time of such legitimation or adoption.

**(2)** The terms "parent", "father", and "mother" include in the case of a posthumous child a deceased parent, father, and mother.

**(d)** Repealed. Pub.L. 100-525, § 9(a)(3), Oct. 24, 1988, 102 Stat. 2619.

**(e)** For the purposes of this chapter--

**(1)** The giving, loaning, or promising of support or of money or any other thing of value to be used for advocating any doctrine shall constitute the advocating of such doctrine; but nothing in this paragraph shall be construed as an exclusive definition of advocating.

**(2)** The giving, loaning, or promising of support or of money or any other thing of value for any purpose to any organization shall be presumed to constitute affiliation therewith; but nothing in this paragraph shall be construed as an exclusive definition of affiliation.

**(3)** Advocating the economic, international, and governmental doctrines of world communism means advocating the establishment of a totalitarian Communist dictatorship in any or all of the countries of the world through the medium of an internationally coordinated Communist movement.

**(f)** For the purposes of this chapter--

No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established is, or was--

**(1)** a habitual drunkard;

**(2)** Repealed. Pub.L. 97-116, § 2(c)(1), Dec. 29, 1981, 95 Stat. 1611.

**(3)** a member of one or more of the classes of persons, whether inadmissible or not, described in paragraphs (2)(D), (6)(E), and (10)(A) of section 1182(a) of this title; or subparagraphs (A) and (B) of section 1182(a)(2) of this title and subparagraph (C) thereof of such section[5] (except as such paragraph relates to a single offense of simple possession of 30 grams or less of marihuana), if the offense described therein, for which such person was convicted or of which he admits the commission, was committed during such period;

**(4)** one whose income is derived principally from illegal gambling activities;

**(5)** one who has been convicted of two or more gambling offenses committed during such period;

**(6)** one who has given false testimony for the purpose of obtaining any benefits under this chapter;

**(7)** one who during such period has been confined, as a result of conviction, to a penal institution for an aggregate period of one hundred and eighty days or more, regardless of whether the offense, or offenses, for which he has been confined were committed within or without such period;

**(8)** one who at any time has been convicted of an aggravated felony (as defined in subsection (a)(43)); or

**(9)** one who at any time has engaged in conduct described in section 1182(a)(3)(E) of this title (relating to assistance in Nazi persecution, participation in genocide, or commission of acts of torture or extrajudicial killings) or 1182(a)(2)(G) of this title (relating to severe violations of religious freedom).

The fact that any person is not within any of the foregoing classes shall not preclude a finding that for other reasons such person is or was not of good moral character. In the case of an alien who makes a false statement or claim of citizenship, or who registers to vote or votes in a Federal, State, or local election (including an initiative, recall, or referendum) in violation of a lawful restriction of such registration or voting to citizens, if each natural parent of the alien (or, in the case of an adopted alien, each adoptive parent of the alien) is or was a citizen (whether by birth or naturalization), the alien permanently resided in the United States prior to attaining the age of 16, and the alien reasonably believed at the time of such statement, claim, or violation that he or she was a citizen, no finding that the alien is, or was, not of good moral character may be made based on it.

**(g)** For the purposes of this chapter any alien ordered deported or removed (whether before or after the enactment of this chapter) who has left the United States, shall be considered to have been deported or removed in pursuance of law, irrespective of the source from which the expenses of his transportation were defrayed or of the place to which he departed.

**(h)** For purposes of section 1182(a)(2)(E) of this title, the term "serious criminal offense" means--

**(1)** any felony;

**(2)** any crime of violence, as defined in section 16 of Title 18; or

**(3)** any crime of reckless driving or of driving while intoxicated or under the influence of alcohol or of prohibited substances if such crime involves personal injury to another.

**(i)** With respect to each nonimmigrant alien described in subsection (a)(15)(T)(i)--

**(1)** the Secretary of Homeland Security, the Attorney General, and other Government officials, where appropriate, shall provide the alien with a referral to a nongovernmental organization that would advise the alien regarding the alien's options while in the United States and the resources available to the alien; and

**(2)** the Secretary of Homeland Security shall, during the period the alien is in lawful temporary resident status under that subsection, grant the alien authorization to engage in employment in the United States and provide the alien with an "employment authorized" endorsement or other appropriate work permit.

### CREDIT(S)

(June 27, 1952, c. 477, Title I, § 101, 66 Stat. 166; Pub.L. 85-316, §§ 1, 2, Sept. 11, 1957, 71 Stat. 639; Pub.L. 85-508, § 22, July 7, 1958, 72 Stat. 351; Pub.L. 86-3, § 20(a), Mar. 18, 1959, 73 Stat. 13; Pub.L. 87-256, § 109(a), (b), Sept. 21, 1961, 75 Stat. 534; Pub.L. 87-301, §§ 1, 2, 7, Sept. 26, 1961, 75 Stat. 650, 653; Pub.L. 89-236, §§ 8, 24, Oct. 3, 1965, 79 Stat. 916, 922; Pub.L. 89-710, Nov. 2, 1966, 80 Stat. 1104; Pub.L. 91-225, § 1, Apr. 7, 1970, 84 Stat. 116; Pub.L. 94-155, Dec. 16, 1975, 89 Stat. 824; Pub.L. 94-484, Title VI, § 601(b), (e), Oct. 12, 1976, 90 Stat. 2301, 2302; Pub.L. 94-571, § 7(a), Oct. 20, 1976, 90

Stat. 2706; Pub.L. 94-484, Title VI, § 602(c), Oct. 12, 1976, as added Pub.L. 95-83, Title III, § 307(q)(3), Aug. 1, 1977, 91 Stat. 395; Pub.L. 95-105, Title I, § 109(b)(3), Aug. 17, 1977, 91 Stat. 847; Pub.L. 96-70, Title III, § 3201(a), Sept. 27, 1979, 93 Stat. 496; Pub.L. 96-212, Title II, § 201(a), Mar. 17, 1980, 94 Stat. 102; Pub.L. 97-116, §§ 2, 5(d)(1), 18(a), Dec. 29, 1981, 95 Stat. 1611, 1614, 1619; Priv.L. 98-47, § 3, Oct. 30, 1984, 98 Stat. 3435; Pub.L. 99-505, § 1, Oct. 21, 1986, 100 Stat. 1806; Pub.L. 99-603, Title III, §§ 301(a), 312, 315(a), Nov. 6, 1986, 100 Stat. 3411, 3434, 3439; Pub.L. 99-653, §§ 2, 3, Nov. 14, 1986, 100 Stat. 3655; Pub.L. 100-459, Title II, § 210(a), Oct. 1, 1988, 102 Stat. 2203; Pub.L. 100-525, §§ 2(o)(1), 8(b), 9(a), Oct. 24, 1988, 102 Stat. 2613, 2617, 2619; Pub.L. 100-690, Title VII, § 7342, Nov. 18, 1988, 102 Stat. 4469; Pub.L. 101-162, Title VI, § 611(a), Nov. 21, 1989, 103 Stat. 1038; Pub.L. 101-238, § 3(a), Dec. 18, 1989, 103 Stat. 2100; Pub.L. 101-246, Title I, § 131(b), Feb. 16, 1990, 104 Stat. 31; Pub.L. 101-649, Title I, §§ 123, 151(a), 153(a), 162(f)(2)(A), Title II, §§ 203(c), 204(a), (c), 205(c) (1), (d), (e), 206(c), 207(a), 208, 209(a), Title IV, § 407(a)(2), Title V, §§ 501(a), 509(a), Title VI, § 603(a)(1), Nov. 29, 1990, 104 Stat. 4995, 5004, 5005, 5012, 5018 to 5020, 5022, 5023, 5026, 5027, 5040, 5048, 5051, 5082; Pub.L. 102-110, § 2(a), Oct. 1, 1991, 105 Stat. 555; Pub.L. 102-232, Title II, §§ 203(a), 205(a) to (c), 206(b), (c)(1), (d), 207(b), Title III, §§ 302(e)(8)(A), 303(a)(5)(A), (7)(A), (14), 305(m)(1), 306(a)(1), 309(b)(1), (4), Dec. 12, 1991, 105 Stat. 1737, 1740, 1741, 1746 to 1748, 1750, 1751, 1758; Pub.L. 103-236, Title I, § 162(h)(1), Apr. 30, 1994, 108 Stat. 407; Pub.L. 103-322, Title XIII, § 130003(a), Sept. 13, 1994, 108 Stat. 2024; Pub.L. 103-337, Div. C, Title XXXVI, § 3605, Oct. 5, 1994, 108 Stat. 3113; Pub.L. 103-416, Title II, §§ 201, 202, 214, 219(a), 222(a), Oct. 25, 1994, 108 Stat. 4310, 4311, 4314, 4316, 4320; Pub.L. 104-51, § 1, Nov. 15, 1995, 109 Stat. 467; Pub.L. 104-132, Title IV, § 440(b), (e), Apr. 24, 1996, 110 Stat. 1277; Pub.L. 104-208, Div. C, Title I, § 104(a), Title III, §§ 301(a), 308(d)(3)(A), (4)(A), (e)(3), (f)(1)(A), (B), 321(a), (b), 322(a)(1), (2)(A), 361(a), 371(a), Title VI, §§ 601(a)(1), 625(a)(2), 671(a)(3)(B), (b)(5), (e)(2), Sept. 30, 1996, 110 Stat. 3009-555, 3009-575, 3009-617, 3009-620, 3009-621, 3009-627 to 3009-629, 3009-644, 3009-645, 3009-689, 3009-700, 3009-721 to 3009-723; Pub.L. 105-54, § 1(a), Oct. 6, 1997, 111 Stat. 1175; Pub.L. 105-119, Title I, § 113, Nov. 26, 1997, 111 Stat. 2460; Pub.L. 105-277, Div. C, Title IV, § 421, Div. G, Title XXII, § 2222(e), Oct. 21, 1998, 112 Stat. 2681-657, 2681-819; Pub.L. 105-319, § 2(b)(1), (e)(2), formerly (d)(2), Oct. 30, 1998, 112 Stat. 3014, 3015, renumbered § 2(e)(2), Pub.L. 108-449, § 1(a)(3)(A), Dec. 10, 2004, 118 Stat. 3470; amended Pub.L. 106-95, § 2(a), (c), Nov. 12, 1999, 113 Stat. 1312; Pub.L. 106-139, § 1(a), (b)(1), Dec. 7, 1999, 113 Stat. 1696; Pub.L. 106-279, Title III, § 302(a), (c), Oct. 6, 2000, 114 Stat. 838, 839; Pub.L. 106-386, Div. A, § 107(e)(1), (4), Div. B, Title V, §§ 1503(a), 1513(b), Oct. 28, 2000, 114 Stat. 1477, 1479, 1518, 1534; Pub.L. 106-395, Title II, § 201(a)(1), Oct. 30, 2000, 114 Stat. 1633; Pub.L. 106-409, § 2(a), Nov. 1, 2000, 114 Stat. 1787; Pub.L. 106-536, § 1(a), Nov. 22, 2000, 114 Stat. 2560; Pub.L. 106-553, § 1(a) (2) [Title XI, §§ 1102(a), 1103(a)], Dec. 21, 2000, 114 Stat. 2762, 2762A-142, 2762A-143; Pub.L. 107-125, § 2(b), Jan. 16, 2002, 115 Stat. 2403; Pub.L. 107-274, § 2(a), (b), Nov. 2, 2002, 116 Stat. 1923; Pub.L. 108-77, Title IV, § 402(a)(1), Sept. 3, 2003, 117 Stat. 939; Pub.L. 108-99, § 1, Oct. 15, 2003, 117 Stat. 1176; Pub.L. 108-193, §§ 4(b)(1), (5), 8(a)(1), Dec. 19, 2003, 117 Stat. 2878, 2879, 2886; Pub.L. 108-449, § 1(a)(2)(B), (b)(1), Dec. 10, 2004, 118 Stat. 3469, 3470; Pub.L. 108-458, Title V, § 5504, Dec. 17, 2004, 118 Stat. 3741; Pub.L. 109-13, Div. B, Title V, § 501(a), May 11, 2005, 119 Stat. 321; Pub.L. 109-90, Title V, § 536, Oct. 18, 2005, 119 Stat. 2087; Pub.L. 109-162, Title VIII, §§ 801, 805(d), 811, 822(c)(1), Jan. 5, 2006, 119 Stat. 3053, 3056, 3057, 3063; Pub.L. 109-248, Title IV, § 402(b), July 27, 2006, 120 Stat. 623; Pub.L. 110-229, Title VII, § 702(j)(1) to (3), May 8, 2008, 122 Stat. 866; Pub.L. 110-391, § 2(a), Oct. 10, 2008, 122 Stat. 4193; Pub.L. 110-457, Title II, §§ 201(a), 235(d)(1), Dec. 23, 2008, 122 Stat. 5052, 5079; Pub.L. 111-9, § 1, Mar. 20, 2009, 123 Stat. 989; Pub.L. 111-83, Title V, § 568(a)(1), Oct. 28, 2009, 123 Stat. 2186; Pub.L. 111-287, § 3, Nov. 30, 2010, 124 Stat. 3058; Pub.L. 111-306, § 1(a), Dec. 14, 2010, 124 Stat. 3280; Pub.L. 112-176, § 3, Sept. 28, 2012, 126 Stat. 1325; Pub.L. 113-4, Title VIII, § 801, Title XII, §§ 1221, 1222, Mar. 7, 2013, 127 Stat. 110, 144; Pub.L. 113-76, Div. K, Title VII, § 7083, Jan. 17, 2014, 128 Stat. 567; Pub.L. 117-31, Title IV, § 403(a), July 30, 2021, 135 Stat. 318; Pub.L. 117-263, Div. E, Title LIX, § 5902(b), Dec. 23, 2022, 136 Stat. 3440; Pub.L. 117-360, § 2, Jan. 5, 2023, 136 Stat. 6292.)

