No. 25-10898

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

STATE OF TEXAS,

*Defendant-Appellee*,

STUDENTS FOR AFFORDABLE TUITION; LA UNION DEL PUEBLO ENTERO; AUSTIN COMMUNITY COLLEGE; OSCAR SILVA,

*Movants-Appellants*.

On Appeal from the United States District Court for the Northern District of Texas, Wichita Falls Division, No. 7:25-cv-00055, Hon. Reed O'Connor

## BRIEF FOR MOVANT-APPELLANT STUDENTS FOR AFFORDABLE TUITION

Thomas A. Saenz
Fernando Nuñez
Luis L. Lozada
MEXICAN AMERICAN LEGAL DEFENSE
AND EDUCATIONAL FUND
634 South Spring Street, Floor 11
Los Angeles, CA 90014
(213) 629-2512

*Counsel for Movant–Appellant Students for Affordable Tuition*

## CERTIFICATE OF INTERESTED PARTIES

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this court may evaluate proper disqualification or recusal.

1. Students for Affordable Tuition
2. Mexican American Legal Defense and Educational Fund (MALDEF)
3. Thomas A. Saenz
4. Fernando Nuñez
5. Luis L. Lozada
6. Nina Perales
7. United States of America
8. Andrew Marshall Bernie
9. Drew C. Ensign
10. Lauren Elizabeth Fascett
11. Daniel Bentele Hahs Tenny
12. State of Texas
13. Nathaniel Anson Plemons
14. William Francis Cole
15. Ralph Michael Molina

16. Zachary Louis Rhines

17. Ryan Daniel Walters

18. La Union del Pueblo Entero

19. Austin Community College

20. Oscar Silva

21. Lynn Pinker Hurst Schwegmann, L.L.P.

22. Andres Correa

23. Yaman Desai

24. Kyle Aaron Gardner

25. Christopher W. Patton

26. Zhenmian Xu

27. Texas Civil Rights Project

28. Zachary Dolling

29. Kassandra Gonzalez

30. Daniel Hatoum

31. Molly Petchenik

32. National Immigration Law Center

33. Marlene Nathalie Berroa Rodriguez

34. Tanya Broder

35. Efren Carlos Olivares

36. Democracy Forward

37. Simon Christopher Brewer

38. Joshua Marc Salzman

39. ACLU Foundation of Texas

40. ACLU of Texas

41. David A Donatti

42. Adriana Cecilia Pinon

43. Edgar Saldivar


*/s/ Fernando Nuñez*
Fernando Nuñez (Cal. Bar No. 327390)
*Attorney for Students for Affordable Tuition*

## STATEMENT REGARDING ORAL ARGUMENT

This appeal presents significant questions of federal preemption, constitutional law under the Tenth Amendment, and the proper application of Federal Rule of Civil Procedure 24. The procedural posture, involving the entry of a final consent judgment the same day the case was filed, and the denial, based on futility, of a motion to intervene for purposes of appeal, is complex. Oral argument would assist the Court in addressing the denial of intervention, and the merits of the underlying preemption and constitutional claims concerning the erroneous invalidation of a Texas statute that has been in effect for nearly 25 years, affecting thousands of students.

# <u>TABLE OF CONTENTS</u>

Page(s)

JURISDICTIONAL STATEMENT……………………………………………..1

ISSUES PRESENTED FOR REVIEW…………………………………………1

STATEMENT OF THE CASE………………………………………………..2

SUMMARY OF THE ARGUMENT……………………………………………6

STANDARD OF REVIEW……………………………………………………...7

ARGUMENT……………………………………………………………………8

I.      The District Court Erred in Denying SAT's Motion to Intervene……………8

   A. SAT Is Entitled to Intervene as of Right…………………………………..9

      1.  SAT's Motion to Intervene Was Timely Filed Within Seven Days After the Consent Judgment Order…………………………………………10

      2.  SAT Has a Direct, Substantial, and Legally Protectable Interest in the Proceedings……………………………………………………….13

      3.  SAT's Interests Are Impaired…………………………………………..14

      4.  Texas Does Not Adequately Represent SAT's Interests……………..16

   B. The District Court Abused its Discretion in Denying Permissive Intervention…………………………………………………………..17

   C. The District Court Erred in Denying Intervention On Grounds of "Futility"……………………………………………………………………..20

II.     The District Court's Entry of the Consent Judgment is Erroneous………….26

   A. The District Court Violated the First Amendment and Due Process by Failing to Hold a Public Hearing Concerning the Rights and Entitlements of Numerous Persons……………………………………………………27

   B. The Texas Dream Act Complies with Section 1623(a) …………………31

      1.  The Plain Language of Section 1623(a) Only Prohibits Benefits Based *Solely* on Residence……………………………………………………34

2.  The Canon of *Expressio Unius* Confirms that Section 1623(a) Does Not Preclude Benefits Here…………………………………………………36

3.  General Principles of Severability Further Confirm that Congress Did Not Intend to Preclude State Laws that Confer Benefits Based on More Than Just Residence…………………………………………………38

C.  Section 1623(a) Violates the Tenth Amendment………………………..40

1.  The Federal Government Cannot Tell the State How to Legislate…...41

2.  Section 1623(a) Improperly Intrudes on State Power Over Education by Requiring Texas to Expand Education Benefits to All U.S. Citizens…………………………………………………………………46

3.  Section 1623(a) Undermines Political Accountability and Structural Safeguards of Federalism…………………………………………………48

D.  The District Court Failed to Consider Whether the Texas Dream Act is Severable and Remains Operative……………………………………………50

CONCLUSION…………………………………………………………………...52

CERTIFICATE OF SERVICE……………………………………………………54

CERTIFICATE OF COMPLIANCE……………………………………………...55

## TABLE OF AUTHORITIES

Cases                                                                   Page(s)

*8fig, Inc. v. Stepup Funny, L.L.C.*,
  135 F.4th 285 (5th Cir. 2025) .............................................. 7, 18, 21
*Arizona v. United States*,
  567 U.S. 387 (2012) ................................................................... 41, 42
*Asadi v. G.E. Energy (USA), L.L.C.*,
  720 F.3d 620 (5th Cir. 2013) ........................................................ 34
*Astoria Fed. Sav. & Loan Ass'n v. Solimino*,
  501 U.S. 104 (1991) ....................................................................... 33
*AT&T Mobility LLC v. Concepcion*,
  563 U.S. 333 (2011) ....................................................................... 30
*Ayotte v. Planned Parenthood of N. New England*,
  546 U.S. 320 (2006) ................................................................... 50, 52
*BedRoc Ltd. v. United States*,
  541 U.S. 176 (2004) ....................................................................... 34
*Berger v. N.C. State Conference of the NAACP*,
  597 U.S. 179 (2022) ....................................................................... 17
*Bill Johnson's Rests., Inc. v. N.L.R.B.*,
  461 U.S. 731 (1983) ....................................................................... 27
*Bond v. United States*,
  564 U.S. 211 (2011) ....................................................................... 40
*Brown v. Bd. of Ed. of Topeka, Shawnee Cty., Kan.*,
  347 U.S. 483 (1954) ....................................................................... 46
*Brumfield v. Dodd*,
  749 F.3d 339 (5th Cir. 2014) ........................................................ 22
*Brumfield v. Louisiana State Bd. of Educ.*,
  806 F.3d 289 (5th Cir. 2015) ................................................... 21, 23
*Conn. Nat'l Bank v. Germain*,
  503 U.S. 249 (1992) ....................................................................... 34
*Crumble v. Blumthal*,
  549 F.2d 462 (7th Cir. 1977) ........................................................ 19
*Cruz v. Beto*,
  405 U.S. 319 (1972) ....................................................................... 27
*Diaz v. S. Drilling Corp.*,
  427 F.2d 1118 (5th Cir. 1970) ...................................................... 13

*Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Lab. v. Perini N. River Assocs.*,
   459 U.S. 297 (1983) .................................................................. 32

*Dynamic Sys., Inc. v. Skanska USA Bldg. Inc.*,
   No. 19 Civ. 10237 (NSR), 2021 WL 6063609 (S.D.N.Y. Dec. 21, 2021) ......... 21

*Edwards v. City of Houston*,
   78 F.3d 983 (5th Cir. 1996) ...................................................... 7

*Field v. Anadarko Petroleum Corp.*,
   35 F.4th 1013 (5th Cir. 2022) ................................................... 1

*Friberg v. Kansas City S. Ry. Co.*,
   267 F.3d 439 (5th Cir. 2001) .................................................... 8

*Fuentes v. Shevin*,
   407 U.S. 67 (1972) ............................................................. 28

*Geisler v. Petrocelli*,
   616 F.2d 636 (2d Cir. 1980) ................................................... 22

*Goldberg v. Kelly*,
   397 U.S. 254 (1970) ....................................................... 28, 29

*Gregory v. Ashcroft*,
   501 U.S. 452 (1991) ........................................................... 42

*Halverson v. Slater*,
   129 F.3d 180 (D.C. Cir. 1997) ................................................. 36

*Hamilton v. First Am. Title Co.*,
   No. 3:07-cv-1442-G, 2008 WL 3876038 (N.D. Tex. Aug. 15, 2008) ............. 22

*Hasberry v. Lee*,
   311 U.S. 32 (1940) ............................................................ 29

*Heaton v. Monogram Credit Card Bank of Ga.*,
   297 F.3d 416 (5th Cir. 2002) ................................................... 14

*Heckman v. Live Nat. Enter., Inc.*,
   120 F.4th 670 (9th Cir. 2024) .............................................. 29, 30

*In re Deepwater Horizon*,
   546 F. App'x 502 (5th Cir. 2013) .......................................... 20, 24

*Jevne v. Super. Ct.*,
   111 P.3d 954 (Cal. 2005) ...................................................... 38

*King v. Flowers Foods, Inc.*,
   No. 21-579-BAJ-SDJ, 2023 WL 2731041 (M.D. La. Mar. 30, 2023) ......... 21, 24

*League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*,
   659 F.3d 421 (5th Cir. 2011) ................................................... 17

*Martin K. Eby Const. Co. v. Dallas Area Rapid Transit*,
   369 F.3d 464 (5th Cir. 2004) ................................................... 23

*Martinez v. Regents of Univ. of Cal.*,
  50 Cal. 4th 1277 (2010) .............................................................. 33, 37
*Milliken v. Bradley*,
  418 U.S. 717 (1974) ........................................................................ 46
*Minnesota v. Mille Lacs Band of Chippewa Indians*,
  526 U.S. 172 (1999) ........................................................................ 38
*Mullane v. Central Hanover Bank & Trust Co.*,
  339 U.S. 306 (1950) ........................................................................ 28
*Murphy v. Nat'l Collegiate Athletic Ass'n*,
  584 U.S. 453 (2018) ............................................................ 41, 42, 43
*N.L.R.B. v. Bell Aerospace Co. Div. of Textron*,
  416 U.S. 267 (1974) ........................................................................ 32
*N.Y. Life Ins. Co. v. Sahani*,
  730 F. App'x 45 (2d Cir. 2018) ...................................................... 21
*New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*,
  732 F.2d 452 (5th Cir. 1984) .......................................................... 18
*New York v. United States*,
  505 U.S. 144 (1992) ............................................................ 41, 45, 48
*Newby v. Enron Corp.*,
  443 F.3d 416 (5th Cir. 2006) .......................................................... 18
*Pin v. Texaco, Inc.*,
  793 F.2d 1448 (5th Cir. 1986) ........................................................ 20
*Plyler v. Doe*,
  457 U.S. 202 (1982) ........................................................................ 46
*Press-Enter. Co. v. Superior Ct. of California, Riverside Cnty.*,
  464 U.S. 501 (1984) .................................................................. 30, 31
*Printz v. United States*,
  521 U.S. 898 (1997) ............................................................ 41, 44, 48
*Regan v. Time, Inc.*,
  468 U.S. 641 (1984) ........................................................................ 38
*Richmond Newspapers, Inc. v. Virginia*,
  448 U.S. 555 (1980) ........................................................................ 30
*Rose v. Doctors Hosp.*,
  801 S.W.2d 841 (Tex. 1990) ...................................................... 39, 50
*Ross v. Marshall*,
  426 F.3d 745 (5th Cir. 2005) ........................................................ 9, 14
*Saavedra v. Murphy Oil U.S.A., Inc.*,
  930 F.2d 1104 (5th Cir. 1991) .................................................... 23, 24
*San Antonio Indep. Sch. Dist. v. Rodriguez*,
  411 U.S. 1 (1973) ............................................................................ 46

*Nat'l Fed. of Indep. Business v. Sebelius*,
    567 U.S. 519 (2012) ...................................................................... 43, 45
*Sierra Club v. Espy*,
    18 F.3d 1202 (5th Cir. 1994) ................................................................ 11
*Spangler v. Pasadena City Bd. of Ed.*,
    552 F.2d 1326 (9th Cir. 1977) .............................................................. 18
*Stallworth v. Monsanto Co.*,
    558 F.2d 257 (5th Cir. 1977) .......................................................... 10, 11
*State v. Abrams*,
    178 P.3d 1021 (Wash. 2008) ................................................................ 38
*Texas v. United States*,
    805 F.3d 653 (5th Cir. 2015) ...................................................... 8, 13, 17
*Trbovich v. United Mine Workers*,
    404 U.S. 528 (1972) ............................................................................. 16
*TRW, Inc. v. Andrews*,
    534 U.S. 19 (2001) ............................................................................... 31
*United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n.*,
    389 U.S. 217 (1967) ............................................................................. 27
*United States ex rel Hernandez v. Team Fin., L.L.C.*,
    80 F.4th 571 (5th Cir. 2023) .......................................................... 18, 19
*United States v. Bonilla-Romero*,
    984 F.3d 414 (5th Cir. 2020) ................................................................ 39
*United States v. Chapple*,
    847 F.3d 227 (5th Cir. 2017) ................................................................ 19
*United States v. Vonn*,
    535 U.S. 55 (2002) ............................................................................... 37
*Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*,
    834 F.3d 562 (5th Cir. 2016) ................................................................. 8
*Williams & Humbert Ltd. v. W&H Trade Marks (Jersey) Ltd.*,
    840 F.2d 72 (D.C. Cir. 1988) ............................................................... 22
*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) ............................................................................. 47
*Young Conservatives of Texas Found. v. Smatresk*,
    73 F.4th 304 (5th Cir. 2023) .................................................... 19, 25, 26
*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ............................................................................. 40

Statutes

8 U.S.C. § 1623(a) ............................................................................. Passim

28 U.S.C. § 1331 ................................................................................................. 1
Tex. Educ. Code § 54.052(a)(3)................................................................ 3, 35, 51
Tex. Educ. Code § 54.206........................................................................... 35
Tex. Educ. Code § 54.052(a)(3)(A) ........................................................... 51
Tex. Educ. Code § 54.052(a)(3)(B) ........................................................... 51
Tex. Gov't Code § 311.032(c) .................................................................... 50
Texas Educ. Code § 54.051(m)............................................................. 2, 4, 5
Texas Educ. Code § 54.052(a) .............................................................. 2, 51
Texas Educ. Code § 54.053(3)(B) .............................................................. 3
U.S. Const. amend. I .................................................................................. 27
U.S. Const. amend. X ................................................................................ 41

Rules

Fed. R. App. P. 4(a)(1)(B) ........................................................................ 1
Fed. R. App. 32(a)(5) ................................................................................ 55
Fed. R. App. 32(a)(6) ................................................................................ 55
Fed. R. App. 32(a)(7)(B) ........................................................................... 55
Fed. R. App. 32(f) ..................................................................................... 55
Fed. R. Civ. P. 24 ............................................................................... Passim
Fed. R. Civ. P. 24(a) ........................................................................... Passim
Fed. R. Civ. P. 24(a)(2) ......................................................................... 9, 16
Fed. R. Civ. P. 24(b) .................................................................... 1, 5, 18, 19
Fed. R. Civ. P. 24(b)(3) ............................................................................. 18
Fed. R. Civ. P. 24(c) ................................................................................. 20

## JURISDICTIONAL STATEMENT

The district court exercised federal-question jurisdiction under 28 U.S.C. § 1331. The district court entered a final consent judgment on June 4, 2025. ROA.52. On August 4, 2025, Students for Affordable Tuition ("SAT") filed a timely protective notice of appeal from that order under Federal Rule of Appellate Procedure 4(a)(1)(B). ROA.706. The district court denied SAT's motion to intervene on August 15, 2025. ROA.746. SAT filed a timely notice of appeal on August 16, 2025. ROA.747. This Court has jurisdiction over the denial of a motion to intervene as an appealable final order. *See Field v. Anadarko Petroleum Corp.*, 35 F.4th 1013, 1017 (5th Cir. 2022) (collecting cases).

