No. 25-10898

# United States Court of Appeals
# for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*

– v. –

STATE OF TEXAS,

*Defendant-Appellee*

STUDENTS FOR AFFORDABLE TUITION; LA UNION DEL PUEBLO
ENTERO; AUSTIN COMMUNITY COLLEGE; OSCAR SILVA,

*Movants-Appellants*

On Appeal from the United States District Court for the Northern District of Texas
No. 7:25-cv-00055

BRIEF OF AMICUS CURIAE, TEXANS FOR ECONOMIC GROWTH, FAITH WORKS, TEXAS IMPACT, JOHN STAUTNER, STAN MAREK, RATIONAL MIDDLE, TEXAS ASSOCIATION OF MEXICAN AMERICAN CHAMBERS OF COMMERCE, FWD.US, TEXAS IMMIGRATION LAW COUNCIL, INTERCULTURAL DEVELOPMENT RESEARCH ASSOCIATION, BARBARA HINES, IMMSCHOOLS, EDTRUST, TEXAS STATE TEACHERS ASSOCIATION, TEXAS AFT, LATINO TEXAS POLICY CENTER, ASIAN TEXANS FOR JUSTICE, CHILDREN AT RISK, TEXAS ASSOCIATION FOR BILINGUAL EDUCATION, TEXAS ASSOCIATION OF CHICANOS IN HIGHER EDUCATION, TEXAS ASSOCIATION OF DIVERSITY OFFICERS IN HIGHER EDUCATION, MASBA-SCHOOL BOARD MEMBERS FOR LATINO EQUITY, ETHNIC STUDIES NETWORK OF TEXAS, ETA ALPHA CHAPTER OF SIGMA LAMBDA BETA INTERNATIONAL FRATERNITY, XI CHAPTER OF SIGMA LAMBDA GAMMA NATIONAL SORORITY, STUDENTS ENGAGED IN ADVANCING TEXAS, EVERY TEXAN, UNITED WE DREAM, AND CHILDREN'S DEFENSE FUND

IN SUPPORT OF INTERVENORS

Kristin Etter
Texas Bar No 24038884
ketter@txilc.org
Texas Immigration Law
Council
5900 Balcones Drive #23122,
Austin, TX, 78731

Celina Moreno
Texas Bar No. 24074754
celina.moreno@idra.org
Paige Duggins-Clay
Texas Bar. No. 24105825
IDRA
paige.duggins-clay@idra.org
5815 Callaghan Road, Suite
101
San Antonio, Texas 78228

Counsel for *Amici Curiae*

**SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS**

The Texas Immigration Law Council and IDRA (Intercultural Development Research Association) file this brief on their own behalf and on behalf of the below-mentioned student groups, educators, employers, faith leaders, legal professionals, business leaders, and community organizations invested in a stable higher education environment and a strong workforce (collectively, "*Amici*"). Pursuant to Fifth Circuit Rule 29.2, *Amici* hereby supplement the certificate of interested persons provided in the briefs of appellants and appellees by naming the following individuals and organizations who have an interest in the outcome of this litigation:

**Texans for Economic Growth ("TEG")** is a Texas business coalition housed at the American Immigration Council that believes access to in-state tuition for eligible Texas high school graduates—regardless of immigration status—is critical to workforce development, economic growth, and Texas' long-term competitiveness.

**FaithWorks** is an independent, ecumenical, Christian nonprofit entity with numerous denominations represented on its board and among its member churches, which are located primarily in Texas, Oklahoma, New Mexico, Arizona, and Southern California. Headquartered in Dallas, FaithWorks' basic mission is to mobilize Christians to practice compassion and pursue justice. Immigration is FaithWorks' most active area of work, which includes supporting a network of churches, ministries, and pastors serving migrants on the U.S. southern border.

**Texas Impact** is comprised of diverse faith communities across Texas to support Texas' historic policy of welcoming and integrating people from all over to build strong economies and communities and has supported Texas' policy of providing in-state tuition as one tactic for advancing this policy.

**John Stautner** is the CEO of **ETSZONE**, a private company founded in 2004 that provides digital communication and advertising services, including content development, SEO, web development, analytics, and social media strategy. Stautner is also the Founder of **TXGOPVote**, a broad community of writers, activists, and legislators who believe that healthy debate will lead to a better Republican Party.

**Stan Marek** is the CEO of **Marek Companies**, a Texas-based construction company founded more than 80 years ago that specializes in residential and commercial projects.

**Rational Middle** is a documentary film movement and collaborative that uses films, podcasts, and other media to foster civil and solutions-based discussions on controversial topics, primarily energy and immigration. The goal is to move past extreme viewpoints and find a balanced "middle ground" where experts, policymakers, and the public can have productive conversations and identify actionable solutions for pressing societal challenges.

The **Texas Association of Mexican American Chambers of Commerce (TAMACC)** is a nonprofit 501(c)(6) organization established in 1975 to promote

business leadership, create economic opportunities, and provide legislative advocacy for the Hispanic business community in Texas. TAMACC has more than 15,000 members and advocates for over 800,000 Hispanic businesses in Texas.

**FWD.us** is a bipartisan political organization that believes America's families, communities, and economy thrive when more individuals are able to achieve their full potential. For too long, our harmful immigration and criminal justice systems have locked too many people out from the American dream.

The **Texas Immigration Law Council ("TxILC")** is a nonpartisan non-profit organization dedicated to protecting and promoting the rights of immigrants in Texas. TxILC leads strategic efforts to create policies and environments where immigrants in Texas can fully access their rights and actively contribute to the well-being of our state and our nation.

**IDRA (Intercultural Development Research Association)** is a national non-profit organization founded in Texas in 1973 dedicated to equal educational opportunity. Through research, educator training, policy advocacy, and community engagement, IDRA works to strengthen public schools so they can prepare all students to access and succeed in college.

**Barbara Hines, Attorney at Law** is an attorney and retired clinical professor of law at the University of Texas School of Law (for identification purposes only)

where she founded and directed the immigration clinic. She has been involved in issues of immigrant access to education throughout her legal career.

**ImmSchools** is a nonprofit organization that supports teachers and school leaders in creating positive school cultures and climates for all their students, parents, and caregivers. ImmSchools provides professional learning, student programming, and family workshops that advance equity and belonging for immigrant, multilingual and culturally diverse communities.

**EdTrust**, established in 1996, advocates for students, especially those whose potential is often overlooked—students of color, students from low-income backgrounds, students with disabilities, and multilingual learners. For nearly three decades, EdTrust's research and advocacy has focused on building an education system where all students thrive—from preschool through college.

**Texas AFT** is a statewide union that believes in equitable education access throughout Texas. Higher education opportunities for all Texans, regardless of status, are essential to the future of our state.

**Texas State Teachers Association** is an organization that unites, organizes and empowers public education advocates to shape public education in Texas thus providing a quality public school for every child.

**Latino Texas Policy Center** is an independent nonprofit organization established to ensure policymaking equitably impacts the Latino community.

**Asian Texans for Justice ("ATJ")** is a nonpartisan non-profit organization dedicated to connecting Asian American and Pacific Islander ("AAPI") Texans to civic action to build political and personal power. Through civic engagement, policy advocacy, and leadership development, ATJ works to ensure that AAPI communities in Texas are fully included in the democratic process and empowered to shape the policies that affect their lives.

**Children at Risk** serves as a catalyst for change to improve the quality of life for children through strategic research, public policy analysis, education, collaboration, and advocacy.

**Texas Association for Bilingual Education ("TABE")** is a nonprofit organization with over 53 years of advocacy in support of bilingual and multicultural education. With more than 5,000 members, TABE represents educators, families, and communities across Texas through its regional affiliates and partnerships with national and state bilingual education associations.

