No. 25-10898

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff – Appellee

v.

STATE OF TEXAS,
Defendant – Appellee

STUDENTS FOR AFFORDABLE TUITION; LA UNION DEL PUEBLO
ENTERO; AUSTIN COMMUNITY COLLEGE; OSCAR SILVA
Movants – Appellants

MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATION FUND
Movants – Appellants

On Appeal from the United States District Court for the Northern District of
Texas, No. 7:25-cv-00055
The Hon. Reed O'Connor, U.S. District Judge

## AMICUS BRIEF IN SUPPORT OF MOVANTS-APPELLANTS LA UNIÓN
## DEL PUEBLO ENTERO, AUSTIN COMMUNITY COLLEGE, OSCAR
## SILVA, AND STUDENTS FOR AFFORDABLE TUITION

Kristyn DeFilipp
Madeleine K. Rodriguez
FOLEY HOAG, LLP
155 Seaport Boulevard
Boston, MA 02210-2600
Tel.: (617) 832-1000
Fax: (617) 832-7000
KDP@foleyhoag.com
mrodriguez@foleyhoag.com

*Attorneys for Amicus Curiae*
*Presidents' Alliance on Higher Education and Immigration*

**SUPPLEMENTAL CERTIFICATE OF INTERESTED PARTIES**

Pursuant to Fifth Circuit Rule 29.2, I hereby supplement the certificate of interested persons provided in the briefs of appellants and appellees by naming the following persons who have an interest in the outcome of this litigation:

**<u>Amicus Curiae</u>**
Presidents' Alliance on Higher Education and Immigration

**<u>Counsel for Amicus Curiae</u>**
Kristyn DeFilipp, Esq.
Madeleine K. Rodriguez, Esq.

## TABLE OF CONTENTS

SUPPLEMENTAL CERTIFICATE OF INTERESTED PARTIES ..........................i

CORPORATE DISCLOSURE ...............................................................ix

INTEREST OF AMICUS CURIAE .........................................................x

SUMMARY OF ARGUMENT ...............................................................1

ARGUMENT ....................................................................................2

    I.    Undocumented Students are an Integral Part of American Society and Its Higher Education System ...........................................................2

    II.    Tuition Equity Policies Throughout the United States .........................6

    III.    The Legal Framework Supports States' Authority to Provide In-State Tuition ........................................................................................9

    IV.    The Government's Position Would Place an Undue Administrative Burden on Colleges and Universities that Are Already Stretched Thin ..................................................................................................11

    V.    Eliminating Tuition Equity Has Dire Economic and Workforce Consequences ..............................................................................16

    VI.    Eliminating Tuition Equity Will Harm Other Texas Students............22

    VII.    Eliminating Tuition Equity Policies Will Undermine the Mission and Threaten the Sustainability of Higher Education Institutions.............23

    VIII.  States Must Uphold Tuition Equity or Be Left Behind. .....................26

CONCLUSION .................................................................................28

CERTIFICATE OF SERVICE ..............................................................28

CERTIFICATE OF COMPLIANCE ........................................................30

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Brown v. Bd. of Education*,
    347 U.S. 484 (1954)..................................................................................11

*Deanda v. Becerra*,
    96 F.4th 750 (5th Cir. 2024) ...............................................................11

*United States v. Beshear*,
    No. 25-CV-00028 (E.D. Ky. June 17, 2025) ........................................7

*United States v. Illinois*,
    No. 25-CV-01691 (S.D. Ill. Sept. 2, 2025)...........................................7

*United States v. Oklahoma*,
    No. 25-CV-265 (E.D. Okla. Aug. 29, 2025) .........................................7

*United States v. Walz*,
    No. 25-cv-02668 (D. Minn. June 25, 2025) ..........................................7

**Statutes**

8 U.S.C. § 1621..........................................................................................27

8 U.S.C. § 1621(c)(1)(B) ...........................................................................10

8 U.S.C. § 1621(d) .......................................................................................2

8 U.S.C. § 1623........................................................................................9, 28

8 U.S.C. § 1623(a) ......................................................................................10

Illegal Immigration Reform and Immigrant Responsibility Act of
    1996, 8 U.S.C. § 1101 ...........................................................................9

Tex. Educ. Code §§ 4.001(a) (2024)........................................................11

Texas Dream Act ...............................................................................*passim*

## Other Authorities

Alexander Villarraga-Orjuela & Brinck Kerr, *Educational Effects of Banning Access to In-State Resident Tuition for Immigrant Students,* 39 EDUC. EVALUATION AND POL'Y ANALYSIS 620 (2017)..................22

Alexandra Jaffe, *Perry in spotlight as Texas DREAM Act scrutinized*, CNN: POLITICS (Apr. 6, 2015, 10:42 AM), https://www.cnn.com/2015/04/06/politics/perry-texas-immigration-dream-act ......................................................................................8

Bradley R. Curs & Ozan Jaquette, *Crowded Out? The Effect of Nonresident Enrollment on Resident Access to Public Research Universities,* 39 EDUC. EVALUATION AND POL'Y ANALYSIS 644 (2017)..............................................................................................26

*Breakdown of the Undocumented Student Population in U.S. Colleges and Universities*, HIGHER ED IMMIGR. PORTAL (June 2025), https://www.higheredimmigrationportal.org/undocumented-students-in-higher-education2/ ..................................................................*passim*

*Building Texas' Future Healthcare Workforce: Texas Healthcare Workforce Task Force Final Report*, TEX. HIGHER EDUC. COORDINATING BD. (Oct. 1, 2024), https://gov.texas.gov/uploads/files/press/2024.10.01_-_Healthcare_Workforce_Report_FINAL_v4_.pdf............................................21

Catalina Amuedo-Dorantes & Chad Sparber, *In-State Tuition for Undocumented Immigrants and its Impact on Enrollment, Tuition Costs, Student Financial Aid, and Indebtedness,* 49 REGIONAL SCIENCE AND URBAN ECONOMICS 11 (2014) ......................................22

Chelsie Kramer, *Texas Dream Act Survives—Because Texans Showed Up*, AM. IMMIGR. COUNCIL (May 30, 2025), https://www.americanimmigrationcouncil.org/blog/texas-dream-act-undocumented-students-legislation/ ............................................20

Christian Penichet-Paul, *Halting of Texas' In-State Tuition for Undocumented Students: Explainer*, NAT'L IMMIGR. F. (June 6, 2025), https://forumtogether.org/article/blocking-of-texas-in-state-tuition-for-undocumented-students-explainer/ ..................................27

*The Cost of Excess: Why Colleges and Universities Must Control Runaway Spending*, AM. COUNCIL OF TRS. AND ALUMNI (Aug. 2021), https://static.howcollegesspendmoney.com/The-Cost-of-Excess-FINAL-Full-Report.pdf .......................................................... 16

*DACA 13 Years Later: From students to careers and families*, FWD.US, (May 20, 2025), https://www.fwd.us/news/daca-anniversary/ ...................................................................................... 18

Dylan Conger & Lesley J. Turner, *The Impact of Tuition Increases on Undocumented College Students' Attainment* (Nat'l Bureau of Econ. Rsch., Working Paper No. 21135, 2015), https://www.nber.org/papers/w21135 ................................................. 23