## TERMINATION OF AMENDMENT

<For termination of amendment by Pub.L. 108-77, § 107(c), see Effective and Applicability Provisions note set out under this section.>

**EXECUTIVE ORDERS**

**EXECUTIVE ORDER NO. 12711**

<Apr. 11, 1990, 55 F.R. 13897>

**Policy Implementation with Respect to Nationals of People's Republic of China**

By the authority vested in me as President by the Constitution and laws of the United States of America, the Attorney General and the Secretary of State are hereby ordered to exercise their authority, including that under the Immigration and Nationality Act (8 U.S.C. 1101-1557) [this chapter], as follows:

**Section 1.** The Attorney General is directed to take any steps necessary to defer until January 1, 1994, the enforced departure of all nationals of the People's Republic of China (PRC) and their dependents who were in the United States on or after June 5, 1989, up to and including the date of this order (hereinafter "such PRC nationals").

**Sec. 2.** The Secretary of State and the Attorney General are directed to take all steps necessary with respect to such PRC nationals (a) to waive through January 1, 1994, the requirement of a valid passport and (b) to process and provide necessary documents, both within the United States and at U.S. consulates overseas, to facilitate travel across the borders of other nations and reentry into the United States in the same status such PRC nationals had upon departure.

**Sec. 3.** The Secretary of State and the Attorney General are directed to provide the following protections:

**(a)** irrevocable waiver of the 2-year home country residence requirement that may be exercised until January 1, 1994, for such PRC nationals;

**(b)** maintenance of lawful status for purposes of adjustment of status or change of nonimmigrant status for such PRC nationals who were in lawful status at any time on or after June 5, 1989, up to and including the date of this order;

**(c)** authorization for employment of such PRC nationals through January 1, 1994; and

**(d)** notice of expiration of nonimmigrant status (if applicable) rather than the institution of deportation proceedings, and explanation of options available for such PRC nationals eligible for deferral of enforced departure whose nonimmigrant status has expired.

**Sec. 4.** The Secretary of State and the Attorney General are directed to provide for enhanced consideration under the immigration laws for individuals from any country who express a fear of persecution upon return to their country related to that country's policy of forced abortion or coerced sterilization, as implemented by the Attorney General's regulation effective January 29, 1990.

**Sec. 5.** The Attorney General is directed to ensure that the Immigration and Naturalization Service finalizes and makes public its position on the issue of training for individuals in F-1 visa status and on the issue of reinstatement into lawful nonimmigrant status of such PRC nationals who have withdrawn their applications for asylum.

**Sec. 6.** The Departments of Justice and State are directed to consider other steps to assist such PRC nationals in their efforts to utilize the protections that I have extended pursuant to this order.

**Sec. 7.** This order shall be effective immediately.

George Bush

**EXECUTIVE ORDER NO. 14159**

<Jan. 20, 2025, 90 F.R. 8443>

**Protecting the American People Against Invasion**

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA) (8 U.S.C. 1101 et seq.) and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1. Purpose.** Over the last 4 years, the prior administration invited, administered, and oversaw an unprecedented flood of illegal immigration into the United States. Millions of illegal aliens crossed our borders or were permitted to fly directly into the United States on commercial flights and allowed to settle in American communities, in violation of longstanding Federal laws.

Many of these aliens unlawfully within the United States present significant threats to national security and public safety, committing vile and heinous acts against innocent Americans. Others are engaged in hostile activities, including espionage, economic espionage, and preparations for terror-related activities. Many have abused the generosity of the American people, and their presence in the United States has cost taxpayers billions of dollars at the Federal, State, and local levels.

Enforcing our Nation's immigration laws is critically important to the national security and public safety of the United States. The American people deserve a Federal Government that puts their interests first and a Government that understands its sacred obligation to prioritize the safety, security, and financial and economic well-being of Americans.

This order ensures that the Federal Government protects the American people by faithfully executing the immigration laws of the United States.

**Sec. 2. Policy.** It is the policy of the United States to faithfully execute the immigration laws against all inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people. Further, it is the policy of the United States to achieve the total and efficient enforcement of those laws, including through lawful incentives and detention capabilities.

**Sec. 3. Faithful Execution of the Immigration Laws.** In furtherance of the policies described in section 2 of this order:

**(a)** Executive Order 13993 of January 20, 2021 (Revision of Civil Immigration Enforcement Policies and Priorities), Executive Order 14010 of February 2, 2021 (Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border), Executive Order 14011 of February 2, 2021 (Establishment of Interagency Task Force on the Reunification of Families), and Executive Order 14012 of February 2, 2021 (Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans) are hereby revoked; and

**(b)** Executive departments and agencies (agencies) shall take all appropriate action to promptly revoke all memoranda, guidance, or other policies based on the Executive Orders revoked in section 3(a) of this order and shall employ all lawful means to ensure the faithful execution of the immigration laws of the United States against all inadmissible and removable aliens.

**Sec. 4. Civil Enforcement Priorities.** The Secretary of Homeland Security shall take all appropriate action to enable the Director of U.S. Immigration and Customs Enforcement, the Commissioner of U.S. Customs and Border Protection, and the Director of U.S. Citizenship and Immigration Services to set priorities for their agencies that protect the public safety and national

security interests of the American people, including by ensuring the successful enforcement of final orders of removal. Further, the Secretary of Homeland Security shall ensure that the primary mission of U.S. Immigration and Customs Enforcement's Homeland Security Investigations division is the enforcement of the provisions of the INA and other Federal laws related to the illegal entry and unlawful presence of aliens in the United States and the enforcement of the purposes of this order.

**Sec. 5. Criminal Enforcement Priorities.** The Attorney General, in coordination with the Secretary of State and the Secretary of Homeland Security, shall take all appropriate action to prioritize the prosecution of criminal offenses related to the unauthorized entry or continued unauthorized presence of aliens in the United States.

**Sec. 6. Federal Homeland Security Task Forces. (a)** The Attorney General and the Secretary of Homeland Security shall take all appropriate action to jointly establish Homeland Security Task Forces (HSTFs) in all States nationwide.

**(b)** The composition of each HSTF shall be subject to the direction of the Attorney General and the Secretary of Homeland Security, but shall include representation from any other Federal agencies with law enforcement officers, or agencies with the ability to provide logistics, intelligence, and operational support to the HSTFs, and shall also include representation from relevant State and local law enforcement agencies. The heads of all Federal agencies shall take all appropriate action to provide support to the Attorney General and the Secretary of Homeland Security to ensure that the HSTFs fulfill the objectives in subsection (c) of this section, and any other lawful purpose that fulfills the policy objectives of this order.

**(c)** The objective of each HSTF is to end the presence of criminal cartels, foreign gangs, and transnational criminal organizations throughout the United States, dismantle cross-border human smuggling and trafficking networks, end the scourge of human smuggling and trafficking, with a particular focus on such offenses involving children, and ensure the use of all available law enforcement tools to faithfully execute the immigration laws of the United States.

**(d)** The Attorney General and the Secretary of Homeland Security shall take all appropriate action to provide an operational command center to coordinate the activities of the HSTFs and provide such support as they may require, and shall also take all appropriate action to provide supervisory direction to their activities as may be required.

**Sec. 7. Identification of Unregistered Illegal Aliens.** The Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to:

**(a)** Immediately announce and publicize information about the legal obligation of all previously unregistered aliens in the United States to comply with the requirements of part VII of subchapter II of chapter 12 of title 8, United States Code;

**(b)** Ensure that all previously unregistered aliens in the United States comply with the requirements of part VII of subchapter II of chapter 12 of title 8, United States Code; and

**(c)** Ensure that failure to comply with the legal obligations of part VII of subchapter II of chapter 12 of title 8, United States Code, is treated as a civil and criminal enforcement priority.

**Sec. 8. Civil Fines and Penalties. (a)** The Secretary of Homeland Security, in coordination with the Secretary of Treasury, shall take all appropriate action to ensure the assessment and collection of all fines and penalties that the Secretary of Homeland Security is authorized by law to assess and collect from aliens unlawfully present in the United States, including aliens who unlawfully entered or unlawfully attempted to enter the United States, and from those who facilitate such aliens' presence in the United States.

**(b)** Within 90 days of the date of this order, the Secretary of the Treasury and the Secretary of Homeland Security shall submit a report to the President regarding their progress implementing the requirements of this section and recommending any additional actions that may need to be taken to achieve its objectives.

**Sec. 9. Efficient Removals of Recent Entrants and Other Aliens.** The Secretary of Homeland Security shall take all appropriate action, pursuant to section 235(b)(1)(A)(iii)(I) of the INA (8 U.S.C. 1225(b)(1)(A)(iii)(I)), to apply, in her sole and unreviewable discretion, the provisions of section 235(b)(1)(A)(i) and (ii) of the INA to the aliens designated under section 235(b)(1)(A)(iii)(II). Further, the Secretary of Homeland Security shall promptly take appropriate action to use all other provisions of the immigration laws or any other Federal law, including, but not limited to sections 238 and 240(d) of the INA (8 U.S.C. 1228 and 1229a(d)), to ensure the efficient and expedited removal of aliens from the United States.

**Sec. 10. Detention Facilities.** The Secretary of Homeland Security shall promptly take all appropriate action and allocate all legally available resources or establish contracts to construct, operate, control, or use facilities to detain removable aliens. The Secretary of Homeland Security, further, shall take all appropriate actions to ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country, to the extent permitted by law.

**Sec. 11. Federal-State Agreements.** To ensure State and local law enforcement agencies across the United States can assist with the protection of the American people, the Secretary of Homeland Security shall, to the maximum extent permitted by law, and with the consent of State or local officials as appropriate, take appropriate action, through agreements under section 287(g) of the INA (8 U.S.C. 1357(g)) or otherwise, to authorize State and local law enforcement officials, as the Secretary of Homeland Security determines are qualified and appropriate, to perform the functions of immigration officers in relation to the investigation, apprehension, or detention of aliens in the United States under the direction and the supervision of the Secretary of Homeland Security. Such authorization shall be in addition to, rather than in place of, Federal performance of these duties. To the extent permitted by law, the Secretary of Homeland Security may structure each agreement under section 287(g) of the INA (8 U.S.C. 1357(g)) in the manner that provides the most effective model for enforcing Federal immigration laws in that jurisdiction.

**Sec. 12. Encouraging Voluntary Compliance with the Law.** The Secretary of Homeland Security shall take all appropriate action, in coordination with the Secretary of State and the Attorney General, and subject to adequate safeguards, assurances, bonds, and any other lawful measure, to adopt policies and procedures to encourage aliens unlawfully in the United States to voluntarily depart as soon as possible, including through enhanced usage of the provisions of section 240B of the INA (8 U.S.C. 1229c), international agreements or assistance, or any other measures that encourage aliens unlawfully in the United States to depart as promptly as possible, including through removals of aliens as provided by section 250 of the INA (8 U.S.C. 1260).

**Sec. 13. Recalcitrant Countries.** The Secretary of State and the Secretary of Homeland Security shall take all appropriate action to:

**(a)** Cooperate and effectively implement, as appropriate, the sanctions provided by section 243(d) of the INA (8 U.S.C. 1253(d)), with the Secretary of State, to the maximum extent permitted by law, ensuring that diplomatic efforts and negotiations with foreign states include the foreign states' acceptance of their nationals who are subject to removal from the United States; and

**(b)** Eliminate all documentary barriers, dilatory tactics, or other restrictions that prevent the prompt repatriation of aliens to any foreign state. Any failure or delay by a foreign state to verify the identity of a national of that state shall be considered in carrying out subsection (a) this section, and shall also be considered regarding the issuance of any other sanctions that may be available to the United States.