## ISSUES PRESENTED FOR REVIEW

1. Whether the district court erred in denying SAT's motion to intervene as of right under Federal Rule of Civil Procedure 24(a), despite demonstrating a timely application, a direct and substantial interest in the litigation, a clear impairment of that interest, and inadequate representation by the existing parties.

2. Whether the district court abused its discretion in denying SAT's motion for permissive intervention under Rule 24(b), where its claims and defenses share common questions of law and fact with the main action, and its intervention would contribute to the just resolution of the issues.

3. Whether the district court committed reversible error when it: (1) entered judgment on the same day the case was filed without a hearing or providing affected third parties an opportunity to be heard; (2) concluded that the Texas Dream Act violates 8 U.S.C. § 1623(a); (3) failed to consider the Tenth Amendment implications of determining that the Texas Dream Act is prohibited by 8 U.S.C. § 1623(a); and/or (4) failed to consider whether the residency provision of the Texas Dream Act should be severed.

## STATEMENT OF THE CASE

In 2001, Texas enacted House Bill 1403, known as the Texas Dream Act, granting eligible undocumented students access to regular tuition rates at Texas public colleges and universities.   As relevant here, Texas Education Code § 54.051(m) states the general rule that a citizen of a country other than the United States must pay out-of-state tuition unless the individual qualifies for regular tuition through another Texas law.   Texas Education Code § 54.052(a) then provides that "the following persons are considered residents of this state for purposes of this title:

>    . . .
>    (3) a person who:
>       (A) graduated from a public or private high school in this state or received the equivalent of a high school diploma in this state; and
>       (B) maintained a residence continuously in this state for:
>          (i) the three years preceding the date of graduation or receipt of the diploma equivalent, as applicable; and
>          (ii) the year preceding the census date of the academic term in which the person is enrolled in an institution of higher education.

Texas Education Code § 54.053(3)(B) states that "if the person applies for resident status under Section 54.052(a)(3)" and "if the person is not a citizen or permanent resident of the United States" they shall submit "an affidavit stating that the person will apply to become a permanent resident of the United States as soon as the person becomes eligible to apply."

Since its enactment, the Texas Dream Act has enabled thousands of Texans to afford a higher education in the state. However, on June 4, 2025, the United States sued the State of Texas to prevent students without lawful immigration status from paying regular tuition rates under the Act. *See* ROA.24–35. Specifically, the United States alleged that 8 U.S.C. § 1623(a) expressly preempts certain Texas Dream Act provisions. *See* ROA.34. Section 1623(a) is part of the 1996 Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), and, as it relates to this action, states the following:

> Notwithstanding any other provision of law, an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident.

8 U.S.C. § 1623(a).

The same day the lawsuit was filed, instead of defending its own law, the State of Texas joined the United States in filing a Joint Motion for Entry of Consent

3

Judgment.  *See* ROA.46–48.  The State of Texas and the United States (hereinafter, "the original parties") asked the court to enter a final judgment declaring that the challenged provisions—Texas Education Code §§ 54.051(m), 54.052(a)—violate the Supremacy Clause of the Constitution, and to issue a permanent injunction prohibiting the State of Texas and its successors, agents, and employees from enforcing the challenged provisions.  *See* ROA.47–48.

The district court granted the motion and entered final judgment that same day without any hearing or opportunity for affected third parties to learn of the case and to intervene or otherwise be heard.  *See* ROA.52.  The district court declared "that the challenged provisions, Texas Education Code §§ 54.051(m), 54.052(a), as applied to aliens who are not lawfully present in the United States, violate the Supremacy Clause and [are] unconstitutional and invalid."  ROA.52.  The Court also permanently enjoined the State of Texas from enforcing the provisions "as applied to aliens who are not lawfully present in the United States."  ROA.52.  The district court provided no reasoning for its decision and simply adopted the proposed order filed by the parties.  *Compare* ROA.49 *with* 52.

Upon learning of the original parties' motion and the entry of judgment by the district court, Students for Affordable Tuition ("SAT") promptly moved to intervene in this action to pursue an appeal to this Court.  *See* ROA.53.  SAT is an unincorporated association whose members attend Texas public colleges and

4

universities.  *See* ROA.92.  It is comprised of students without lawful immigration status who rely on paying regular tuition rates to afford their education—something that was promised by Texas law for more than two decades.  *See id.*  SAT exists for the purpose of promoting, advocating for, and ensuring access to affordable higher education in Texas, including maintaining regular tuition rates for certain students without lawful immigration status.  *See id.*  Because of this case's final judgment, SAT's members face significant increases in their higher education costs, putting college out of reach for many of them, some of whom have already spent years in college and will not be able to complete their specific program.  *See id.*

On June 11, 2025, SAT filed its motion to intervene under Federal Rule of Civil Procedure 24(a) as a matter of right or, in the alternative, under Rule 24(b) for permissive intervention.  *See* ROA.53.[1]  Both the United States and the State of Texas opposed SAT's motion to intervene.  *See* ROA.487–518.

On August 4, 2025, because the district court had not ruled on SAT's motion to intervene, SAT filed a protective notice of appeal to preserve its right to challenge the district court's consent judgment in this Court if SAT is granted intervention. *See* ROA.706.  On August 15, 2025, the district court denied SAT's motion because it determined that intervention would be futile.  *See* ROA.735–46.  SAT filed a notice

---

[1] Almost two weeks later, on June 24, 2025, La Union Del Pueblo Entero and others ("LUPE") also moved to intervene.  *See* ROA.115.

of appeal of that order the next day.  *See* ROA.747.  This Court has jurisdiction to review SAT's appeals.

## SUMMARY OF THE ARGUMENT

The district court erred in denying SAT the right to intervene to defend a long-standing state law that is critical to its members' ability to pursue higher education in Texas.  SAT timely sought to intervene after the original parties—the United States and the State of Texas—agreed to invalidate the Texas Dream Act on the very same day the lawsuit was filed.  SAT readily satisfies all four requirements for intervention as of right under Federal Rule of Civil Procedure 24(a): its motion was timely, it has a direct and substantial interest in the law, the district court's judgment impairs that interest, and Texas's capitulation demonstrates it is an inadequate representative.  SAT also sought permissive intervention and satisfied the requirements for the district court to exercise its discretion to allow intervention.

The district court denied intervention solely on the grounds that any appeal by SAT would be futile.  This was reversible error.  The court improperly transformed the threshold intervention inquiry into a premature adjudication of the merits, effectively denying SAT its right to be heard, and insulating the final consent judgment from appellate review.  Futility is not a proper basis to deny intervention where, as here, the proposed defenses are legally sufficient and raise substantial questions of law.

The district court's final consent judgment is erroneous for multiple reasons. First, the Texas Dream Act complies with 8 U.S.C. § 1623(a). The federal statute only prohibits postsecondary benefits based *solely* on residence. The Texas Dream Act, however, bases eligibility on a combination of factors, including high school graduation within the state, not just residence. A plain-language reading of the statute, as well as established principles of statutory construction, support this interpretation. Second, a conflict between the Texas Dream Act and Section 1623(a) raises serious constitutional concerns about Section 1623(a) itself. Specifically, Section 1623(a)—which compels Texas to change its educational policies with regard to non-immigrant students—is a violation of the Tenth Amendment and established principles of federalism. Finally, even if a portion of the Texas Dream Act is preempted, the district court erred by failing to consider Texas severability law before invalidating the entire statutory scheme.

For these reasons, the district court's permanent injunction and order denying intervention should be reversed and the case should be remanded for further proceedings.

## STANDARD OF REVIEW

"A ruling denying intervention of right is reviewed *de novo*." *Edwards v. City of Houston*, 78 F.3d 983, 995 (5th Cir. 1996). This Court reviews denials of permissive intervention under a "clear abuse of discretion" standard. *8fig, Inc. v.*

*Stepup Funny, L.L.C.*, 135 F.4th 285, 291 (5th Cir. 2025).  Legal conclusions as to whether a statute is preempted by federal law are reviewed *de novo*.  *See Friberg v. Kansas City S. Ry. Co.*, 267 F.3d 439, 442 (5th Cir. 2001).

## ARGUMENT

### I.     The District Court Erred in Denying SAT's Motion to Intervene

In denying SAT's motion to intervene for purposes of appeal based on purported futility, the district court essentially imposed a "likelihood of success on the merits" requirement not found in Federal Rule of Civil Procedure 24.  That contravenes this Court's directive to liberally allow intervention.  *See Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, 834 F.3d 562, 565 (5th Cir. 2016) ("Rule 24 is to be liberally construed").  Doing so is especially egregious in this case, which imposes significant harms on third parties by suddenly upending lives, without giving them the ability to participate in the case.  Further, allowing affected third parties, such as SAT, to participate would result in a more informed judicial opinion and promote the administration of justice, which this Court has also directed district courts to consider.  *See Texas v. United States*, 805 F.3d 653, 657 (5th Cir. 2015) ("Federal courts should allow intervention where no one would be hurt and the greater justice could be attained") (citation omitted).  Accordingly, and for the reasons stated below, SAT respectfully requests that this Court grant SAT's intervention.

## A. SAT Is Entitled to Intervene as of Right

In denying the motion to intervene, the district court did not discuss whether SAT satisfied *any* of the Rule 24(a) requirements for intervention of right.  *See* ROA.740–45.  Instead, the district court circumvented the rule's requirements in order to reach the merits of SAT's appeal in a flawed assessment of "futility."  As shown below, SAT meets every requirement to intervene as of right in this case; as a result, the district court was obligated to allow intervention for purposes of appeal.  Specifically, SAT meets the following requirements to intervene under Rule 24(a)(2):

> (1) the motion to intervene is timely; (2) the potential intervener asserts an interest that is related to the property or transaction that forms the basis of the controversy in the case into which she seeks to intervene; (3) the disposition of that case may impair or impede the potential intervener's ability to protect her interest; and (4) the existing parties do not adequately represent the potential intervener's interest.

*Ross v. Marshall*, 426 F.3d 745, 753 (5th Cir. 2005).  If a movant meets these requirements—as SAT does—courts "must" allow intervention without reviewing the underlying merits of the contentions of the proposed intervenor.  *See* Fed. R. Civ. P. 24(a).

///

///

### 1. SAT's Motion to Intervene Was Timely Filed Within Seven Days After the Consent Judgment Order

Whether a motion to intervene is timely is determined by a four-factor balancing test. *See Stallworth v. Monsanto Co.*, 558 F.2d 257, 264–66 (5th Cir. 1977). Courts consider (1) "[t]he length of time during which the would-be intervenor actually or reasonably should have known of his interest in the case before he petitioned for leave to intervene," (2) "[t]he extent of prejudice that the existing parties to the litigation may suffer as a result of the would-be intervenor's failure to apply for intervention as soon as he actually knew or reasonably should have known of his interest in the case," (3) "[t]he extent of the prejudice that the would-be intervenor may suffer if his petition for leave to intervene is denied," and (4) "[t]he existence of unusual circumstances militating either for or against a determination that the application is timely." *Id.* All four factors favor SAT.

Regarding the first factor, this Court has long held that moving to intervene less than one month after learning about a case of interest discharges the duty to act quickly. *See Stallworth*, 558 F.2d at 267. SAT discharged that duty when it filed a motion to intervene a mere seven days after the lawsuit was filed. *See* ROA.53. Under the second factor, the original parties to the case were not prejudiced by a seven-day delay—especially when they decided to end a decades-old law in one afternoon. Indeed, the original parties did not argue that SAT waited too long to

intervene. Instead, the State of Texas argued that it would be prejudiced if intervention were allowed at all. *See* ROA.502. But this Court has made clear that "prejudice must be measured by the delay in seeking intervention, not the inconvenience to the existing parties of allowing the intervenor to participate in the litigation." *Sierra Club v. Espy*, 18 F.3d 1202, 1206 (5th Cir. 1994). Any argument regarding SAT moving after the entry of final judgment is absurd when considering the mere hours between commencement of the lawsuit and final judgment. Such arguments also have limited effect, especially when SAT moved to intervene for purposes of appeal well before the 60-day deadline to file a notice of appeal. *See Stallworth*, 558 F.2d at 266 (whether an intervention is before or after judgment is of "limited significance").

In contrast, regarding the third factor, SAT's members have been significantly prejudiced by the denial of intervention and will continue to be prejudiced if this Court upholds that denial. For example, as a result of the district court's final consent judgment, SAT's members have seen significant increases to their tuition, causing some to defer attending their respective programs. *See* ROA.563–66. If SAT is precluded from intervening for purposes of appeal, the district court's injunction will remain in place and permanently deny SAT's members the regular tuition rate they relied upon to attend public colleges in Texas. Indeed, SAT's members have seen increased tuition rates for the 2025 fall semester. SAT's

members have suffered severe financial hardships, and some of them will not be able to continue their higher education, rendering the time and tuition they have already spent wasted and unrecoverable.