**Texas Association of Chicanos in Higher Education (TACHE)** is a professional organization dedicated to the improvement and advancement of education and employment opportunities for Latinos/Hispanics/Chicanos in higher education. TACHE is comprised of students, scholars, practitioners, advocates, and leaders making important contributions in Texas and beyond. Its members contribute

to expanding scholarship, to Texas' economy, and to preparing today and tomorrow's civically engaged and responsible leaders.

**Texas Association of Diversity Officers in Higher Education (TADOHE)** is a chapter of the National Association of Diversity Officers in Higher Education and is aimed at leading higher education toward inclusive excellence through institutional change as well as supporting our membership of professionals through support and community.

**MASBA-School Board Members for Latino Equity** is an organization that empowers school board members to be culturally conscious leaders for the advancement of the Latino/Mexican American community.

**Ethnic Studies Network of Texas** is a community of educators, students, parents, and organizers dedicated to expanding and advocating Ethnic Studies in Texas schools, from pre-kindergarten through post-secondary education, and supports humanizing and just educational systems.

**Eta Alpha Chapter of Sigma Lambda Beta International Fraternity,** incorporated, at the University of Texas at Austin ("Eta Alpha Chapter ΣΛΒ"), is a multicultural fraternal organization established in 1996 dedicated to brotherhood, community service, scholarship, and cultural awareness. The Eta Alpha Chapter ΣΛΒ's mission is to nurture and further a dynamic, values-based environment that

utilizes our historically Latino-based fraternity as a catalyst to better serve the needs and wants of all people, opportunity for wisdom, and wisdom for culture.

**Xi Chapter of Sigma Lambda Gamma National Sorority**, incorporated, at the University of Texas at Austin ("Xi Chapter $\Sigma\Lambda\Gamma$"), is a multicultural, Latina-founded organization established in 1995, dedicated to academics, community service, cultural awareness, morals and ethics, and social interaction. Through excellence in our founding five principles, the Xi Chapter $\Sigma\Lambda\Gamma$ provides opportunities for life-long empowerment to sisters, thereby positively influencing the global community; culture is pride, pride is success.

**Students Engaged in Advancing Texas (SEAT)** is a movement of young people developing transferable skills and demonstrating youth visibility in traditionally adult-dominated fields of policymaking.

**Every Texan** is a nonprofit research and advocacy organization that strengthens public policy to expand opportunity for all Texans. Every Texan was founded in Texas in 1985 and works to promote policies expanding access to affordable higher education for Texas families.

**United We Dream** is the largest immigrant youth-led community in the country that advocates to improve the lives of immigrants, their families and communities.

**Children's Defense Fund-TX ("CDF-TX"),** established in 1999, has connected more than one million children and youth to affordable health care, supported Texas youth in pursuing education and personal growth, and advocated for resources that nurture the next generation of leaders. CDF-TX advocates for policies benefiting Texas families, provides essential resources, and amplifies the voices of youth, families, and communities.

## TABLE OF CONTENTS

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS ....................... iii

TABLE OF AUTHORITIES ................................................................................ xii

I.  Interest of *Amici* .................................................................................... 1

II.  Summary of the Argument ..................................................................... 2

III.  Argument .................................................................................................. 3

    A.  The Court Order Inflicts Irreparable Harm on Texas Students and Families Who Relied on Nearly 25 Years of the *Texas Dream Act* ....... 3

    B.  The Public Interest Suffers When Collusive Lawsuits Replace the Adversarial Process Needed to Safeguard Legislative Authority and Judicial Integrity ........................................................... 7

    C.  The Court Should Grant the Intervenors' Requests to Defend the State's Lawful Educational Policy ........................................................ 9

        1.  Texas Has a Constitutional Obligation to Secure its Future Through the Support and Maintenance of Public Higher Education ................................................................................. 10

        2.  The Court Should Allow Intervenors to Defend the Texas Legislature's Implementation of its Constitutional Responsibility and Lawful Educational Policy ........................ 13

        3.  A Fair and Robust Adversarial Process Will Demonstrate that the District Court Did Not Accurately Assess the Operation of Texas' Tuition Statutes ........................................ 16

    D.  Immigrant Students Are Integral to Texas' Economy, Workforce, and Communities—and Excluding Them Harms the State as a Whole ............................................................................................. 20

IV.  Conclusion ............................................................................................. 23

CERTIFICATE OF SERVICE .......................................................................... 25

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS ............ 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Alien Child. Ed. Litig.*,
    501 F. Supp. 544 (S.D. Tex. 1980), *subsequently aff'd sub nom. Plyler v. Doe*, 457 U.S. 202 (1982) ...................................................................14

*Berger v. N.C. State Conference of the NAACP*,
    597 U.S. 179 (2022) .........................................................................8, 15, 16

*Brown v. Bd. of Ed. of Topeka, Shawnee Cty., Kan.*,
    347 U.S. 483 (1954) ...................................................................................14

*c.f. Nelson v. Adams USA, Inc.*,
    529 U.S. 460 (2000) .....................................................................................8

*Harris v. Hahn*,
    827 F.3d 359 (5th Cir. 2016) ....................................................................14

*Muskrat v. United States*,
    219 U.S. 346 (1911) .....................................................................................7

*Plyler v. Doe*,
    457 U.S. 202 (1982) ...................................................................................15

*Richmond Newspapers, Inc. v. Virginia*,
    448 U.S. 555 (1980) .....................................................................................7

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
    411 U.S. 1 (1973) .......................................................................................14

*Starns v. Malkerson*,
    326 F. Supp. 234 (D. Minn. 1970), *aff'd*, 401 U.S. 985 (1971) ..........14

*Vlandis v. Kline*,
    412 U.S. 441 (U.S. 1973) ..........................................................................15

**Constitution**

Tex. Const. art. VII § 1 ....................................................................................10

Tex. Const. art. VII § 10 ..................................................................................10

Tex. Const. art. VII § 11 ..................................................................................10

Tex. Const. art. VII § 11a ...............................................................10

Tex. Const. art. VII § 11b ...............................................................10

Tex. Const. art. VII §§ 12–20 .........................................................10

Tex. Const. art. VII §17(d) .............................................................10

U.S. Const. Art. III, §2 .....................................................................7

**Statutes**

19 Tex. Admin. Code § 21.24(d) .....................................................18

8 U.S.C. § 1623 .........................................................................18, 19

Tex. Educ. Code § 51.102 ...............................................................13

Tex. Educ. Code § 51.810 ...............................................................12

Tex. Educ. Code § 54 ......................................................................16

Tex. Educ. Code § 54.003 ...............................................................13

Tex. Educ. Code § 54.051(c) ...........................................................13

Tex. Educ. Code § 54.051(d) .....................................................13, 19

Tex. Educ. Code § 54.052(a)(1) .......................................................18

Tex. Educ. Code § 54.052(a)(1)–(2) ................................................13

Tex. Educ. Code § 54.052(a)(2) .......................................................18

Tex. Educ. Code § 54.052(a)(3) .........................................14, 17, 18

Tex. Educ. Code § 54.052(a)(3)(B) .............................................18, 19

Tex. Educ. Code § 54.053(3). ..........................................................19

Tex. Educ. Code § 54.075(a) ...........................................................10

Tex. Educ. Code § 56.011 ...............................................................12

Tex. Educ. Code § 56.012 ...............................................................12

Tex. Educ. Code § 61.002(a) ...........................................................10

Tex. Educ. Code § 61.002(c) .....................................................11, 13

Tex. Educ. Code § 62 ......................................................................10

Tex. Educ. Code § 63 ......................................................................10

Tex. Gov't Code § 2308A.002(1) .....................................................12

## Other Authorities

Alexandra Villarreal, *What's happened since Texas killed in-state tuition for undocumented students*, THE HECHINGER REPORT (Aug. 21, 2025), https://hechingerreport.org/whats-happened-since-texas-killed-in-state-tuition-for-undocumented-students/ ....................................................................5