*The Economic Cost of Repealing In-State Tuition in Texas*, AMERICAN IMMIGRATION COUNCIL (March, 2023), https://www.americanimmigrationcouncil.org/wp-content/uploads/2025/01/20230320_factsheet_tx_instatetuition_2023.pdf/ .................................................................................. 18, 19, 27

*The Economic Impact of the Trump Administration's Immigration Policies*, NATIONAL FOUNDATION FOR AMERICAN POLICY (NFAP), https://nfap.com/studies/the-economic-impact-of-the-trump-administrations-immigration-policies/ (October 2025) ..................................... 17

Eleanor Klibanoff & Jessica Priest, *Texas Ends In-State Tuition for Undocumented Students*, GOVERNING (June 5, 2025), https://www.governing.com/policy/texas-ends-in-state-tuition-for-undocumented-students ..................................................................... 26

Evin Millet, *Highly-Educated Undocumented Immigrants in the United States*, CTR. FOR MIGRATION STUD. (Aug. 2, 2022), https://cmsny.org/educated-immigrants-millet-080122/ .................................... 17

H.B. 232, 89th Leg., Reg. Sess. (Tex. 2025) ............................................................ 9

*How do colleges get my official transcripts?*, COMMON APP, https://appsupport.commonapp.org/applicantsupport/s/article/How-do-colleges-get-my-official-transcripts?tref=1003 (last visited Oct. 27, 2025) ............................................................................................. 12

Hyein Lee, *From Dreams to Destinations - A Decade of Immigrant Achievements and the Future Ahead* (TheDream.US, 2025), https://www.thedream.us/wp-content/uploads/2025/02/10-Year-Impact-Report-2025.pdf .......................................................................6

*Immigrant-Origin Students in U.S. Higher Education: Powering the future workforce and helping to drive excellence and innovation on our campuses, in our communities, and for our country.* HIGHER ED IMMIGR. PORTAL, https://www.higheredimmigrationportal.org/research/immigrant-origin-students-in-u-s-higher-education-updated-august-2024// (last updated Oct. 2024)..................................................................17

*Immigration Related Campus Concerns*, AM. COUNCIL ON EDUC. (Jan. 2025), https://www.acenet.edu/Documents/Issue-Brief-Immigration-Related-Campus-Concerns-2025.pdf ...........................................25

Jeanne Batalova, *How Many Unauthorized Immigrants Graduate U.S. High Schools Annually?* (Migration Policy Inst., forthcoming 2025) .........................................................................................3

Jessica Priest, *Confusion reigns as Texas colleges scramble to comply with ban on in-state tuition for undocumented students*, THE TEX. TRIB. (Aug. 19, 2025), https://www.texastribune.org/2025/08/19/texas-colleges-undocumented-immigrants-tuition-ruling/ .......................................15

John V. Winters, *In-State College Enrollment and Later Life Location Decisions,* 55 J. HUM. RES. 1400 (2020) ...........................................27

Letter from Yvette Gullatt, U.C. Vice President for Graduate and Undergraduate Affs. and Vice Provost for Equity, Diversity and Inclusion to Stephanie Valentine, PRA Coordinator, U.S. Department of Educ. (Apr. 25, 2022), available at https://www.ucop.edu/federal-governmental-relations/_files/regulatory/20220425-ipeds-comment-letter.pdf.........................5

Lucy Madison, *Perry defends law allowing in-state tuition for undocumented immigrants,* CBS NEWS (Sept. 13, 2011, 12:45 AM), https://www.cbsnews.com/news/perry-defends-law-allowing-in-state-tuition-for-undocumented-immigrants/...................................8

Madeline Zavodny, *The Importance of Immigrants and International Students to Higher Education in America*, NATIONAL FOUNDATION FOR AMERICAN POLICY (NFAP) (May 2025), https://nfap.com/studies/the-importance-of-immigrants-and-international-students-to-higher-education-in-america/ .......................................4

Marcelo M. Suarez-Orozco et al., *In the Shadows of the Ivory Tower: Undocumented Undergraduates and the Liminal State of Immigration Reform*, THE UNDOCUSCHOLARS PROJECT: INSTITUTE FOR IMMIGR., GLOBALIZATION & EDUC., UCLA (2015), https://www.undocuscholars.org/assets/undocuscholarsreport2015.pdf .................................................................................................24

Nattanicha Chairassamee & Oudom Hean, *Financing and Enrollments in Public Universities,* 56 APPLIED ECON. 812 (2023).......................................26

*New Research: Without Immigrants and International Students U.S. College Enrollment Would Plummet*, NAT'L FOUND. for AM. POL'Y (May 21, 2025), https://nfap.com/wp-content/uploads/2025/05/Importance-of-Immigrants-and-International-Students.DAY-OF-RELEASE.2025.pdf ................................23, 24

*Profile of the Unauthorized Population: Texas*, MIGRATION POL'Y INSTITUTE, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/TX (last visited Oct. 28, 2025) .............................20

Proposition 308 (2022)'s consistency with federal law, Op. Att'ys Gen. I25-006 (2025) .................................................................................27, 28

*Racial Profiling After HB 56*, NAT'L IMMIGR. L. CTR. (Aug. 2012), https://www.nilc.org/wp-content/uploads/2016/02/Alabama-Stories-2012-08-23_final.pdf.............................................................................25

*Residency*, DALL. COLL., https://www.dallascollege.edu/admissions/application/residency/ (last visited Oct. 27, 2025).................................................................................15

Samuel Cervantes, *Undocumented Texans Paid $4.9 Billion in State and Local Taxes in 2022*, EVERY TEXAN (August 6, 2024), https://everytexan.org/2024/08/06/undocumented-texans-paid-4-9-billion-in-state-and-local-taxes-in-2022/ ...........................................................26

Skyler Korgel, *Celebrating a Decade of DACA in Texas*, EVERY
   TEXAN (Sept. 29, 2022),
   https://everytexan.org/2022/09/29/celebrating-a-decade-of-daca-in-
   texas/ ............................................................................................................19

Steven A. Camarota & Karen Zeigler, *Foreign-Born Number and
   Share of U.S. Population at All-Time Highs in January 2025*, CTR.
   FOR IMMIGR. STUD. (Mar. 12, 2025),
   https://cis.org/Report/ForeignBorn-Number-and-Share-US-
   Population-AllTime-Highs-January-2025 ..........................................................17

Tex. Const. art. VII, § 10 ...............................................................................11

*Texas Higher Education Strategic Plan: 2015–2030*, TEX. HIGHER
   EDUC. COORDINATING BD. (2015),
   https://reportcenter.highered.texas.gov/agency-
   publication/miscellaneous/thecb-60x30-strategic-plan/ ....................................21

Tom K. Wong et al., DACA Recipients' Livelihoods, Families, and
   Sense of Security Are at Stake This November, CTR. FOR AM.
   PROGRESS (Sept. 19, 2010),
   https://www.americanprogress.org/article/daca-recipients-
   livelihoods-families-sense-security-stake-november/ .................................17, 22

*Undocumented Students in Higher Education: How Many Students
   Are in U.S. Colleges and Universities, and Who Are They?*,
   HIGHER ED IMMIGR. PORTAL,
   https://www.higheredimmigrationportal.org/research/report-
   undocumented-students-in-higher-education/. (last updated Aug.
   2023) .............................................................................................................18

Wynn Rosser, Memorandum Regarding Court Ruling, TEX. HIGHER
   EDUC. COORDINATING BD. (June 18, 2025),
   https://reportcenter.highered.texas.gov/correspondence/commissio
   ner-correspondence/memorandum-regarding-court-ruling ...............................15

## CORPORATE DISCLOSURE

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amicus curiae* certifies that *amicus curiae* does not have a parent corporation, and no publicly held corporation owns ten percent or more of *amicus curiae's* stock.