**Sec. 14. Visa Bonds.** The Secretary of Treasury shall take all appropriate action, in coordination with the Secretary of State and the Secretary of Homeland Security, to establish a system to facilitate the administration of all bonds that the Secretary of State or the Secretary of Homeland Security may lawfully require to administer the provisions of the INA.

**Sec. 15. Reestablishment of the VOICE Office and Addressing Victims of Crimes Committed by Removable Aliens.** The Secretary of Homeland Security shall direct the Director of U.S. Immigration and Customs Enforcement (ICE) to take all appropriate and lawful action to reestablish within ICE an office to provide proactive, timely, adequate, and professional services to victims of crimes committed by removable aliens, and those victims' family members. The Attorney General shall also ensure that the provisions of 18 U.S.C. 3771 are followed in all Federal prosecutions involving crimes committed by removable aliens.

**Sec. 16. Addressing Actions by the Previous Administration.** The Secretary of State, the Attorney General, and the Secretary of Homeland Security shall promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States, and align any and all departmental activities with the policies set out by this order and the immigration laws. Such action should include, but is not limited to:

**(a)** ensuring that the parole authority under section 212(d)(5) of the INA (8 U.S.C. 1182(d)(5)) is exercised on only a case-by-case basis in accordance with the plain language of the statute, and in all circumstances only when an individual alien demonstrates urgent humanitarian reasons or a significant public benefit derived from their particular continued presence in the United States arising from such parole;

**(b)** ensuring that designations of Temporary Protected Status are consistent with the provisions of section 244 of the INA (8 U.S.C. 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute; and

**(c)** ensuring that employment authorization is provided in a manner consistent with section 274A of the INA (8 U.S.C. 1324a), and that employment authorization is not provided to any unauthorized alien in the United States.

**Sec. 17. Sanctuary Jurisdictions.** The Attorney General and the Secretary of Homeland Security shall, to the maximum extent possible under law, evaluate and undertake any lawful actions to ensure that so-called "sanctuary" jurisdictions, which seek to interfere with the lawful exercise of Federal law enforcement operations, do not receive access to Federal funds. Further, the Attorney General and the Secretary of Homeland Security shall evaluate and undertake any other lawful actions, criminal or civil, that they deem warranted based on any such jurisdiction's practices that interfere with the enforcement of Federal law.

**Sec. 18. Information Sharing. (a)** The Secretary of Homeland Security shall promptly issue guidance to ensure maximum compliance by Department of Homeland Security personnel with the provisions of 8 U.S.C. 1373 and 8 U.S.C. 1644 and ensure that State and local governments are provided with the information necessary to fulfill law enforcement, citizenship, or immigration status verification requirements authorized by law; and

**(b)** The Attorney General, the Secretary of Health and Human Services, and the Secretary of Homeland Security shall take all appropriate action to stop the trafficking and smuggling of alien children into the United States, including through the sharing of any information necessary to assist in the achievement of that objective.

**Sec. 19. Funding Review.** The Attorney General and the Secretary of Homeland Security shall:

**(a)** Immediately review and, if appropriate, audit all contracts, grants, or other agreements providing Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens, to ensure that such agreements conform to applicable law and are free of waste, fraud, and abuse, and that they do not promote or facilitate violations of our immigration laws;

**(b)** Pause distribution of all further funds pursuant to such agreements pending the results of the review in subsection (a) of this section;

**(c)** Terminate all such agreements determined to be in violation of law or to be sources of waste, fraud, or abuse and prohibit any such future agreements;

**(d)** Coordinate with the Director of the Office of Management and Budget to ensure that no funding for agreements described in subsection (c) of this section is included in any appropriations request for the Department of Justice or the Department of Homeland Security; and

**(e)** Initiate clawback or recoupment procedures, if appropriate, for any agreements described in subsection (c) of this section.

**Sec. 20. Denial of Public Benefits to Illegal Aliens.** The Director of the Office of Management and Budget shall take all appropriate action to ensure that all agencies identify and stop the provision of any public benefits to any illegal alien not authorized to receive them under the provisions of the INA or other relevant statutory provisions.

**Sec. 21. Hiring More Agents and Officers.** Subject to available appropriations, the Secretary of Homeland Security, through the Commissioner of U.S. Customs and Border Protection and the Director of U.S. Immigration and Customs Enforcement, shall take all appropriate action to significantly increase the number of agents and officers available to perform the duties of immigration officers.

**Sec. 22. Severability.** It is the policy of the United States to enforce this order to the maximum extent possible to advance the interests of the United States. Accordingly:

**(a)** If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

**(b)** If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid because of the failure to follow certain procedures, the relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

**Sec. 23. General Provisions. (a)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

Donald J. Trump

## EXECUTIVE ORDER NO. 14161

<Jan. 20, 2025, 90 F.R. 8451>

**Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats**

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 et seq., and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1. Policy and Purpose. (a)** It is the policy of the United States to protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes.

**(b)** To protect Americans, the United States must be vigilant during the visa-issuance process to ensure that those aliens approved for admission into the United States do not intend to harm Americans or our national interests. More importantly, the United States must identify them before their admission or entry into the United States. And the United States must ensure that admitted aliens and aliens otherwise already present in the United States do not bear hostile attitudes toward its citizens, culture, government, institutions, or founding principles, and do not advocate for, aid, or support designated foreign terrorists and other threats to our national security.

**Sec. 2. Enhanced Vetting and Screening Across Agencies.**

**(a)** The Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall promptly:

  **(i)** identify all resources that may be used to ensure that all aliens seeking admission to the United States, or who are already in the United States, are vetted and screened to the maximum degree possible;

  **(ii)** determine the information needed from any country to adjudicate any visa, admission, or other benefit under the INA for one of its nationals, and to ascertain whether the individual seeking the benefit is who the individual claims to be and that the individual is not a security or public-safety threat;

  **(iii)** re-establish a uniform baseline for screening and vetting standards and procedures, consistent with the uniform baseline that existed on January 19, 2021, that will be used for any alien seeking a visa or immigration benefit of any kind; and

  **(iv)** vet and screen to the maximum degree possible all aliens who intend to be admitted, enter, or are already inside the United States, particularly those aliens coming from regions or nations with identified security risks.

**(b)** Within 60 days of the date of this order, the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence shall jointly submit to the President, through the Assistant to the President for Homeland Security, a report:

  **(i)** identifying countries throughout the world for which vetting and screening information is so deficient as to warrant a partial or full suspension on the admission of nationals from those countries pursuant to section 212(f) of the INA (8 U.S.C. 1182(f)); and

  **(ii)** identifying how many nationals from those countries have entered or have been admitted into the United States on or since January 20, 2021, and any other information the Secretaries and Attorney General deem relevant to the actions or activities of such nationals since their admission or entry to the United States.

**(c)** Whenever information is identified that would support the exclusion or removal of any alien described in subsection 2(b), the Secretary of Homeland Security shall take immediate steps to exclude or remove that alien unless she determines that doing so

would inhibit a significant pending investigation or prosecution of the alien for a serious criminal offense or would be contrary to the national security interests of the United States.

**Sec. 3. Additional Measures to Protect the Nation.** As soon as possible, but no later than 30 days from the date of this order, the Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall also:

**(a)** Evaluate and adjust all existing regulations, policies, procedures, and provisions of the Foreign Service Manual, or guidance of any kind pertaining to each of the grounds of inadmissibility listed in sections 212(a)(2)-(3) of the INA (8 U.S.C. 1182(a)(2)-(3)), to ensure the continued safety and security of the American people and our constitutional republic;

**(b)** Ensure that sufficient safeguards are in place to prevent any refugee or stateless individual from being admitted to the United States without undergoing stringent identification verification beyond that required of any other alien seeking admission or entry to the United States;

**(c)** Evaluate all visa programs to ensure that they are not used by foreign nation-states or other hostile actors to harm the security, economic, political, cultural, or other national interests of the United States;

**(d)** Recommend any actions necessary to protect the American people from the actions of foreign nationals who have undermined or seek to undermine the fundamental constitutional rights of the American people, including, but not limited to, our Citizens' rights to freedom of speech and the free exercise of religion protected by the First Amendment, who preach or call for sectarian violence, the overthrow or replacement of the culture on which our constitutional Republic stands, or who provide aid, advocacy, or support for foreign terrorists;

**(e)** Ensure the devotion of adequate resources to identify and take appropriate action for offenses described in 8 U.S.C. 1451;

**(f)** Evaluate the adequacy of programs designed to ensure the proper assimilation of lawful immigrants into the United States, and recommend any additional measures to be taken that promote a unified American identity and attachment to the Constitution, laws, and founding principles of the United States; and

**(g)** Recommend any additional actions to protect the American people and our constitutional republic from foreign threats.

**Sec. 4. General Provisions. (a)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

Donald J. Trump

**EXECUTIVE ORDER NO. 14163**

<Jan. 20, 2025, 90 F.R. 8459>

**Realigning the United States Refugee Admissions Program**

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 et seq., and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1. Purpose.** Over the last 4 years, the United States has been inundated with record levels of migration, including through the U.S. Refugee Admissions Program (USRAP). Cities and small towns alike, from Charleroi, Pennsylvania, and Springfield, Ohio, to Whitewater, Wisconsin, have seen significant influxes of migrants. Even major urban centers such as New York City, Chicago, and Denver have sought Federal aid to manage the burden of new arrivals. Some jurisdictions, like New York and Massachusetts, have even recently declared states of emergency because of increased migration.

The United States lacks the ability to absorb large numbers of migrants, and in particular, refugees, into its communities in a manner that does not compromise the availability of resources for Americans, that protects their safety and security, and that ensures the appropriate assimilation of refugees. This order suspends the USRAP until such time as the further entry into the United States of refugees aligns with the interests of the United States.

**Sec. 2. Policy.** It is the policy of the United States to ensure that public safety and national security are paramount considerations in the administration of the USRAP, and to admit only those refugees who can fully and appropriately assimilate into the United States and to ensure that the United States preserves taxpayer resources for its citizens. It is also the policy of the United States that, to the extent permitted by law and as practicable, State and local jurisdictions be granted a role in the process of determining the placement or settlement in their jurisdictions of aliens eligible to be admitted to the United States as refugees.

**Sec. 3. Realignment of the U.S. Refugee Admissions Program. (a)** I hereby proclaim, pursuant to sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), that entry into the United States of refugees under the USRAP would be detrimental to the interests of the United States. I therefore direct that entry into the United States of refugees under the USRAP be suspended-- subject to the exceptions set forth in subsection (c) of this section--until a finding is made in accordance with section 4 of this order. This suspension shall take effect at 12:01 a.m. eastern standard time on January 27, 2025.

**(b)** The Secretary of Homeland Security shall suspend decisions on applications for refugee status, until a finding is made in accordance with section 4 of this order.

**(c)** Notwithstanding the suspension of the USRAP imposed pursuant to subsections (a) and (b) of this section, the Secretary of State and the Secretary of Homeland Security may jointly determine to admit aliens to the United States as refugees on a case-by-case basis, in their discretion, but only so long as they determine that the entry of such aliens as refugees is in the national interest and does not pose a threat to the security or welfare of the United States.

**(d)** The Secretary of Homeland Security, in consultation with the Attorney General, shall examine existing law to determine the extent to which, consistent with applicable law, State and local jurisdictions may have greater involvement in the process of determining the placement or resettlement of refugees in their jurisdictions, and shall devise a proposal to lawfully promote such involvement. In all cases, the Secretary of State and the Secretary of Health and Human Services shall ensure that the State and local consultation requirements in 8 U.S.C. 1522(a)(2) are carried out with respect to all refugees admitted to the United States.

**Sec. 4. Resumption of the U.S. Refugee Admissions Program.** Within 90 days of this order, the Secretary of Homeland Security, in consultation with the Secretary of State, shall submit a report to the President through the Homeland Security Advisor regarding whether resumption of entry of refugees into the United States under the USRAP would be in the interests of the United States, in light of the policies outlined in section 2 of this order. The Secretary of Homeland Security, in consultation

with the Secretary of State, shall submit further reports every 90 days thereafter until I determine that resumption of the USRAP is in the interests of the United States.

**Sec. 5. Revocation.** Executive Order 14013 of February 4, 2021 (Rebuilding and Enhancing Programs To Resettle Refugees and Planning for the Impact of Climate Change on Migration), is hereby revoked.

**Sec. 6. Severability.** If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its other provisions to any other persons or circumstances shall not be affected thereby.