Finally, the unusual circumstances of this case support SAT's timeliness. The original parties to this case colluded to manufacture the lawsuit shortly after the Texas legislature declined to repeal the Texas Dream Act. They then filed a joint motion for entry of consent judgment the same day the action was filed, asking the district court to put an end to a decades-old Texas law that countless students relied upon when deciding to attend college in Texas. *See* ROA.46–48. Instead of holding a hearing to provide third parties—such as SAT's members—an opportunity to be heard, the district court entered an order granting the parties' motion the same day it was filed. *See* ROA.52. Commencing and adjudicating this case in one afternoon was erroneous because it was evident from the outset that this case had many third parties with interests at stake who deserved an opportunity to be heard. These are all unusual circumstances that militate towards granting SAT's intervention.

In sum, SAT's motion to intervene—filed seven days after the lawsuit commenced—was timely.

///

///

## 2. SAT Has a Direct, Substantial, And Legally Protectable Interest in The Proceedings

For the second requirement, a movant must demonstrate a "direct, substantial, legally protectable interest in the proceedings." *Texas*, 805 F.3d at 657 (internal quotation marks omitted).  This Court made clear long ago that such an interest does not have to be "of a legal nature identical to that of the claims asserted in the main action." *Diaz v. S. Drilling Corp.*, 427 F.2d 1118, 1124 (5th Cir. 1970).  All this Court requires is a concrete stake in the matter, as opposed to a generalized preference in the outcome. *See id.*  SAT's interests here satisfy this requirement.

SAT seeks intervention to protect the interests of its members to continue receiving the regular tuition rate that was promised by the state for more than 24 years.  SAT's members depend on the regular tuition rate to continue their higher education in Texas.  This type of interest is sufficient for intervention. *See Texas*, 805 F.3d at 659 ("[A]n interest is sufficient if it is of the type that the law deems worthy of protection . . . .").  SAT's members, like many other students without lawful immigration status, come from low-income backgrounds and are ineligible for federal financial aid.  Without regular tuition rates, they face severe financial hardship.  SAT is not seeking to uphold the statutes at issue based on a generalized preference of governmental policy.  It, through its members, has been directly harmed by this action. *See Texas*, 805 F.3d at 658 ("[A]n interest that is concrete,

personalized, and legally protectable is sufficient to support intervention."). SAT, then, has an interest in this proceeding.

### 3. SAT's Interests Are Impaired

Under Rule 24's impairment requirement, SAT need only show that disposition of the action "may impair or impede [its] ability to protect [its] interest." *Heaton v. Monogram Credit Card Bank of Ga.*, 297 F.3d 416, 422 (5th Cir. 2002); *see also Ross*, 426 F.3d at 761 (this requirement is satisfied where there exists a "potential to impair" an interest). Consistent with that principle, Rule 24(a) Advisory Committee Notes make clear that "[i]f an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene . . . ." Fed. R. Civ. P. 24 Advisory Comm. Note to 1996 Amend.

SAT's interests are plainly impaired. Its members have already suffered concrete harm that goes beyond any mere "potential" for impairment. Formerly entitled to regular tuition rates, SAT's members now face substantially higher tuition costs. These increased costs impose severe financial hardship, forcing many students to either assume unsustainable debt or abandon their education altogether. *See* ROA.563–66, 76.

Moreover, the harm to SAT's members—some of whom are Deferred Action for Childhood Arrivals ("DACA") recipients—have been exacerbated by Texas's

14

inaccurate representations to the district court.  In opposing SAT's motion to intervene, Texas assured the district court that "DACA recipients are presently considered to be lawfully present in the United States" and, therefore, "[t]hey will continue, for the foreseeable future, to be entitled to discounted in-state tuition at state universities and have thus suffered no cognizable injury."  *See* ROA.494–95.[2]  Those representations have since proven false.  Reports now show that several Texas colleges and universities have begun classifying DACA recipients as "unlawfully present" and requiring them to pay out-of-state tuition rates.[3]

The Texas Higher Education Coordinating Board ("THECB") has further compounded this harm by refusing to clarify the definition of "lawful presence."[4]  In adopting new rules following the district court's order, THECB declined to define the term, instead directing state colleges and universities to "confer with counsel to determine the status(es) that may be considered lawfully present during a given

---

[2] The State of Texas made these representations based on its mistaken assumption that SAT's membership consisted solely of DACA recipients, and argued that, because those students would purportedly continue to receive in-state tuition rates, SAT lacked standing to intervene for purposes of appeal.  *See* ROA.494–95.

[3] *See, e.g.* Ruiz, Maria, *Dream Act repeal slams Laredo students with tuition hikes, lost aid,* Laredo Morning Times (Sept. 9, 2025), https://www.lmtonline.com/local/article/laredo-students-texas-dream-act-repeal-21033285.php (last visited Oct. 26, 2025).

[4] Texas Higher Education Coordinating Board, *Agenda Item V-F(3)*, Report Center, https://reportcenter.highered.texas.gov/meeting/committee-supporting-documents/idea-v-f-3-ch13k-determination-of-resident-status/ (Last visited Oct. 28, 2025).

calendar year."[5]  This abdication of responsibility has created a patchwork of inconsistent interpretations across public institutions, leaving DACA recipients and other protected immigrants vulnerable to arbitrary misclassifications and loss of access to regular tuition rates.

Thus, contrary to Texas's assurances, SAT's members are directly harmed by the invalidation of the Texas Dream Act.  Their access to affordable tuition has been stymied, and their ability to remain enrolled jeopardized.  Continuing enforcement of the consent judgment not only impairs SAT's interests, but also ensures that the harm will deepen with every passing semester.

### 4. Texas Does Not Adequately Represent SAT's Interests

Regarding the final requirement, this Court has clarified that demonstrating inadequate representation is a "minimal" burden; a movant need only show that the representation "may be" inadequate. *Trbovich v. United Mine Workers,* 404 U.S. 528, 538 n.10 (1972).  The State of Texas proved it is an inadequate representative of SAT's interests when it willingly entered into an expedited agreement to have its own 24-year-old law declared unconstitutional and did nothing to ensure the district court was apprised of the effect on third parties, such as SAT's members.  *See* ROA.46–48.  Further, SAT's members have unique interests in maintaining the regular tuition rates necessary for them to pursue their higher education in Texas.

---

[5] *Id.*

Because that goal is apparently not shared by the state, it cannot be an adequate representative. *See Texas*, 805 F.3d at 664 ("adversity of interest" is sufficient to "rebut[] the presumption of adequate representation"); *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 659 F.3d 421, 435 (5th Cir. 2011) (existing parties' opposition to relief sought by intervenor means they do not adequately represent his interest).

The Supreme Court has cautioned courts about litigants who "select as their defendants those individual officials they consider most sympathetic to their cause or most inclined to settle favorably and quickly." *Berger v. N.C. State Conference of the NAACP*, 597 U.S. 179, 191–92 (2022). When that happens, courts run the risk of basing their decisions on "hobbled litigation rather than a full and fair testing." *Id.* at 192. Here, the original parties did not provide adversarial briefing, resulting in a district court decision that was "based on an incomplete understanding" of the Texas Dream Act and Section 1623(a). *Id.*

Accordingly, the original parties do not adequately represent SAT's interests.

## B. The District Court Abused its Discretion in Denying Permissive Intervention

"To intervene by permissive intervention, a putative intervenor must show that they are: (A) given a conditional right to intervene by a federal statute; or (B) [have] a claim or defense that shares with the main action a common question of law

or fact." *8fig, Inc.*, 135 F.4th at 290 (internal quotation marks and citation omitted). "The 'claim or defense' portion of Rule 24(b) . . . [is to be] construed liberally." *United States ex rel Hernandez v. Team Fin., L.L.C.*, 80 F.4th 571, 577 (5th Cir. 2023) (quoting *Newby v. Enron Corp.*, 443 F.3d 416, 422 (5th Cir. 2006)). Courts must also consider whether intervention "will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). Further, "it is proper to consider, among other things, 'whether the intervenors' interests are adequately represented by other parties' and whether they 'will significantly contribute to full development of the underlying factual issues in the suit.'" *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452, 472 (5th Cir. 1984) (quoting *Spangler v. Pasadena City Bd. of Ed.*, 552 F.2d 1326, 1329 (9th Cir. 1977)).

The district court did not address whether SAT satisfied the requirements for permissive intervention. *See generally* ROA.735–46. In its briefing, SAT demonstrated that it shares common questions of law and fact with the action, and the original parties did not dispute that. *See* ROA.101, 507–08, 515–17. Specifically, SAT seeks to defend the law that the parties agreed to invalidate. SAT's participation would not unduly delay or prejudice the rights of the original parties because SAT is only intervening for purposes of appeal, and the parties do not have a right to preclude review by this Court. In fact, SAT's participation

contributes to the full development of the issues by giving this Court jurisdiction to review the district court's consent judgment, which was based on the original parties' misinterpretation of this Court's decision two years ago and their flawed application of preemption law. *See* ROA.47 (citing *Young Conservatives of Texas Found. v. Smatresk*, 73 F.4th 304 (5th Cir. 2023)).

The district court erred in denying SAT's motion to intervene for purposes of appeal despite SAT meeting the requirements for permissive intervention. *See Crumble v. Blumthal*, 549 F.2d 462, 468–69 (7th Cir. 1977) (district court abused its discretion in denying permissive intervention when party met Rule 24(b) requirements and court did not explain reasons for denial). Specifically, the district court's denial in the context of this case was an abuse of discretion because it, in effect, gave itself the final word without full, adversarial briefing on an important constitutional issue. This Court should have input regarding the proper interpretation and application of the law to a longstanding Texas statute.

Although district courts have broad discretion when deciding permissive intervention, this Court has held that a district court abuses its discretion when it bases its decision on an error of law. *See United States ex rel Hernandez*, 80 F.4th at 575–76 (citing *United States v. Chapple*, 847 F.3d 227, 229 (5th Cir. 2017)). As demonstrated below, the district court based its decision on an error of law when it decided that SAT's motion to intervene was "futile," and that that determination was

conclusive. Accordingly, the district court abused its discretion in denying permissive intervention.

## C. The District Court Erred in Denying Intervention On Grounds of "Futility"

Instead of allowing SAT to intervene for purposes of appeal, the district court effectively adjudicated SAT's appellate arguments when it denied intervention—both as of right and permissive—on the basis of purported futility. Rule 24 does not identify "futility" as a basis for denying a motion to intervene—and for good reason. At the intervention stage, a district court's role is limited to determining who may participate as a party to the litigation—not a final judgment on the merits or even a preliminary determination of likelihood of success. Although Rule 24(c) requires that a motion to intervene "be accompanied by a pleading that sets out the . . . defense for which intervention is sought," that requirement concerns legal sufficiency, not an early adjudication of the merits. Fed. R. Civ. P. 24(c). Here, the district court required SAT to prove the elements of intervention and, at the same time, show that it was likely to succeed on the merits of the appeal.

This Court and others have recognized futility only where a proposed claim or defense is facially frivolous or legally insufficient. *See, e.g.*, *Pin v. Texaco, Inc.*, 793 F.2d 1448, 1450 (5th Cir. 1986) (affirming denial of intervention and sanctions for filing motion with frivolous causes of action); *In re Deepwater Horizon*, 546 F.

App'x 502, 506 (5th Cir. 2013) ("[W]hen . . . the district court is without power to grant the relief sought by the movant, we have held that the motion to intervene must be denied."); *N.Y. Life Ins. Co. v. Sahani*, 730 F. App'x 45, 50 (2d Cir. 2018) (affirming denial where proposed intervenor "asserted no viable claims"). Indeed, other district courts recognize that in "determining whether the proposed intervention is futile, [they] must review the application on the tendered pleadings— that is, whether those pleadings allege a legally sufficient claim or defense and not whether the applicant is likely to prevail on the merits." *King v. Flowers Foods, Inc.*, No. 21-579-BAJ-SDJ, 2023 WL 2731041, at *2 (M.D. La. Mar. 30, 2023) (quoting *Dynamic Sys., Inc. v. Skanska USA Bldg. Inc.*, No. 19 Civ. 10237 (NSR), 2021 WL 6063609, at *2 (S.D.N.Y. Dec. 21, 2021)).

Resolving disputed factual or legal questions at the intervention stage impermissibly transforms the threshold inquiry of legal sufficiency into a premature adjudication on the merits without affording the proposed intervenor a fair opportunity to litigate. *See Brumfield v. Louisiana State Bd. of Educ.*, 806 F.3d 289, 301 (5th Cir. 2015) ("The very purpose of intervention is to allow interested parties to air their views so that a court may consider them before making potentially adverse decisions.") (internal quotation marks omitted). Deviation from that principle undermines Rule 24's liberal construction in favor of intervention. *See 8fig, Inc.,* 135 F.4th at 290 n.4 (noting Fifth Circuit's "broad policy favoring

intervention" and "minimal burden" on proposed intervenors) (internal quotation marks omitted); *Brumfield v. Dodd*, 749 F.3d 339, 341 (5th Cir. 2014) ("Rule 24 is to be liberally construed.").

Here, the district court went well beyond this threshold inquiry and denied intervention because it agreed with the original parties that the challenged statutes were preempted. *See* ROA.740–45. In so doing, the district court failed to consider the various appealable issues presented by its final consent judgment. *See infra* Section II. The district court also failed to address SAT's affirmative defenses, including its Tenth Amendment argument. *See* ROA.83. Each of these wholly undermines any conclusion of futility. The district court's analysis improperly weighed the merits of preemption contentions rather than assessing whether SAT's answer and its associated defenses were legally sufficient when viewed in the light most favorable to SAT. *See Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980) (court's function "is merely to assess the feasibility of the [proposed intervention], not to assay the weight of the evidence [that] might be offered in support thereof."); *Williams & Humbert Ltd. v. W&H Trade Marks (Jersey) Ltd.*, 840 F.2d 72, 76 (D.C. Cir. 1988) ("[T]hese allegations adequately state a claim cognizable for Rule 24(a) purposes."); *Hamilton v. First Am. Title Co.*, No. 3:07-cv-1442-G, 2008 WL 3876038, at *4 (N.D. Tex. Aug. 15, 2008) ("[W]hen an opposing party argues futility, the court reviews the proposed [pleadings] in the light most favorable to the

proponent, accepting all well-pleaded facts as true, with every doubt to be resolved in favor of the proponent.") (citing *Martin K. Eby Const. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)).   The district court went against the purpose of Rule 24—to ensure that those with protectable interests can participate and safeguard their rights.   In this regard, Rule 24's purpose would be frustrated in the post-judgment stage if courts could deny intervention for purposes of appeal by doubling down on the decision that led to the need for intervention, prematurely adjudicating potential defenses before an intervenor can fully litigate them.   *See Brumfield*, 806 F.3d at 301.