Bill Analysis, HB 2181, 70th R.S. https://lrl.texas.gov/LASDOCS/70R/HB2181/HB2181_70R.pdf#page=110...10, 11

Dan Godwin, *End of Texas Dream Act means higher tuition for some UNT students*, Fox News 4 (August 4, 2025), https://www.fox4news.com/news/end-texas-dream-act-means-higher-tuition-some-unt-students ....................................................................6

Daniel Perez, *Status of Texas' in-state tuition leaves El Paso colleges, students off balance*, EL PASO MATTERS (June 16, 2025), https://elpasomatters.org/2025/06/16/undocumented-student-in-state-tuition-rescinded-texas-utep-epcc/........................................................4

Eleanor Klibanoff, Jessica Priest and María Méndez, *What to know about Texas ending in-state tuition for undocumented students*, THE TEXAS TRIBUNE (Aug. 28, 2025), https://www.texastribune.org/2025/06/14/texas-undocumented-students-tuition-explainer/ ...........................................................5

Erin Davis, *Higher Education board absent from hearing on Texas Dream Act*,  Spectrum News 1 (Sept. 23, 2025), https://spectrumlocalnews.com/tx/austin/news/2025/09/23/higher-education-board-absent-from-hearing-on-texas-dream-act..................................9

FWD.us, "Immigrants Are Crucial to Texas' Economy," Feb. 7, 2025, https://www.fwd.us/news/texas-immigrants ................................................20, 21

Greta Díaz González Vázquez, *How rolling back the Texas Dream Act is affecting thousands of students*, NPR (Sept. 8, 2025), https://www.npr.org/2025/09/08/nx-s1-5522917/how-rolling-back-the-texas-dream-act-is-affecting-thousands-of-students............................................5

Greta Díaz González Vázquez, *Immigrant families struggle to pay tuition at UT Austin after Texas Dream Act is repealed*, KUT Austin (Aug. 28, 2025), https://www.kut.org/education/2025-08-28/immigrant-students-legal-status-ut-austin-in-state-tuition-texas-dream-act-repealed.........................6

H.B. 1403, 77th R.S. (2001),
    https://lrl.texas.gov/legis/billSearch/BillDetails.cfm?legSession=77-
    0&billTypeDetail=HB&billnumberDetail=1403&submitbutton=Search+b
    y+bill ..................................................................................................... 17

H.B. 2550, 83rd R.S. (2013) ................................................................... 12

H.B. 38, Acts 1979, 66th R.S., ch. 706, General and Special Laws of Texas,
    https://lrl.texas.gov/LASDOCS/66R/HB38/HB38_66R.pdf#page=77 ............. 11

H. Research Org., *Bill Analysis*, S.B. 1528, 79 Leg., Reg. Sess. (Tex. 2005)
    https://hro.house.texas.gov/pdf/ba79r/sb1528.pdf#navpanes=0 ........................ 17

Jessica Priest, *Confusion reigns as Texas colleges scramble to comply with
    ban on in-state tuition for undocumented students*, The Texas Tribune
    (Aug. 19, 2025), https://www.texastribune.org/2025/08/19/texas-colleges-
    undocumented-immigrants-tuition-ruling/ ....................................................... 3, 5

Julieta Garaby, *I Was an Undocumented Texas College Student. I'm Not
    Going Anywhere-and Neither Is Our Movement*, THE TEXAS OBSERVER
    (June 6, 2025),  https://www.texasobserver.org/texas-dream-act-paxton-
    trump-immigrant-rights-movement/ .................................................................. 23

Kristin Etter, et al., Public Comment Submitted to Dr. Charles W. Contéro-
    Puls Assistant Commissioner for Student Financial Aid Programs, THECB
    (Sept. 21, 2025), available at https://www.idra.org/wp-
    content/uploads/2025/10/Comment-THECB-September-5-2025.pdf .................. 4

Lacey Beasley, Julia Falcon, *North Texas college students' tuition doubles
    after reversal of Texas Dream Act*, CBS News Texas (Sept. 4, 2025),
    https://www.cbsnews.com/texas/news/college-student-tuition-reversal-
    texas-dream-act/ .............................................................................................. 6

Lily Kepner, College students in limbo as nonprofits urge judge to reinstate
    Texas Dream Act, Austin American-Statesman, (Aug. 12, 2025),
    https://www.fox4news.com/news/end-texas-dream-act-means-higher-
    tuition-some-unt-students ................................................................................. 3

*Maria* Ruiz, *Dream Act repeal slams Laredo students with tuition hikes, lost
    aid*, Laredo Morning Times, (Sept. 9, 2025),
    https://www.lmtonline.com/local/article/laredo-students-texas-dream-act-
    repeal-21033285.php ....................................................................................... 6

Phillip Connor, et al, *Forfeiting the Trillion Dollar Dream: The Long-Term, Staggering Human and Economic Cost of Ending DACA* (2025), https://www.coalitionfortheamericandream.us/daca-economics/ ...................... 22

Pia Orrenius, Alexander T. Abraham, and Stephanie Gullo, *Gone to Texas: Migration Vital to Growth in the Lone Star State*, Fed. Reserve Bank of Dallas, Southwest Economy (Q1 2018) https://www.dallasfed.org/research/economists/~/media/documents/research/swe/2018/swe1801b.pdf ........................................................... 20, 21

Ryan J. Reilly, *DOJ coordinated with Texas AG to kill Texas Dream Act, Trump official says*, NBC NEWS (June 26, 2025), https://www.nbcnews.com/politics/justice-department/doj-coordinated-texas-ag-kill-texas-dream-act-trump-official-says-rcna214871 .......................... 2

S.B. 215 83R (2013), https://capitol.texas.gov/tlodocs/83R/billtext/pdf/SB00215F.pdf#navpanes=0 ............................................................................................. 11

S.B. 1528, 79th R.S. (2005), https://lrl.texas.gov/legis/billSearch/BillDetails.cfm?legSession=79-0&billTypeDetail=SB&billnumberDetail=1528&submitbutton=Search+by+bill ........................................................................................................ 17

Samantha Ketterer and Julián Aguilar, *She's 8 credits shy of graduation. A challenge to the Texas Dream Act is pushing her out of college*, HOUSTON CHRONICLE (Aug. 13, 2025) https://www.houstonchronicle.com/news/houston-texas/education/article/texas-dream-act-tuition-20814370.php .......................... 4

Sara Weissman, *Texas Undocumented Students Start the Semester Without In-State Tuition*, INSIDE HIGHER EDUCATION (Sept. 9, 2025), https://www.insidehighered.com/news/government/state-policy/2025/09/09/undocumented-students-face-fall-without-state-tuition ......... 5

Shafaq Patel, *Texas kills in-state tuition for undocumented students hours after lawsuit*, AXIOS (June 4, 2025), https://www.axios.com/local/houston/2025/06/04/trump-lawsuit-doj-texas-tuition-undocumented-immigrants; *leading the rollback*, THE 19TH (July 23, 2025), https://19thnews.org/2025/07/texas-dream-act-repeal-undocumented-students-tuition/ .......................................................... 2

Sneha Dey, *Texas' guidance on end of in-state tuition for undocumented students doesn't clear confusion, advocates say*, THE TEXAS TRIBUNE, (Sept. 26, 2025), https://www.texastribune.org/2025/09/26/texas-colleges-undocumented-students-guidance/ ......................................................................4

Texas 2036 and George W. Bush Institute, *The State of Readiness: Are Texas Students Prepared for Life after High School?*, 2023, https://texas2036.org/wp-content/uploads/2023/03/The-State-of-Readiness-Report-March-2023.pdf ....................................................21