Dated: November 5, 2025

## INTEREST OF AMICUS CURIAE

Amicus curiae[1] Presidents' Alliance on Higher Education and Immigration (the "Presidents' Alliance") is a nonpartisan, nonprofit organization comprising over 580 presidents and chancellors of public and private colleges and universities and their institutions, serving over five million students in 42 states, the District of Columbia, and Puerto Rico.  Member institutions include large public universities, private research universities, community colleges, liberal arts colleges, and faith-based institutions.  The Presidents' Alliance analyzes how immigration policies and practices impact students, campuses, and communities.  In particular, the Presidents' Alliance includes 23 members from Texas, including two- and four-year public institutions in the state.

The Presidents' Alliance submits this brief in support of proposed intervenors' appeal of the district court's order denying their motion to intervene to underscore the urgency of including these essential voices in the case.  The intervenors' participation will enable the Court to fully appreciate the reliance interests, economic impacts, and educational consequences now unfolding in Texas and beyond.

---

[1] Counsel certifies that: (1) no counsel for a party authored this brief in whole or in part; (2) no party or party's counsel contributed money that was intended to fund the preparation or submission of this brief; and (3) no person or entity—other than amicus curiae, its members, or its counsel—contributed money intended to fund the preparation or submission of this brief. *See* FIFTH CIR. R. 29(a)(4)(E). All parties have consented to the filing of this brief.

This amicus brief is intended to provide the Court with information regarding undocumented students and why they are an integral part of American society and our higher-education system; the administrative burden on colleges and universities impacted by the government's position; the economic consequences of eliminating tuition equity; how elimination of tuition equity will impact higher-education institutions and threaten their long-term sustainability; and other policy considerations.

The following institutions and organizations, described in more detail in Addendum A, support the Presidents' Alliance's filing of this brief:

Aliento
American Association of Colleges and Universities
Antioch College
Association of Catholic Colleges and Universities
California State Polytechnic University, Pomona
California State University, Channel Islands
California State University, Fresno
California State University, Long Beach
California State University, San Marcos
California State University, Stanislaus
College of Marin
College Track
Communications Workers of America, AFL-CIO
Communities for Our Colleges
Dickinson College

Dominican University
Donnelly College
Eastern Connecticut State University
Illinois Dream Fund
Illinois Institute of Technology
Immigrants Rising
Institutional Solutions
Metropolitan State University of Denver
Middle States Commission on Higher Education
Montgomery College
National Association for College Admission Counseling
Pre-Health Dreamers
The President and Fellows of Middlebury College
Roosevelt University
San Diego State University
San Francisco State University
Texas AFL-CIO
TheDream.US

Trinity Washington University
U.S. Africa Institute
UnidosUS
Western Connecticut State University

## SUMMARY OF ARGUMENT

The district court erred in summarily approving the consent judgment in this matter. It violates democratic principles by denying all interested parties their right to be heard. The combined actions of the federal Government (the "Government") and Texas will cause substantial harm to undocumented students, to the financial, cultural, and academic strength of postsecondary institutions, and to the local communities and economies that depend on them.

Texas has become the testing ground for efforts to restrict access to higher education for undocumented students who have grown up in the U.S., many of whom completed their elementary and secondary education in local schools. The affected parties in Texas and beyond never had the opportunity to resist these efforts because the Texas Attorney General and the Government proceeded in concert without providing for an adversarial process.

The harmful effects will not stop at the campus gates. A less-educated populace will harm the economy nationwide, including by limiting the tax base and impairing much-needed workforces. Texas will miss its higher-education goals by miles, businesses will look elsewhere for competitive candidates, and Texans will fall immeasurably behind the world population.

The Government's preemption arguments are incorrect as a matter of law. Congress explicitly permitted the provision of in-state tuition for undocumented

students under 8 U.S.C. § 1621(d). The interpretation of federal law offered by the Government and the State of Texas intrudes upon state sovereignty and undermines the authority of states to determine the cost of the public education they provide.

The consent judgment guarantees that postsecondary institutions across the state will face depressed enrollment rates, debilitating administrative burdens, significant revenue losses, and diminished cultural and academic achievement. These harms extend beyond individual students and institutions, threatening broader infrastructures that depend on an educated and skilled workforce.

*Amicus curiae* respectfully requests that this Court vacate the consent judgment and remand with instructions to allow intervention and a full and fair adversarial adjudication.

## ARGUMENT

## I.    Undocumented Students are an Integral Part of American Society and Its Higher Education System

The Government's position – that tuition-equity laws somehow incentivize illegal immigration and provide improper benefits to undocumented individuals – ignores the substantial and enduring impact of undocumented individuals on our campuses and throughout the nation. Despite the challenges they face, undocumented individuals enroll in, persist through, and graduate from college at remarkable rates, forming a key enrollment demographic and talent pipeline for

2

U.S. industries.

According to a forthcoming Migration Policy Institute report, approximately 139,000 undocumented students graduate from U.S. high schools annually, including 25,000 in Texas.[2] In 2023, there were approximately 510,000 undocumented students enrolled in U.S. higher education institutions, representing about 2.4% of individuals pursuing postsecondary credentials across the country.[3] Fifteen percent of undocumented students in higher education are pursuing graduate degrees, preparing to contribute the skills and knowledge our country needs to thrive.[4] Twenty-nine percent of these students hold undergraduate degrees in science, technology, engineering, and mathematics, and 20% hold an undergraduate health degree.[5] These students will graduate from their programs ready to fill critical needs in healthcare, innovation, and research.[6] They consistently demonstrate high achievement.

Local communities rely on, and benefit from, their roles as classmates, customers, and neighbors. More than half of these students arrived in the United States as children or adolescents, reflecting deep social and educational integration

---

[2] Jeanne Batalova, *How Many Unauthorized Immigrants Graduate U.S. High Schools Annually?* (Migration Policy Inst., forthcoming 2025)

[3] *See* Breakdown of the Undocumented Student Population in U.S. Colleges and Universities, HIGHER ED IMMIGR. PORTAL (June 2025), https://www.higheredimmigrationportal.org/undocumented-students-in-higher-education2/.

[4] *Id.*

[5] *Id.*

[6] *Id.*

into American communities and K–12 schools before matriculating into postsecondary institutions.[7] These figures make plain that undocumented students and graduates are neither marginal nor transient; they are part of the mainstream of American higher education and the broader economy.