**Sec. 7. General Provisions. (a)** Nothing in this order shall be construed to impair or otherwise affect:

    **(i)** the authority granted by law to an executive department or agency, or the head thereof; or

    **(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

Donald J. Trump


## EXECUTIVE ORDER NO. 14165

<Jan. 20, 2025, 90 F.R. 8467>


### Securing Our Borders

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 et seq., and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1. Purpose.** Over the last 4 years, the United States has endured a large-scale invasion at an unprecedented level. Millions of illegal aliens from nations and regions all around the world successfully entered the United States where they are now residing, including potential terrorists, foreign spies, members of cartels, gangs, and violent transnational criminal organizations, and other hostile actors with malicious intent.

Deadly narcotics and other illicit materials have flowed across the border while agents and officers spend their limited resources processing illegal aliens for release into the United States. These catch-and-release policies undermine the rule of law and our sovereignty, create substantial risks to public safety and security, and divert critical resources away from stopping the entry of contraband and fugitives into the United States.

We have limited information on the precise whereabouts of a great number of these illegal aliens who have entered the United States over the last 4 years.

This cannot stand. A nation without borders is not a nation, and the Federal Government must act with urgency and strength to end the threats posed by an unsecured border.

One of my most important obligations is to protect the American people from the disastrous effects of unlawful mass migration and resettlement.

My Administration will marshal all available resources and authorities to stop this unprecedented flood of illegal aliens into the United States.

**Sec. 2. Policy.** It is the policy of the United States to take all appropriate action to secure the borders of our Nation through the following means:

**(a)** Establishing a physical wall and other barriers monitored and supported by adequate personnel and technology;

**(b)** Deterring and preventing the entry of illegal aliens into the United States;

**(c)** Detaining, to the maximum extent authorized by law, aliens apprehended on suspicion of violating Federal or State law, until such time as they are removed from the United States;

**(d)** Removing promptly all aliens who enter or remain in violation of Federal law;

**(e)** Pursuing criminal charges against illegal aliens who violate the immigration laws, and against those who facilitate their unlawful presence in the United States;

**(f)** Cooperating fully with State and local law enforcement officials in enacting Federal-State partnerships to enforce Federal immigration priorities; and

**(g)** Obtaining complete operational control of the borders of the United States.

**Sec. 3. Physical Barriers.** The Secretary of Defense and the Secretary of Homeland Security shall take all appropriate action to deploy and construct temporary and permanent physical barriers to ensure complete operational control of the southern border of the United States.

**Sec. 4. Deployment of Personnel. (a)** The Secretary of Defense and the Secretary of Homeland Security shall take all appropriate and lawful action to deploy sufficient personnel along the southern border of the United States to ensure complete operational control; and

**(b)** The Attorney General and the Secretary of Homeland Security shall take all appropriate action to supplement available personnel to secure the southern border and enforce the immigration laws of the United States through the use of sections 1103(a)(2) and (4)-(6) of the INA (8 U.S.C. 1103(a)(2) and (4)-(6)).

**Sec. 5. Detention.** The Secretary of Homeland Security shall take all appropriate actions to detain, to the fullest extent permitted by law, aliens apprehended for violations of immigration law until their successful removal from the United States. The Secretary shall, consistent with applicable law, issue new policy guidance or propose regulations regarding the appropriate and consistent use of lawful detention authority under the INA, including the termination of the practice commonly known as "catch-and-release," whereby illegal aliens are routinely released into the United States shortly after their apprehension for violations of immigration law.

**Sec. 6. Resumption of Migrant Protection Protocols.** As soon as practicable, the Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to resume the Migrant Protection Protocols in all sectors along the southern border of the United States and ensure that, pending removal proceedings, aliens described in section 235(b)(2)(C) of the INA (8 U.S.C. 1225(b)(2)(C)) are returned to the territory from which they came.

**Sec. 7. Adjusting Parole Policies.** The Secretary of Homeland Security shall, consistent with applicable law, take all appropriate action to:

**(a)** Cease using the "CBP One" application as a method of paroling or facilitating the entry of otherwise inadmissible aliens into the United States;

**(b)** Terminate all categorical parole programs that are contrary to the policies of the United States established in my Executive Orders, including the program known as the "Processes for Cubans, Haitians, Nicaraguans, and Venezuelans."

**(c)** Align all policies and operations at the southern border of the United States to be consistent with the policy of Section 2 of this order and ensure that all future parole determinations fully comply with this order and with applicable law.

**Sec. 8. Additional International Cooperation.** The Secretary of State, in coordination with the Attorney General and the Secretary of Homeland Security, shall take all appropriate action to facilitate additional international cooperation and agreements, consistent with the policy of Section 2, including entering into agreements based upon the provisions of section 208(a)(2)(A) of the INA (8 U.S.C. 1158(a)(2)(A)) or any other applicable provision of law.

**Sec. 9. DNA and Identification Requirements. (a)** The Attorney General and the Secretary of Homeland Security shall take all appropriate action to fulfill the requirements of the DNA Fingerprint Act of 2005, title X of Public Law 109-162, for all aliens detained under the authority of the United States; and

**(b)** The Secretary of Homeland Security shall take all appropriate action to use any available technologies and procedures to determine the validity of any claimed familial relationship between aliens encountered or apprehended by the Department of Homeland Security.

**Sec. 10. Prosecution of Offenses.** The Attorney General and the Secretary of Homeland Security shall take all appropriate action to prioritize the prosecution of offenses that relate to the borders of the United States, including the investigation and prosecution of offenses that involve human smuggling, human trafficking, child trafficking, and sex trafficking in the United States.

**Sec. 11. Additional Measures.** Within 14 days of the date of this order, the Secretary of State, the Attorney General, the Secretary of Health and Human Services, and the Secretary of Homeland Security shall provide recommendations to the President regarding the use of any other authority to protect the United States from foreign threats and secure the southern border.

**Sec. 12. General Provisions. (a)** Nothing in this order shall be construed to impair or otherwise affect:

   **(i)** the authority granted by law to an executive department or agency, or the head thereof; or

   **(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

Donald J. Trump

### EXECUTIVE ORDER NO. 14167

<Jan. 20, 2025, 90 F.R. 8613>

**Clarifying the Military's Role in Protecting the Territorial Integrity of the United States**

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1. Purpose. (a)** As Chief Executive and as Commander in Chief of the Armed Forces of the United States, I have no more solemn responsibility than protecting the sovereignty and territorial integrity of the United States along our national borders. The protection of a nation's territorial integrity and national boundaries is paramount for its security.

**(b)** The Armed Forces of the United States have played a long and well-established role in securing our borders against threats of invasion, against unlawful forays by foreign nationals into the United States, and against other transnational criminal activities that violate our laws and threaten the peace, harmony, and tranquility of the Nation. These threats have taken a variety of forms over our Nation's history, but the Armed Forces have consistently played an integral role in protecting the sovereignty of the United States.

**(c)** Threats against our Nation's sovereignty continue today, and it is essential that the Armed Forces staunchly continue to participate in the defense of our territorial integrity and sovereignty. A National Emergency currently exists along the southern border of the United States. Unchecked unlawful mass migration and the unimpeded flow of opiates across our borders continue to endanger the safety and security of the American people and encourage further lawlessness. Accordingly, through this order, I am acting in accordance with my solemn duty to protect and defend the sovereignty and territorial integrity of the United States along our national borders.

**Sec. 2. Policy.** It is the policy of the United States to ensure that the Armed Forces of the United States prioritize the protection of the sovereignty and territorial integrity of the United States along our national borders.

**Sec. 3. Implementation.** The Secretary of Defense shall:

**(a)** No later than 10 days from the effective date of this order, deliver to the President a revision to the Unified Command Plan that assigns United States Northern Command (USNORTHCOM) the mission to seal the borders and maintain the sovereignty, territorial integrity, and security of the United States by repelling forms of invasion including unlawful mass migration, narcotics trafficking, human smuggling and trafficking, and other criminal activities.

**(b)** On the effective date of this order, add the following requirements to the Contingency Planning Guidance and Guidance for the Employment of the Force:

**(i)** A Level 3 planning requirement for USNORTHCOM to seal the borders and maintain the sovereignty, territorial integrity, and security of the United States by repelling forms of invasion, including unlawful mass migration, narcotics trafficking, human smuggling and trafficking, and other criminal activities, with a commander's estimate due to the Secretary of Defense within 30 days of the effective date of this order.

**(ii)** A campaign planning requirement for USNORTHCOM to provide steady-state southern border security, seal the border, and maintain the sovereignty, territorial integrity, and security of the United States by repelling forms of invasion, including unlawful mass migration, narcotics trafficking, human smuggling and trafficking, and other criminal activities.

**(iii)** Continuous assessments of all available options to protect the sovereign territory of the United States from mass unlawful entry and impingement on our national sovereignty and security by foreign nations and transnational criminal organizations.

**Sec. 4. General Provisions. (a)** Nothing in this order shall be construed to impair or otherwise affect:

**(i)** the authority granted by law to an executive department or agency, or the head thereof; or

**(ii)** the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

**(b)** This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**(c)** This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

Donald J. Trump

## PROCLAMATIONS

### PROCLAMATION NO. 8697

For Proclamation No. 8697, relating to suspension of entry as immigrants and nonimmigrants of persons who participate in serious human rights and humanitarian law violations and other abuses, see Proc. No. 8697, Aug. 4, 2011, 76 F.R. 49277, set out as a note under 8 U.S.C.A. § 1182.

## MEMORANDA OF PRESIDENT

### PRESIDENTIAL MEMORANDUM

<Feb. 7, 1995, 60 F.R. 7885>

### Deterring Illegal Immigration

**Memorandum for the Heads of Executive Departments and Agencies**

It is a fundamental right and duty for a nation to protect the integrity of its borders and its laws. This Administration shall stand firm against illegal immigration and the continued abuse of our immigration laws. By closing the back door to illegal immigration, we will continue to open the front door to legal immigrants.

My Administration has moved swiftly to reverse the course of a decade of failed immigration policies. Our initiatives have included increasing overall Border personnel by over 50 percent since 1993. We also are strengthening worksite enforcement and work authorization verification to deter employment of illegal aliens. Asylum rules have been reformed to end abuse by

those falsely claiming asylum, while offering protection to those in genuine fear of persecution. We are cracking down on smugglers of illegal aliens and reforming criminal alien deportation for quicker removal. And we are the first Administration to obtain funding to reimburse States for a share of the costs of incarcerating criminal illegal aliens.

While we already are doing more to stem the flow of illegal immigration than has any previous Administration, more remains to be done. In conjunction with the Administration's unprecedented budget proposal to support immigration initiatives, this directive provides a blueprint of policies and priorities for this Administration's continuing work to curtail illegal immigration. With its focus on strong border deterrence backed up by effective worksite enforcement, removal of criminal and other deportable aliens and assistance to states, this program protects the security of our borders, our jobs and our communities for all Americans--citizens and legal immigrants alike.

## COMPREHENSIVE BORDER CONTROL STRATEGY

### A. Deterring Illegal Immigration At Our Borders

I have directed the Attorney General to move expeditiously toward full implementation of our comprehensive border control strategy, including efforts at the southwest border. To support sustained long-term strengthening of our deterrence capacity, the Administration shall seek funding to add new Border Patrol agents to reach the goal of at least 7,000 agents protecting our borders by the year 2000.

### Flexible Border Response Capacity

To further this strategy, the Department of Justice shall implement the capacity to respond to emerging situations anywhere along our national borders to deter buildups of illegal border crossers, smuggling operations, or other developing problems.

### Strategic Use of High Technology

Through the strategic use of sensors, night scopes, helicopters, light planes, all-terrain vehicles, fingerprinting and automated recordkeeping, we have freed many Border Patrol agents from long hours of bureaucratic tasks and increased the effectiveness of these highly-trained personnel. Because these tools are essential for the Immigration and Naturalization Service (INS) to do its job, I direct the Attorney General to accelerate to the greatest extent possible their utilization and enhancement to support implementation of our deterrence strategy.

### Strong Enforcement Against Repeat Illegal Crossers

The Department of Justice shall assess the effectiveness of efforts underway to deter repeat illegal crossers, such as fingerprinting and dedicating prosecution resources to enforce the new prosecution authority provided by the Violent Crime Control and Law Enforcement Act of 1994 [Pub.L. 103-322, Sept. 13, 1994, 108 Stat. 1796; for complete classification of this Act to the Code, see Tables].

The Department of Justice shall determine whether accelerated expansion of these techniques to additional border sectors is warranted.

### B. Deterring Alien Smuggling

This Administration has had success deterring large ship-based smuggling directly to United States shores. In response, smugglers are testing new routes and tactics. Our goal: similar success in choking off these attempts by adjusting our anti-smuggling initiatives to anticipate shifting smuggling patterns.