The district court only cited two cases to support its extraordinary ability to deny a motion to intervene for purposes of appeal as futile.   *See* ROA.740–41.   But the court did not discuss the outcome of those cases.   That is because those cases showcase the limitations of a "futility" screen and otherwise support allowing intervention in this case.   For example, in *Saavedra v. Murphy Oil U.S.A., Inc.*, 930 F.2d 1104 (5th Cir. 1991), the district court *granted* the intervention for purposes of appeal, which is exactly what SAT sought here.   *See Saavedra*, 930 F.2d at 1109 ("The district court did grant Travelers' motion to intervene 'primarily for the purpose to permit it to appeal along with plaintiffs.'").   Although the district court also simultaneously dismissed the intervenor's claim and request for sanctions, which this Court affirmed, it only did so because the claim was "wholly derivative

23

of [the plaintiff]'s claim which had previously been dismissed." *Id.*  Here, SAT's

defenses and appeal arguments are not derivative of any other party's claims or

defenses.  Rather, as explained above, SAT's membership is *distinctly* harmed by

the district court's order invalidating the Texas Dream Act.  Yet, unlike the district

court in *Saavedra*, the court here did not even allow SAT to intervene for purposes

of appeal.

Similarly, in *King v. Flowers Foods, Inc.*, Case No. 21-579-BAJ-SDJ, 2023

WL 2731041 (M.D. La. Mar. 30, 2023), the district court *granted* the motion to

intervene under the less strict permissive intervention standard even though the

intervenor's claims were potentially time-barred.  *See King*, 2023 WL 2731041 at

3–4 (concluding that "at this stage of the litigation, it cannot be determined that

Movant's Motion to Intervene is futile").  Here, unlike the intervenor in *King*, SAT's

defenses do not face any statute of limitations issues.  The district court should

have—like in *King*—granted SAT's motion even if it had concerns about the

ultimate success of SAT's defenses or arguments on appeal.

Denial of intervention on futility grounds is appropriate only when the

proposed claim or defense is clearly barred as a matter of law—for example, by res

judicata, a jurisdictional defect, or a statute of limitations.  *See In re Deepwater

Horizon*, 546 F. App'x at 506.  That is not the case here.  By prematurely

adjudicating the merits rather than assessing only the legal sufficiency of SAT's

defenses, the district court subjected SAT to a higher standard not supported by the federal rules or case law. Because SAT's proposed defenses are not only legally sufficient but also support remanding the district court's final judgment, denial of intervention on futility grounds was improper.

The district court based its futility reasoning largely on this Court's decision in *Young Conservatives of Texas Found. v. Smatresk*, 73 F.4th 304 (5th Cir. 2023). *See* ROA.740–45. But that decision does not compel the outcome decided by the district court. To the contrary, the district court should have allowed SAT's intervention for purposes of appeal so that this Court could resolve the issue that it referenced but did not have jurisdiction to decide in *Young Conservatives*: whether the Texas Dream Act is preempted by Section 1623(a). *See Young Conservatives*, 73 F.4th at 314–15.

That issue was not settled by this Court. For one, *Young Conservatives* dealt with different provisions of the Texas Education Code and an interpretation of Section 1623(a) to require Texas to provide regular tuition to all U.S. citizens. *See Young Conservatives*, 73 F.4th at 312. Neither of those issues are present in this case. Although the Court made certain statements in dicta implicating the provisions at issue here, those statements are inconclusive and do not foreclose further review. For example, the Court concluded that the challenged provision before the Court was not preempted "even if other, unchallenged provisions in Texas' scheme *may*

25

be." *Young Conservatives*, 73 F.4th at 311 (emphasis added). It also noted that an unchallenged "portion of Texas' scheme *seems* to conflict with § 1623(a)"). *Id.* at 314 (emphasis added). The Court's inconclusive language indicate that it was reserving the issue until it was properly before the Court.

Second, because it did not hold that any statute was preempted, the Court in *Young Conservatives* did not consider arguments regarding the implications of preemption, including Tenth Amendment concerns, presented below. Accordingly, the district court erred when it denied intervention based on its merits-based futility analysis rather than limiting its inquiry to the legal sufficiency of SAT's proposed defenses under a Rule 12(b)(6) standard. As further demonstrated below, SAT's defenses and arguments warrant a remand for further proceedings.

## II.    The District Court's Entry of the Consent Judgment is Erroneous

The district court committed four reversible errors when it entered the consent judgment. First, the district court's same-day entry of judgment, without a hearing or an opportunity for affected third parties to be heard, violated due process rights. Second, the district court erred when it concluded that the Texas Dream Act violates Section 1623(a). Third, the district court erred when, having concluded that the Texas Dream Act was prohibited by Section 1623(a), it failed to consider the Tenth Amendment implications of Section 1623(a). Finally, the district court erred when

it failed to consider whether the residency provision of the Texas Dream Act should be severed.  SAT addresses each of these errors below.

### A. The District Court Violated the First Amendment and Due Process by Failing to Hold a Public Hearing Concerning the Rights and Entitlements of Numerous Persons

The district court violated the rights of SAT members when it entered the consent judgment without holding a public hearing to allow affected third parties to present argument and seek redress for the harms caused by the potential invalidation of the Texas Dream Act.

The First Amendment provides that "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances."  U.S. Const. amend. I.  The Supreme Court has recognized that the right to petition includes the right to access the courts to seek redress.  *See Bill Johnson's Rests., Inc. v. N.L.R.B.*, 461 U.S. 731, 741 (1983) ("[T]he right to access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances."); *Cruz v. Beto*, 405 U.S. 319, 321 (1972) ("[P]ersons . . . have the right to petition the Government for redress of grievances which, of course, includes access . . . to the courts for the purpose of presenting their complaints.") (internal quotation marks and citations omitted).  This right is "among the most precious of the liberties safeguarded by the Bill of Rights."  *United Mine Workers of Am., Dist.*

*12 v. Ill. State Bar Ass'n.*, 389 U.S. 217, 222 (1967). It ensures that affected persons have the opportunity to be heard and to challenge decisions that affect their interests.

Here, the district court entered the consent judgment—eliminating access to regular tuition rates and eviscerating the rights of numerous third parties—without providing any public hearing. By failing to hold a public hearing, the district court deprived affected persons of any opportunity to be heard or to exercise their constitutional right to seek redress. This closed proceeding effectively denied SAT's members a meaningful opportunity to challenge the consent judgment and deprivation of their rights. Accordingly, the district court violated the First Amendment's guarantee that all persons may petition their government for redress of grievances.

The district court's failure also violated due process of law. "The fundamental requisite of due process of law is the opportunity to be heard." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (internal quotation marks and citation omitted). Due process requires "appris[ing] interested parties of the pendency of the action and afford[ing] them an opportunity to present their objections." *Id.* at 314 (citations omitted). That opportunity must be provided at "a meaningful time and in a meaningful manner." *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970). "Parties whose rights are to be affected are entitled to be heard[.]" *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (internal quotation marks omitted).

Before eliminating the legal entitlements of numerous affected third parties, the district court was constitutionally required to provide notice and opportunity for them to participate in a public hearing.  Courts have held, "binding litigants to the rulings of cases in which they have no right to participate—let alone case[s] of which they have no knowledge—violates basic principles of due process." *Heckman v. Live Nat. Enter., Inc.*, 120 F.4th 670, 684 (9th Cir. 2024) (citing *Hasberry v. Lee,* 311 U.S. 32, 40–43 (1940)).  By entering the consent judgment without such a hearing, the district court deprived SAT's members of the opportunity to intervene or to be heard before their rights were rescinded.

The rights of SAT's members to regular tuition rates constitute an entitlement under Texas law protected by due process.  This case is analogous to the principle articulated in *Goldberg v. Kelly*, 397 U.S. 254 (1970), where the Supreme Court made clear that individuals must receive a meaningful opportunity to be heard before being deprived of entitlements under state law.  *Id.* at 262 (welfare recipients are constitutional entitled to a hearing and an "opportunity to be heard . . . at a meaningful time and in a meaningful manner" before the termination of entitlements) (internal quotation marks and citations omitted).  *Goldberg* provided for each individual's right to adequate due process, yet here the district court deprived thousands of individuals of an entitlement under state law in one afternoon,

with no hearing whatsoever. The district court's actions violated core due process principles.

The safeguards of due process are relevant when a court decision affects a large number of individuals. In the context of mass arbitration protocols, courts have recognized that when the rights of numerous persons are decided collectively, the "absent members [in a class] must be afforded notice, an opportunity to be heard, and a right to opt out of the class." Heckman, 120 F.4th at 684 (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 349 (2011)). Courts cannot eliminate the rights of persons en masse without affording them the protections that due process requires.

Public court hearings serve a vital constitutional function: they ensure transparency, public confidence in the judicial process, and assurance that the court has the opportunity to consider the interests of all affected parties before undertaking a decision that curtails significant rights. As the Supreme Court has emphasized, "[p]eople in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572 (1980). "Closed proceedings, although not absolutely precluded, must be rare and only for cause shown that outweighs the value of openness." *Press-Enter. Co. v. Superior Ct. of California, Riverside Cnty.*, 464 U.S. 501, 509 (1984). "The presumption of openness may be

30

overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id.* at 510.

Because the district court approved a consent judgment the very same afternoon the case was filed, without holding a noticed public hearing, it deprived numerous third parties, including SAT's members, of their constitutionally guaranteed right to redress their grievances and the due-process opportunity to be heard before their access to regular tuition rates was rescinded. The lack of a noticed public hearing, therefore, constitutes reversible error.

### B. The Texas Dream Act Complies with Section 1623(a)

Section 1623(a) states that students without lawful immigration status "shall not be eligible *on the basis of residence* unless a citizen or national of the United States is eligible for such a benefit . . . without regard to whether the citizen or national is such a resident." 8 U.S.C. § 1623(a) (emphasis added). The phrase "on the basis of residence" cannot be superfluous and must be given its proper meaning. *See TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (internal quotation marks and citation omitted)). Thus, the question before this Court is whether Section 1623(a) prohibits educational benefits for students without lawful immigration status if they are based *solely on residency* or

if they are based *in any way on residency*.  The district court erred because it appears to have concluded that the Texas Dream Act violates Section 1623(a) based on the latter interpretation.

The Texas Dream Act—enacted five years after IIRIRA—was written to comply with congressional intent in Section 1623(a).  *See Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Lab. v. Perini N. River Assocs.*, 459 U.S. 297, 319 (1983) (elected representatives are presumed to know the law) (citation omitted).  Indeed, for more than 24 years, no presidential administration, regardless of political party, questioned its validity or sought to challenge it.  During that same period, Congress—fully aware of the Texas Dream Act and nearly two dozen similar laws enacted by other states—has not amended Section 1623(a) to address the proliferation of these laws.  Congress's decision not to amend Section 1623(a) confirms that the broad interpretation adopted by several states—under which they may extend regular tuition rates if they are not based *solely* on residency—reflects Congress's accepted understanding of the statute's proper application.  Just as congressional inaction in the face of an agency's interpretation of a statute may indicate legislative approval, Congress's failure to revise Section 1623(a) is evidence that the prevailing interpretation reflects its intended meaning.  *See N.L.R.B. v. Bell Aerospace Co. Div. of Textron*, 416 U.S. 267, 275 (1974).

Congress's long silence in the face of widespread state practice reflects not only acquiescence but also recognition of what Section 1623(a) actually provides. The statutory text, read in its full context, demonstrates that Congress did not impose a categorical prohibition on states providing educational benefits to students without lawful immigration status. *See Martinez v. Regents of Univ. of Cal.,* 50 Cal. 4th 1277, 1291 (2010) ("If Congress had intended to prohibit states entirely from making unlawful aliens eligible for in-state tuition, it could easily have done so."). Rather, Section 1623(a) reflects a narrower congressional directive: states may not condition eligibility for postsecondary education benefits solely on residence unless they make the same benefits available to U.S. citizens regardless of residence. *See id.*; 8 U.S.C. § 1623(a). Thus, Section 1623(a) must be understood to allow states to provide higher education benefits to students without lawful immigration status as long as they comply with Section 1623(a)'s limitations—basing eligibility on something other than residence alone.

Under both the plain language of the statute and established principles of statutory construction—which courts presume Congress legislates with understanding of—the Texas Dream Act must be understood to fall within the contours of Section 1623(a), as further explained below. *See Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) ("Congress is understood to legislate against a background of common-law adjudicatory principles.").

### 1. The Plain Language of Section 1623(a) Only Prohibits Benefits Based *Solely* on Residence

The plain language of Section 1623(a), which state legislatures from many states have reasonably interpreted, prohibits only those educational benefits that are based solely on residence. When the statutory language is clear, courts "must apply the statute according to its terms." *Asadi v. G.E. Energy (USA), L.L.C.*, 720 F.3d 620, 622 (5th Cir. 2013) (internal quotation marks and citation omitted); *see also BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004) ("The preeminent canon of statutory interpretation requires us to 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.'") (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992)). The text of Section 1623(a) is unambiguously narrow. It states that a person without lawful immigration status cannot be "eligible on the basis of residence within a State . . . for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit . . . ." 8 U.S.C. § 1623(a). Congress did not use broader formulations that would have explicitly extended the prohibition beyond benefits based solely on residence. For example, Congress could have phrased Section 1623(a) to include the following:

- shall not be eligible based in whole or in part on residence within a State;
- shall not be eligible based in any way on residence within a State; or
- shall not be eligible on the basis of anything related to residence within a State.

Any one of these phrasings in Section 1623(a) would have clearly prohibited states from providing educational benefits if they were based in any respect on residence. But Congress elected not to do so. That means that Congress only intended to prohibit benefits if they were based *solely* on residence.[6]

The Texas Dream Act does not grant benefits to immigrants based solely on residency. Instead, it conforms with the requirements of Section 1623(a) by requiring high school graduation (or receiving the equivalent diploma) and the submission of an affidavit stating that the person will apply to become a permanent resident as soon as the person becomes eligible. *See* Tex. Educ. Code §§ 54.052(a)(3), 54.053(3)(B). These requirements establish eligibility based on academic achievement within the state and future compliance with federal immigration processes—two criteria deemed important by Texas. Thus, residence is just one of the criteria that is considered by the Texas Dream Act rather than the sole determinative factor, which puts it outside the narrow scope of Section 1623(a).

---

[6] Even if Section 1623(a) prohibited tuition benefits based in any way on residence, the Texas Dream Act does not automatically violate the statute. A violation would occur only if Texas failed to make eligible "a citizen or national of the United States . . . without regard to whether the citizen or national is such a resident." 8 U.S.C. 1623(a). Texas satisfies that condition because it also offers several waivers, exemptions, and other tuition and fee benefits that are available to qualifying U.S. citizens regardless of residency in Texas. *See, e.g.*, Tex. Educ. Code §§ 54.206 (Foreign Service Officers); 54.369 (Employees of national laboratories); 54.211 (Faculty and Dependents); 54.224 (Resident Tuition for Students in Military-Related Programs); 54.261 (Hardship Waiver).

Even if there is some ambiguity regarding Section 1623(a), other principles of statutory construction also support a reading that only prohibits benefits conferred *solely* on the basis of residence within a state.