THECB, *2022-2030 Strategic Plan: Building a Talent Strong Texas*, https://reportcenter.highered.texas.gov/agency-publication/miscellaneous/building-talent-strong-texas/.............................12, 22

THECB, *A Higher Education Brief: Residency and In-State Tuition* (2007), https://www.sos.state.tx.us/border/forms/reports-07/thecb-april2007.pdf.........17

THECB, *Closing the Gaps Final Progress Report* 27 (2016), https://reportcenter.highered.texas.gov/reports/data/closing-the-gaps-final-progress-report-june-2016/ ...................................................................................12

THECB, *Closing the Gaps: The Texas Higher Education Plan* 3 (2000), https://reportcenter.highered.texas.gov/agency-publication/miscellaneous/closing-the-gaps-by-2015/ ......................................11

THECB, *Overview: Tuition Deregulation* (2010), https://files.eric.ed.gov/fulltext/ED509082.pdf;.................................................12

THECB, *Texas Higher Education Strategic Plan: 2015–2030* (2015), https://reportcenter.highered.texas.gov/agency-publication/miscellaneous/60x30tx-strategic-plan-for-higher-education/ .........11

Witness List, SB 1798, 89th R.S., https://capitol.texas.gov/tlodocs/89R/witlistbill/pdf/SB01798S.pdf#navpanes=0 ...................................................................................................................1

## I.     Interest of *Amici*

*Amici* consist of a bipartisan group of Texas students, educators, employers, faith leaders, legal professionals, businesses, and community organizations invested in higher education access and a strong workforce. Many *Amici* have vigorously advocated at the Texas Legislature both to establish the *Texas Dream Act* in 2001 and to defend it in the decades since—including as recently as the 89th Regular Legislative Session, when dozens of Texans stayed late into the evening to share the benefits and positive impact of the law on all Texans.[1]

*Amici* advocate for students and families who have built their lives in Texas— smart, resilient, and meritorious individuals who have overcome extraordinary challenges—and who represent exactly the talent Texas needs to keep its economy strong, communities vibrant, and workforce stable. Our perspective highlights the real-world reliance, public interest, and economic contributions that complement the Intervenors' arguments and underscore why protecting all students' access to higher education benefits all Texans. We write to urge the Court to grant the Intervenors' motion and to protect *Amici*'s and the public's interest in ensuring the democratic process core to our constitutional order is respected and upheld.

---

[1] *See* Witness List, SB 1798, 89th R.S.,
https://capitol.texas.gov/tlodocs/89R/witlistbill/pdf/SB01798S.pdf#navpanes=0; ROA 244–46.

## II.    Summary of the Argument

Texas' growth, prosperity, and culture have always relied on welcoming and integrating people from all over to build strong economies and communities. Immigrants have been—and continue to be—central to this spirit. Our state has thrived because we honor merit and grit in our decades-long approach to education, exemplified by the bipartisan *Texas Dream Act*, which has ensured that all eligible, meritorious students can access higher education at in-state tuition rates. That approach has kept Texas competitive, strengthened our economy and workforce, and filled our schools with talented, determined students from all backgrounds. It is no coincidence that the *Texas Dream Act* has always enjoyed bipartisan support: it benefits everyone, and the Texas Legislature has repeatedly refused to repeal the law because it is rooted in fairness, opportunity, and the long-term interests of Texas.

This past summer, however, the Texas Attorney General and the U.S. Department of Justice coordinated[2] a lawsuit that was filed and resolved in just six hours, producing a one-page Consent Order and Final Judgment ("Court Order") that barred application of the *Texas Dream Act* to students deemed "not lawfully present

---

[2] *See* Ryan J. Reilly, *DOJ coordinated with Texas AG to kill Texas Dream Act, Trump official says*, NBC NEWS (June 26, 2025), https://www.nbcnews.com/politics/justice-department/doj-coordinated-texas-ag-kill-texas-dream-act-trump-official-says-rcna214871; Shafaq Patel, *Texas kills in-state tuition for undocumented students hours after lawsuit*, AXIOS (June 4, 2025), https://www.axios.com/local/houston/2025/06/04/trump-lawsuit-doj-texas-tuition-undocumented-immigrants; *leading the rollback*, THE 19TH (July 23, 2025), https://19thnews.org/2025/07/texas-dream-act-repeal-undocumented-students-tuition/.

in the United States." The term "lawful presence" is a policy term, not defined in any one federal or state statute, unrecognized in education law and—because the lawsuit was coordinated non-adversarial—was never defined or clarified in the Court Order. Furthermore, this collusive settlement bypassed legislative authority, stripped thousands of Texas students of their earned opportunities, and jeopardized both educational stability and our state's long-term economic prosperity—with harmful effects that continue to unfold across Texas today. We respectfully urge the Court to grant the motions for intervention and allow the Intervenors to defend Texas' lawful educational policy in the face of the Texas Attorney General's abdication of his responsibility to represent the will and interests of the State.

## III.  Argument

### A.  The Court Order Inflicts Irreparable Harm on Texas Students and Families Who Relied on Nearly 25 Years of the *Texas Dream Act*

Within weeks of the Court Order, *Amici* began to receive urgent phone calls and emails from students, educators and businesses across the State. Since June 4, 2025, *Amici* have fielded hundreds of questions from concerned and worried students, educators, businesses and schools. By bypassing an open and transparent judicial process, this lawsuit has sown confusion and panic,[3] leaving students and

---

[3] *See*, e.g., Lily Kepner, College students in limbo as nonprofits urge judge to reinstate Texas Dream Act, Austin American-Statesman, (Aug. 12, 2025), https://www.fox4news.com/news/end-texas-dream-act-means-higher-tuition-some-unt-students; Jessica Priest, Confusion reigns as Texas colleges scramble to comply with ban on in-state tuition for undocumented students, The

schools without clear guidance,[4] jeopardizing educational futures,[5] and destabilizing communities.[6]

The confusion and disruption caused by the abrupt and opaque Court Order have been compounded by the Texas Higher Education Coordinating Board ("THECB") instructing schools to immediately reclassify *Texas Dream Act* students as "not lawfully present," even though many have some form of lawful immigration status.[7] When asked for the legal authority supporting the directive for schools to utilize the "lawful presence" standard, THECB circularly directed schools, students, and families back to the Court Order—all without providing consistent guidance or clear standards for schools or students to follow. As a result, schools, students and families who have relied on the *Texas Dream Act* for nearly 25 years are left without clear guidance from the Court Order or any other authority. That has created

*Texas Tribune* (Aug. 19, 2025), https://www.texastribune.org/2025/08/19/texas-colleges-undocumented-immigrants-tuition-ruling/.

[4] Sneha Dey, *Texas' guidance on end of in-state tuition for undocumented students doesn't clear confusion, advocates say*, THE TEXAS TRIBUNE, (Sept. 26, 2025), https://www.texastribune.org/2025/09/26/texas-colleges-undocumented-students-guidance/

[5] *See, e.g.*, Samantha Ketterer and Julián Aguilar, *She's 8 credits shy of graduation. A challenge to the Texas Dream Act is pushing her out of college*, HOUSTON CHRONICLE (Aug. 13, 2025) https://www.houstonchronicle.com/news/houston-texas/education/article/texas-dream-act-tuition-20814370.php.

[6] *See, e.g.*, Daniel Perez, *Status of Texas' in-state tuition leaves El Paso colleges, students off balance*, EL PASO MATTERS (June 16, 2025), https://elpasomatters.org/2025/06/16/undocumented-student-in-state-tuition-rescinded-texas-utep-epcc/.