Undocumented students attend institutions in every region of the country, from community colleges to flagship public research universities and private institutions. Three-quarters of the undocumented student population are enrolled in public institutions of higher education – the very institutions that provide in-state tuition for certain populations pursuant to state statute.[8] Public colleges and universities have benefited from the inclusion of undocumented students on their campuses, and due to financial constraints, many of those students may not have attended college but for access to in-state tuition. It is also highly unlikely that colleges and universities will be able to replace those students with others, thereby reducing enrollment and resulting in a loss of much-needed funds.[9]

These benefits also flow to private institutions. Twenty-five percent of undocumented students are enrolled in private colleges and universities,[10]

---

[7] *Id.*

[8] *Id.*

[9] *See, e.g.,* Record Appendix p. 321; Madeline Zavodny, *The Importance of Immigrants and International Students to Higher Education in America*, NATIONAL FOUNDATION FOR AMERICAN POLICY (NFAP) (May 2025), https://nfap.com/studies/the-importance-of-immigrants-and-international-students-to-higher-education-in-america/.

[10] *Breakdown of the Undocumented Student Population in U.S. Colleges and Universities, supra, note 3.*

including many faith-based institutions.   Policies that impact their access to affordable tuition and financial aid thus impact all institutional types.  In Texas, as elsewhere, undocumented students were eligible for state financial aid whether they enrolled in public or private institutions.

Beyond financial considerations, however, public and private college and university leaders have emphasized that undocumented students enhance campus culture.[11]  The undocumented student population is racially, ethnically, and geographically diverse, representing immigrants from Central America and the Caribbean, Asia and the Middle East, South America, Africa, Europe, and North America.[12] The heterogeneity of this population expands the range of perspectives in classrooms and laboratories, and strengthens the pipeline of talent that institutions develop to serve regional and national workforce needs.  The effects of eliminating tuition equity are therefore not confined to a single demographic or locale; rather, such policies reverberate across communities and sectors that benefit from the educational advancement of these students.

Once undocumented students graduate, they go on to make their

---

[11] *See, e.g.*, Letter from Yvette Gullatt, U.C. Vice President for Graduate and Undergraduate Affs. and Vice Provost for Equity, Diversity and Inclusion to Stephanie Valentine, PRA Coordinator, U.S. Department of Educ. (Apr. 25, 2022), available at https://www.ucop.edu/federal-governmental-relations/_files/regulatory/20220425-ipeds-comment-letter.pdf ("Undocumented students can be found across the 10 campuses and making profound contributions to the UC community and across California.").
[12] *Breakdown of the Undocumented Student Population in U.S. Colleges and Universities, supra, note 3.*

communities stronger.  Data from TheDream.US, a national scholarship program that has supported thousands of students around the country, attests to the impact undocumented students have after graduation.  Ninety-three percent of TheDream.US alumni with work authorization are working.[13]  Their top industries of employment include the highest-need sectors in the United States, including education; business health and medicine; science; math; technology; and public and social services.  They fulfill important roles throughout U.S. society, paving the way for future generations.

Tuition-equity policies make it possible for undocumented students to attend college, earn their degrees, and embark on impactful careers.  As one University of Houston alumna described:

> Having the privilege of acquiring a college degree brought financial stability into my life, opened many doors in my STEM field, and most importantly allowed me to provide for my family. Every day I wake up happy to go to a job I am passionate about, knowing that I contribute to research that has the potential to help millions of people one day. Simply knowing that I am part of something bigger than myself lets me know that it was all worth it.[14]

## II.    Tuition Equity Policies Throughout the United States

Recognizing the many contributions that undocumented students make to

---

[13] Hyein Lee, *From Dreams to Destinations - A Decade of Immigrant Achievements and the Future Ahead* (TheDream.US, 2025), https://www.thedream.us/wp-content/uploads/2025/02/10-Year-Impact-Report-2025.pdf.

[14] *Id*.

their institutions and to society, twenty-two states and the District of Columbia currently allow those students to access in-state-tuition rates if they meet necessary eligibility qualifications.[15] In addition, eighteen states and the District of Columbia provide access to state financial aid (including scholarships) to eligible undocumented students,  allowing these students to better afford college, including at private institutions.  In turn, these policies have also enabled private institutions, including small and large faith-based, liberal arts, and research institutions to enroll these students, helping to support domestic enrollment growth and workforce development.[16]  These state policy choices reflect a bipartisan, evidence-based judgment: expanding affordable access to higher education for undocumented students strengthens state economies, increases degree attainment, and yields long-term fiscal and social returns.

Texas was the first to extend in-state tuition to undocumented students through the Texas Dream Act in 2001.  Texas, with the second-largest population

---

[15] The Government has similarly challenged the availability of in-state tuition in Oklahoma, Kentucky, Minnesota, and Illinois.  *See United States v. Illinois*, No. 25-CV-01691, (S.D. Ill. Sept. 2, 2025) ("Illinois Complaint"); *United States v. Oklahoma*, No. 25-CV-265 (E.D. Okla. Aug. 5, 2025); *United States v. Walz*, No. 25-cv-02668 (D. Minn. June 25, 2025) ("Minnesota Complaint"); *United States v. Beshear*, No. 25-CV-00028 (E.D. Ky. June 17, 2025).  Like Texas, Oklahoma's Attorney General quickly acquiesced to the Government's demands, and a district court judge did away with in-state tuition for undocumented students in a one-page order. *United States v. Oklahoma*, No. 25-CV-265 (E.D. Okla. Aug. 29, 2025) (adopting August 7, 2025 report and recommendation from magistrate judge).

[16] Two such states are Illinois and Minnesota.  The Government has challenged the accessibility of state financial aid in its litigations against those states, as well.  Minnesota Complaint, ¶¶ 33-36; Illinois Complaint, ¶¶ 65-66.

of undocumented students in higher education in the nation, recognized that

creating tuition equity for those students would benefit the nation as a whole.  At

the time of its passage, the Texas Dream Act had bipartisan support and was signed

into law by Republican Governor Rick Perry.  In the years following its passage,

Texas officials on both sides of the aisle recognized the economic boon the Act

provides.  In 2011, when Perry was running to be the Republican presidential

nominee, he repeatedly defended the Texas Dream Act, including by describing the

provision of in-state tuition to undocumented students as "the American way," and

arguing that the Texas Dream Act prevented those individuals from "be[ing] on the

government dole." [17]  In 2015, a Perry spokesperson highlighted that the Texas

Dream Act was an "economic decision" that "allows these young people to

become productive, contributing members of society." [18]

Texas's legislature reaffirmed its support for the Texas Dream Act during its

most recent legislative session.  The present litigation arose only after repeated

legislative efforts to repeal the Act failed.  During Texas's 89th Legislative

Session, several bills sought to repeal the Texas Dream Act, but none passed.

When those legislative efforts failed, the Government filed this instant action just

---

[17] *See* Lucy Madison, Perry *defends law allowing in-state tuition for undocumented immigrants*, CBS News (Sept. 13, 2011, 12:45 AM), https://www.cbsnews.com/news/perry-defends-law-allowing-in-state-tuition-for-undocumented-immigrants/.
[18] Alexandra Jaffe, *Perry in spotlight as Texas DREAM Act scrutinized*, CNN: Politics (Apr. 6, 2015, 10:42 AM), https://www.cnn.com/2015/04/06/politics/perry-texas-immigration-dream-act.

two days after the session's close.[19]

## III.    The Legal Framework Supports States' Authority to Provide In-State Tuition

The Government claims that 8 U.S.C. § 1623, a statutory provision included in the Illegal Immigration Reform and Immigrant Responsibility Act, prevents states from ever offering undocumented immigrants in-state tuition, as compared to U.S. nationals coming from outside of the state.  This interpretation is incorrect for several reasons.