To meet new and continuing challenges posed along transport routes and in foreign locations by smuggling organizations, we will augment diplomatic and enforcement resources at overseas locations to work with host governments, and increase related intelligence gathering efforts.

The Departments of State and Justice, in cooperation with other relevant agencies, will report to the National Security Council within 30 days on the structure of interagency coordination to achieve these objectives.

Congressional action will be important to provide U.S. law enforcement agencies with needed authority to deal with international smuggling operations. I will propose that the Congress pass legislation providing wiretap authority for investigation of alien smuggling cases and providing authorization to seize the assets of groups engaged in trafficking in human cargo.

In addition, I will propose legislation to give the Attorney General authority to implement procedures for expedited exclusion to deal with large flows of undocumented migrants, smuggling operations, and other extraordinary migration situations.

**C. Visa Overstay Deterrence**

Nearly half of this country's illegal immigrants come into the country legally and then stay after they are required by law to depart, often using fraudulent documentation. No Administration has ever made a serious effort to identify and deport these individuals. This Administration is committed to curtailing this form of illegal immigration.

Therefore, relevant departments and agencies are directed to review their policies and practices to identify necessary reforms to curtail visa overstayers and to enhance investigations and prosecution of those who fraudulently produce or misuse passports, visas, and other travel related documents. Recommendations for administrative initiatives and legislative reform shall be presented to the White House Interagency Working Group on Immigration by June 30, 1995.

**REDUCING THE MAGNET OF WORK OPPORTUNITIES, WORKSITE ENFORCEMENT, AND DETERRENCE**

Border deterrence cannot succeed if the lure of jobs in the United States remains. Therefore, a second major component of the Administration's deterrence strategy is to toughen worksite enforcement and employer sanctions. Employers who hire illegal immigrants not only obtain unfair competitive advantage over law-abiding employers, their unlawful use of illegal immigrants suppresses wages and working conditions for our country's legal workers. Our strategy, which targets enforcement efforts at employers and industries that historically have relied upon employment of illegal immigrants, will not only strengthen deterrence of illegal immigration, but better protect American workers and businesses that do not hire illegal immigrants.

Central to this effort is an effective, nondiscriminatory means of verifying the employment authorization of all new employees. The Administration fully supports the recommendation of the Commission on Legal Immigration Reform to create pilot projects to test various techniques for improving workplace verification, including a computer database test to validate a new worker's social security number for work authorization purposes. The Immigration and Naturalization Service (INS) and Social Security Administration are directed to establish, implement, monitor, and review the pilots and provide me with an interim report on the progress of this program by March 1, 1996.

In addition, the INS is directed to finalize the Administration's reduction of the number of authorized documents to support work verification for noncitizens. Concurrently, the Administration will seek further reduction legislatively in the number of documents that are acceptable for proving identity and work authorization. The Administration will improve the security of existing documents to be used for work authorization and seek increased penalties for immigration fraud, including fraudulent production and use of documents.

The Department of Labor shall intensify its investigations in industries with patterns of labor law violations that promote illegal immigration.

I also direct the Department of Labor, INS, and other relevant Federal agencies to expand their collaboration in cracking down on those who subvert fair competition by hiring illegal aliens. This may include increased Federal authority to confiscate assets that are the fruits of that unfair competition.

The White House Interagency Working Group on Immigration shall further examine the link between immigration and employment, including illegal immigration, and recommend to me other appropriate measures.

## DETENTION AND REMOVAL OF DEPORTABLE ILLEGAL ALIENS

The Administration's deterrence strategy includes strengthening the country's detention and deportation capability. No longer will criminals and other high risk deportable aliens be released back into communities because of a shortage of detention space and ineffective deportation procedures.

### A. Comprehensive Deportation Process Reform

The Department of Justice, in consultation with other relevant agencies, shall develop a streamlined, fair, and effective procedure to expedite removal of deportable aliens. As necessary, additional legislative authority will be sought in this area. In addition, the Department of Justice shall increase its capacity to staff deportation and exclusion hearings to support these objectives.

### B. National Detention and Removal Plan

To address the shortage of local detention space for illegal aliens, the Administration shall devise a National Detention, Transportation, and Removal Policy that will permit use of detention space across the United States and improve the ability to remove individuals with orders of deportation. The Department of Justice, in consultation with other agencies as appropriate and working under the auspices of the White House Interagency Working Group on Immigration, shall finalize this plan by April 30, 1995.

The Administration will seek support and funding from the Congress for this plan and for our efforts to double the removal of illegal aliens with final orders of deportation.

### C. Identification and Removal of Criminal Aliens

The Institutional Hearing Program is successfully expediting deportation of incarcerated criminal aliens after they serve their sentences.

To further expedite removal of criminal aliens from this country and reduce costs to Federal and State governments, the Department of Justice is directed to develop an expanded program of verification of the immigration status of criminal aliens within our country's prisons. In developing this program, the viability of expanding the work of the Law Enforcement Support Center should be assessed and all necessary steps taken to increase coordination and cooperative efforts with State, and local law enforcement officers in identification of criminal aliens.

## TARGETED DETERRENCE AREAS

Many of the Administration's illegal immigration enforcement initiatives are mutually reinforcing. For example, strong interior enforcement supports border control. While there have been efforts over the years at piecemeal cooperation, this Administration will examine, develop, and test a more comprehensive coordinated package of deterrence strategies in selected metropolitan areas by multiple Federal, State, and local agencies.

The White House Interagency Working Group on Immigration shall coordinate the development of this interagency and intergovernmental operation.

**VERIFICATION OF ELIGIBILITY FOR BENEFITS**

The law denies most government benefits to illegal aliens. The government has a duty to assure that taxpayer-supported public assistance programs are not abused. As with work authorization, enforcement of eligibility requirements relies upon a credible system of verification. The INS, working with the White House Interagency Working Group on Immigration as appropriate, shall review means of improving the existing benefits verification program. In addition, we will seek new mechanisms--including increased penalties for false information used to qualify for benefits--to protect the integrity of public programs.

**ANTI-DISCRIMINATION**

Our efforts to combat illegal immigration must not violate the privacy and civil rights of legal immigrants and U.S. citizens. Therefore, I direct the Attorney General, the Secretary of Health and Human Services, the Chair of the Equal Employment Opportunity Commission, and other relevant Administration officials to vigorously protect our citizens and legal immigrants from immigration-related instances of discrimination and harassment. All illegal immigration enforcement measures shall be taken with due regard for the basic human rights of individuals and in accordance with our obligations under applicable international agreements.

**ASSISTANCE TO STATES**

States today face significant costs for services provided to illegal immigrants as a result of failed policies of the past. Deterring illegal immigration is the best long-term solution to protect States from growing costs for illegal immigration. This is the first Administration to address this primary responsibility squarely. We are targeting most of our Federal dollars to those initiatives that address the root causes that lead to increased burdens on States.

The Federal Government provides States with billions of dollars to provide for health care, education, and other services and benefits for immigrants. This Administration is proposing increases for immigration and immigration-related spending of 25 percent in 1996 compared to 1993 levels. In addition, this Administration is the first to obtain funding from the Congress to reimburse States for a share of the costs of incarcerated illegal aliens.

This Administration will continue to work with States to obtain more Federal help for certain State costs and will oppose inappropriate cost-shifting to the States.

**INTERNATIONAL COOPERATION**

This Administration will continue to emphasize international cooperative efforts to address illegal immigration.

Pursuant to a Presidential Review Directive (PRD), the Department of State is now coordinating a study on United States policy toward international refugee and migration affairs. I hereby direct that, as part of that PRD process, this report to the National Security Council include the relationship of economic development and migration in the Western Hemisphere and, in particular, provide recommendations for further foreign economic policy measures to address causes of illegal immigration.

The Department of State shall coordinate an interagency effort to consider expanded arrangements with foreign governments for return of criminal and deportable aliens.

The Department of State also shall seek to negotiate readmission agreements for persons who could have sought asylum in the last country from which they arrived. Such agreements will take due regard of U.S. obligations under the Protocol Relating to the Status of Refugees.

The Department of State further shall implement cooperative efforts with other nations receiving smuggled aliens or those used as transshipment points by smugglers. In particular, we will look to countries in our hemisphere to join us by denying their territory as bases for smuggling operations.

The Department of State shall initiate negotiations with foreign countries to secure authority for the United States Coast Guard to board source country vessels suspected of transporting smuggled aliens.

This directive shall be published in the **Federal Register.**

William J. Clinton

## DETERMINATION OF PRESIDENT

### Immigration Emergency Resulting From Alien Smuggling

Presidential Determinations regarding the immigration emergency resulting from alien smuggling were contained in the following:

Presidential Determination No. 97-16, Feb. 12, 1997, 62 F.R. 13981.

Presidential Determination No. 95-49, Sept. 28, 1995, 60 F.R. 53677.

Notes of Decisions (3831)

Footnotes

1    So in original. The words "the alien" probably should not appear.

2    So in original. Probably should be followed by "; or".

3    So in original. Probably should be preceded by "is".

4    So in original. Probably should be followed by a semicolon.

5    So in original. The phrase "of such section" probably should not appear.

8 U.S.C.A. § 1101, 8 USCA § 1101
Current through P.L. 119-36. Some statute sections may be more current, see credits for details.

 KeyCite Yellow Flag
Proposed Legislation

United States Code Annotated
  Title 8. Aliens and Nationality (Refs & Annos)
    Chapter 14. Restricting Welfare and Public Benefits for Aliens
      Subchapter II. Eligibility for State and Local Public Benefits Programs

8 U.S.C.A. § 1623

## § 1623. Limitation on eligibility for preferential treatment of aliens not lawfully present on basis of residence for higher education benefits

Currentness

**(a) In general**

Notwithstanding any other provision of law, an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident.

**(b) Effective date**

This section shall apply to benefits provided on or after July 1, 1998.

**CREDIT(S)**

(Pub.L. 104-208, Div. C, Title V, § 505, Sept. 30, 1996, 110 Stat. 3009-672.)

Notes of Decisions (10)

8 U.S.C.A. § 1623, 8 USCA § 1623
Current through P.L. 119-36. Some statute sections may be more current, see credits for details.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
 Education Code (Refs & Annos)
  Title 3. Higher Education
   Subtitle A. Higher Education in General
    Chapter 54. Tuition and Fees (Refs & Annos)
     Subchapter B. Tuition Rates (Refs & Annos)

V.T.C.A., Education Code § 54.0501

## § 54.0501. Definitions

Currentness

In this subchapter:

(1) "Census date" means the date in an academic term on which an institution of higher education is required to certify a student's enrollment to the coordinating board for purposes of determining formula funding for the institution.

(2) "Dependent" means a person who:

   (A) is less than 18 years of age and has not been emancipated by marriage or court order; or

   (B) as provided by coordinating board rule, is eligible to be claimed as a dependent of a parent of the person for purposes of determining the parent's income tax liability under the Internal Revenue Code of 1986.

(3) "Domicile" means a person's principal, permanent residence to which the person intends to return after any temporary absence.

(4) "Nonresident tuition" means the amount of tuition paid by a person who is not a resident of this state and who is not entitled or permitted to pay resident tuition under this subchapter.

(5) "Parent" means a natural or adoptive parent, managing or possessory conservator, or legal guardian of a person.

(6) "Residence" means a person's home or other dwelling place.

(7) "Resident tuition" means the amount of tuition paid by a person who is a resident of this state.

**Credits**

Added by Acts 2005, 79th Leg., ch. 888, § 2, eff. Sept. 1, 2005.

Notes of Decisions (1)

V. T. C. A., Education Code § 54.0501, TX EDUC § 54.0501
Current through the end of the 2025 Regular, First Called and Chapters 2 through 4 of the Second Called Sessions of the 89th Legislature.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.


KeyCite Yellow Flag

Unconstitutional or PreemptedLimited on Preemption Grounds by United States v. Texas, N.D.Tex., June 04, 2025

Vernon's Texas Statutes and Codes Annotated
 Education Code (Refs & Annos)
  Title 3. Higher Education
   Subtitle A. Higher Education in General
    Chapter 54. Tuition and Fees (Refs & Annos)
     Subchapter B. Tuition Rates (Refs & Annos)

V.T.C.A., Education Code § 54.051

# § 54.051. Tuition Rates

Currentness

(a) In this section:

(1) "Coordinating board" means the Texas Higher Education Coordinating Board.

(2) "General academic teaching institution" has the meaning assigned by Section 61.003(3) of this code.

(3) "Medical and dental unit" has the meaning assigned by Section 61.003 of this code.