### 2. The Canon of *Expressio Unius* Confirms that Section 1623(a) Does Not Preclude Benefits Here

The statutory-construction canon of *expressio unius est exclusio alterius* (the "mention of one thing implies the exclusion of another thing") further reinforces that Section 1623(a) does not bar states from providing educational benefits if they are based on criteria in addition to residence. *See Halverson v. Slater*, 129 F.3d 180, 185 (D.C. Cir. 1997) (citation and quotation omitted). Under this principle, when Congress chooses to specify a particular restriction in statutory language, it is presumed that Congress intentionally omitted other potential restrictions that it could have easily imposed.

Here, Congress identified only one impermissible basis for providing educational benefits: residence within a state. Its omission of any language precluding benefits conditioned on other criteria, such as high school attendance or graduation, indicates that Congress did not want the statute to reach state laws that confer benefits on criteria in addition to residency. As the California Supreme Court noted when it interpreted this very provision, "[t]he reference to the benefit being on the basis of residence must have some meaning. It can only qualify, and thus limit,

the prohibition's reach." *Martinez*, 50 Cal. 4th at 1291.  In other words, by specifying residence as the sole prohibited basis, Congress implicitly excluded from the statute's reach state laws with additional non-residency-based conditions.

This inference is particularly compelling in the context of higher education, where states have long conditioned benefits, such as tuition rates, on factors such as high school attendance and graduation, academic achievement, and financial need. These are all familiar, legitimate, and predictable criteria that Congress surely knew states employed when it drafted Section 1623(a).  The fact that Congress did not include any of these criteria in Section 1623(a) means that Congress only intended for the statute to apply to benefits based solely on residency.  *See United States v. Vonn*, 535 U.S. 55, 65 (2002) ("[E]xpressing one item of a commonly associated group or series excludes another left unmentioned.").  Further, as noted above, Congress has seen various states pass laws like the Texas Dream Act over the past quarter century and has never deemed it necessary to amend Section 1623(a).

Accordingly, under the canon of *expressio unius*, Section 1623(a) cannot be construed to invalidate state laws—such as the Texas Dream Act—that incorporate additional, non-residency criteria.  The district court's decision to hold otherwise expands the statute beyond what Congress legislated and intended under well-established principles of statutory interpretation.

### 3. General Principles of Severability Further Confirm that Congress Did Not Intend to Preclude State Laws that Confer Benefits Based on More Than Just Residence

Additionally, longstanding principles of severability confirm that Section 1623(a) was not intended to invalidate entire statutory schemes merely because they incorporate residency among other eligibility criteria.[7]  That is because Congress is presumed to understand that courts across the country will not invalidate more than what is necessary in a statute.  Indeed, the Supreme Court has cautioned courts as much.  *See Regan v. Time, Inc.*, 468 U.S. 641, 652 (1984).  It has stated that "[u]nless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is *fully operative* as a law."  *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 191 (1999) (citation omitted) (emphasis added).  Several states also require severability of statutes if the remaining portions are operative.  For example, California and Washington courts may sever a provision if it is "grammatically, functionally, and volitionally separable" from the remainder of the statute.  *Jevne v. Super. Ct.*, 111 P.3d 954, 971–72 (Cal. 2005); *State v. Abrams*,

---

[7] Severability in this context supports SAT's interpretation of Section 1623(a), based on congressional understanding when it enacted the statute.  It is distinct from argument concerning the specific severability of the Texas Dream Act, which is discussed below.

178 P.3d 1021, 1025–27 (Wash. 2008).  Texas also permits severability "[i]f, when the unconstitutional portion is stricken out, that which remains is complete in itself, and capable of being executed . . . ."  *See Rose v. Doctors Hosp.*, 801 S.W.2d 841, 844 (Tex. 1990).  This Court has also recognized the need to preserve as much of statutes as possible.  *See United States v. Bonilla-Romero*, 984 F.3d 414, 418 (5th Cir. 2020) ("[W]hen a portion of a statute is unconstitutional, the traditional rule is that the unconstitutional provision must be severed unless the statue created in its absence is legislation that congress would not have enacted.") (internal quotation marks omitted).

Severability nationwide incorporates some notion of functionality; laws that cannot function without the severed portion cannot survive, while those that can function without the severed portion can survive if consistent with legislative intent.  With that understanding of severability principles applied across the country, had Congress intended to nullify state schemes that confer benefits based on residency in any manner, it would have understood that it needed to speak clearly to overcome severability of the residency provisions.  Congress is presumed to have understood that state laws with residency as the sole criterion could not function or operate once that sole criterion is severed; by contrast, laws with more than one criterion of eligibility could function or operate with the single criterion of residency severed.  Yet, Congress failed to make clear any intent to strike laws with multiple criteria, of

which residency is but one.  Instead, the phrasing of Section 1623(a) targets only those state laws granting benefits based solely on residence, leaving undisturbed those, like the Texas Dream Act, that base eligibility on additional, independent criteria.

### C. Section 1623(a) Violates the Tenth Amendment[8]

If this Court were to conclude, despite the contentions above, that the Texas Dream Act conflicts with Section 1623(a), that conflict would necessarily call into question the constitutionality of Section 1623(a) itself.  That is because the statute does not simply regulate immigration or the conduct of private individuals.  Instead, it directs state legislatures to structure their own laws in accordance with federal preferences—dictating when and how states may extend educational benefits to their residents and to non-residents from other states.  In doing so, Congress has crossed the line from exercising its enumerated powers into a realm reserved exclusively to the states, which raises serious Tenth Amendment concerns.[9]

---

[8] This Court need not reach this issue if it agrees that the Texas Dream Act complies with Section 1623(a) and that the district court erred in holding otherwise.  *See Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) (explaining the canon of constitutional avoidance).

[9] SAT has standing to assert a Tenth Amendment argument because the district court's order striking down provisions of the Texas Dream Act caused injury to its members.  *See Bond v. United States*, 564 U.S. 211, 220 (2011) ("[I]ndividual[s], in a proper case, can assert injury from governmental action taken in excess of the authority that federalism defines.").

The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. As the Supreme Court made clear, "the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States." *New York v. United States*, 505 U.S. 144, 157–58 (1992); *see also Arizona v. United States*, 567 U.S. 387, 398 (2012) ("[B]oth the National and State Governments have elements of sovereignty the other is bound to respect."). When the federal government issues commands to the states—whether by direct order or by coercive condition—it violates the foundational principle of dual sovereignty. As explained below, Section 1623(a) improperly instructs and coerces state legislation, intruding upon education, a traditional area of exclusive state authority, and therefore diffuses accountability.

### 1.   The Federal Government Cannot Tell the State How to Legislate

Section 1623(a) improperly purports to authorize Congress to tell the Texas legislature what it "may and may not do." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 474 (2018); *see also Printz v. United States*, 521 U.S. 898, 935 (1997) ("Congress cannot compel States to enact or enforce a federal regulatory program."). The United States Constitution limited but did not eliminate the sovereignty of the states. "Thus, both the Federal Government and the States wield sovereign powers,

and that is why our system of government is said to be one of 'dual sovereignty.'" *Murphy*, 584 U.S. at 470 (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991)).

Within this dual sovereignty system, Congress has the power to regulate on matters of immigration. As the Supreme Court stated in 2012, "[t]he Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). That is based upon its "power to 'establish an uniform Rule of Naturalization' and its inherent power as sovereign to control and conduct relations with foreign nations." *Id.* at 394–95 (citations omitted). However, federal power over immigration matters does not give the federal government power over states themselves. The Supreme Court clarified that limitation in federal power when it stated that "regardless of the language sometimes used by Congress and this Court, every form of preemption is based on a federal law that regulates the conduct of private actors, not the States." *Murphy*, 584 U.S. at 479 (explaining the reasoning in *Arizona v. United States*, 567 U.S. 387 (2012)).

In that sense, Congress was within its authority to completely foreclose benefits to students without lawful immigration status. A statute that did that would be nested within congressional power over immigration by specifically regulating the conduct of private actors. Thus, in this case, there would be no Tenth Amendment concern if Section 1623(a) ended before "unless." But Congress did

not choose to completely ban educational benefits for undocumented students. Instead, Congress decided to allow undocumented students to receive educational benefits *only if* states made all U.S. citizens or nationals also eligible for those benefits. This is the problem with Section 1623(a).

By adding that requirement, states that want to provide educational benefits to undocumented students based on their residency within the state, must change their laws to also provide those same benefits to all United States citizens or nationals. *See* 8 U.S.C. § 1623(a). Such a requirement to legislate in that specific manner tells a state what it "may and may not do." *Murphy*, 584 U.S. at 474. It is "as if federal officers were installed in state legislative chambers and were armed with the authority to stop legislators from voting on any offending proposals." *Id.* Or it is as if federal officers were inserting provisions in state legislation without the consent of the legislators. That is something Congress simply cannot do under the Tenth Amendment. This limitation applies when the federal government "directly commands" a state to regulate or "indirectly coerces" it into adopting a federal regulatory system. *Sebelius*, 567 U.S. at 578.

As the Supreme Court made clear, "conspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States." *Murphy*, 584 U.S. at 471. "The Federal Government may neither issue directives requiring the States to address particular problems, nor command the

States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz*, 521 U.S. at 935.    "[S]uch commands are fundamentally incompatible with our constitutional system of dual sovereignty." *Id.* Thus, regardless of what problem Congress may have perceived with providing, or not providing, in-state tuition to citizen residents of other states, it has no authority to tell any state how to legislatively address the matter.

Moreover, Section 1623(a)'s requirement to provide educational benefits to United States citizens or nationals has *nothing* to do with immigration.  The mere fact that it is embedded in a statute as a part of IIRIRA does not mean that it confers on Congress powers that are beyond what is reserved to it by the Constitution.[10]  If Congress could regulate broader state tuition policies simply because the beneficiaries include students without lawful immigration status, there would be no limiting principle: Congress could just as easily condition a state's decision to extend those educational benefits to immigrants to that state's reduction of sales tax rates by fifty percent.  Such a condition would also be unconstitutional because Congress has no authority to compel or penalize a state's internal fiscal or educational policy choices under the guise of regulating immigration.

---

[10] Congress was trying to coerce its preferred policy on immigration by adding the condition about citizens from other states, but that is improper coercion under the Tenth Amendment because it dictates policy in a plainly non-immigration-related area.

Ultimately, Section 1623(a) functions as a coercive tool for Congress to bring state policy into alignment with federal preferences. Several states, like Texas, have decided that it serves their interest to extend regular tuition rates to students without lawful immigration status who have resided in their state and graduated high school. Congress, through Section 1623(a), overrides those state decisions by imposing an onerous condition that no state would accept: providing regular tuition rates to all U.S. citizens regardless of their connection to the state. States simply cannot afford to provide regular tuition rates to all U.S. citizens from other states. That would obliterate in-state tuition schemes and result in massive financial loss to public universities. Thus, Congress has sought to do what it cannot and compel states to follow federal policy directives in state legislation. *See New York*, 505 U.S. at 161 (1992) (stating that Congress may not compel states to enact a federal regulatory program). As the Supreme court emphasized, "Congress cannot order states to forgo a sovereign power by an explicit command or a conditional offer a State cannot refuse." *Nat'l Fed. of Indep. Business v. Sebelius*, 567 U.S. 519, 576–77 (2012).

Because Section 1623(a) allows the federal government to coerce state legislation, it impermissibly violates state sovereignty.

///

///

45

**2. Section 1623(a) Improperly Intrudes on State Power Over Education by Requiring Texas to Expand Education Benefits to All U.S. Citizens**

Section 1623(a), by requiring states to provide educational benefits to all U.S. citizens and nationals—something completely unrelated to the regulation of immigration—intrudes upon a domain historically and constitutionally reserved to the states: education policy and funding. "The American people have always regarded education and the acquisition of knowledge as matters of supreme importance." *Plyler v. Doe*, 457 U.S. 202, 221 (1982) (internal quotations and citation omitted). Indeed, education and its acquisition are universally recognized as core state functions. *See, e.g., Brown v. Bd. of Ed. of Topeka, Shawnee Cty., Kan.*, 347 U.S. 483, 493 (1954) ("Today, education is perhaps the most important function of state and local governments."); *Milliken v. Bradley*, 418 U.S. 717, 741 (1974) ("No single tradition in public education is more deeply rooted than local control over the operation of schools"); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 29 (1973) ("[E]ducation is perhaps the most important function of state and local governments."). Thus, federal intrusion into this domain must be looked upon with utmost caution.

State control of education is not a matter of administrative convenience, but a constitutional necessity that flows from our system of dual sovereignty. It ensures

that decisions about the education of a state's citizenry, including how to fund schools, determine curricula, or structure tuition, are made by the states according to mandates by their citizens. *See Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972) ("Providing public schools ranks at the very apex of the function of a State.").

Section 1623(a) intrudes into state sovereignty over education when it mandates that if a state wishes to offer regular tuition or similar educational benefits to certain immigrants, it must extend those same benefits to all U.S. citizens and nationals, regardless of whether they reside in that state. *See* 8 U.S.C. § 1623(a). This federal directive effectively overrides state determinations about who qualifies for regular tuition, who merits financial support, and how state funds should be distributed among students. Those are quintessential state policy judgments—ones that the federal government has no constitutional authority to dictate.

What makes this intrusion particularly troubling is the manner in which Congress enters the field of education—through the shadow of an immigration statute. Section 1623(a) appears in the IIRIRA, a law enacted to strengthen federal control over immigration enforcement. But Section 1623(a)'s conditional clause does not determine who may enter or remain in the United States or who may obtain immigration status. Instead, it regulates how states allocate in-state tuition rates among their citizen students, a question of domestic education policy—not

immigration. Thus, Section 1623(a) is an impermissible intrusion into state sovereignty over education.

### 3. Section 1623(a) Undermines Political Accountability and Structural Safeguards of Federalism

Beyond intruding into state education functions, Section 1623(a) also undermines one of the most fundamental protections of the federalist system: political accountability. Federalism is not merely a division of power between the federal and state governments; it is a structural safeguard to ensure that both levels of government remain directly answerable to their respective constituents. *See New York*, 505 U.S. at 168 ("Accountability is . . . diminished when, due to federal coercion, elected state officials cannot regulate in accordance with the views of the local electorate in matters not pre-empted by federal regulation."). Thus, when federal law forces state legislatures to enact or maintain policies not of their choosing, accountability blurs. Citizens can no longer tell whether their state officials or Congress are to blame for unpopular policies. This is contrary to what the Constitution contemplates—"that a State's government will represent and remain accountable to its own citizens." *Printz*, 521 U.S. at 920.

Section 1623(a) produces this exact problem. By requiring states to extend regular tuition to all U.S. citizens and nationals as a condition of offering that benefit

to students without lawful immigration status, the federal government forces state legislatures to enact policies that they, and their constituents, do not want to enact.

This is especially important regarding decision-making concerning tuition rates at public colleges and universities, which belongs exclusively to the states. The core concept of accountability is undermined when the federal government mandates that Texas extend regular tuition to all U.S. citizens—regardless of their ties to the state. Decisions about tuition rates and eligibility for other educational benefits are central to state policy. Each State must balance fiscal realities, economic priorities, and educational goals in determining how to allocate limited public funds. When Congress dictates the outcome of those decisions—by commanding that they extend educational benefits to all U.S. citizens, it strips those choices from the people and their elected state representatives. What results is that state officials bear the political cost of a policy they were forced to adopt, while Congress reaps the benefit of setting a national policy without the political consequences of implementing or funding it.