[7] *See* Kristin Etter, et al., Public Comment Submitted to Dr. Charles W. Contéro-Puls Assistant Commissioner for Student Financial Aid Programs, THECB (Sept. 21, 2025), available at https://www.idra.org/wp-content/uploads/2025/10/Comment-THECB-September-5-2025.pdf.

uncertainty as well as disparate and arbitrary enforcement, eroding the stability and fundamental fairness of our education system.[8]

The consequences of the Court Order are real and urgent. Some schools immediately reclassified all *Texas Dream Act* students as non-residents by default and increased their tuition, without providing students an opportunity to provide any documentation of lawful presence. Others reclassified all *Texas Dream Act* students as non-residents and then placed the burden on the students to disprove that classification, without any guidance from the Court Order on how lawful presence should be determined.[9] At other institutions, students who have lawful presence—such as those with Deferred Action for Childhood Arrivals (DACA)—were nevertheless misclassified, despite the State's formal concession that DACA students are in fact lawfully present.[10] As a result, students have been forced to delay

---

[8] *See* Alexandra Villarreal, *What's happened since Texas killed in-state tuition for undocumented students*, THE HECHINGER REPORT (Aug. 21, 2025), https://hechingerreport.org/whats-happened-since-texas-killed-in-state-tuition-for-undocumented-students/; Eleanor Klibanoff, Jessica Priest and María Méndez, *What to know about Texas ending in-state tuition for undocumented students*, THE TEXAS TRIBUNE (Aug. 28, 2025), https://www.texastribune.org/2025/06/14/texas-undocumented-students-tuition-explainer/; *Greta Díaz González Vázquez, How rolling back the Texas Dream Act is affecting thousands of students*, NPR (Sept. 8, 2025), https://www.npr.org/2025/09/08/nx-s1-5522917/how-rolling-back-the-texas-dream-act-is-affecting-thousands-of-students; Sara Weissman, *Texas Undocumented Students Start the Semester Without In-State Tuition*, INSIDE HIGHER EDUCATION (Sept. 9, 2025), https://www.insidehighered.com/news/government/state-policy/2025/09/09/undocumented-students-face-fall-without-state-tuition.

[9] *See* Priest, *supra* n.3.

[10] *See id*. Of note, the term "lawful presence" is used in relation to the accrual of "unlawful presence" under INA §212. It is not a recognized concept in education law, and its meaning and

their college plans,[11] take out private loans to cover unexpected tuition increases,[12] or drop out of school altogether because the higher tuition rates are cost prohibitive.

And these are only the cases that *Amici* are aware of. Countless more students have likely been misclassified, overcharged, denied aid, or forced out of school. The turmoil now causing irreparable harm to students stems directly from the Court Order, which was entered within hours and without full adversarial testing nor any input from an intervenor representing students, schools, or the Texas public, leaving key issues—such as students' reliance interests, higher education finance, and economic consequences—unexplored and undeveloped.

*Texas Dream Act* students have made life-altering educational, professional, and financial decisions in reliance on the legal guarantee of eligibility for in-state

---

implications could have been clarified had an adversarial process provided the Court with input from impacted parties and experts in education and immigration law.

[11] *See, e.g.*, Weissman, *supra* n.8 (describing the experience of University of Houston student Jose, who stated that the collusive lawsuit "left him with a hard choice: drop out, because he could no longer afford tuition, or transfer to a private institution that could offer financial help. It was only a few months before the start of the fall semester. He decided to take a pause and transfer in the spring.").

[12] *See, e.g.*, Dan Godwin, *End of Texas Dream Act means higher tuition for some UNT students*, Fox News 4 (August 4, 2025), https://www.fox4news.com/news/end-texas-dream-act-means-higher-tuition-some-unt-students; Greta Díaz González Vázquez, *Immigrant families struggle to pay tuition at UT Austin after Texas Dream Act is repealed*, KUT Austin (Aug. 28, 2025), https://www.kut.org/education/2025-08-28/immigrant-students-legal-status-ut-austin-in-state-tuition-texas-dream-act-repealed; Lacey Beasley, Julia Falcon, *North Texas college students' tuition doubles after reversal of Texas Dream Act*, CBS News Texas (Sept. 4, 2025), https://www.cbsnews.com/texas/news/college-student-tuition-reversal-texas-dream-act/; *Maria* Ruiz, *Dream Act repeal slams Laredo students with tuition hikes, lost aid*, Laredo Morning Times, (Sept. 9, 2025), https://www.lmtonline.com/local/article/laredo-students-texas-dream-act-repeal-21033285.php.

tuition rates. The abrupt revocation of that guarantee through the Court Order directly threatens these settled expectations,[13] inflicting irreparable harm by derailing educational and professional trajectories, destabilizing families, and undermining the broader workforce and economic interests that rely on these students' contributions.

### B.    The Public Interest Suffers When Collusive Lawsuits Replace the Adversarial Process Needed to Safeguard Legislative Authority and Judicial Integrity

State policy is designed to be made—or repealed—through legislative deliberation. Legislatures exist to weigh competing interests, consider evidence, and enact laws that reflect the will of the people through a democratic process. Indeed, despite repeated attempts over the years that never gained serious traction, the Texas Legislature repeatedly chose to preserve the *Texas Dream Act*, reflecting broad bipartisan recognition of its value to students, families, higher education, and the state's economy.

Adversarial judicial processes serve a distinct and equally vital role, and the public expects courts to resolve real conflicts in public, adversarial settings. Our Constitution demands that federal courts transparently hear real cases and

---

[13] *See, e.g.*, (quoting a Texas student, Mariel: "That was the one thing that I felt like I had was my education, that I could study here. That's the one thing that I thought that I had. Like, that would never be taken away from me.").

controversies, because that is how justice remains fair and accountable. *See* U.S. Const. Art. III, §2; *Muskrat v. United States*, 219 U.S. 346, 362 (1911); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 (1980). By requiring real disputes, courts are constrained from issuing abstract rulings or acting on political whims. When courts circumvent that process and decide cases without genuine adversarial testing or behind closed doors, they harm the public because judicial decisions are rendered on incomplete information and reliance interests are ignored. *See Berger v. N.C. State Conference of the NAACP*, 597 U.S. 179, 192 (2022) (finding that intervention is particularly warranted in cases where the selected state defendants are "most inclined to settle favorably and quickly," resulting in "hobbled litigation" that risks "setting aside duly enacted state law based on an incomplete understanding" of the relevant interests and arguments"); *c.f. Nelson v. Adams USA, Inc.*, 529 U.S. 460, 471 (2000) ("Judicial predictions about the outcome of hypothesized litigation cannot substitute for the actual opportunity to defend that due process affords.").

Here, had the constitutionality of the *Texas Dream Act* been fully adjudicated in an adversarial judicial proceeding, the widespread chaos and confusion now impacting Texas students, families, and institutions could have been avoided. For nearly 25 years, families have relied on stable tuition and higher education policies in making educational and financial plans—plans that are now upended. Institutions

of higher education are struggling to interpret the Court Order, leading to misclassification and inconsistent treatment of students across the state. Adding insult to injury, and compounding the harm to the stakeholders represented by *Amici*, Texas' higher education authority did not have even one of its board members or commissioners present when asked to hold a public hearing to craft administrative regulations implementing the Court Order.[14]

The Court Order is directly responsible for the chaos, disruption and harm described above. By circumventing a genuine adversarial process, the district court not only disregarded the abovementioned reliance interests but also eroded public confidence in judicial transparency, accountability, and the fair application of law.

### C.    The Court Should Grant the Intervenors' Requests to Defend the State's Lawful Educational Policy

The Texas Legislature has established a robust system of higher education finance that reflects the State's commitment to ensuring college access for Texans. The district court's preemption ruling and resulting Court Order relies on an incorrect statutory analysis of both federal and state law and intrudes on a core domain of state sovereignty—public education.

---

[14] *See* Erin Davis, *Higher Education board absent from hearing on Texas Dream Act*,  Spectrum News 1 (Sept. 23, 2025), https://spectrumlocalnews.com/tx/austin/news/2025/09/23/higher-education-board-absent-from-hearing-on-texas-dream-act.