First, Section 1623 does not categorically prohibit states from offering in-state tuition rates to undocumented students. The provision merely limits a state's ability to provide such rates solely "on the basis of residence within a State" unless the state does not also provide in-state tuition rates to a citizen or national of the United States "without regard to whether the citizen or national is such a resident." Therefore, a state may offer in-state tuition to undocumented students provided it is (1) not solely "on the basis of residence" or (2) is offered to citizens or nationals of the United States even if they are not a "resident."

Importantly, the statute's text does not define "higher education benefit," and nothing in its structure or legislative history compels the conclusion that in-state tuition necessarily constitutes such a benefit. The statutory framework

---

[19] H.B. 232, 89th Leg., Reg. Sess. (Tex. 2025).

confirms that "benefit," as used in § 1623(a) refers to state-funded assistance or direct monetary support—not to tuition classifications.[20] In contrast, in-state tuition simply sets the rate a student pays; it does not confer a subsidy or payment from state funds. Accordingly, in-state tuition classifications are pricing determinations, not benefit disbursements. Students pay the same published rate as others who qualify, and the institution receives full payment for the education provided. Treating such classifications as "benefits" would expand the term beyond Congress's textual and structural intent.

Many states tie eligibility to neutral, education-related criteria that apply without regard to immigration status—graduation from a state high school, sustained enrollment in and completion of coursework within the state, or other measures of long-term presence and integration. Many such laws also require noncitizen students to submit affidavits confirming their intent to seek lawful immigration status when eligible.

These requirements are based on prior educational achievement, long-term presence, and a demonstrated commitment to remain in and contribute to the community. Put simply, undocumented students must meet educational and community integration conditions that go far beyond mere residence.

---

[20] *See* 8 U.S.C. § 1621(c)(1)(B) (defining "state or local public benefit" to include grants, contracts, loans, and licenses funded by public resources).

Courts have also recognized that federal preemption is inappropriate when operating in an area of state concern.[21]  Education is one such area.  For Texas, public higher education is a constitutional cause.  The State constitution required the Texas legislature to "establish, organize and provide for the maintenance, support and direction of a University of the first class . . ..[22]"  The Texas legislature has faithfully followed this directive, enacting the Texas Educational Code and in numerous instances recognizing the significance of an accessible public higher-education system to the state's welfare and security.[23]  There are few areas in which a State such as Texas has a stronger concern than that of the accessibility of its public education system.  *See Brown v. Bd. of Education*, 347 U.S. 484, 493 (1954) ("education is perhaps the most important function of state and local governments").  The Government and Texas Attorney General must not be permitted to override the State's democratically enacted policies.

## IV.    The Government's Position Would Place an Undue Administrative Burden on Colleges and Universities that Are Already Stretched Thin

The Government's position would require colleges and universities to add a complex, immigration-based overlay to their administration of tuition and financial

---

[21] *See Deanda v. Becerra*, 96 F.4th 750, 761 (5th Cir. 2024) ("Preemption analysis begins 'with the assumption that the historic police powers of the States [are] not to be superseded . . . unless that was the clear and manifest purpose of Congress.'").

[22] Tex. Const. art. VII, § 10.

[23] *See, e.g.,* Tex. Educ. Code §§ 4.001(a) (2024) ("The mission of the public education system . . . is grounded on the conviction that a general diffusion of knowledge is essential for the welfare of this state and for the preservation of liberties and rights of citizens").

aid, imposing significant new duties on institutions that accept students at in-state tuition rates. These new requirements would upend settled, resource-efficient processes for determining in-state tuition eligibility and force institutions to take on screening and compliance work they are neither staffed nor trained to perform.

Schools determine in-state-tuition eligibility by applying straightforward criteria set by state law. Admissions or financial-aid officers review some combination of objective indicia—a student's home address, school transcripts or graduation records, family tax filings—using documentation already collected in the standard admissions or financial-aid process. This documentation comes to the school already verified by outside sources, including the student's high school or community college, the Common App and other application or testing platforms, or the federal government via information submitted during the Free Application for Federal Student Aid (FAFSA) application process.[24] Confirming whether a student qualifies for in-state tuition is therefore largely ministerial and varies little from year to year. Both families and institutions come into this process with clear expectations and outcomes.

Mandating immigration-status screening would fundamentally change and complicate this process. First, it would obligate institutions to identify which

---

[24] *See, e.g.*, *How do colleges get my official transcripts?*, COMMON APP, https://appsupport.commonapp.org/applicantsupport/s/article/How-do-colleges-get-my-official-transcripts?tref=1003 (last visited Oct. 27, 2025).

students are "lawfully present" under federal immigration law—a term whose contours are unsettled and program-specific. Whether individuals with deferred action (including DACA), Temporary Protected Status, humanitarian parole, pending asylum or adjustment applications, Special Immigrant Juvenile status, U visas, or other visas or humanitarian protections are considered "lawfully present" depends on evolving statutes, regulations, and agency guidance that differ across federal programs and may change at a moment's notice with policy shifts. Tasking college and university enrollment officers with evaluating students' immigration status would require specialized legal expertise and management systems colleges do not possess.

The resources and efforts involved would be significant, particularly for institutions with limited administrative capacity, and would have downstream effects on the timely awarding of scholarships, state-supported financial aid, and related tuition relief. These burdens would affect both domestic and non-citizen students, because institutions would be compelled to verify the status of all students, not only those who self-report as non-U.S. citizens and regardless of whether they apply for federal aid. A significant part of the burden involves how to implement verifications quickly and efficiently without undermining efforts to recruit and enroll students.

For example, at one member institution of the Presidents' Alliance,

administrators reported that these verification processes are not a one-time task, but require continuous monitoring, document management, and staff training to remain compliant while safeguarding student privacy. Immigration classifications are dynamic: documents expire; adjudications are delayed; and interim authorizations can be granted or withdrawn, sometimes through formal notices and others via agency memoranda.  To remain compliant, institutions would have to install ongoing monitoring programs, integrate with federal verification tools, train staff on sensitive document handling, create appeal and error-correction processes, and accurately track and calendar renewals, expirations, and potential status changes, all under strict privacy protections.  This represents continuous compliance management, not routine administrative work.

The complexity of these tasks will inevitably produce mistakes.  Two kinds of errors are especially foreseeable and harmful: (1) overcorrection: risk-averse institutions facing potential penalties for misclassification will deny in-state rates to students who, in fact, qualify, chilling access for lawfully present noncitizens and U.S. citizens with complex documentation; and (2) inadvertent errors: inexpert review of unfamiliar federal documents could grant resident rates to students whom institutions later conclude do not meet the applicable criteria for  "lawful presence." Either error undermines the integrity of the tuition system and exposes institutions to disputes and liabilities they are ill-equipped and have limited

resources to manage.