(4) "Public junior college" has the meaning assigned by Section 61.003(2) of this code.

(b) The governing board of each institution of higher education and of the Texas State Technical College System shall cause to be collected from students registering at the institution tuition or registration fees at the rates prescribed in this section.

(c) Unless a different rate is specified by this section, tuition for a resident student at a general academic teaching institution is $50 per semester credit hour.

(d) Unless a different rate is specified by this section, tuition for a nonresident student at a general academic teaching institution or medical and dental unit is an amount per semester credit hour equal to the average of the nonresident undergraduate tuition charged to a resident of this state at a public state university in each of the five most populous states other than this state, as computed by the coordinating board under this subsection. The coordinating board shall set the tuition rate provided by this subsection for each academic year and report that rate to each appropriate institution not later than January 1 of the calendar year in which the academic year begins, or as soon after that January 1 as practicable. In computing the tuition rate, the coordinating board shall use the nonresident tuition rates for the other states in effect for the academic year in progress when the board makes the computation.

(e) Tuition for a resident student registered only for thesis or dissertation credit that is the final credit hour requirement for the degree in progress is determined by the governing board of the institution in which the student is enrolled.

(f) Tuition for a resident student enrolled in a program leading to an M.D. or D.O. degree is $6,550 per academic year. Tuition for a nonresident student enrolled in a program leading to an M.D. or D.O. degree is an amount per year equal to three times the rate that a resident student enrolled in a program leading to an M.D. or D.O. degree would pay during the corresponding academic year.

(g) Tuition for a resident student enrolled in a program leading to a D.D.S. degree is $5,400 per academic year. Tuition for a nonresident student enrolled in program leading to a D.D.S. degree is an amount per year equal to three times the rate that a resident student enrolled in a program leading to a D.D.S. degree would pay during the corresponding academic year.

(h) Tuition for a resident student enrolled in a program leading to a D.V.M. degree is $5,400 per academic year. Tuition for a nonresident student enrolled in a program leading to a D.V.M. degree is an amount per year equal to three times the rate that a resident student enrolled in a program leading to a D.V.M. degree would pay during the corresponding academic year.

(i) Tuition for a resident student registered at a law school is $80 per semester credit hour. Tuition for a nonresident student registered at a law school is the amount that can be charged a nonresident graduate student under Subsection (d) and Section 54.008.

(j) Tuition for a student registered in a program leading to a degree in nursing or in an allied health profession is the same as for students with the same residency registered at a general academic teaching institution.

(k) Tuition for a resident student registered at the Texas State Technical College System is the greater of $50 or an amount set by the governing board of the system at not less than $16 per semester credit hour. Tuition for a nonresident student registered at the Texas State Technical College System is an amount set by the governing board of the system at not less than $80 per semester credit hour.

(l) Resident students or nonresident students registered for a course or courses in art, architecture, drama, speech, or music, where individual coaching or instruction is the usual method of instruction, shall pay a fee, in addition to the regular tuition, set by the governing board of the institution.

(m) Unless the student establishes residency or is entitled or permitted to pay resident tuition as provided by this subchapter, tuition for a student who is a citizen of any country other than the United States of America is the same as the tuition required of other nonresident students.

(n) Tuition for a resident student registered in a public junior college is determined by the governing board of each institution, but the tuition may not be less than $8 for each semester credit hour and may not total less than $25 for a semester. Tuition for a nonresident student is determined by the governing board of each institution but the tuition may not be less than $200 for each semester.

(o) Renumbered as V.T.C.A., Education Code § 54.063 and amended by Acts 1985, 69th Leg., ch. 708, § 8, eff. Aug. 26, 1985.

(p) Renumbered as V.T.C.A., Education Code § 54.064 and amended by Acts 1985, 69th Leg., ch. 708, § 9, eff. Aug. 26, 1985.

**Credits**

Acts 1971, 62nd Leg., p. 3072, ch. 1024, art. 1, § 1, eff. Sept. 1, 1971. Amended by Acts 1971, 62nd Leg., p. 3352, ch. 1024, art. 2, § 29, eff. Sept. 1, 1971; Acts 1973, 63rd Leg., p. 88, ch. 51, § 8, eff. Aug. 27, 1973; Acts 1975, 64th Leg., p. 1358, ch. 515, §§ 1, 2, eff. June 19, 1975; Acts 1975, 64th Leg., p. 2326, ch. 720, § 2, eff. Sept. 1, 1975; Acts 1979, 66th Leg., p. 1382, ch. 617, § 1, eff. Aug. 27, 1979; Acts 1984, 68th Leg., 2nd C.S., ch. 31, art. 10, § 1; Acts 1985, 69th Leg., ch. 708, §§ 1, 8, 9, eff. Aug. 26, 1985; Acts 1991, 72nd Leg., ch. 287, § 26, eff. Sept. 1, 1991; Acts 1991, 72nd Leg., 1st C.S., ch. 5, § 6.01, eff. Sept. 1, 1992; Acts 1995, 74th Leg., ch. 451, § 2, eff. Aug. 28, 1995; Acts 1997, 75th Leg., ch. 1073, § 1.02, eff. Aug. 1, 1997; Acts 2001, 77th Leg., ch. 655, § 2, eff. Sept. 1, 2001; Acts 2001, 77th Leg., ch. 1392, § 1, eff. June 16, 2001; Acts 2005, 79th Leg., ch. 888, § 6, eff. Sept. 1, 2005.

**Editors' Notes**

**VALIDITY**

<For validity of this section, see United States v. Tex., No. 7:25-CV-00055-O, 2025 WL 2423900 (N.D. Tex. Aug. 15, 2025).>

Notes of Decisions (37)

V. T. C. A., Education Code § 54.051, TX EDUC § 54.051
Current through the end of the 2025 Regular, First Called and Chapters 2 through 4 of the Second Called Sessions of the 89th Legislature.

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag

Unconstitutional or PreemptedLimited on Preemption Grounds by United States v. Texas, N.D.Tex., June 04, 2025

KeyCite Yellow Flag

Proposed Legislation

Vernon's Texas Statutes and Codes Annotated

    Education Code (Refs & Annos)

        Title 3. Higher Education

           Subtitle A. Higher Education in General

               Chapter 54. Tuition and Fees (Refs & Annos)

                    Subchapter B. Tuition Rates (Refs & Annos)

V.T.C.A., Education Code § 54.052

# § 54.052. Determination of Resident Status

Currentness

(a) Subject to the other applicable provisions of this subchapter governing the determination of resident status, the following persons are considered residents of this state for purposes of this title:

(1) a person who:

(A) established a domicile in this state not later than one year before the census date of the academic term in which the person is enrolled in an institution of higher education; and

(B) maintained that domicile continuously for the year preceding that census date;

(2) a dependent whose parent:

(A) established a domicile in this state not later than one year before the census date of the academic term in which the dependent is enrolled in an institution of higher education; and

(B) maintained that domicile continuously for the year preceding that census date; and

(3) a person who:

(A) graduated from a public or private high school in this state or received the equivalent of a high school diploma in this state; and

(B) maintained a residence continuously in this state for:

(i) the three years preceding the date of graduation or receipt of the diploma equivalent, as applicable; and

(ii) the year preceding the census date of the academic term in which the person is enrolled in an institution of higher education.

(b) For purposes of this section, the domicile of a dependent's parent is presumed to be the domicile of the dependent unless the person establishes eligibility for resident status under Subsection (a)(3).

**Credits**
Added by Acts 2005, 79th Leg., ch. 888, § 3, eff. Sept. 1, 2005.

**Editors' Notes**

### VALIDITY

<For validity of this section, see United States v. Tex., No. 7:25-CV-00055-O, 2025 WL 2423900 (N.D. Tex. Aug. 15, 2025).>

Notes of Decisions (19)

V. T. C. A., Education Code § 54.052, TX EDUC § 54.052
Current through the end of the 2025 Regular, First Called and Chapters 2 through 4 of the Second Called Sessions of the 89th Legislature.

**End of Document**                           © 2025 Thomson Reuters. No claim to original U.S. Government Works.


KeyCite Yellow Flag
Proposed Legislation

Vernon's Texas Statutes and Codes Annotated
  Education Code (Refs & Annos)
    Title 3. Higher Education
      Subtitle A. Higher Education in General
        Chapter 54. Tuition and Fees (Refs & Annos)
          Subchapter B. Tuition Rates (Refs & Annos)

V.T.C.A., Education Code § 54.053

## § 54.053. Information Required to Establish Resident Status

Currentness

A person shall submit the following information to an institution of higher education to establish resident status under this subchapter:

  (1) if the person applies for resident status under Section 54.052(a)(1):

    (A) a statement of the dates and length of time the person has resided in this state, as relevant to establish resident status under this subchapter; and

    (B) a statement by the person that the person's presence in this state for that period was for a purpose of establishing and maintaining a domicile;

  (2) if the person applies for resident status under Section 54.052(a)(2):

    (A) a statement of the dates and length of time any parent of the person has resided in this state, as relevant to establish resident status under this subchapter; and

    (B) a statement by the parent or, if the parent is unable or unwilling to provide the statement, a statement by the person that the parent's presence in this state for that period was for a purpose of establishing and maintaining a domicile; or

  (3) if the person applies for resident status under Section 54.052(a)(3):

    (A) a statement of the dates and length of time the person has resided in this state, as relevant to establish resident status under this subchapter; and

(B) if the person is not a citizen or permanent resident of the United States, an affidavit stating that the person will apply to become a permanent resident of the United States as soon as the person becomes eligible to apply.

**Credits**

Added by Acts 2005, 79th Leg., ch. 888, § 3, eff. Sept. 1, 2005.

Notes of Decisions (2)

V. T. C. A., Education Code § 54.053, TX EDUC § 54.053
Current through the end of the 2025 Regular, First Called and Chapters 2 through 4 of the Second Called Sessions of the 89th Legislature.

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Federal Rules of Civil Procedure for the United States District Courts (Refs & Annos)
    Title IV. Parties

Federal Rules of Civil Procedure Rule 24

# Rule 24. Intervention

Currentness

**(a) Intervention of Right.** On timely motion, the court must permit anyone to intervene who:

**(1)** is given an unconditional right to intervene by a federal statute; or

**(2)** claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

**(b) Permissive Intervention.**

**(1)** *In General.* On timely motion, the court may permit anyone to intervene who:

**(A)** is given a conditional right to intervene by a federal statute; or

**(B)** has a claim or defense that shares with the main action a common question of law or fact.

**(2)** *By a Government Officer or Agency.* On timely motion, the court may permit a federal or state governmental officer or agency to intervene if a party's claim or defense is based on:

**(A)** a statute or executive order administered by the officer or agency; or

**(B)** any regulation, order, requirement, or agreement issued or made under the statute or executive order.

**(3)** *Delay or Prejudice.* In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.

**(c) Notice and Pleading Required.** A motion to intervene must be served on the parties as provided in Rule 5. The motion must state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which intervention is sought.

**CREDIT(S)**

(Amended December 27, 1946, effective March 19, 1948; December 29, 1948, effective October 20, 1949; January 21, 1963, effective July 1, 1963; February 28, 1966, effective July 1, 1966; March 2, 1987, effective August 1, 1987; April 30, 1991, effective December 1, 1991; April 12, 2006, effective December 1, 2006; April 30, 2007, effective December 1, 2007.)

<**Amendments received through April 1, 2025**>

**ADVISORY COMMITTEE NOTES**

1937 Adoption

The right to intervene given by the following and similar statutes is preserved, but the procedure for its assertion is governed by this rule:

U.S.C., Title 28 former sections:

     45a [now 2323] (Special attorneys; participation by Interstate Commerce Commission; intervention) (in certain cases under interstate commerce laws)

     48 [now 2322] (Suits to be against United States; intervention by United States)

     401 [now 2403] (Intervention by United States; constitutionality of Federal statute)

U.S.C., Title 40:

     276a-2(b) [now 3162(a)(2)] (Bonds of contractors for public buildings or works; rights of persons furnishing labor and materials).