The Constitution does not permit Congress to obscure accountability in this way. Because educational policy and tuition decisions belong to the States, the federal government may not require them to provide regular tuition rates to individuals that the states have deemed ineligible.

## D. The District Court Failed to Consider Whether the Texas Dream Act is Severable and Remains Operative

The district court erred when it invalidated the Texas Dream Act in its entirety. As mentioned above, courts are not empowered to strike down an entire statute merely because one portion may be invalid. *See Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) (courts should not "nullify more of a legislature's work than is necessary"). That is particularly problematic where a state legislature has expressed a preference for severability or where state law provides a severability rule.

Here, Texas law expressly provides for severability even when a statute lacks a specific severability clause. *See* Tex. Gov't Code § 311.032(c). Texas provides that "if any provision of the statute . . . is held invalid, the invalidity does not affect other provisions . . . of the statute that can be *given effect* without the invalid provision . . . ." *Id.* (emphasis added). Thus, in Texas, the default rule is that statutes are severable unless the invalid portion is essential to the remaining portion. *See Rose*, 801 S.W.2d at 844 ("If, when the unconstitutional portion is stricken out, that which remains is complete in itself, and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected, it must stand.") (citation omitted).

Here, the Texas Dream Act satisfies that standard.  The relevant portion states that "the following persons are considered residents of this state for purposes of this title:

> . . .
> (3) a person who:
>> (A) graduated from a public or private high school in this state or received the equivalent of a high school diploma in this state; and
>> (B) maintained a residence continuously in this state for:
>>> (i) the three years preceding the date of graduation or receipt of the diploma equivalent, as applicable; and
>>> (ii) the year preceding the census date of the academic term in which the person is enrolled in an institution of higher education.

Texas Education Code § 54.052(a).  It contains two distinct criteria for students to receive regular tuition: one based on high school attendance and graduation within Texas (Tex. Educ. Code § 54.052(a)(3)(A)), and one based on residence (Tex. Educ. Code § 54.052(a)(3)(B)).  These two provisions are grammatically and functionally independent.  Grammatically, each clause of § 54.052(a)(3) is drafted as an independent condition, separated by clear subparagraphs, punctuation, and statutory numbering.  Functionally, either of the two provisions could operate alone.  Each also serves a distinct legislative purpose. The high school clause expresses the legislature's intent to reward students who have spent formative years in Texas schools and have integrated into the state's educational system.  It recognizes a student's investment in and connection to the State's academic community.  The residence clause, by contrast, reflects a more traditional criterion for establishing

domicile or physical presence within the State.  Thus, even if the residence provision is held to be unconstitutional, it could be severed from the rest of the statute, leaving the high school provision of the Texas Dream Act in place.

Accordingly, assuming the district court would have disagreed with SAT regarding the proper interpretation of Section 1623(a)'s residence prohibition, it still erred by failing to consider severability when it granted the extraordinary remedy requested by the Parties.   Accordingly, SAT respectfully asks this Court to remand the case for the district court to consider the severability issue, which requires specific findings and conclusions that must be reached by the district court.  *See Ayotte*, 546 U.S. at 331 (remanding for the lower court to consider severability issue).

## CONCLUSION

For each and all of the foregoing reasons, SAT respectfully asks this Court to grant SAT's intervention, to lift the consent judgment order entered without considering any of these issues, and remand the case for further proceedings.

Dated: October 29, 2025                    Respectfully submitted,

*/s/ Fernando Nuñez*
Thomas A. Saenz (Cal. Bar No. 159430)
Fernando Nuñez (Cal. Bar No. 327390)
Luis L. Lozada (Cal. Bar No. 344357)
**MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND**
634 South Spring Street, 11th floor
Los Angeles, CA 90014

Facsimile: (213) 629-0266
Email: tsaenz@maldef.org
fnunez@maldef.org
llozada@maldef.org

Nina Perales (Tex. Bar No. 24005046)
MEXICAN AMERICAN LEGAL DEFENSE
AND EDUCATIONAL FUND
110 Broadway, Suite 300
San Antonio, Texas 78205
Facsimile: (210) 224-5382
Email: nperales@maldef.org

*Attorneys for Students for Affordable Tuition*

## CERTIFICATE OF SERVICE

I hereby certify that on October 29, 2025, I filed the foregoing with the Clerk of the Court via CM/ECF, which will deliver electronic copies to all counsel of record in this appeal.

Respectfully submitted,

*/s/ Fernando Nuñez*
Fernando Nuñez (Cal. Bar No. 327390)
*Attorney for Students for Affordable Tuition*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. 32(a)(7)(B) because this brief contains 12,714 words excluding the parts of the brief exempted by Fed. R. App. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman font size 14.

Dated: October 29, 2025

Respectfully submitted,

*/s/ Fernando Nuñez*
Fernando Nuñez (Cal. Bar No. 327390)
*Attorney for Students for Affordable Tuition*

# ADDENDUM

United States Code Annotated
    Federal Rules of Civil Procedure for the United States District Courts (Refs & Annos)
        Title IV. Parties

Federal Rules of Civil Procedure Rule 24

Rule 24. Intervention

Currentness

**(a) Intervention of Right.** On timely motion, the court must permit anyone to intervene who:

**(1)** is given an unconditional right to intervene by a federal statute; or

**(2)** claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

**(b) Permissive Intervention.**

**(1)** *In General.* On timely motion, the court may permit anyone to intervene who:

**(A)** is given a conditional right to intervene by a federal statute; or

**(B)** has a claim or defense that shares with the main action a common question of law or fact.

**(2)** *By a Government Officer or Agency.* On timely motion, the court may permit a federal or state governmental officer or agency to intervene if a party's claim or defense is based on:

**(A)** a statute or executive order administered by the officer or agency; or

**(B)** any regulation, order, requirement, or agreement issued or made under the statute or executive order.

**(3)** *Delay or Prejudice.* In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.

**(c) Notice and Pleading Required.** A motion to intervene must be served on the parties as provided in Rule 5. The motion must state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which intervention is sought.

**CREDIT(S)**

(Amended December 27, 1946, effective March 19, 1948; December 29, 1948, effective October 20, 1949; January 21, 1963, effective July 1, 1963; February 28, 1966, effective July 1, 1966; March 2, 1987, effective August 1, 1987; April 30, 1991, effective December 1, 1991; April 12, 2006, effective December 1, 2006; April 30, 2007, effective December 1, 2007.)

<**Amendments received through April 1, 2025**>

**ADVISORY COMMITTEE NOTES**

1937 Adoption

The right to intervene given by the following and similar statutes is preserved, but the procedure for its assertion is governed by this rule:

U.S.C., Title 28 former sections:

> 45a [now 2323] (Special attorneys; participation by Interstate Commerce Commission; intervention) (in certain cases under interstate commerce laws)

> 48 [now 2322] (Suits to be against United States; intervention by United States)

> 401 [now 2403] (Intervention by United States; constitutionality of Federal statute)

U.S.C., Title 40:

> 276a-2(b) [now 3162(a)(2)] (Bonds of contractors for public buildings or works; rights of persons furnishing labor and materials).

Compare with the last sentence of [former] Equity Rule 37 (Parties Generally--Intervention). This rule amplifies and restates the present federal practice at law and in equity. For the practice in admiralty see Admiralty Rules 34 (How Third Party May Intervene) and 42 (Claims Against Proceeds in Registry). See generally Moore and Levi, *Federal Intervention: I The Right to Intervene and Reorganization* (1936), 45 Yale L.J. 565. Under the codes two types of intervention are provided, one for the recovery of specific real or personal property (2 Ohio Gen.Code Ann. (Page, 1926) § 11263; Wyo.Rev.Stat.Ann. (Courtright, 1931) § 89-522), and the other allowing intervention generally when the applicant has an interest in the matter in litigation (1 Colo.Stat.Ann. (1935) Code Civ.Proc. § 22; La.Code Pract. (Dart, 1932) Arts. 389-394; Utah Rev.Stat.Ann. (1933) § 104-3-24). The English intervention practice is based upon various rules and decisions and falls into the two categories of absolute right and discretionary right. For the absolute right see *English Rules Under the Judicature Act* (The Annual Practice, 1937) O. 12, r. 24 (admiralty), r. 25 (land), r. 23 (probate); O. 57, r. 12 (execution); J.A. (1925) §§ 181, 182, 183(2) (divorce); *In re Metropolitan Amalgamated Estates, Ltd.,* (1912) 2 Ch. 497 (receivership); *Wilson v. Church,* 9 Ch.D. 552 (1878) (representative action). For the discretionary right see O. 16, r. 11 (non-joinder) and *Re Fowler,* 142 L.T.Jo. 94 (Ch.1916), *Vavasseur v. Krupp,* 9 Ch.D. 351 (1878) (persons out of the jurisdiction).

**1946 Amendment**

**Note. Subdivision (a).** The addition to subdivision (a)(3) covers the situation where property may be in the actual custody of some other officer or agency--such as the Secretary of the Treasury--but the control and disposition of the property is lodged in the court wherein the action is pending.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.    2

**Subdivision (b).** The addition in subdivision (b) permits the intervention of governmental officers or agencies in proper cases and thus avoids exclusionary constructions of the rule. For an example of the latter, see *Matter of Bender Body Co.,* Ref. Ohio 1941, 47 F.Supp. 224, holding that the Administrator of the Office of Price Administration, then acting under the authority of an Executive Order of the President, could not intervene in a bankruptcy proceeding to protest the sale of assets above ceiling prices. Compare, however, *Securities and Exchange Commission v. United States Realty & Improvement Co.,* 1940, 310 U.S. 434, 60 S.Ct. 1044, where permissive intervention of the Commission to protect the public interest in an arrangement proceeding under Chapter XI of the Bankruptcy Act was upheld. See also dissenting opinion in *Securities and Exchange Commission v. Long Island Lighting Co.,* C.C.A.2d 1945, 148 F.2d 252, judgment vacated as moot and case remanded with direction to dismiss complaint, 1945, 325 U.S. 833, 65 S.Ct. 1085. For discussion see Commentary, *Nature of Permissive Intervention Under Rule 24b,* 1940, 3 Fed.Rules Serv. 704; Berger, *Intervention by Public Agencies in Private Litigation in the Federal Courts,* 1940, 50 Yale L.J. 65.

Regarding the construction of subdivision (b)(2), see *Allen Calculators, Inc. v. National Cash Register Co.,* 1944, 64 S.Ct. 905, 322 U.S. 137, 88 L.Ed. 1188.

### 1948 Amendment

The amendment substitutes the present statutory reference.

### 1963 Amendment

This amendment conforms to the amendment of Rule 5(a). See the Advisory Committee's Note to that amendment.

### 1966 Amendment

In attempting to overcome certain difficulties which have arisen in the application of present Rule 24(a)(2) and (3), this amendment draws upon the revision of the related Rules 19 (joinder of persons needed for just adjudication) and 23 (class actions), and the reasoning underlying that revision.

Rule 24(a)(3) as amended in 1948 provided for intervention of right where the applicant established that he would be adversely affected by the distribution or disposition of property involved in an action to which he had not been made a party. Significantly, some decided cases virtually disregarded the language of this provision. Thus Professor Moore states: "The concept of a fund has been applied so loosely that it is possible for a court to find a fund in almost any in personam action." 4 Moore's *Federal Practice,* par. 24.09[3], at 55 (2d ed. 1962), and see, e.g., *Formulabs, Inc. v. Hartley Pen Co.,* 275 F.2d 52 (9th Cir.1960). This development was quite natural, for Rule 24(a)(3) was unduly restricted. If an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene, and his right to do so should not depend on whether there is a fund to be distributed or otherwise disposed of. Intervention of right is here seen to be a kind of counterpart to Rule 19(a)(2)(i) on joinder of persons needed for a just adjudication: where, upon motion of a party in an action, an absentee should be joined so that he may protect his interest which as a practical matter may be substantially impaired by the disposition of the action, he ought to have a right to intervene in the action on his own motion. See Louisell & Hazard, *Pleading and Procedure: State and Federal* 749-50 (1962).

The general purpose of original Rule 24(a)(2) was to entitle an absentee, purportedly represented by a party, to intervene in the action if he could establish with fair probability that the representation was inadequate. Thus, where an action is being prosecuted or defended by a trustee, a beneficiary of the trust should have a right to intervene if he can show that the trustee's representation of his interest probably is inadequate; similarly a member of a class should have the right to intervene in a class action if he can show the inadequacy of the representation of his interest by the representative parties before the court.

Original Rule 24(a)(2), however, made it a condition of intervention that "the applicant is or may be bound by a judgment in the action," and this created difficulties with intervention in class actions. If the "bound" language was read literally in the sense of res judicata, it could defeat intervention in some meritorious cases. A member of a class to whom a judgment in a class action extended by its terms (see Rule 23(c)(3), as amended) might be entitled to show in a later action, when the judgment in the class action was claimed to operate as res judicata against him, that the "representative" in the class action had not in fact adequately represented him. If he could make this showing, the class-action judgment might be held not to bind him. See *Hansberry v. Lee,* 311 U.S. 32 (1940). If a class member sought to intervene in the class action proper, while it was still pending, on grounds of inadequacy of representation, he could be met with the argument: if the representation was in fact inadequate, he would not be "bound" by the judgment when it was subsequently asserted against him as res judicata, hence he was not entitled to intervene; if the representation was in fact adequate, there was no occasion or ground for intervention. See *Sam Fox Publishing Co. v. United States,* 366 U.S. 683 (1961); cf. *Sutphen Estates, Inc. v. United States,* 342 U.S. 19 (1951). This reasoning might be linguistically justified by original Rule 24(a)(2); but it could lead to poor results. Compare the discussion in *International M. & I. Corp. v. Von Clemm,* 301 F.2d 857 (2d Cir.1962); *Atlantic Refining Co. v. Standard Oil Co.,* 304 F.2d 387 (D.C.Cir.1962). A class member who claims that his "representative" does not adequately represent him, and is able to establish that proposition with sufficient probability, should not be put to the risk of having a judgment entered in the action which by its terms extends to him, and be obliged to test the validity of the judgment as applied to his interest by a later collateral attack. Rather he should, as a general rule, be entitled to intervene in the action.

The amendment provides that an applicant is entitled to intervene in an action when his position is comparable to that of a person under Rule 19(a)(2)(i), as amended, unless his interest is already adequately represented in the action by existing parties. The Rule 19(a)(2)(i) criterion imports practical considerations, and the deletion of the "bound" language similarly frees the rule from undue preoccupation with strict considerations of res judicata.