1.      **Texas Has a Constitutional Obligation to Secure its Future Through the Support and Maintenance of Public Higher Education**

For nearly 150 years, the State of Texas has committed to providing free public education to Texas students. *See* Tex. Const. art. VII § 1. Recognizing that a "general diffusion of knowledge" at the elementary and secondary level was not enough to secure the future of Texas, Texas' constitutional framers established the foundation of Texas public higher education by requiring the Legislature to establish a state university "of the first class . . . for the promotion of literature, and the arts and sciences." Tex. Const. art. VII § 10. The framers also made significant investments for higher education's financial support and maintenance, *see* Tex. Const. art. VII §§ 11, 11a, and 11b, and directed the Legislature to build on and expand that investment, *see generally* Tex. Const. art. VII §§ 12–20.

The Texas Legislature has implemented this mandate by establishing and refining a state system for financing public higher education at all levels, *see generally* Tex. Educ. Code ch. 62,[15] and established THECB to oversee higher education, *id.* § 61.002(a).[16] Acting on decades of research on economic

---

[15] *See also* Tex. Educ. Code ch. 63, *id.* § 130.003.
[16] *See also id.* § 54.075(a); Tex. Const. art. 7 §17(d).

development, education policy, and civic engagement,[17] Texas policymakers in 1987

found that the three major goals of Texas higher education "involve 1) access to

education, 2) achieving excellence in education, and 3) support to the State's

economy." Bill Analysis, HB 2181, 70th R.S.[18] Building on this assessment, the

Legislature in 2013 reaffirmed:

> "Postsecondary education for qualified Texans who desire to pursue
> such education is important to the welfare and security of this state and
> the nation and, consequently, is an important public purpose. The
> legislature finds and declares that the state can achieve its full economic
> and social potential only if every individual has the opportunity to
> contribute to the full extent of the individual's capabilities and only
> when financial barriers to the individual's economic, social, and
> educational goals are removed."

Tex. Educ. Code § 61.002(c).[19]

These are not mere idealist principles. Beginning in 2000, the State has

developed and implemented three comprehensive strategic plans aimed at "closing

---

[17] *See, e.g.*, Bill Analysis, HB 2181, 70th R.S. ("Since early statehood, Texas public higher education has been a major factor in contributing to the state's economic preeminence. As early as 1836, Texas had recognized the importance of public higher education to the future of Texas.").

[18] Available at https://lrl.texas.gov/LASDOCS/70R/HB2181/HB2181_70R.pdf#page=110.

[19] *See also* S.B. 215 83R (2013), https://capitol.texas.gov/tlodocs/83R/billtext/pdf/SB00215F.pdf#navpanes=0. Of note, the original version of this legislative finding was adopted in H.B. 38 in 1979, which included a "Declaration of Policy" stating: "The legislature, **giving due consideration to the historical and continuing interest of the people of the State of Texas in encouraging deserving and qualified persons to realize their aspirations for education beyond high school**, finds and declares that postsecondary education for those who desire such an education and are properly qualified therefor is important to the welfare and security of this state and the nation . . . ." H.B. 38, Acts 1979, 66th R.S., ch. 706, General and Special Laws of Texas [page 1, lines 8–15], https://lrl.texas.gov/LASDOCS/66R/HB38/HB38_66R.pdf#page=77.

the gaps in higher education participation and success, in educational excellence, and in funded research."[20] Ensuring access for Texas high school graduates has long been a critical component of the State's plans and success: in addition to passing the *Texas Dream Act* in 2001, in 2003, the State appropriated millions of dollars to help low-income Texans attend college and ensured that funds would be set aside to provide financial assistance for Texas residents in the face of the rising costs of higher education.[21] The Legislature enhanced its policy in 2013[22] by "encourag[ing] higher education institutions to collaborate with high schools identified as having chronically low college-going rates to increase student success, with emphasis on African American males and Hispanics, two groups that have traditionally had lower college enrollment and persistence rates." Tex. Educ. Code § 51.810.[23] Additionally, in 2021, the Legislature established the "Tri-agency Workforce Initiative," which

---

[20] *See* THECB, *Closing the Gaps: The Texas Higher Education Plan* 3 (2000), https://reportcenter.highered.texas.gov/agency-publication/miscellaneous/closing-the-gaps-by-2015/ ("*Closing the Gaps*"); *see also* THECB, *Texas Higher Education Strategic Plan: 2015–2030* (2015), https://reportcenter.highered.texas.gov/agency-publication/miscellaneous/60x30tx-strategic-plan-for-higher-education/ ("60x30TX Strategic Plan"); THECB, *2022-2030 Strategic Plan: Building a Talent Strong Texas*, https://reportcenter.highered.texas.gov/agency-publication/miscellaneous/building-talent-strong-texas/ ("*Talent Strong Texas*").

[21] *See* THECB, *Overview: Tuition Deregulation* (2010), https://files.eric.ed.gov/fulltext/ED509082.pdf; *see also* Tex. Educ. Code §§ 56.011, 56.012 (requiring institutions to set aside tuition charged to resident students to provide financial assistance for students).

[22] *See* H.B. 2550, 83rd R.S. (2013).

[23] THECB, *Closing the Gaps Final Progress Report* 27 (2016), https://reportcenter.highered.texas.gov/reports/data/closing-the-gaps-final-progress-report-june-2016/.

codified the commitments of the Governor, Coordinating Board, Texas Education Agency, and Texas Workforce Commission to increase economic growth by shepherding Texas elementary and secondary students into Texas higher education and, ultimately, the Texas workforce. Tex. Gov't Code § 2308A.002(1). For all of these reasons, the State has asked "government, institutions, community organizations, and business leaders to rally around the common cause of ensuring Texans of all backgrounds have access to higher education and the means to pursue it."[24] The Court Order undermines and sets the State back in its goals to increase access to public higher education for graduates of Texas high schools, cultivate civic engagement, and generate economic prosperity through a home-grown workforce.

### 2.    The Court Should Allow Intervenors to Defend the Texas Legislature's Implementation of its Constitutional Responsibility and Lawful Educational Policy

Because access to higher education is critical to the welfare and prosperity of the State,[25] the Texas Legislature sets and controls Texas tuition policy, prohibiting Texas colleges and universities from collecting tuition, fees, or charges from students "except as permitted by [state] law." Tex. Educ. Code § 54.003. To make good on its constitutional commitments to educate its populace and capitalize on the investments of the taxpayers of the State, Texas has established a system of

---

[24] *60x30TX* Strategic Plan, *supra* n. 20, at 15.
[25] *See* Tex. Educ. Code § 61.002(c); *see also id.* § 51.102.

resident/non-resident tuition. *Id.* § 54.051(c), (d). Texas' decision to provide reduced tuition rates for students establishing residency status reflects the State's commitment to prioritize higher education access for students who (1) are (or who come from families who are) taxpayers contributing to the economy of the State,[26] and/or (2) the State has already invested in educating and developing through public education.[27] This approach has repeatedly been recognized as reasonable and constitutional by the federal courts.[28]

Federal courts have historically recognized and deferred to the states' plenary power to set educational policy, including school finance. *See Brown v. Bd. of Ed. of Topeka, Shawnee Cty., Kan.*, 347 U.S. 483, 493 (1954) ("Today, education is perhaps the most important function of state and local governments."); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 30 (1973) (reaffirming, in the context of public-school finance, *Brown*'s holding that public education is one of the most important services performed by a state); *In re Alien Child. Ed. Litig.*, 501 F. Supp. 544, 562 (S.D. Tex. 1980), *subsequently aff'd sub nom. Plyler v. Doe*, 457 U.S. 202 (1982)

---

[26] *See* Tex. Educ. Code § 54.052(a)(1)–(2).