These issues are not hypothetical.  Two weeks after the court's ruling amending the Texas Dream Act, the Texas Higher Education Coordinating Board instructed colleges to identify and reclassify students who are not lawfully present in the country as nonresidents for the upcoming school year.[25] This instruction, however, offered no guidance on how schools should manage this process, make these determinations, or what documentation to accept as proof of lawful presence.[26] Some universities have inconsistently interpreted the court's ruling, leaving students confused and unsure of their academic and financial futures.[27] As a result of the confusion, Texas is now home to dozens of public higher-education institutions—state agencies—that are interpreting the state's own law inconsistently.

These new burdens come as higher education faces sustained financial difficulties, and college becomes less affordable for families.  Requiring

---

[25] Wynn Rosser, *Memorandum Regarding Court Ruling*, TEX. HIGHER EDUC. COORDINATING BD. (June 18, 2025), https://reportcenter.highered.texas.gov/correspondence/commissioner-correspondence/memorandum-regarding-court-ruling/.

[26] Jessica Priest, *Confusion reigns as Texas colleges scramble to comply with ban on in-state tuition for undocumented students*, THE TEX. TRIB. (Aug. 19, 2025), https://www.texastribune.org/2025/08/19/texas-colleges-undocumented-immigrants-tuition-ruling/.

[27] For example, Dallas College's student-facing website indicates that those persons are eligible. *Residency*, DALL. COLL., https://www.dallascollege.edu/admissions/application/residency/ (last visited Oct. 27, 2025).  On the other hand, University of Houston notified at least one Dreamer that she was no longer eligible due to the court's ruling.

institutions to build and operate a new, specialized immigration-status apparatus adds costs when campuses are already cutting services and consolidating staff. Those costs are not merely assumed by the institution; they are passed along to students and families in the form of higher tuition and fees, or to academic programs or other necessary support services on campus through further cuts. Administrative-expense growth is well-recognized as the main driver of rising college and university tuition.[28]  Imposing another compliance mandate of this magnitude will exacerbate affordability challenges and further strain institutional capacity without advancing any academic mission or Texas public policy.

## V.      Eliminating Tuition Equity Has Dire Economic and Workforce Consequences

Contrary to the Government's position, undocumented students do not drain the economy or damage state programs.  They have the opposite effect.  The nation's economic competitiveness depends on cultivating a skilled, educated workforce.  Without equitable access, the pipeline of future teachers, healthcare providers, and STEM professionals shrinks at a time when shortages in these fields are becoming increasingly urgent.

Undocumented immigrants contribute significant amounts of revenue in

---

[28] *The Cost of Excess: Why Colleges and Universities Must Control Runaway Spending*, AM. COUNCIL OF TRS. AND ALUMNI (Aug. 2021), https://static.howcollegesspendmoney.com/The-Cost-of-Excess-FINAL-Full-Report.pdf.

taxes, Social Security, and Medicare; they pay substantial amounts into state

programs and institutions; and they wield immense spending power.[29] Their

contributions grow exponentially as their access to postsecondary education

increases.[30] Of the total population of approximately 15.4 million undocumented

immigrants currently in the U.S., just over 1.7 million are over the age of 18 and

highly educated, equipped with bachelor's, master's, and professional degrees;

more than 40% of those with bachelor's degrees continue their education after

college.[31]

  Nationwide, households led by undocumented immigrants contribute over

$30.8 billion in taxes annually, including $18.6 billion in federal income taxes and

---

[29] *Immigrant-Origin Students in U.S. Higher Education: Powering the future workforce and helping to drive excellence and innovation on our campuses, in our communities, and for our country.* HIGHER ED IMMIGR. PORTAL, https://www.higheredimmigrationportal.org/research/immigrant-origin-students-in-u-s-higher-education-updated-august-2024// (last updated Oct. 2024); *The Economic Impact of the Trump Administration's Immigration Policies*, NATIONAL FOUNDATION FOR AMERICAN POLICY (NFAP), https://nfap.com/studies/the-economic-impact-of-the-trump-administrations-immigration-policies/ (October 2025).

[30] Tom K. Wong et al., DACA Recipients' Livelihoods, Families, and Sense of Security Are at Stake This November, CTR. FOR AM. PROGRESS (Sept. 19, 2010), https://www.americanprogress.org/article/daca-recipients-livelihoods-families-sense-security-stake-november/ (Individuals' hourly wages more than doubled after receiving DACA, enabling them to achieve financial independence for themselves and their families).

[31] Evin Millet, *Highly-Educated Undocumented Immigrants in the United States*, CTR. FOR MIGRATION STUD. (Aug. 2, 2022), https://cmsny.org/educated-immigrants-millet-080122/; Steven A. Camarota & Karen Zeigler, *Foreign-Born Number and Share of U.S. Population at All-Time Highs in January* 2025, CTR. FOR IMMIGR. STUD. (Mar. 12, 2025), https://cis.org/Report/ForeignBorn-Number-and-Share-US-Population-AllTime-Highs-January-2025.

$12.2 billion in state and local taxes.[32] Eighty-eight percent of DACA recipients are employed; the employment rate of highly educated undocumented immigrants nationally is on par with that of highly educated documented immigrants and with the U.S.-born population.[33] The majority of employed, highly educated, undocumented immigrants work in management, business, science, and the arts.[34] Many are also engaged in occupations in service and sales. They are software developers, engineers, scientists, analysts, salespersons, and healthcare professionals, and their individual average annual income is estimated at over $73,000.[35]

The American Immigration Council (AIC) estimates that obtaining a bachelor's degree increases Texas affidavit students' earnings by more than 57%,[36] placing them in a better position to secure high-wage jobs and contribute to the state economy through taxes and spending. This pattern holds even for those who do not complete their degrees, increasing their wage outcomes and, thus, their

---

[32] *Undocumented Students in Higher Education: How Many Students Are in U.S. Colleges and Universities, and Who Are They?*, HIGHER ED IMMIGR. PORTAL, https://www.higheredimmigrationportal.org/research/report-undocumented-students-in-higher-education/. (last updated Aug. 2023)

[33] *DACA 13 Years Later: From students to careers and families*, FWD.US, (May 20, 2025), https://www.fwd.us/news/daca-anniversary/; Millet, *supra note* 41.

[34] *Id.*

[35] *Id.*

[36] *The Economic Cost of Repealing In-State Tuition in Texas*, AMERICAN IMMIGRATION COUNCIL (March, 2023), https://www.americanimmigrationcouncil.org/wp-content/uploads/2025/01/20230320_factsheet_tx_instatetuition_2023.pdf/.

potential contributions to the state economy.[37]  As with all undocumented immigrants, the highly educated subset is mostly concentrated in four states, with Texas accounting for over 14% of the undocumented student population in higher education.[38]

This is evidenced by the active DACA recipients in Texas in 2022—just 101,340 individuals—who had a collective spending power of $3.7 billion in that state alone.[39] A decade of Texas DACA recipients has demonstrated the immense economic potential of undocumented immigrants with access to opportunity.  They have made significant contributions to the Texas workforce and filled high-needs shortages, including 4,300 healthcare workers; 2,800 teachers; and tens of thousands of essential workers.[40]

Of the more than 1.7 million undocumented immigrants who call Texas home, 73,000 are enrolled in postsecondary education.[41]  Comprising over 3.9% of the total postsecondary student population in the state, undocumented students contribute significantly to the financial wellbeing of Texas institutions and the

---

[37] Id.