Compare with the last sentence of [former] Equity Rule 37 (Parties Generally--Intervention). This rule amplifies and restates the present federal practice at law and in equity. For the practice in admiralty see Admiralty Rules 34 (How Third Party May Intervene) and 42 (Claims Against Proceeds in Registry). See generally Moore and Levi, *Federal Intervention: I The Right to Intervene and Reorganization* (1936), 45 Yale L.J. 565. Under the codes two types of intervention are provided, one for the recovery of specific real or personal property (2 Ohio Gen.Code Ann. (Page, 1926) § 11263; Wyo.Rev.Stat.Ann. (Courtright, 1931) § 89-522), and the other allowing intervention generally when the applicant has an interest in the matter in litigation (1 Colo.Stat.Ann. (1935) Code Civ.Proc. § 22; La.Code Pract. (Dart, 1932) Arts. 389-394; Utah Rev.Stat.Ann. (1933) § 104-3-24). The English intervention practice is based upon various rules and decisions and falls into the two categories of absolute right and discretionary right. For the absolute right see *English Rules Under the Judicature Act* (The Annual Practice, 1937) O. 12, r. 24 (admiralty), r. 25 (land), r. 23 (probate); O. 57, r. 12 (execution); J.A. (1925) §§ 181, 182, 183(2) (divorce); *In re Metropolitan Amalgamated Estates, Ltd.,* (1912) 2 Ch. 497 (receivership); *Wilson v. Church,* 9 Ch.D. 552 (1878) (representative action). For the discretionary right see O. 16, r. 11 (non-joinder) and *Re Fowler,* 142 L.T.Jo. 94 (Ch.1916), *Vavasseur v. Krupp,* 9 Ch.D. 351 (1878) (persons out of the jurisdiction).

**1946 Amendment**

**Note. Subdivision (a).** The addition to subdivision (a)(3) covers the situation where property may be in the actual custody of some other officer or agency--such as the Secretary of the Treasury--but the control and disposition of the property is lodged in the court wherein the action is pending.

**Subdivision (b).** The addition in subdivision (b) permits the intervention of governmental officers or agencies in proper cases and thus avoids exclusionary constructions of the rule. For an example of the latter, see *Matter of Bender Body Co.,* Ref. Ohio 1941, 47 F.Supp. 224, holding that the Administrator of the Office of Price Administration, then acting under the authority of an Executive Order of the President, could not intervene in a bankruptcy proceeding to protest the sale of assets above ceiling prices. Compare, however, *Securities and Exchange Commission v. United States Realty & Improvement Co.,* 1940, 310 U.S. 434, 60 S.Ct. 1044, where permissive intervention of the Commission to protect the public interest in an arrangement proceeding under Chapter XI of the Bankruptcy Act was upheld. See also dissenting opinion in *Securities and Exchange Commission v. Long Island Lighting Co.,* C.C.A.2d 1945, 148 F.2d 252, judgment vacated as moot and case remanded with direction to dismiss complaint, 1945, 325 U.S. 833, 65 S.Ct. 1085. For discussion see Commentary, *Nature of Permissive Intervention Under Rule 24b,* 1940, 3 Fed.Rules Serv. 704; Berger, *Intervention by Public Agencies in Private Litigation in the Federal Courts,* 1940, 50 Yale L.J. 65.

Regarding the construction of subdivision (b)(2), see *Allen Calculators, Inc. v. National Cash Register Co.,* 1944, 64 S.Ct. 905, 322 U.S. 137, 88 L.Ed. 1188.

**1948 Amendment**

The amendment substitutes the present statutory reference.

**1963 Amendment**

This amendment conforms to the amendment of Rule 5(a). See the Advisory Committee's Note to that amendment.

**1966 Amendment**

In attempting to overcome certain difficulties which have arisen in the application of present Rule 24(a)(2) and (3), this amendment draws upon the revision of the related Rules 19 (joinder of persons needed for just adjudication) and 23 (class actions), and the reasoning underlying that revision.

Rule 24(a)(3) as amended in 1948 provided for intervention of right where the applicant established that he would be adversely affected by the distribution or disposition of property involved in an action to which he had not been made a party. Significantly, some decided cases virtually disregarded the language of this provision. Thus Professor Moore states: "The concept of a fund has been applied so loosely that it is possible for a court to find a fund in almost any in personam action." 4 Moore's *Federal Practice,* par. 24.09[3], at 55 (2d ed. 1962), and see, e.g., *Formulabs, Inc. v. Hartley Pen Co.,* 275 F.2d 52 (9th Cir.1960). This development was quite natural, for Rule 24(a)(3) was unduly restricted. If an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene, and his right to do so should not depend on whether there is a fund to be distributed or otherwise disposed of. Intervention of right is here seen to be a kind of counterpart to Rule 19(a)(2)(i) on joinder of persons needed for a just adjudication: where, upon motion of a party in an action, an absentee should be joined so that he may protect his interest which as a practical matter may be substantially impaired by the disposition of the action, he ought to have a right to intervene in the action on his own motion. See Louisell & Hazard, *Pleading and Procedure: State and Federal* 749-50 (1962).

The general purpose of original Rule 24(a)(2) was to entitle an absentee, purportedly represented by a party, to intervene in the action if he could establish with fair probability that the representation was inadequate. Thus, where an action is being prosecuted or defended by a trustee, a beneficiary of the trust should have a right to intervene if he can show that the trustee's representation of his interest probably is inadequate; similarly a member of a class should have the right to intervene in a class action if he can show the inadequacy of the representation of his interest by the representative parties before the court.

Original Rule 24(a)(2), however, made it a condition of intervention that "the applicant is or may be bound by a judgment in the action," and this created difficulties with intervention in class actions. If the "bound" language was read literally in the sense of res judicata, it could defeat intervention in some meritorious cases. A member of a class to whom a judgment in a class action extended by its terms (see Rule 23(c)(3), as amended) might be entitled to show in a later action, when the judgment in the class action was claimed to operate as res judicata against him, that the "representative" in the class action had not in fact adequately represented him. If he could make this showing, the class-action judgment might be held not to bind him. See *Hansberry v. Lee,* 311 U.S. 32 (1940). If a class member sought to intervene in the class action proper, while it was still pending, on grounds of inadequacy of representation, he could be met with the argument: if the representation was in fact inadequate, he would not be "bound" by the judgment when it was subsequently asserted against him as res judicata, hence he was not entitled to intervene; if the representation was in fact adequate, there was no occasion or ground for intervention. See *Sam Fox Publishing Co. v. United States,* 366 U.S. 683 (1961); cf. *Sutphen Estates, Inc. v. United States,* 342 U.S. 19 (1951). This reasoning might be linguistically justified by original Rule 24(a)(2); but it could lead to poor results. Compare the discussion in *International M. & I. Corp. v. Von Clemm,* 301 F.2d 857 (2d Cir.1962); *Atlantic Refining Co. v. Standard Oil Co.,* 304 F.2d 387 (D.C.Cir.1962). A class member who claims that his "representative" does not adequately represent him, and is able to establish that proposition with sufficient probability, should not be put to the risk of having a judgment entered in the action which by its terms extends to him, and be obliged to test the validity of the judgment as applied to his interest by a later collateral attack. Rather he should, as a general rule, be entitled to intervene in the action.

The amendment provides that an applicant is entitled to intervene in an action when his position is comparable to that of a person under Rule 19(a)(2)(i), as amended, unless his interest is already adequately represented in the action by existing parties. The Rule 19(a)(2)(i) criterion imports practical considerations, and the deletion of the "bound" language similarly frees the rule from undue preoccupation with strict considerations of res judicata.

The representation whose adequacy comes into question under the amended rule is not confined to formal representation like that provided by a trustee for his beneficiary or a representative party in a class action for a member of the class. A party to an action may provide practical representation to the absentee seeking intervention although no such formal relationship exists between them, and the adequacy of this practical representation will then have to be weighed. See *International M. & I. Crop. v. Von Clemm,* and *Atlantic Refining Co. v. Standard Oil Co.,* both supra; *Wolpe v. Poretsky,* 144 F.2d 505 (D.C.Cir.1944), cert. denied, 323 U.S. 777 (1944); cf. *Ford Motor Co. v. Bisanz Bros.,* 249 F.2d 22 (8th Cir.1957); and generally, Annot., 84 A.L.R.2d 1412 (1961).

An intervention of right under the amended rule may be subject to appropriate conditions or restrictions responsive among other things to the requirements of efficient conduct of the proceedings.

1987 Amendment

The amendments are technical. No substantive change is intended.

1991 Amendment

Language is added to bring Rule 24(c) into conformity with the statute cited, resolving some confusion reflected in district court rules. As the text provides, counsel challenging the constitutionality of legislation in an action in which the appropriate government is not a party should call the attention of the court to its duty to notify the appropriate governmental officers. The statute imposes the burden of notification on the court, not the party making the constitutional challenge, partly in order to protect against any possible waiver of constitutional rights by parties inattentive to the need for notice. For this reason, the failure of a party to call the court's attention to the matter cannot be treated as a waiver.

2006 Amendment

New Rule 5.1 replaces the final three sentences of Rule 24(c), implementing the provisions of 28 U.S.C. § 2403. Section 2403 requires notification to the Attorney General of the United States when the constitutionality of an Act of Congress is called in question, and to the state attorney general when the constitutionality of a state statute is drawn into question.

2007 Amendment

The language of Rule 24 has been amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only.

The former rule stated that the same procedure is followed when a United States statute gives a right to intervene. This statement is deleted because it added nothing.

Notes of Decisions (2557)

**O'CONNOR'S CROSS REFERENCES**
**O'Connor's Federal Rules Civil Trials:**

See ***O'Connor's Federal Rules***, "Motion to Intervene," ch. 5-J, §1 et seq.; ***O'Connor's Federal Civil Forms***, FORMS 5J:1 et seq.

**O'CONNOR'S ANNOTATIONS**

*Generally*

*Moses v. City of Perry*, 90 F.4th 501, 505 (6th Cir.2024). "'[A] plaintiff may dismiss an action without a court order by filing … a stipulation of dismissal signed by all parties who have appeared.' [¶] But a nonparty does not become a 'party' under [FRCP] 41 as soon as it moves to intervene. '[W]hen the term [to intervene] is used in reference to legal proceedings, it covers the right of one to interpose in, or *become a party to*, a proceeding already instituted.' So a nonparty does not become a party until the district court grants the motion to intervene. [¶] The text of the [FRCPs] is consistent with this understanding of the term 'party.' [FRCP] 24 … uses 'existing parties,' 'original parties,' and 'parties' interchangeably, and as a different category from proposed intervenors. For intervention of right, 'existing parties' must not adequately represent the proposed intervenor's interest. For permissive intervention, the court must consider prejudice to 'the original parties' rights.' And would-be intervenors must serve their motion to intervene on 'the parties.' That same rule refers to the proposed intervenor as 'the movant' or 'anyone.'" Held: Stipulation of dismissal was effective without proposed intervenor signing it.

*In re Brewer*, 863 F.3d 861, 868 (D.C.Cir.2017). "[W]e must determine the effect of a stipulated dismissal upon a subsequent motion for intervention for the purposes of appealing. [¶] A stipulated dismissal is 'effective automatically' upon filing and requires no further action on behalf of a district court in order to constitute a final judgment, ripe for appeal. *At 869:* Some Circuits have reasoned the 'jurisdiction-stripping' effect of a stipulated dismissal precludes a district court from taking further action on motions made after, or even before, the dismissal. Those decisions suggest that upon the stipulated or voluntary dismissal of the current parties' claims, a court may lack jurisdiction to review a non-party's motion for intervention. [¶] In our view, a stipulated dismissal, aside from its immediate effectiveness, is no different in jurisdictional effect from a dismissal by court order…. [¶] Several Circuits have framed the jurisdictional effect of a stipulated dismissal in sweeping terms, … but none has suggested that effect is unique to a stipulated dismissal, as opposed to a court-ordered dismissal…. Nor is there anything in [FRCP] 41(a)(1)(A)(ii) (stipulated dismissals), or in the remainder of Rule 41 (dismissals in general), that suggests a stipulated dismissal is in any way jurisdictionally unique. *At 870:* For these reasons, we conclude that mootness, albeit accelerated by the immediacy of a stipulated dismissal, is what gives a dismissal pursuant to Rule 41(a)(1)(A)(ii) its jurisdictional effect. And if a motion to intervene can survive a case becoming otherwise moot, then so too can a motion to intervene survive a stipulated dismissal."

***National Parks Conserv. Ass'n v. U.S. EPA***, 759 F.3d 969, 973-74 (8th Cir.2014). "The … issue is what information should a court consider when assessing a motion to intervene and how should that information be considered. [T]he court should [focus] on the [plaintiffs'] complaint and the allegations in [the prospective intervenor's] motion to intervene. [¶] A court ruling on a motion to intervene must accept as true all material allegations in the motion to intervene and must construe the motion in favor of the prospective intervenor. … When the allegations in the underlying controversy are relevant [to intervention,] the court should focus its attention on the pleadings…. Viewing the complaint holistically, the court should assume the plaintiff will receive the relief it seeks and, from that assumption, assess the sufficiency of the prospective intervenor's motion. [¶] Allowing litigants to defeat a motion to intervene by expanding or constricting the scope of a lawsuit through allegations at a motion hearing or arguments in a brief would promote gamesmanship and create uncertainty for prospective intervenors. … By contrast, when a court focuses its intervention analysis on the underlying pleadings, it provides a prospective intervenor a stable source to determine whether intervention is prudent."