The representation whose adequacy comes into question under the amended rule is not confined to formal representation like that provided by a trustee for his beneficiary or a representative party in a class action for a member of the class. A party to an action may provide practical representation to the absentee seeking intervention although no such formal relationship exists between them, and the adequacy of this practical representation will then have to be weighed. See *International M. & I. Crop. v. Von Clemm,* and *Atlantic Refining Co. v. Standard Oil Co.,* both supra; *Wolpe v. Poretsky,* 144 F.2d 505 (D.C.Cir.1944), cert. denied, 323 U.S. 777 (1944); cf. *Ford Motor Co. v. Bisanz Bros.,* 249 F.2d 22 (8th Cir.1957); and generally, Annot., 84 A.L.R.2d 1412 (1961).

An intervention of right under the amended rule may be subject to appropriate conditions or restrictions responsive among other things to the requirements of efficient conduct of the proceedings.

1987 Amendment

The amendments are technical. No substantive change is intended.

1991 Amendment

Language is added to bring Rule 24(c) into conformity with the statute cited, resolving some confusion reflected in district court rules. As the text provides, counsel challenging the constitutionality of legislation in an action in which the appropriate government is not a party should call the attention of the court to its duty to notify the appropriate governmental officers. The statute imposes the burden of notification on the court, not the party making the constitutional challenge, partly in order to protect against any possible waiver of constitutional rights by parties inattentive to the need for notice. For this reason, the failure of a party to call the court's attention to the matter cannot be treated as a waiver.

2006 Amendment

New Rule 5.1 replaces the final three sentences of Rule 24(c), implementing the provisions of 28 U.S.C. § 2403. Section 2403 requires notification to the Attorney General of the United States when the constitutionality of an Act of Congress is called in question, and to the state attorney general when the constitutionality of a state statute is drawn into question.

2007 Amendment

The language of Rule 24 has been amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only.

The former rule stated that the same procedure is followed when a United States statute gives a right to intervene. This statement is deleted because it added nothing.

Notes of Decisions (2558)

**O'CONNOR'S CROSS REFERENCES**
**O'Connor's Federal Rules Civil Trials:**

See *O'Connor's Federal Rules*, "Motion to Intervene," ch. 5-J, §1 et seq.; *O'Connor's Federal Civil Forms*, FORMS 5J:1 et seq.

**O'CONNOR'S ANNOTATIONS**

*Generally*
*Moses v. City of Perry*, 90 F.4th 501, 505 (6th Cir.2024). "'[A] plaintiff may dismiss an action without a court order by filing … a stipulation of dismissal signed by all parties who have appeared.' [¶] But a nonparty does not become a 'party' under [FRCP] 41 as soon as it moves to intervene. '[W]hen the term [to intervene] is used in reference to legal proceedings, it covers the right of one to interpose in, or *become a party to*, a proceeding already instituted.' So a nonparty does not become a party until the district court grants the motion to intervene. [¶] The text of the [FRCPs] is consistent with this understanding of the term 'party.' [FRCP] 24 … uses 'existing parties,' 'original parties,' and 'parties' interchangeably, and as a different category from proposed intervenors. For intervention of right, 'existing parties' must not adequately represent the proposed intervenor's interest. For permissive intervention, the court must consider prejudice to 'the original parties' rights.' And would-be intervenors must serve their motion to intervene on 'the parties.' That same rule refers to the proposed intervenor as 'the movant' or 'anyone.'" Held: Stipulation of dismissal was effective without proposed intervenor signing it.

*In re Brewer*, 863 F.3d 861, 868 (D.C.Cir.2017). "[W]e must determine the effect of a stipulated dismissal upon a subsequent motion for intervention for the purposes of appealing. [¶] A stipulated dismissal is 'effective automatically' upon filing and requires no further action on behalf of a district court in order to constitute a final judgment, ripe for appeal. *At 869:* Some Circuits have reasoned the 'jurisdiction-stripping' effect of a stipulated dismissal precludes a district court from taking further action on motions made after, or even before, the dismissal. Those decisions suggest that upon the stipulated or voluntary dismissal of the current parties' claims, a court may lack jurisdiction to review a non-party's motion for intervention. [¶] In our view, a stipulated dismissal, aside from its immediate effectiveness, is no different in jurisdictional effect from a dismissal by court order…. [¶] Several Circuits have framed the jurisdictional effect of a stipulated dismissal in sweeping terms, … but none has suggested that effect is unique to a stipulated dismissal, as opposed to a court-ordered dismissal…. Nor is there anything in [FRCP] 41(a) (1)(A)(ii) (stipulated dismissals), or in the remainder of Rule 41 (dismissals in general), that suggests a stipulated dismissal is in any way jurisdictionally unique. *At 870:* For these reasons, we conclude that mootness, albeit accelerated by the immediacy of a stipulated dismissal, is what gives a dismissal pursuant to Rule 41(a)(1)(A)(ii) its jurisdictional effect. And if a motion to intervene can survive a case becoming otherwise moot, then so too can a motion to intervene survive a stipulated dismissal."

***National Parks Conserv. Ass'n v. U.S. EPA***, 759 F.3d 969, 973-74 (8th Cir.2014). "The … issue is what information should a court consider when assessing a motion to intervene and how should that information be considered. [T]he court should [focus] on the [plaintiffs'] complaint and the allegations in [the prospective intervenor's] motion to intervene. [¶] A court ruling on a motion to intervene must accept as true all material allegations in the motion to intervene and must construe the motion in favor of the prospective intervenor. … When the allegations in the underlying controversy are relevant [to intervention,] the court should focus its attention on the pleadings…. Viewing the complaint holistically, the court should assume the plaintiff will receive the relief it seeks and, from that assumption, assess the sufficiency of the prospective intervenor's motion. [¶] Allowing litigants to defeat a motion to intervene by expanding or constricting the scope of a lawsuit through allegations at a motion hearing or arguments in a brief would promote gamesmanship and create uncertainty for prospective intervenors. … By contrast, when a court focuses its intervention analysis on the underlying pleadings, it provides a prospective intervenor a stable source to determine whether intervention is prudent."

***U.S. v. City of Detroit***, 712 F.3d 925, 931-32 (6th Cir.2013). "[C]ourts are not faced with an all-or-nothing choice between grant or denial [of intervention]: Rule 24 also provides for limited-in-scope intervention. [C]ourts often permit intervention even after final judgment, for the limited purpose of appeal, … or to participate in future remedial proceedings…. Intervention may also be limited to 'claims raised by the original parties,' subject to a bar to raising 'collateral issues.' [¶] Limited intervention is particularly appropriate in fact-specific situations … where the case is complicated, non-adversarial, and implicates the public interest; getting all interested parties to the table promotes an effective and fair solution, but preventing an expansion of the scope is necessary to keep control of the case."

***Disability Advocates, Inc. v. New York Coalition for Quality Assisted Living, Inc.***, 675 F.3d 149, 160 (2d Cir.2012). "[I]f jurisdiction is lacking at the commencement of a suit, it cannot be aided by the intervention of a plaintiff with a sufficient claim. [¶] That is, Rule 24 does not itself provide a basis for jurisdiction. *At 161:* [But a district court has] discretion to treat the pleading of an intervenor as a separate action … to adjudicate the claims raised by the intervenor even if the underlying claim [is] jurisdictionally deficient [as long as] the intervention [has] occurred before any action by the defendants [has] been taken. [¶] [H]owever, [permitting] interven[tion] *after the trial had concluded* … would allow the … exception (that curative interventions be construed as separate actions when they are effected at the beginning of the proceedings) to swallow the clearly-established constitutional rule that intervention cannot cure any jurisdictional defect that would have barred the federal court from hearing the original action. [¶] The relevant question … is not whether the curative intervenor is prepared to take the case 'as he finds it' for the sake of judicial economy, but rather, whether he entered sufficiently early in the litigation to ensure that parties invoking the court's jurisdiction have alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult questions." (Internal quotes omitted.)

***In re Bayshore Ford Trucks Sales, Inc.***, 471 F.3d 1233, 1246 (11th Cir.2006). "Once a court grants intervention, whether of right or by permission, the 'intervenor is treated as if [it] were an original party and has equal standing with the original parties.' Toward that end, both Rule 24(a) and Rule 24(b) require the prospective intervenor to anchor its request in the dispute giving rise to the pending lawsuit. The prospective intervenor must demonstrate 'an interest relating to the property or transaction which is *the subject of the action*' if relying on Rule 24(a), or it must show that its 'claim or defense and *the main action* have a question of law or fact in common' if relying on Rule 24(b). In either case, the plain language of Rule 24 requires the intervenor's interest to be based on the action pending before the court."

### Intervention of Right

***Town of Chester v. Laroe Estates, Inc.***, 581 U.S. 433, 435 (2017). "Must a litigant possess Article 3 standing … to intervene of right under [FRCP] 24(a)(2)? *At 440:* [A]n intervenor of right must have Article 3 standing in order to pursue relief that is different from that which is sought by a party with standing. That includes cases in which both the plaintiff and the intervenor seek separate money judgments in their own names."

*Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972). FRCP 24(a) "is satisfied if the applicant shows that representation of his interest 'may be' inadequate; and the burden of making that showing should be treated as minimal." *See also Berger v. North Carolina State Conf. of the NAACP*, 597 U.S. 179, 195-97 (2022).

*La Union del Pueblo Entero v. Abbott*, 29 F.4th 299, 307-08 (5th Cir.2022). Under "the inadequacy-of-representation requirement[, an applicant for intervention] 'need not show that the representation by existing parties will be, for certain, inadequate,' but instead that it *may* be inadequate. [¶] Though we have characterized this burden as 'minimal,' … to give it some 'teeth,' we have recognized 'two presumptions of adequate representation….' The first presumption arises when the intervenor 'has the same ultimate objective as a party to the lawsuit.' This presumption can be overcome by showing 'adversity of interest, collusion, or nonfeasance on the part of the existing party.' *At 308 n.6:* '[A]dversity of interest, collusion, or nonfeasance on the part of the existing party' is not an exclusive list of ways to rebut the presumption…. *At 308:* An intervenor can establish an adversity of interest if 'its interests diverge from the putative representative's interests in a manner germane to the case.' The second presumption arises when the existing party 'is a governmental body or officer charged by law with representing the interests' of the intervenor, which can be overcome by showing that the intervenor's 'interest is in fact different from that of the' governmental party 'and that the interest will not be represented by' the existing governmental party." *See also South Dakota v. U.S. Dept. of Interior*, 317 F.3d 783, 785 (8th Cir.2003) (applicant for intervention bears heavier burden to prove inadequate representation when party already in suit has obligation to represent applicant's interests); *Clark v. Putnam Cty.*, 168 F.3d 458, 461 (11th Cir.1999) (presumption of adequate representation is weak; it merely imposes upon proposed interveners burden of coming forward with some evidence to contrary).

*Texas v. U.S.*, 805 F.3d 653, 657 (5th Cir.2015). "[T]he 'interest' requirement of Rule 24(a)(2) … requires that intervenors claim an interest relating to the property or transaction that is the subject of the action. … Although there is not any clear definition of the nature of the interest that is required for intervention of right, … Rule 24(a)(2) [has been interpreted] to require a direct, substantial, legally protectable interest in the proceedings…. [¶] [T]he inquiry turns on whether the intervenor has a stake in the matter that goes beyond a generalized preference that the case come out a certain way. So, an intervenor fails to show a sufficient interest when he seeks to intervene solely for ideological, economic, or precedential reasons; that would-be intervenor merely *prefers* one outcome to the other. *At 658:* On the other hand, an interest that is concrete, personalized, and legally protectable is sufficient to support intervention. A property interest, for example, is the most elementary type of right that Rule 24(a) is designed to protect … because it is concrete, specific to the person possessing the right, and legally protectable. [¶] Although property interests are almost always adequate, … we have disclaimed the notion that a person must possess a pecuniary or property interest to satisfy the requirement of Rule 24(a)(2). Non-property interests are sufficient to support intervention when … they are concrete, personalized, and legally protectable. *At 659:* Moreover, although an asserted interest must be 'legally protectable,' it need not be legally *enforceable*. In other words, an interest is sufficient if it is of the type that the law deems worthy of protection, even if the intervenor does not have an enforceable legal entitlement or would not have standing to pursue her own claim." (Internal quotes omitted.) *See also California Dept. of Toxic Substances Control v. Jim Dobbas, Inc.*, 54 F.4th 1078, 1086-88 (9th Cir.2022); *San Juan Cty. v. U.S.*, 503 F.3d 1163, 1200-01 (10th Cir.2007).

*WildEarth Guardians v. National Park Serv.*, 604 F.3d 1192, 1198 (10th Cir.2010). "We follow 'a somewhat liberal line in allowing intervention.' The factors of Rule 24(a)(2) are intended to 'capture the circumstances in which the practical effect on the prospective intervenor justifies its participation in the litigation,' and '[t]hose factors are not rigid, technical requirements.' [¶] The *interest* element is 'a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process.' The movant's claimed interest is measured in terms of its relationship to the property or transaction that is the subject of the action, not in terms of the particular issue before the district court. *At 1199:* The second element--*impairment*--presents a minimal burden. '[A] would-be intervenor must show only that impairment of its substantial legal interest is possible if intervention is denied.' … 'We may consider any significant legal effect in the applicant's interest and we are not restricted to a rigid *res judicata* test.' *At 1200:* Finally, the *inadequate representation* element of Rule 24(a)(2) also presents a minimal burden. The movant must show only the possibility that representation may be inadequate. 'The possibility that the interests of the applicant and the parties may diverge need not be great in order to satisfy this minimal burden.'"

*California v. U.S.*, 450 F.3d 436, 441 (9th Cir.2006). "An applicant has a significant protectable interest in an action if (1) it asserts an interest that is protected under some law, and (2) there is a relationship between its legally protected interest and the plaintiff's claims." (Internal quotes omitted.) *See also Medical Liab. Mut. Ins. v. Alan Curtis LLC*, 485 F.3d 1006, 1008 (8th Cir.2007) (economic interest in outcome of litigation and interest contingent on occurrence of sequence of events are insufficient to allow intervention); *Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc.*, 72 F.3d 361, 366 (3d Cir.1995) (mere economic interest is insufficient to allow intervention, but interest in specific fund is sufficient).

*Liberty Mut. Ins. v. Treesdale, Inc.*, 419 F.3d 216, 230 (3d Cir.2005). "There is … a difference between [FRCP] 19 and [FRCP] 24. Although both Rules speak of the applicant's ability to protect an interest, Rule 24 contains an additional element, i.e., the adequacy of representation. … Rule 19 does not invite inquiry into the adequacy of representation. It is therefore illogical to conclude that a party who meets the joinder requirements of Rule 19(a)(2)(I) [now Rule 19(a)(1)(B)(i)] automatically qualifies to intervene as of right under Rule 24(a)(2). That interpretation would read the 'adequacy of representation' requirement out of Rule 24(a)(2) by creating a backdoor into the litigation through the less restrictive inquiry of Rule 19(a)(2)(I)."