[27] *See id.* § 54.052(a)(3); *see also Harris*, 827 F.3d at 367–69, 372 (5th Cir. 2016) (recognizing state's interest in incentivizing completion of high school and investing in students most likely to remain in state after graduation, "thereby preserving the financial resources of Texas taxpayers and maximizing the returns to the local economy").

[28] *See, e.g.*, *Starns v. Malkerson*, 326 F. Supp. 234, 241 (D. Minn. 1970), *aff'd*, 401 U.S. 985 (1971) ("This state has a valid interest in providing tuition-free education to those who have demonstrated by a year's residence a bona fide intention of remaining here and who, by reason of that education, will be prepared to make a greater contribution to the state's economy and future.") (cleaned up).

-14-

("[I]n Texas, the provision of education is a state function."); *Harris v. Hahn*, 827 F.3d 359, 362, 368–69 (5th Cir. 2016) (affirming that "[p]romoting education plainly is a legitimate state interest" and that "providing financial assistance for postsecondary education . . . encourages Texas high school students to graduate . . . and return to attend college and graduate school") (cleaned up). Texas indisputably has "a legitimate interest in protecting and preserving the quality of its colleges and universities," including "the right of its . . . residents to attend such institutions on a preferential tuition basis." *See Vlandis v. Kline*, 412 U.S. 441, 453 (U.S. 1973); *c.f. Berger v. N.C. State Conference of the NAACP*, 597 U.S. 179, 191(2022) ("No one questions that States possess 'a legitimate interest in the continued enforce[ment] of [their] own statutes.'") (cleaned up).

Here, the coordination between the Department of Justice and Texas Attorney General sanctioned by the district court's order undermines the Texas Legislature's intent and infrastructure to support college access for Texans, interrupts the state's pipeline of high-qualified workers, reduces the ability of Texas institutions of higher education to recruit the best and brightest young people to their academic and professional programs, and shortchanges Texas taxpayers who have invested in the

constitutionally-protected right of all children to attend public schools.[29] For these reasons, the court should allow Intervenors to defend the Texas Legislature's implementation of its constitutional responsibility and lawful educational policy.

### 3.     A Fair and Robust Adversarial Process Will Demonstrate that the District Court Did Not Accurately Assess the Operation of Texas' Tuition Statutes

As the Supreme Cout recently reaffirmed, intervention promotes the "full and fair adversarial testing" of arguments. *Berger v. N.C. State Conference of the NAACP*, 597 U.S. 179, 192 (2022). That function is particularly important in circumstances where a plaintiff has selected state defendants "most inclined to settle favorably and quickly," resulting in "hobbled litigation" that risks "setting aside duly enacted state law based on an incomplete understanding" of the relevant interests and arguments. *Id.* Here, the district court ruled "based on an incomplete understanding" of Texas' tuition statutes. *See id.*

In Texas, tuition status is determined by meeting various statutory, regulatory, and institutional requirements and/or by qualifying for one or more tuition

---

[29] *See Plyler v. Doe*, 457 U.S. 202, 221 (1982) ("[E]ducation provides the basic tools by which individuals might lead economically productive lives to the benefit of us all. . . . [and] has a fundamental role in maintaining the fabric of our society").

exemptions established by the State, the Coordinating Board, or the institution itself. Those additional fact-specific pathways allow out-of-state students to access Texas' in-state tuition rates—or even be exempt from paying tuition at all. *See generally* Tex. Educ. Code ch. 54, subch. D. In 2001, the Legislature revised state residency laws to allow a student to be classified as a Texas resident if the student graduated from a Texas high school and resided continuously in Texas for three years leading up to high school graduation or receipt of a GED. Tex. Educ. Code § 54.052(a)(3).[30] The law was amended in 2005 to broaden access to the in-state tuition rate,[31] with the explicit goal of including many students who were legally domiciled outside of the state.[32] *See* H. Research Org., *Bill Analysis*, S.B. 1528, 79 Leg., Reg. Sess., at 3 (Tex. 2005) ("The bill [] would give U.S. citizens and permanent residents the same

---

[30]      *See*      H.B.      1403,      77th      R.S.      (2001), https://lrl.texas.gov/legis/billSearch/BillDetails.cfm?legSession=77-0&billTypeDetail=HB&billnumberDetail=1403&submitbutton=Search+by+bill.

[31]      *See*      S.B.      1528,      79th      R.S.      (2005), https://lrl.texas.gov/legis/billSearch/BillDetails.cfm?legSession=79-0&billTypeDetail=SB&billnumberDetail=1528&submitbutton=Search+by+bill.

[32] *See* THECB, *A Higher Education Brief: Residency and In-State Tuition* (2007), https://www.sos.state.tx.us/border/forms/reports-07/thecb-april2007.pdf ("The primary difference is that the new statute allows all persons whether international, US Citizens or Permanent Residents, to establish an independent claim to residency based on graduation from high school or the completion of its equivalent after residing in the state for at least 36 months. The fact that this provision applies to all high school graduates relieves the state of any threat of a lawsuit based on preferential treatment.").

opportunity to base residency on three years residence and high school graduation.").[33]

On its face, then, the plain text of the high school graduation pathway applies to U.S. citizens, permanent residents and undocumented immigrants who meet the statute's requirements. For example, students born and raised in Texas but whose parents moved out of state before they had enrolled in college were previously classified as nonresidents. Likewise, students raised by grandparents or other family members who had never gone to court to acquire legal custody were considered residents of the state in which their biological parents lived.[34] The revised section 54.052(a)(3) "enabled these students, and all other students who graduate from high school in Texas under the prescribed conditions, to be classified as residents and allow them to enroll while paying the resident tuition rate."[35]

The district court seemed to conclude that the Texas tuition law is preempted because Texas does not make *all* U.S. citizens eligible for in-state tuition when even a single undocumented Texan is eligible for the same. This is a grossly overbroad reading of Section 1623(a), which establishes compliance requirements for

---

[33] Available at https://hro.house.texas.gov/pdf/ba79r/sb1528.pdf#navpanes=0.

[34] In addition, students who attend and graduate from boarding school in Texas (who previously could not always qualify because their parents were often domiciled outside of Texas) also would qualify. *See, e.g.*, https://texasboardingschools.org/schools/.

[35] *THECB Residency Overview* at 2.

institutions of higher education, and not an entitlement for U.S. citizens. *See* 8 U.S.C. § 1623. The mere presence of the word "reside" in section 54.052(a)(3)(B) does not bring the Texas tuition statute into conflict with federal law. Texas law allows any U.S. citizen to qualify for in-state tuition establishing domicile in Texas for one year prior to enrolling. Tex. Educ. Code § 54.052(a)(1). Undocumented immigrants are not granted that privilege. *See* 19 Tex. Admin. Code § 21.24(d).[36] Instead, the Texas Legislature added three additional requirements for undocumented immigrants seeking to access in-state tuition: one year of residency prior to enrollment, *plus* graduation from a Texas public or private high school (or equivalent), *plus* three additional years of residency while enrolled in high school; *plus* the signing of an affidavit committing to seek lawful immigration status as soon as they are eligible. Tex. Educ. Code §§ 54.052(a)(3)(B); 54.053(3). Put simply, the only pathway for undocumented students requires far more than residency alone. This is not preferential treatment on the basis of residency for undocumented students prohibited by 8 U.S.C. section 1623.

In failing to review the DOJ's challenge to section 54.051(d) in the broader context of the Texas tuition statutes, the district court erroneously concluded that the

---

[36] Consistent with 8 U.S.C. section 1623, Texas law only allows lawfully-present immigrants to establish domicile and thus be qualified as "residents" under the two one-year domicile avenues in Texas Education Code section 54.052(a)(1) and (2)). *See* 19 TAC § 21.24(d).