[38] *Breakdown of the Undocumented Student Population in U.S. Colleges and Universities, supra, note 3.*

[39] Skyler Korgel, *Celebrating a Decade of DACA in Texas*, Every Texan (Sept. 29, 2022), https://everytexan.org/2022/09/29/celebrating-a-decade-of-daca-in-texas/.

[40] Korgel, *supra*, note 49.

[41] *Breakdown of the Undocumented Student Population in U.S. Colleges and Universities, supra note 3.*

economy.[42]  In 2021 alone, Texas Dream Act students contributed $81.6 million in

tuition and fees to Texas public institutions.  Without the Texas Dream Act, the

state will lose an estimated $461 million annually in economic activity.[43]  Over

time, the state stands to lose $33 billion in taxable wage earnings and $28.5 billion

in additional economic activity.

Imposing greater barriers to these students' ability to access higher

education will only increase the economic losses to the state.  Already, 66% of the

undocumented population between the ages of 18 and 24 in Texas is not enrolled

in postsecondary education.  That is a significant drop from high school, in which

89% of students between 13 and 17 are enrolled.[44] This represents a substantial lost

opportunity for Texas in financial and economic growth, which will only further

deteriorate if affordable tuition is denied to those who need it most.

Texas recognizes that, to be competitive, it needs more college-educated

Texans.

> The demand for skilled and knowledgeable workers
> continues to outpace workforce supply in Texas.  For the
> state to remain competitive and prosperous, it will need
> approximately 60 percent of its 25- to 34-year-olds to

---

[42] *Id.*

[43] Chelsie Kramer, *Texas Dream Act Survives—Because Texans Showed Up*, AM. IMMIGR. COUNCIL (May 30, 2025), https://www.americanimmigrationcouncil.org/blog/texas-dream-act-undocumented-students-legislation/.

[44] *Profile of the Unauthorized Population: Texas,* MIGRATION POL'Y INSTITUTE, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/TX (last visited Oct. 28, 2025).

hold a quality certificate or degree by 2030.[45]

It also needs more healthcare professionals.  In recognition of the dire deficit in April 2024, Texas Governor Greg Abbott directed the Texas Higher Education Coordinating Board to create a task force with the urgent directive of providing opportunities and removing barriers to expand healthcare programs and provide students with the tools necessary to succeed.[46]  Healthcare professionals make up 13% of the Texas workforce, which means it is already the largest employment sector in the state, and yet, 224 of 254 Texas counties are designated as healthcare-professional shortage areas ("HPSAs").  Over 6 million Texas residents live in a HPSA.[47]  Those shortages are unlikely to improve without accessible postsecondary pathways for undocumented students in healthcare and related fields.

Undocumented students in Texas are active contributors to their communities and economy.  Studies have consistently shown that the more education undocumented immigrants receive, the better employment they obtain and the more income they generate, which translates directly into the future

---

[45] *Texas Higher Education Strategic Plan: 2015–2030,* TEX. HIGHER EDUC. COORDINATING BD. (2015), https://reportcenter.highered.texas.gov/agency-publication/miscellaneous/thecb-60x30-strategic-plan/.

[46] *Building Texas' Future Healthcare Workforce: Texas Healthcare Workforce Task Force Final Report*, TEX. HIGHER EDUC. COORDINATING BD. (Oct. 1, 2024), https://gov.texas.gov/uploads/files/press/2024.10.01_-_Healthcare_Workforce_Report_FINAL_v4_.pdf.

[47] *Id.*

economic prosperity of Texas and all Texans' ability to compete in an increasingly educated world arena. Approximately 64% of DACA recipients who are over 16 years of age are employed. They pay taxes, support the economy with their spending, and often create jobs for themselves and others. Nationwide, 48% of DACA business owners employ, on average, 4.5 workers in addition to themselves.[48]

## VI.    Eliminating Tuition Equity Will Harm Other Texas Students

The Government's position is premised on the idea that tuition-equity policies reduce access to higher education for United States citizens. However, analyses of in-state tuition policies show that these policies have a positive effect on enrollment among undocumented students with neutral or positive effects on their U.S. citizen peers.[49]

Without access to in-state tuition, many undocumented students would be unable to afford college at all, meaning that institutions would not capture their tuition revenue in any form. In contrast, providing in-state tuition enables their enrollment, ensuring that colleges benefit from tuition payments that would otherwise be foregone. In this way, extending in-state tuition represents not a loss

---

[48] Tom K. Wong et al., *supra*, note 40.

[49] Alexander Villarraga-Orjuela & Brinck Kerr, *Educational Effects of Banning Access to In-State Resident Tuition for Immigrant Students*, 39 EDUC. EVALUATION AND POL'Y ANALYSIS 620 (2017); Catalina Amuedo-Dorantes & Chad Sparber, *In-State Tuition for Undocumented Immigrants and its Impact on Enrollment, Tuition Costs, Student Financial Aid, and Indebtedness*, 49 REGIONAL SCIENCE AND URBAN ECONOMICS 11 (2014).

of institutional revenue, but a retention and recovery of funds that would not exist without such policies.

Rescinding tuition equity policies introduces uncertainty into the financial aid system, leaving students confused and nervous about the short- and medium-term stability of their overall college costs. Even temporary price shocks can impact enrollment trends. The City University of New York (CUNY) provides an illustrative example: in 2002, CUNY briefly reversed its tuition equity policy. While the reversal only lasted one semester, the effects were pronounced, especially among students earlier in their college careers. Evaluators estimate that the reversal of the policy decreased degree completion by 22 percent among such students.[50]

## VII.    Eliminating Tuition Equity Policies Will Undermine the Mission and Threaten the Sustainability of Higher Education Institutions.

U.S. higher education institutions are already facing enrollment issues. Following its peak in 2010-2011, postsecondary enrollment has steadily declined. Because of declining birth rates, the number of U.S.-born, traditional college-age students is expected to decrease further beginning this year, potentially by as much as 15% between 2025 and 2029.[51]  Without the children of immigrants,

---

[50] Dylan Conger & Lesley J. Turner, *The Impact of Tuition Increases on Undocumented College Students' Attainment* (Nat'l Bureau of Econ. Rsch., Working Paper No. 21135, 2015), https://www.nber.org/papers/w21135.
[51] *New Research: Without Immigrants and International Students U.S. College Enrollment Would Plummet*, Nat'l Found. for Am. Pol'y (May 21, 2025), https://nfap.com/wp-

undergraduate enrollment could plummet by almost 23% and graduate enrollment by about 16% during that same period.[52]

Schools thrive on the ability to serve all students who meet academic standards.  When institutions are required to serve as arbitrators of immigration status, their ability to fulfill their core academic mission is diminished.  These harms reverberate beyond individual students, threatening both institutional sustainability and broader economic vitality.