***U.S. v. City of Detroit***, 712 F.3d 925, 931-32 (6th Cir.2013). "[C]ourts are not faced with an all-or-nothing choice between grant or denial [of intervention]: Rule 24 also provides for limited-in-scope intervention. [C]ourts often permit intervention even after final judgment, for the limited purpose of appeal, … or to participate in future remedial proceedings…. Intervention may also be limited to 'claims raised by the original parties,' subject to a bar to raising 'collateral issues.' [¶] Limited intervention is particularly appropriate in fact-specific situations … where the case is complicated, non-adversarial, and implicates the public interest; getting all interested parties to the table promotes an effective and fair solution, but preventing an expansion of the scope is necessary to keep control of the case."

***Disability Advocates, Inc. v. New York Coalition for Quality Assisted Living, Inc.***, 675 F.3d 149, 160 (2d Cir.2012). "[I]f jurisdiction is lacking at the commencement of a suit, it cannot be aided by the intervention of a plaintiff with a sufficient claim. [¶] That is, Rule 24 does not itself provide a basis for jurisdiction. *At 161:* [But a district court has] discretion to treat the pleading of an intervenor as a separate action … to adjudicate the claims raised by the intervenor even if the underlying claim [is] jurisdictionally deficient [as long as] the intervention [has] occurred before any action by the defendants [has] been taken. [¶] [H]owever, [permitting] interven[tion] *after the trial had concluded* … would allow the … exception (that curative interventions be construed as separate actions when they are effected at the beginning of the proceedings) to swallow the clearly-established constitutional rule that intervention cannot cure any jurisdictional defect that would have barred the federal court from hearing the original action. [¶] The relevant question … is not whether the curative intervenor is prepared to take the case 'as he finds it' for the sake of judicial economy, but rather, whether he entered sufficiently early in the litigation to ensure that parties invoking the court's jurisdiction have alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult questions." (Internal quotes omitted.)

***In re Bayshore Ford Trucks Sales, Inc.***, 471 F.3d 1233, 1246 (11th Cir.2006). "Once a court grants intervention, whether of right or by permission, the 'intervenor is treated as if [it] were an original party and has equal standing with the original parties.' Toward that end, both Rule 24(a) and Rule 24(b) require the prospective intervenor to anchor its request in the dispute giving rise to the pending lawsuit. The prospective intervenor must demonstrate 'an interest relating to the property or transaction which is *the subject of the action*' if relying on Rule 24(a), or it must show that its 'claim or defense and *the main action* have a question of law or fact in common' if relying on Rule 24(b). In either case, the plain language of Rule 24 requires the intervenor's interest to be based on the action pending before the court."

### Intervention of Right

***Town of Chester v. Laroe Estates, Inc.***, 581 U.S. 433, 435 (2017). "Must a litigant possess Article 3 standing … to intervene of right under [FRCP] 24(a)(2)? *At 440:* [A]n intervenor of right must have Article 3 standing in order to pursue relief that is different from that which is sought by a party with standing. That includes cases in which both the plaintiff and the intervenor seek separate money judgments in their own names."

*Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972). FRCP 24(a) "is satisfied if the applicant shows that representation of his interest 'may be' inadequate; and the burden of making that showing should be treated as minimal." *See also Berger v. North Carolina State Conf. of the NAACP*, 597 U.S. 179, 195-97 (2022).

*La Union del Pueblo Entero v. Abbott*, 29 F.4th 299, 307-08 (5th Cir.2022). Under "the inadequacy-of-representation requirement[, an applicant for intervention] 'need not show that the representation by existing parties will be, for certain, inadequate,' but instead that it *may* be inadequate. [¶] Though we have characterized this burden as 'minimal,' … to give it some 'teeth,' we have recognized 'two presumptions of adequate representation….' The first presumption arises when the intervenor 'has the same ultimate objective as a party to the lawsuit.' This presumption can be overcome by showing 'adversity of interest, collusion, or nonfeasance on the part of the existing party.' *At 308 n.6:* '[A]dversity of interest, collusion, or nonfeasance on the part of the existing party' is not an exclusive list of ways to rebut the presumption…. *At 308:* An intervenor can establish an adversity of interest if 'its interests diverge from the putative representative's interests in a manner germane to the case.' The second presumption arises when the existing party 'is a governmental body or officer charged by law with representing the interests' of the intervenor, which can be overcome by showing that the intervenor's 'interest is in fact different from that of the' governmental party 'and that the interest will not be represented by' the existing governmental party." *See also South Dakota v. U.S. Dept. of Interior*, 317 F.3d 783, 785 (8th Cir.2003) (applicant for intervention bears heavier burden to prove inadequate representation when party already in suit has obligation to represent applicant's interests); *Clark v. Putnam Cty.*, 168 F.3d 458, 461 (11th Cir.1999) (presumption of adequate representation is weak; it merely imposes upon proposed interveners burden of coming forward with some evidence to contrary).

*Texas v. U.S.*, 805 F.3d 653, 657 (5th Cir.2015). "[T]he 'interest' requirement of Rule 24(a)(2) … requires that intervenors claim an interest relating to the property or transaction that is the subject of the action. … Although there is not any clear definition of the nature of the interest that is required for intervention of right, … Rule 24(a)(2) [has been interpreted] to require a direct, substantial, legally protectable interest in the proceedings…. [¶] [T]he inquiry turns on whether the intervenor has a stake in the matter that goes beyond a generalized preference that the case come out a certain way. So, an intervenor fails to show a sufficient interest when he seeks to intervene solely for ideological, economic, or precedential reasons; that would-be intervenor merely *prefers* one outcome to the other. *At 658:* On the other hand, an interest that is concrete, personalized, and legally protectable is sufficient to support intervention. A property interest, for example, is the most elementary type of right that Rule 24(a) is designed to protect … because it is concrete, specific to the person possessing the right, and legally protectable. [¶] Although property interests are almost always adequate, … we have disclaimed the notion that a person must possess a pecuniary or property interest to satisfy the requirement of Rule 24(a)(2). Non-property interests are sufficient to support intervention when … they are concrete, personalized, and legally protectable. *At 659:* Moreover, although an asserted interest must be 'legally protectable,' it need not be legally *enforceable*. In other words, an interest is sufficient if it is of the type that the law deems worthy of protection, even if the intervenor does not have an enforceable legal entitlement or would not have standing to pursue her own claim." (Internal quotes omitted.) *See also California Dept. of Toxic Substances Control v. Jim Dobbas, Inc.*, 54 F.4th 1078, 1086-88 (9th Cir.2022); *San Juan Cty. v. U.S.*, 503 F.3d 1163, 1200-01 (10th Cir.2007).

*WildEarth Guardians v. National Park Serv.*, 604 F.3d 1192, 1198 (10th Cir.2010). "We follow 'a somewhat liberal line in allowing intervention.' The factors of Rule 24(a)(2) are intended to 'capture the circumstances in which the practical effect on the prospective intervenor justifies its participation in the litigation,' and '[t]hose factors are not rigid, technical requirements.' [¶] The *interest* element is 'a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process.' The movant's claimed interest is measured in terms of its relationship to the property or transaction that is the subject of the action, not in terms of the particular issue before the district court. *At 1199:* The second element--*impairment*--presents a minimal burden. '[A] would-be intervenor must show only that impairment of its substantial legal interest is possible if intervention is denied.' … 'We may consider any significant legal effect in the applicant's interest and we are not restricted to a rigid *res judicata* test.' *At 1200:* Finally, the *inadequate representation* element of Rule 24(a)(2) also presents a minimal burden. The movant must show only the possibility that representation may be inadequate. 'The possibility that the interests of the applicant and the parties may diverge need not be great in order to satisfy this minimal burden.'"

*California v. U.S.*, 450 F.3d 436, 441 (9th Cir.2006). "An applicant has a significant protectable interest in an action if (1) it asserts an interest that is protected under some law, and (2) there is a relationship between its legally protected interest and the plaintiff's claims." (Internal quotes omitted.) *See also Medical Liab. Mut. Ins. v. Alan Curtis LLC*, 485 F.3d 1006, 1008 (8th Cir.2007) (economic interest in outcome of litigation and interest contingent on occurrence of sequence of events are insufficient to allow intervention); *Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 366 (3d Cir.1995) (mere economic interest is insufficient to allow intervention, but interest in specific fund is sufficient).

*Liberty Mut. Ins. v. Treesdale, Inc.*, 419 F.3d 216, 230 (3d Cir.2005). "There is … a difference between [FRCP] 19 and [FRCP] 24. Although both Rules speak of the applicant's ability to protect an interest, Rule 24 contains an additional element, i.e., the adequacy of representation. … Rule 19 does not invite inquiry into the adequacy of representation. It is therefore illogical to conclude that a party who meets the joinder requirements of Rule 19(a)(2)(I) [now Rule 19(a)(1)(B)(i)] automatically qualifies to intervene as of right under Rule 24(a)(2). That interpretation would read the 'adequacy of representation' requirement out of Rule 24(a)(2) by creating a backdoor into the litigation through the less restrictive inquiry of Rule 19(a)(2)(I)."

### Permissive Intervention

*Nebraska v. Wyoming*, 515 U.S. 1, 21-22 (1995). "A state is presumed to speak in the best interests of those citizens, and requests to intervene by individual contractees may be treated under the general rule that an individual's motion for leave to intervene in this court will be denied absent a 'showing [of] some compelling interest in his own right, apart from his interest in a class with all other citizens and creatures of the state, which interest is not properly represented by the state.'"

*Arizona v. California*, 460 U.S. 605, 615 (1983). "[P]ermission to intervene does not carry with it the right to relitigate matters already determined in the case.…"

### Timing of Intervention

*Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 279-80 (2022). "Timeliness is an important consideration in deciding whether intervention should be allowed, … but '[t]imeliness is to be determined from all the circumstances,' and 'the point to which [a] suit has progressed is ... not solely dispositive.…' [¶] Here, the most important circumstance relating to timeliness is that the [applicant] sought to intervene 'as soon as it became clear' that the [applicant's] interests 'would no longer be protected' by the parties in the case. [¶] Although the litigation by that time had proceeded for years, that factor is not dispositive."

*NAACP v. New York*, 413 U.S. 345, 365-66 (1973). "Whether intervention be claimed of right or as permissive, it is … apparent, from the initial words of both Rule 24(a) and Rule 24(b), that the application must be 'timely.' If it is untimely, intervention must be denied. … Although the point to which the suit has progressed is one factor … it is not solely dispositive. Timeliness is to be determined from all the circumstances." *See also Alt v. U.S. EPA*, 758 F.3d 588, 591 (4th Cir.2014); *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 797-98 (7th Cir.2013).

*In re Efron*, 746 F.3d 30, 35 (1st Cir.2014). "The first of [the elements a putative intervenor must demonstrate]--timeliness--is the sentinel that guards the gateway to intervention. [¶] [T]imeliness involves more than merely checking off the pages of a calendar. But even though multiple factors may influence the timeliness inquiry, … the most important factor is the length of time that the putative intervenor knew or reasonably should have known that his interest was imperiled before he deigned to seek intervention. For this purpose, '[t]he passage of time is measured in relative, not absolute, terms.' 'As a case progresses toward its ultimate conclusion, the scrutiny attached to a request for intervention necessarily intensifies.' In the end, '[t]imeliness is to be gauged from all the circumstances, including the stage to which the proceedings have progressed before intervention is sought.' *At 36:* '[P]arties having knowledge of the pendency of litigation which may affect their interests sit idle at their peril.'" *See also Kalbers v. U.S. Dept. of Justice*, 22 F.4th 816, 822-23 (9th Cir.2021).

*Roane v. Leonhart*, 741 F.3d 147, 151 (D.C.Cir.2014). "The timeliness of a motion to intervene is 'to be judged in consideration of all the circumstances.' Though the 'time elapsed since the inception of the suit' is relevant, … measuring the length of time passed 'is not in itself the determinative test' … because we do not require timeliness for its own sake. Instead, the requirement of timeliness is aimed primarily at preventing potential intervenors from unduly disrupting litigation, to the unfair detriment of the existing parties. Thus, even where a would-be intervenor could have intervened sooner, in assessing timeliness a court must weigh whether any delay in seeking intervention 'unfairly disadvantage[d] the original parties.'" *See also Peruta v. County of San Diego*, 824 F.3d 919, 940 (9th Cir.2016).

Fed. Rules Civ. Proc. Rule 24, 28 U.S.C.A., FRCP Rule 24
Including Amendments Received Through 9-1-2025

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.