*Permissive Intervention*

*Nebraska v. Wyoming*, 515 U.S. 1, 21-22 (1995). "A state is presumed to speak in the best interests of those citizens, and requests to intervene by individual contractees may be treated under the general rule that an individual's motion for leave to intervene in this court will be denied absent a 'showing [of] some compelling interest in his own right, apart from his interest in a class with all other citizens and creatures of the state, which interest is not properly represented by the state.'"

*Arizona v. California*, 460 U.S. 605, 615 (1983). "[P]ermission to intervene does not carry with it the right to relitigate matters already determined in the case…."


*Timing of Intervention*

*Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 279-80 (2022). "Timeliness is an important consideration in deciding whether intervention should be allowed, … but '[t]imeliness is to be determined from all the circumstances,' and 'the point to which [a] suit has progressed is ... not solely dispositive….' [¶] Here, the most important circumstance relating to timeliness is that the [applicant] sought to intervene 'as soon as it became clear' that the [applicant's] interests 'would no longer be protected' by the parties in the case. [¶] Although the litigation by that time had proceeded for years, that factor is not dispositive."

*NAACP v. New York*, 413 U.S. 345, 365-66 (1973). "Whether intervention be claimed of right or as permissive, it is … apparent, from the initial words of both Rule 24(a) and Rule 24(b), that the application must be 'timely.' If it is untimely, intervention must be denied. … Although the point to which the suit has progressed is one factor … it is not solely dispositive. Timeliness is to be determined from all the circumstances." *See also Alt v. U.S. EPA*, 758 F.3d 588, 591 (4th Cir.2014); *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 797-98 (7th Cir.2013).

*In re Efron*, 746 F.3d 30, 35 (1st Cir.2014). "The first of [the elements a putative intervenor must demonstrate]--timeliness-- is the sentinel that guards the gateway to intervention. [¶] [T]imeliness involves more than merely checking off the pages of a calendar. But even though multiple factors may influence the timeliness inquiry, … the most important factor is the length of time that the putative intervenor knew or reasonably should have known that his interest was imperiled before he deigned to seek intervention. For this purpose, '[t]he passage of time is measured in relative, not absolute, terms.' 'As a case progresses toward its ultimate conclusion, the scrutiny attached to a request for intervention necessarily intensifies.' In the end, '[t]imeliness is to be gauged from all the circumstances, including the stage to which the proceedings have progressed before intervention is sought.' *At 36:* '[P]arties having knowledge of the pendency of litigation which may affect their interests sit idle at their peril.'" *See also Kalbers v. U.S. Dept. of Justice*, 22 F.4th 816, 822-23 (9th Cir.2021).

*Roane v. Leonhart*, 741 F.3d 147, 151 (D.C.Cir.2014). "The timeliness of a motion to intervene is 'to be judged in consideration of all the circumstances.' Though the 'time elapsed since the inception of the suit' is relevant, … measuring the length of time passed 'is not in itself the determinative test' … because we do not require timeliness for its own sake. Instead, the requirement of timeliness is aimed primarily at preventing potential intervenors from unduly disrupting litigation, to the unfair detriment of the existing parties. Thus, even where a would-be intervenor could have intervened sooner, in assessing timeliness a court must weigh whether any delay in seeking intervention 'unfairly disadvantage[d] the original parties.'" *See also* *Peruta v. County of San Diego*, 824 F.3d 919, 940 (9th Cir.2016).

Fed. Rules Civ. Proc. Rule 24, 28 U.S.C.A., FRCP Rule 24
Including Amendments Received Through 10-1-2025

**End of Document**                                            © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2025 Thomson Reuters. No claim to original U.S. Government Works.   9

United States Code Annotated
    Title 8. Aliens and Nationality (Refs & Annos)
        Chapter 14. Restricting Welfare and Public Benefits for Aliens
            Subchapter II. Eligibility for State and Local Public Benefits Programs

8 U.S.C.A. § 1623

§ 1623. Limitation on eligibility for preferential treatment of aliens not
lawfully present on basis of residence for higher education benefits

Currentness

**(a) In general**

Notwithstanding any other provision of law, an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident.

**(b) Effective date**

This section shall apply to benefits provided on or after July 1, 1998.

**CREDIT(S)**

(Pub.L. 104-208, Div. C, Title V, § 505, Sept. 30, 1996, 110 Stat. 3009-672.)

Notes of Decisions (10)

8 U.S.C.A. § 1623, 8 USCA § 1623
Current through P.L. 119-36. Some statute sections may be more current, see credits for details.

---

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Education Code (Refs & Annos)
    Title 3. Higher Education
      Subtitle A. Higher Education in General
        Chapter 54. Tuition and Fees (Refs & Annos)
          Subchapter B. Tuition Rates (Refs & Annos)

V.T.C.A., Education Code § 54.051

§ 54.051. Tuition Rates

Currentness

(a) In this section:

   (1) "Coordinating board" means the Texas Higher Education Coordinating Board.

   (2) "General academic teaching institution" has the meaning assigned by Section 61.003(3) of this code.

   (3) "Medical and dental unit" has the meaning assigned by Section 61.003 of this code.

   (4) "Public junior college" has the meaning assigned by Section 61.003(2) of this code.

(b) The governing board of each institution of higher education and of the Texas State Technical College System shall cause to be collected from students registering at the institution tuition or registration fees at the rates prescribed in this section.

(c) Unless a different rate is specified by this section, tuition for a resident student at a general academic teaching institution is $50 per semester credit hour.

(d) Unless a different rate is specified by this section, tuition for a nonresident student at a general academic teaching institution or medical and dental unit is an amount per semester credit hour equal to the average of the nonresident undergraduate tuition charged to a resident of this state at a public state university in each of the five most populous states other than this state, as computed by the coordinating board under this subsection. The coordinating board shall set the tuition rate provided by this subsection for each academic year and report that rate to each appropriate institution not later than January 1 of the calendar year in which the academic year begins, or as soon after that January 1 as practicable. In computing the tuition rate, the coordinating board shall use the nonresident tuition rates for the other states in effect for the academic year in progress when the board makes the computation.

(e) Tuition for a resident student registered only for thesis or dissertation credit that is the final credit hour requirement for the degree in progress is determined by the governing board of the institution in which the student is enrolled.

(f) Tuition for a resident student enrolled in a program leading to an M.D. or D.O. degree is $6,550 per academic year. Tuition for a nonresident student enrolled in a program leading to an M.D. or D.O. degree is an amount per year equal to three times the rate that a resident student enrolled in a program leading to an M.D. or D.O. degree would pay during the corresponding academic year.

(g) Tuition for a resident student enrolled in a program leading to a D.D.S. degree is $5,400 per academic year. Tuition for a nonresident student enrolled in program leading to a D.D.S. degree is an amount per year equal to three times the rate that a resident student enrolled in a program leading to a D.D.S. degree would pay during the corresponding academic year.

(h) Tuition for a resident student enrolled in a program leading to a D.V.M. degree is $5,400 per academic year. Tuition for a nonresident student enrolled in a program leading to a D.V.M. degree is an amount per year equal to three times the rate that a resident student enrolled in a program leading to a D.V.M. degree would pay during the corresponding academic year.

(i) Tuition for a resident student registered at a law school is $80 per semester credit hour. Tuition for a nonresident student registered at a law school is the amount that can be charged a nonresident graduate student under Subsection (d) and Section 54.008.

(j) Tuition for a student registered in a program leading to a degree in nursing or in an allied health profession is the same as for students with the same residency registered at a general academic teaching institution.

(k) Tuition for a resident student registered at the Texas State Technical College System is the greater of $50 or an amount set by the governing board of the system at not less than $16 per semester credit hour. Tuition for a nonresident student registered at the Texas State Technical College System is an amount set by the governing board of the system at not less than $80 per semester credit hour.

(l) Resident students or nonresident students registered for a course or courses in art, architecture, drama, speech, or music, where individual coaching or instruction is the usual method of instruction, shall pay a fee, in addition to the regular tuition, set by the governing board of the institution.

(m) Unless the student establishes residency or is entitled or permitted to pay resident tuition as provided by this subchapter, tuition for a student who is a citizen of any country other than the United States of America is the same as the tuition required of other nonresident students.

(n) Tuition for a resident student registered in a public junior college is determined by the governing board of each institution, but the tuition may not be less than $8 for each semester credit hour and may not total less than $25 for a semester. Tuition for a nonresident student is determined by the governing board of each institution but the tuition may not be less than $200 for each semester.

(o) Renumbered as V.T.C.A., Education Code § 54.063 and amended by Acts 1985, 69th Leg., ch. 708, § 8, eff. Aug. 26, 1985.

(p) Renumbered as V.T.C.A., Education Code § 54.064 and amended by Acts 1985, 69th Leg., ch. 708, § 9, eff. Aug. 26, 1985.

**Credits**

Acts 1971, 62nd Leg., p. 3072, ch. 1024, art. 1, § 1, eff. Sept. 1, 1971. Amended by Acts 1971, 62nd Leg., p. 3352, ch. 1024, art. 2, § 29, eff. Sept. 1, 1971; Acts 1973, 63rd Leg., p. 88, ch. 51, § 8, eff. Aug. 27, 1973; Acts 1975, 64th Leg., p. 1358, ch. 515, §§ 1, 2, eff. June 19, 1975; Acts 1975, 64th Leg., p. 2326, ch. 720, § 2, eff. Sept. 1, 1975; Acts 1979, 66th Leg., p. 1382, ch. 617, § 1, eff. Aug. 27, 1979; Acts 1984, 68th Leg., 2nd C.S., ch. 31, art. 10, § 1; Acts 1985, 69th Leg., ch. 708, §§ 1, 8, 9, eff. Aug. 26, 1985; Acts 1991, 72nd Leg., ch. 287, § 26, eff. Sept. 1, 1991; Acts 1991, 72nd Leg., 1st C.S., ch. 5, § 6.01, eff. Sept. 1, 1992; Acts 1995, 74th Leg., ch. 451, § 2, eff. Aug. 28, 1995; Acts 1997, 75th Leg., ch. 1073, § 1.02, eff. Aug. 1, 1997; Acts 2001, 77th Leg., ch. 655, § 2, eff. Sept. 1, 2001; Acts 2001, 77th Leg., ch. 1392, § 1, eff. June 16, 2001; Acts 2005, 79th Leg., ch. 888, § 6, eff. Sept. 1, 2005.

**Editors' Notes**

### VALIDITY

<For validity of this section, see United States v. Tex., No. 7:25-CV-00055-O, 2025 WL 2423900 (N.D. Tex. Aug. 15, 2025).>

Notes of Decisions (37)

V. T. C. A., Education Code § 54.051, TX EDUC § 54.051
Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated

Education Code (Refs & Annos)

Title 3. Higher Education

Subtitle A. Higher Education in General

Chapter 54. Tuition and Fees (Refs & Annos)

Subchapter B. Tuition Rates (Refs & Annos)

V.T.C.A., Education Code § 54.052

§ 54.052. Determination of Resident Status

Currentness

(a) Subject to the other applicable provisions of this subchapter governing the determination of resident status, the following persons are considered residents of this state for purposes of this title:

(1) a person who:

(A) established a domicile in this state not later than one year before the census date of the academic term in which the person is enrolled in an institution of higher education; and

(B) maintained that domicile continuously for the year preceding that census date;

(2) a dependent whose parent:

(A) established a domicile in this state not later than one year before the census date of the academic term in which the dependent is enrolled in an institution of higher education; and

(B) maintained that domicile continuously for the year preceding that census date; and

(3) a person who:

(A) graduated from a public or private high school in this state or received the equivalent of a high school diploma in this state; and

(B) maintained a residence continuously in this state for:

(i) the three years preceding the date of graduation or receipt of the diploma equivalent, as applicable; and

(ii) the year preceding the census date of the academic term in which the person is enrolled in an institution of higher education.

(b) For purposes of this section, the domicile of a dependent's parent is presumed to be the domicile of the dependent unless the person establishes eligibility for resident status under Subsection (a)(3).

**Credits**

Added by Acts 2005, 79th Leg., ch. 888, § 3, eff. Sept. 1, 2005.

**Editors' Notes**

### VALIDITY

<For validity of this section, see United States v. Tex., No. 7:25-CV-00055-O, 2025 WL 2423900 (N.D. Tex. Aug. 15, 2025).>

Notes of Decisions (19)

V. T. C. A., Education Code § 54.052, TX EDUC § 54.052
Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Education Code (Refs & Annos)
    Title 3. Higher Education
      Subtitle A. Higher Education in General
        Chapter 54. Tuition and Fees (Refs & Annos)
          Subchapter B. Tuition Rates (Refs & Annos)

V.T.C.A., Education Code § 54.053

§ 54.053. Information Required to Establish Resident Status

Currentness

A person shall submit the following information to an institution of higher education to establish resident status under this subchapter:

(1) if the person applies for resident status under Section 54.052(a)(1):

(A) a statement of the dates and length of time the person has resided in this state, as relevant to establish resident status under this subchapter; and

(B) a statement by the person that the person's presence in this state for that period was for a purpose of establishing and maintaining a domicile;

(2) if the person applies for resident status under Section 54.052(a)(2):

(A) a statement of the dates and length of time any parent of the person has resided in this state, as relevant to establish resident status under this subchapter; and

(B) a statement by the parent or, if the parent is unable or unwilling to provide the statement, a statement by the person that the parent's presence in this state for that period was for a purpose of establishing and maintaining a domicile; or

(3) if the person applies for resident status under Section 54.052(a)(3):

(A) a statement of the dates and length of time the person has resided in this state, as relevant to establish resident status under this subchapter; and

(B) if the person is not a citizen or permanent resident of the United States, an affidavit stating that the person will apply to become a permanent resident of the United States as soon as the person becomes eligible to apply.

**Credits**

Added by Acts 2005, 79th Leg., ch. 888, § 3, eff. Sept. 1, 2005.

Notes of Decisions (2)

V. T. C. A., Education Code § 54.053, TX EDUC § 54.053

Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
    Government Code (Refs & Annos)
        Title 3. Legislative Branch (Refs & Annos)
            Subtitle B. Legislation
                Chapter 311. Code Construction Act (Refs & Annos)
                    Subchapter C. Construction of Statutes (Refs & Annos)

V.T.C.A., Government Code § 311.032

§ 311.032. Severability of Statutes

Currentness

(a) If any statute contains a provision for severability, that provision prevails in interpreting that statute.

(b) If any statute contains a provision for nonseverability, that provision prevails in interpreting that statute.

(c) In a statute that does not contain a provision for severability or nonseverability, if any provision of the statute or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the statute that can be given effect without the invalid provision or application, and to this end the provisions of the statute are severable.

**Credits**

Acts 1985, 69th Leg., ch. 479, § 1, eff. Sept. 1, 1985.

Notes of Decisions (15)

V. T. C. A., Government Code § 311.032, TX GOVT § 311.032
Current through the end of the 2025 Regular and Second Called Sessions of the 89th Legislature.

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.