*Texas Dream Act* is preempted by 8 U.S.C. section 1623. It is not. The State has made available several pathways for out-of-state citizens to access in-state tuition, including through the high school graduation pathway that permits a limited number of undocumented students (who must meet additional requirements), to qualify.

**D.    Immigrant Students Are Integral to Texas' Economy, Workforce, and Communities—and Excluding Them Harms the State as a Whole**

The consequences of the Court Order reach well beyond individual students: by restricting access to higher education, the Court Order jeopardizes Texas' future workforce, destabilizes communities, and diminishes the economic contributions of the very students whose talent and dedication were meant to benefit the state as a whole. The success of the Texas economy and the prospects for its future growth are inextricably tied to the contributions of immigrants and the development of a skilled and well-educated workforce. Currently, Texas' employers rely heavily on the immigrants who make up nearly a quarter (23%) of the state's labor force.[37] With more than 3.7 million immigrant workers, Texas has the nation's second-largest immigrant labor force after California, contributing an estimated $192 billion annually to the Texas economy.[38] Among Texas' workforce are an estimated 1.2

---

[37] FWD.us, "Immigrants Are Crucial to Texas' Economy," Feb. 7, 2025, https://www.fwd.us/news/texas-immigrants (hereinafter "FWD.us Report").

[38] *Id.*; *see also* Pia Orrenius, Alexander T. Abraham, and Stephanie Gullo, *Gone to Texas: Migration Vital to Growth in the Lone Star State*, Fed. Reserve Bank of Dallas, Southwest

million workers who are undocumented and/or have temporary legal protections (such as DACA, Temporary Protected Status, or an active asylum claim), representing almost 8% of the total workforce.[39] Immigrants make up large percentages of the labor force in key industries in Texas, including healthcare and education, and they are especially critical during crises such as the COVID-19 pandemic and natural disasters.[40] The importance of immigrants, including undocumented immigrants, to Texas employers is magnified by the fact that Texas' workforce, without additional immigration, would be rapidly aging as the Baby Boomer generation reaches retirement.[41] With more than 3.7 million immigrant workers, Texas has the nation's second-largest immigrant labor force after California, contributing an estimated $192 billion annually to the Texas economy.[42] Among Texas' workforce are an estimated 1.2 million workers who are undocumented and/or have temporary legal protections (such as DACA, Temporary Protected Status, or an active asylum claim), representing almost 8% of the total workforce.[43] Immigrants make up large percentages of the labor force in key industries in Texas, including healthcare and education, and they are especially

---

Economy (Q1 2018) https://www.dallasfed.org/research/economists/~/media/documents/research/swe/2018/swe1801b.pdf (hereinafter "Dallas Fed Report").
[39] *See* FWD.us Report, *supra* n. 37.
[40] *Id.*
[41] *See* Dallas Fed Report, *supra* n.38, at 10.
[42] *Id.*
[43] FWD.us Report, *supra* n. 37.

critical during crises such as the COVID-19 pandemic and natural disasters.[44] The importance of immigrants, including undocumented immigrants, to Texas employers is magnified by the fact that Texas' workforce, without additional immigration, would be rapidly aging as the Baby Boomer generation reaches retirement.[45]

The health and growth of Texas' economy also depend on creating a well-educated labor force. Texas 2036, a nonpartisan public policy research and advocacy organization, estimates that by 2036, more than 70% of jobs in Texas will require a postsecondary credential of some sort,[46] and THECB has set a goal of having 60% of Texans between the ages of 25 and 64 receive a postsecondary credential by 2030.[47] The state, however, has struggled to meet the demand for workers with postsecondary credentials.[48] Shutting out undocumented students—many who have lived most of their lives in Texas—from eligibility for in-state tuition rates and higher education will significantly hamper Texas' economic future and pose significant challenges for Texas employers looking to fill jobs with college-educated workers.

---

[44] *Id.*
[45] *Id.* at 10
[46] Texas 2036 and George W. Bush Institute, *The State of Readiness: Are Texas Students Prepared for Life after High School?*, 2023, https://texas2036.org/wp-content/uploads/2023/03/The-State-of-Readiness-Report-March-2023.pdf.
[47] Talent Strong Texas, *supra* n.20.
[48] *Id.*

For Texas employers, perhaps the clearest example of the value created by broadening access to higher education for undocumented students is the experience of young people who received DACA. By the end of 2024, there were an estimated 89,000 DACA recipients living in Texas, 97% of whom had received a high school diploma or its equivalent.[49] Because they were able to access higher education, these DACA recipients are now contributing in countless ways to Texas' economy, filling critical gaps in the workforce. Indeed, over 50% of DACA recipients living in Texas have some college education, and almost 80% are in the labor force.[50] They include healthcare workers, STEM professionals, and educators.[51] Ultimately, Texas' economy is jeopardized as students—ready and able to contribute to the state's growth and prosperity—are effectively misclassified and blocked from higher education due to the Court Order, disrupting the pipeline of skilled, educated workers.

## IV.    Conclusion

The Court Order is not a mere administrative adjustment—it is destabilizing families, confusing institutions, and jeopardizing Texas' workforce pipeline. The abrupt revocation of decades of Texas educational policy in mere hours crushes

---

[49] Phillip Connor, et al, Forfeiting the Trillion Dollar Dream: The Long-Term, Staggering Human and Economic Cost of Ending DACA (2025), https://www.coalitionfortheamericandream.us/daca-economics/.
[50] *Id.*
[51] *Id.*

expectations that were built over decades, undermining not only the students' personal and professional futures but also the broader public interest and economic vitality of Texas.[52] We urge the Court to uphold the integrity of the adversarial process by ensuring that intervenors—students, schools, and communities who rely on the *Texas Dream Act*—have a meaningful opportunity to be heard. We urge the Court to uphold the integrity of the adversarial process by reversing the denial of intervention and vacating the Court Order.

Respectfully Submitted,

*/s/Kristin Etter*
Kristin Etter
Texas Bar No 24038884
ketter@txilc.org
Texas Immigration Law
Council
5900 Balcones Drive #23122,
Austin, TX, 78731

Celina Moreno
Texas Bar No. 24074754
celina.moreno@idra.org
Paige Duggins-Clay
Texas Bar. No. 24105825
IDRA
paige.duggins-clay@idra.org
5815 Callaghan Road, Suite
101
San Antonio, Texas 78228

---

[52] *See* Julieta Garaby, *I Was an Undocumented Texas College Student. I'm Not Going Anywhere—and Neither Is Our Movement*, THE TEXAS OBSERVER (June 6, 2025), https://www.texasobserver.org/texas-dream-act-paxton-trump-immigrant-rights-movement/ ("Texas made a wise investment over two decades ago when it passed [the Texas Dream Act]. That investment has paid off in the form of stronger communities, a better-educated workforce, and a richer civic life. Dismantling that progress would not only harm immigrants—it would harm Texas.").

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system. I also certify that a true and correct copy of the foregoing document was served on opposing counsel by mail or e-mail.

Dated: October 30, 2025

*/s/Kristin Etter*
Kristin Etter
Counsel for *Amici Curiae*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 5,631 words, excluding the sections of the brief exempted by Fed. R. App. P. 32(f). This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman font size 14 (footnotes size 12).

Dated: October 30, 2025          */s/ Kristin Etter*
                                 Kristin Etter

Kristin Etter                    Celina Moreno
Texas Bar No 24038884            Texas Bar No. 24074754
ketter@txilc.org                 celina.moreno@idra.org
Texas Immigration Law            Paige Duggins-Clay
Council                          Texas Bar. No. 24105825
5900 Balcones Drive #23122,      IDRA
Austin, Texas 78731              paige.duggins-clay@idra.org
                                 5815 Callaghan Road,
                                 Suite 101
                                 San Antonio, Texas 78228

                                 Counsel for *Amici Curiae*