Eliminating tuition equity would erode trust between students and administrators.  When students fear that disclosures about identity, finances, or family circumstances could be used to exclude or penalize them, they are less likely to seek advising, counseling, health services, or financial aid assistance, with predictable adverse effects on mental health, academic performance, and graduation rates.  According to a 2015 study by the Institute for Immigration, Globalization, and Education, 61% of undocumented students reported feeling uncomfortable seeking support from campus staff due to fears about their immigration status.[53] The American Council on Education has warned that such

---

content/uploads/2025/05/Importance-of-Immigrants-and-International-Students.DAY-OF-RELEASE.2025.pdf.

[52] *Id.*

[53] Marcelo M. Suarez-Orozco et al., *In the Shadows of the Ivory Tower: Undocumented Undergraduates and the Liminal State of Immigration Reform*, THE UNDOCUSCHOLARS PROJECT: INSTITUTE FOR IMMIGR., GLOBALIZATION & EDUC., UCLA (2015), https://www.undocuscholars.org/assets/undocuscholarsreport2015.pdf.

policies can create a climate of fear and disengagement, undermining the educational mission of colleges and universities and overall academic experience of all students.[54]

When a category of qualified students is targeted for enforcement, campuses lose students, tuition revenue shrinks, and programs contract.  Experience in jurisdictions that have enacted restrictive measures confirms this trajectory.  For example, after Alabama passed HB 56, which barred undocumented students from enrolling in public colleges, the University of Alabama system reported a decline in Hispanic enrollment and a chilling effect on applications from immigrant communities, without regard to whether any individual was undocumented.[55]

These outcomes run counter to the public interest in an educated workforce and undermine colleges' ability to fulfill their educational and economic missions. Taken together, these findings demonstrate that in-state tuition equity policies expand overall access to higher education while strengthening institutional revenue streams. They rebut the claim that undocumented students displace others, showing instead that these policies create additional opportunity without reducing access for

---

[54] *Immigration Related Campus Concerns*, AM. COUNCIL ON EDUC. (Jan. 2025), https://www.acenet.edu/Documents/Issue-Brief-Immigration-Related-Campus-Concerns-2025.pdf.
[55] *Racial Profiling After HB 56*, NAT'L IMMIGR. L. CTR. (Aug. 2012), https://www.nilc.org/wp-content/uploads/2016/02/Alabama-Stories-2012-08-23_final.pdf.

anyone.[56] They help to maintain enrollments and a robust student body, which benefits institutions and the broader economy.

## VIII.  States Must Uphold Tuition Equity or Be Left Behind.

At the start of the year, approximately half the states and the District of Columbia offered tuition equity for undocumented students.  Since then, Florida, Texas, and Oklahoma have taken steps to restrict access for undocumented students.[57] These policy reversals will reduce tuition and spending revenue and hinder long term economic competitiveness compared with states that maintain inclusive higher education policies.

Texas, which receives over $4.9 billion in state and local taxes from its undocumented population, is similarly poised to lose big.[58]  The increased price tag will cause them to stop out, resulting in a loss of $81 million in tuition revenue.[59] It also stands to lose over $461 million in taxes and spending power because undocumented Texans with bachelor's degrees earn 57% more than those

---

[56] Nattanicha Chairassamee & Oudom Hean, *Financing and Enrollments in Public Universities*, 56 APPLIED ECON. 812 (2023); Bradley R. Curs & Ozan Jaquette, *Crowded Out? The Effect of Nonresident Enrollment on Resident Access to Public Research Universities*, 39 EDUC. EVALUATION AND POL'Y ANALYSIS 644 (2017).

[57] A settlement that will determine the fate of tuition equity in Kentucky is currently pending.

[58] Samuel Cervantes, *Undocumented Texans Paid $4.9 Billion in State and Local Taxes in 2022*, EVERY TEXAN (August 6, 2024), https://everytexan.org/2024/08/06/undocumented-texans-paid-4-9-billion-in-state-and-local-taxes-in-2022/

[59] Eleanor Klibanoff & Jessica Priest, *Texas Ends In-State Tuition for Undocumented Students,* GOVERNING (June 5, 2025), https://www.governing.com/policy/texas-ends-in-state-tuition-for-undocumented-students (citing EVERY TEXAN).

without.[60]

Students who pursue higher education in Texas are also more likely to remain in Texas after graduation.[61] Policies that discourage students from enrolling in Texas institutions can facilitate talent drain to states with friendlier policies, costing the state crucial local talent sources in the long term.

Facilitating access to a college education also has several indirect benefits. Individuals who earn a postsecondary degree are far less likely to require social services. Reducing access to in-state tuition thus stands to cost Texas not only in future earnings and tax contributions, but also in higher dependency on public resources.

States that maintain tuition equity policies will continue to realize both short- and long-term advantages. For example, in August 2025, Arizona confirmed that Arizona's Proposition 308, which permits students to receive in-state tuition at any Arizona university or community college based on attendance and high-school graduation requirements, regardless of immigration status, is: (a) exempted under 8 U.S.C. § 1621—because it was enacted after August 1996, and it affirmatively

---

[60] *The Economic Cost of Repealing In-State Tuition in Texas*, AMERICAN IMMIGRATION COUNCIL (March, 2023), https://www.americanimmigrationcouncil.org/wp-content/uploads/2025/01/20230320_factsheet_tx_instatetuition_2023.pdf/; Christian Penichet-Paul, *Halting of Texas' In-State Tuition* for *Undocumented Students: Explainer*, NAT'L IMMIGR. F. (June 6, 2025), https://forumtogether.org/article/blocking-of-texas-in-state-tuition-for-undocumented-students-explainer/.
[61] John V. Winters, *In-State College Enrollment and Later Life Location Decisions*, 55 J. HUM. RES. 1400 (2020).

provides for eligibility, and (b) consistent with 8 U.S.C. § 1623—because eligibility is not conditioned on residence.[62]  And as recently as July 2025, Vermont began offering tuition equity.

States that uphold tuition equity will remain better positioned for sustained prosperity, workforce development, and competitiveness. By contrast, those that dismantle such policies, particularly those with large undocumented populations, will forfeit millions in potential revenue, tax contributions, and consumer spending, weakening their ability to compete in an economy increasingly dependent on educated talent.

## CONCLUSION

The Court should reverse the district court's approval of the consent judgment, vacate the order, and remand with instructions to permit intervention and full adversarial development of the legal and factual issues.

## CERTIFICATE OF SERVICE

I certify that on November 5, 2025, a true and correct copy of this Brief was filed with the Clerk for the United States Court of Appeals for the Fifth Circuit via the Court's electronic filing system, which will forward a copy to all counsel of record.  I certify that I separately served Defendants' counsel of record via email.

---

[62] Proposition 308 (2022)'s consistency with federal law, Op. Att'ys Gen. I25-006 (2025).

Dated: November 5, 2025                    /s/ *Madeleine K. Rodriguez*
                                            Counsel for the Presidents' Alliance
                                            on Higher Education and Immigration

**CERTIFICATE OF COMPLIANCE**

This brief complies with the typeface and type-volume limitations in Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 6,499 words, excluding the accompanying documents authorized by Federal Rule of Appellate Procedure 27(a)(2)(B) and the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: November 5, 2025

/s/ *Madeleine K. Rodriguez*
Counsel for the Presidents' Alliance
on Higher Education and Immigration