No. 25-10898

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff - Appellee

v.

STATE OF TEXAS,
Defendant - Appellee

STUDENTS FOR AFFORDABLE TUITION; LA UNION DEL PUEBLO
ENTERO; AUSTIN COMMUNITY COLLEGE; OSCAR SILVA
Movants - Appellants

On Appeal from the United States District Court for the Northern
District of Texas, No. 7:25-cv-00055
The Hon. Reed O'Connor, U.S. District Judge

**REPLY BRIEF OF APPELLANTS LA UNIÓN DEL PUEBLO ENTERO,
AUSTIN COMMUNITY COLLEGE, AND OSCAR SILVA**

Andrés Correa
LYNN PINKER HURST &
SCHWEGMANN, LLP
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Tel.: (214) 981-3800
Fax: (214) 981-3839
acorrea@lynnllp.com

## CERTIFICATE OF INTERESTED PARTIES

### No. 25-10898, *United States v. Students*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

ACLU Foundation of Texas

ACLU of Texas

Austin Community College

Bernie, Andrew

Berroa Rodriguez, Marlene Nathalie

Brewer, Simon Christopher

Broder, Tanya

Corning, Sarah

Correa, Andres

Democracy Forward Foundation

Desai, Yaman

Dolling, Zachary

Donatti, David A.

Ensign, Drew C.

Fascett, Lauren

Fleming, Angel

Gardner, Kyle Aaron

Gonzalez, Kassandra

Hatoum, Daniel

Johnson, Wade Allen

La Unión del Pueblo Entero

Lynn Pinker Hurst & Schwegmann

Kambli, Abhishek

Kercher, Ryan

Molina, Ralph Michael

National Immigration Law Center

Netter, Brian David

Olivares, Efren Carlos

Patton, Christopher W.

Perez, Elianis N.

Perryman, Skye L.

Petchenik, Molly

Pinon, Adriana Cecilia

Saldivar, Edgar

Salzman, Joshua Marc

Silva, Oscar

Skedzielewski, Sean

Students for Affordable Tuition

Tenny, Daniel

Texas Civil Rights Project

Walters, Ryan David

Wolfson, Paul

Woodward, Daniel

Xu, Zhenmain

/s/ Andrés Correa

*Attorney of record for Appellants LUPE, ACC, and Oscar Silva*

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 1

ARGUMENT ...................................................................... 2

    I.    LUPE Intervenors Were Entitled to Intervene. ....................... 2

        A.    LUPE Intervenors satisfied the four intervention factors. ...................................................................... 2

        B.    The district court's futility analysis was misguided. ..... 7

    II.    The Consent Judgment Should Be Vacated. ........................... 9

        A.    LUPE Intervenors properly challenge denial of vacatur. ...................................................................... 9

        B.    Lack of adversity deprived the district court of jurisdiction. ................................................................ 10

        C.    The consent decree was entered without affording procedural protections for LUPE Intervenors. ............. 13

    III.    The Parties Fail To Show That the Dream Act Is Preempted. 14

        A.    Section 1623 does not preempt the Dream Act. .......... 14

            1. The Dream Act does not provide benefits on "the basis of residence." ........................................... 15

            2. In-state tuition is not a "postsecondary education benefit." ............................................................ 18

            3. Non-resident citizens are eligible for in-state tuition. ........................................................... 20

        B.    Federalism principles confirm that the Dream Act is not preempted. ................................................................ 23

        C.    The Dream Act is severable. ....................................... 25

CONCLUSION ...................................................................... 27

# TABLE OF AUTHORITIES

## Cases

*Altria Grp., Inc. v. Good*,
    555 U.S. 70 (2008)................................................................ 27, 28

*Bituminous Casualty Corp. v. Garcia*,
    223 F.R.D. 308 (N.D. Tex. 2004)....................................................16

*Black Fire Fighters Ass'n of Dallas v. City of Dallas*,
    19 F.3d 992 (5th Cir. 1994) ...........................................................3

*Bond v. United States*,
    564 U.S. 211 (2011).....................................................................14

*Bostock v. Clayton Cnty.*,
    590 U.S. 644 (2020).....................................................................19

*Brumfield v. Dodd*,
    749 F.3d 339 (5th Cir. 2014) .......................................................3, 6

*Carney v. Adams*,
    592 U.S. 53 (2020).......................................................................12

*Chicago & Grand Trunk Ry. Co. v. Wellman*,
    143 U.S. 339 (1892).....................................................................13

*City of Houston v. Am. Traffic Solutions, Inc.*
    668 F.3d 291 (5th Cir. 2012) .........................................................7

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,
    589 U.S. 327 (2020).....................................................................19

*Deanda v. Becerra*,
    96 F.4th 750 (5th Cir. 2024) .........................................................21

*Edwards v. City of Houston*,
    78 F.3d 983 (5th Cir. 1996) ..................................................... 11, 12

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024)......................................................................6

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
   561 U.S. 477 (2010)........................................................................32

*Greenwich Ins. Co. v. Miss. Windstorm Underwriting Ass'n*,
   808 F.3d 652 (5th Cir. 2015) ................................................. 17, 28

*La Union del Pueblo Entero v. Abbott*,
   29 F.4th 299 (5th Cir. 2022) ........................................... 7, 25, 27

*League of United Latin Am. Citizens, Council No. 4434 v. Clements*,
   999 F.2d 831 (5th Cir. 1993) ..................................................7, 15

*League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*,
   659 F.3d 421 (5th Cir. 2011) ........................................................3

*League of Women Voters of U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ..........................................................4

*Liljeberg v. Health Services Acquisition Corp.*,
   486 U.S. 847 (1988)......................................................................17

*Martinez v. Regents of Univ. of California*,
   50 Cal. 4th 1277 (2010) ..............................................................30

*Murphy v. NCAA*,
   584 U.S. 453 (2018)......................................................................29

*Nelson v. Adams USA, Inc.*,
   529 U.S. 460 (2000)......................................................................10

*New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*,
   732 F.2d 452 (5th Cir. 1984) .........................................................4

*Pin v. Texaco, Inc.*,
   793 F.2d 1448 (5th Cir. 1986) .......................................................8

*Pool v. City of Houston*,
   87 F.4th 733 (5th Cir. 2023) ................................................ 12, 14

*Pool v. City of Houston*,
   978 F.3d 307 (5th Cir. 2020) ("*Pool I*")....................................14

*R.I. Fed'n of Tchrs., AFL-CIO v. Norberg*,
    630 F.2d 850 (1st Cir. 1980)................................................................9

*SEC v. Forex Asset Mgmt. LLC*,
    242 F.3d 325 (5th Cir. 2001) .........................................................11

*Sierra Club v. Espy*,
    18 F.3d 1202 (5th Cir. 1994) ...........................................................4

*Space Expl. Techs. Corp. v. NLRB*,
    151 F.4th 761 (5th Cir. 2025) .................................................. 12, 13

*Stanley v. City of Sanford*,
    606 U.S. 46 (2025)..........................................................................28

*Texas v. United States*,
    50 F.4th 498 (5th Cir. 2022) .......................................................5, 10

*Texas v. United States*,
    805 F.3d 653 (5th Cir. 2015) ...........................................................5

*Trump v. Barbara*,
    No. 25-365 (U.S. Jan. 23, 2026)....................................................21

*U.S. v. Illinois*,
    No. 3:25-cv-01691 (S.D. Ill.) .........................................................10

*U.S. v. Walz*,
    No. 0:25-cv-02668 (D. Minn.)........................................................10

*United States v. Allegheny-Ludlum Industries, Inc.*,
    517 F.2d 826 (5th Cir. 1975) .........................................................15

*Williams & Humbert Ltd. v. W. & H. Trade Marks (Jersey) Ltd.*,
    840 F.2d 72 (D.C. Cir. 1988)...........................................................9

*Young Conservatives of Texas Found. v. Smatresk*,
    73 F.4th 304 (5th Cir. 2023) ..................................................... 22, 27

## Statutes

1 U.S.C. § 1 ..............................................................................................22

42 U.S.C. § 1981 ................................................................16

8 U.S.C. § 1101(a)(33) ........................................................15

8 U.S.C. § 1621(c)(1)(B) .....................................................19

8 U.S.C. § 1621(d) ..............................................................17

8 U.S.C. § 1623 ....................................................................1

Minn. Stat. § 135A.043(a) ...................................................26

Tex. Educ. Code § 54.052(a)(3) ..........................................15

Tex Educ. Code § 54.0501(6) ..............................................15

Tex. Educ. Code § 54.0501(3) .............................................17

Tex. Educ. Code § 54.051(c)-(d) .........................................20

Tex. Educ. Code § 54.052(a)(1) ..........................................17

Tex. Educ. Code § 54.052(a)(2) ..........................................17

Tex. Educ. Code § 61.002(a)-(b) .........................................20

Tex. Gov't Code § 311.032 ..................................................26

**Rules**

Fed. R. Civ. P. 24(a) ..............................................................7

Fed. R. Civ. P. 60(b)(6) ........................................................13

Fed. R. Civ. P. 8(b)(1) ...........................................................8

**Other Sources**

Op. Tex. Att'y Gen. No. GA-0732 (2009) ..............................8

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Neither Texas nor the United States disputes that the nominal adversaries in this litigation were working together to achieve their shared goal of securing invalidation of a Texas statute. The people of Texas deserve more than sham litigation before one of their democratically enacted statutes is enjoined. When the Texas Attorney General was unwilling to discharge his duty of defending the Texas Dream Act, LUPE Intervenors sought to do so in his stead. Each of these putative intervenors has a direct, substantial, and legally protectible interest in the Dream Act and, accordingly, is an appropriate party to assume that burden.

The parties principally argue that the district court correctly predicted that any defense of the Dream Act would not change the outcome of the action. They go on to claim this prejudgment alone was an adequate basis for denying LUPE Intervenors their entitlement to be heard in a case affecting their interests. These arguments are flawed for several reasons. The district court never engaged with LUPE Intervenors' threshold argument that there was no case or controversy between the parties and, accordingly, that the district court lacked jurisdiction to enter the consent judgment. The district court also should not have resolved the preemption merits without a full adversarial presentation. These defects warrant vacatur of the consent judgment.

In any case, the Dream Act is not preempted. The parties insist that 8 U.S.C. § 1623 should be given a maximalist reading, preempting all State laws to the extent

that they do not affirmatively bar undocumented immigrants from accessing in-state tuition. But the statute is susceptible to a more modest reading. Crediting the parties' shared interpretation of Section 1623 would enable a novel and constitutionally troubling intrusion into core domains of State sovereignty. The parties' overbroad reading should be rejected.

## ARGUMENT

### I.    LUPE Intervenors Were Entitled to Intervene.

The primary question on appeal is whether the district court erred in denying intervention. The district court failed to address the factors governing intervention as of right set forth in binding precedent. Instead, the district court applied an atextual "futility" standard that imported, and then misapplied, the pleading standards for a motion to dismiss. This Court should reverse the district court's order denying intervention, vacate the judgment, and direct the district court to dismiss the case for want of jurisdiction.

### A.    LUPE Intervenors satisfied the four intervention factors.

Like the district court, the United States does not question that LUPE Intervenors satisfied the four criteria for intervention as of right. *See* LUPE.Br. 15–22. Texas, however, disputes that LUPE Intervenors have an interest in the action that will be impaired in their absence from the litigation. Tex.Br. 27–33. That contention is meritless.

1. Texas mischaracterizes LUPE Intervenors' interests as mere policy objections, but their interests are at least as significant and concrete as those this Court has recognized as sufficient under Federal Rule of Civil Procedure 24(a). Such interests include preventing a hypothetical rollback of vouchers and scholarships for certain schools in which parents wished to enroll their children, *Brumfield v. Dodd*, 749 F.3d 339, 344 (5th Cir. 2014); voting for all city council members, *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 659 F.3d 421, 434−35 (5th Cir. 2011); and removing barriers to promotion opportunities, *Black Fire Fighters Ass'n of Dallas v. City of Dallas*, 19 F.3d 992, 994 (5th Cir. 1994).

Austin Community College's ("ACC") mission to provide accessible, high-quality education to individuals from historically underrepresented and economically disadvantaged backgrounds is imperiled by the consent judgment. ROA.359. Excluding these students from campus, whether by charging them unaffordable tuition or deterring them from ever applying, ROA.360, fundamentally changes the nature of the school. *Cf. League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (recognizing harm to mission as a type of injury).

Texas ignores this aspect of ACC's injury, focusing on ACC's additional concern for lost tuition revenue. But lost revenue is also a classic pocketbook injury sufficient for intervention. *See Sierra Club v. Espy*, 18 F.3d 1202, 1207 (5th Cir. 1994) (affirming intervention as of right where association members had legally

3

protectable property interests in existing contracts threatened by the challenged action). This impact is direct and is not the kind of attenuated economic interest that has been found insufficient. *Cf. New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452, 464 (5th Cir. 1984) (en banc) (no intervention as of right where the intervenor merely asserted another party's contract rights without any enforceable rights of its own). Nor is this injury speculative, as ACC's Chancellor explained that the four-fold increase in tuition is "unaffordable for the vast majority" of affected students, ROA.360. And Texas cannot negate ACC's interest by speculating about offsetting benefits from higher tuition rates. *Cf. Texas v. United States*, 50 F.4th 498, 518 (5th Cir. 2022) ("In resolving standing, courts do not engage in such an 'accounting exercise.'"). For intervention, the real possibility of harm to this interest is sufficient, particularly because intervenors' pleadings must be taken as true. *See Texas v. United States*, 805 F.3d 653, 657 (5th Cir. 2015).

Oscar Silva also articulated specific interests in his ability to continue his education. He has qualified for in-state tuition at the University of North Texas under the Texas Dream Act, based on his graduation from a Texas high school, ROA.355, and is the "intended beneficiar[y] of" the law. *Texas v. United States*, 805 F.3d at 660. But he will be unable to provide documentation of lawful status if requested, making his eligibility uncertain. ROA.653. His interest in access to a reduced tuition rate is not merely a question of convenience—for Silva and students like him, it

means the difference between graduating and being deprived of the degrees he has spent years working towards. ROA.356–57.

Texas also attempts to undermine Silva's interest by casting uncertainty on the threat. But this kind of uncertainty is exactly why the Federal Rules provide for intervention; unless LUPE Intervenors are permitted to defend the Texas Dream Act, students like Silva cannot rely on their access to higher education. Intervenors "need not wait to see whether [the threatened action] ultimately happens" to "describe[] an interest justifying intervention" where "[t]he possibility is . . . real" that their interest may be infringed. *Brumfield*, 749 F.3d at 344. The consent judgment has exposed Silva to the mercy of officials' inconsistent attempts to make sense of eligibility requirements. *See* Brief of Amici Curiae Texans for Econ. Growth *et al.* at 8–9, Dkt. 121-2.

LUPE also has a direct, substantial, and legally protectable interest. Educational access is core to LUPE's mission and services. LUPE provides programming to help undocumented students seeking higher education, counsels students on in-state tuition eligibility, and produces materials to help students through the college application process. ROA.332–33. Far beyond a mere diversion of resources, LUPE's response to the consent judgment has required a dismantling and reorientation of its core programming, in which it has invested significant time, labor, and skill. It has been forced to rapidly tailor its services as result of a torrent

of calls from anxious members, uncertain if they will be able to continue the education they had been promised. ROA.336.

Texas's reliance (at 31–32) on *FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024), is misplaced. The Supreme Court explained that an organization cannot "manufacture" standing "simply by expending money to gather information and advocate against the defendant's action." *Id.* at 394. By contrast, the consent judgment here imperils LUPE's longstanding interests and investments that predate the challenged action. LUPE's established programs supporting non-citizen students in the years preceding this action mirror the "money and time" that the intervenors in *City of Houston v. Am. Traffic Solutions, Inc.*, invested before the litigation was filed, which this Court accepted as a basis for intervention. 668 F.3d 291, 292–94 (5th Cir. 2012).

**2.** Each intervenor's exclusion from the suit has also impaired its ability to protect its interests during the litigation. *See La Union del Pueblo Entero v. Abbott*, 29 F.4th 299, 307 (5th Cir. 2022) ("[Intervenors] need only show that if they cannot intervene, there is a possibility that their interest could be impaired or impeded."). Here, the Texas Attorney General colluded with the Department of Justice to circumvent Texas's legislative process. *See League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 842 (5th Cir. 1993) (en banc) (The Attorney General "represents the State but does not make its policies."). Though the

Attorney General enjoys the right and duty of representation of the State, "he must in fact *represent*" its interests. *Id*. LUPE Intervenors are not trying to "hijack the State's defense" of this litigation (Tex.Br. 7), but rather, to ensure that at least some defense is mounted notwithstanding the Attorney General's abdication.

### B.    The district court's futility analysis was misguided.

The parties, like the district court, insist that intervention was properly denied as futile. But Rule 24(a) is clear that district courts "must permit" intervention if the traditional four-factor test is satisfied. FED. R. CIV. P. 24(a). A party need not win its case before it is even allowed in the door. The United States argues (at 47) that it would be impractical to allow intervention if the putative intervenor does not have a winning claim, but the Federal Rules do not require intervention motions to double as summary judgment briefs.

The parties' cases do not hold otherwise, and they are distinguishable. For example, this case bears no resemblance to *Pin v. Texaco, Inc.*, 793 F.2d 1448 (5th Cir. 1986), which does not even reference "futility," and which concerned a putative intervenor who belatedly sought to raise a sanctionably frivolous issue as an end-run around a settlement in parallel litigation. *Id.* at 1455–56. Here, by contrast, LUPE Intervenors merely seek to ensure adversarial presentation on the central issue in the litigation. *See also* LUPE.Br. 24 & n.3 (distinguishing cases).

If, as Texas contends, a putative intervenor must submit a "well-pleaded" defense (Tex.Br. 9), that requires nothing more than a "short and plain" statement of the defense theory, *see* FED. R. CIV. P. 8(b)(1), not a fully articulated merits brief. This standard cannot be any more demanding than a requirement that the intervenors raise "a colorable defense to the statute." *R.I. Fed'n of Tchrs., AFL-CIO v. Norberg*, 630 F.2d 850, 855 (1st Cir. 1980); *see also Williams & Humbert Ltd. v. W. & H. Trade Marks (Jersey) Ltd.*, 840 F.2d 72, 75 (D.C. Cir. 1988) ("An application to intervene should be viewed on the tendered pleadings—that is, whether those pleadings allege a legally sufficient claim or defense and not whether the applicant is likely to prevail on the merits."). Anything more would require impermissible "judicial predictions about the outcome of hypothesized litigation," *Nelson v. Adams USA, Inc.*, 529 U.S. 460, 471 (2000), and would be inconsistent with this Court's liberal construction of the intervention standards, *Texas v. United States*, 805 F.3d at 656–57.

LUPE Intervenors readily satisfy that standard. *See* LUPE.Br. 26–28. The Dream Act's alleged unconstitutionality is no foregone conclusion, as underscored by the fact that then-Attorney General Abbott refused to predict how courts would resolve this very question. *See* Op. Tex. Att'y Gen. No. GA-0732 (2009). And other States are actively defending their Dream Act analogues against Section 1623

challenges. *See, e.g.*, *United States v. Walz*, No. 0:25-cv-02668 (D. Minn.); *United States v. Illinois*, No. 3:25-cv-01691 (S.D. Ill.).

## II.    The Consent Judgment Should Be Vacated.

The collusive consent judgment was entered without adversity between the parties and should be vacated on that basis. The improper denial of intervention is also grounds for vacatur.

### A.    LUPE Intervenors properly challenge denial of vacatur.

The parties question whether the validity of the consent judgment is properly before the Court. But as established above, *supra* Section I.A, LUPE Intervenors are entitled to intervene as of right. That alone is sufficient for them to challenge the district court's refusal to vacate the consent judgment. *See Edwards v. City of Houston,* 78 F.3d 983, 1006 (5th Cir. 1996) (vacating consent decree after reversing district court's denial of several motions to intervene). And it gives them the necessary personal stake in the appeal of the consent judgment. *See SEC v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 329 (5th Cir. 2001) (en banc) ("[I]f the decree affects a third party's interests, he is often allowed to appeal.").

Texas argues that, because LUPE Intervenors are not presently parties to the lawsuit, they have no right to appeal the judgment entering the consent judgment. The United States similarly argues that vacatur would be unnecessary or premature at this juncture, U.S.Br. 49, even if this Court concludes that the district court erred

in denying the motion to intervene. But in *Edwards*, the Court dismissed putative intervenors' appeal from an order approving a consent decree and still vacated the consent decree because intervention should have been granted. 8 F.3d at 993, 1006. This Court thus recognized that an appeal from a denial of intervention placed the validity of a consent judgment before the Court.

Moreover, LUPE Intervenors have appealed not only from the denial of their intervention motion, but also from the denial of their motion for vacatur. ROA.749. This, too, places the validity of the consent judgment squarely before the Court.

### B.    Lack of adversity deprived the district court of jurisdiction.

As our opening brief established (at 29–33), the district court lacked Article III jurisdiction. A federal court may adjudicate only "a genuine, live dispute between adverse parties." *Carney v. Adams*, 592 U.S. 53, 58 (2020). "When litigants 'desire precisely the same result,' no case or controversy exists." *Space Expl. Techs. Corp. v. NLRB*, 151 F.4th 761, 767 n.5 (5th Cir. 2025) (quoting *Pool v. City of Houston*, 87 F.4th 733, 733–34 (5th Cir. 2023) ("*Pool II*")). Under these principles, "a friendly suit" must be dismissed. *Chicago & Grand Trunk Ry. Co. v. Wellman*, 143 U.S. 339, 345 (1892).

The United States and Texas have never explained how their interests or desired outcomes in any way diverged. *Cf. Space Expl. Techs.*, 151 F.4th at 767 n.5 (holding that adversity existed where the "the parties agree[d] on the underlying

constitutional issue" but did "not seek 'the same result'"). From the beginning, both have desired precisely the same outcome: a consent judgment declaring the Texas Dream Act preempted and enjoining its enforcement. That is why this suit began and ended within hours. *See* LUPE.Br. 35. And the parties' lockstep agreement highlights the danger the Supreme Court identified a century ago: that "a party beaten in the legislature" could seek to invalidate a law via a friendly suit in federal court. *Wellman*, 143 U.S. at 345. After the Texas legislature declined to repeal the Texas Dream Act, the parties "talk[ed] in advance" to devise a suit that would, according to the plaintiff, eliminate "a statute that's been a problem for the state." ROA.435. The resulting "faux dispute" fails to support Article III jurisdiction. *Pool II*, 87 F.4th at 734.[1]

Notwithstanding these precedents, the United States contends (at 39) that adversity existed because the Dream Act "was continuing to be applied and enforced by Texas public institutions" prior to the suit. But that merely underscores the lack of adversity, as the Attorney General—who nominally defended the suit—disclaims

---

[1] Texas mistakenly suggests *Pool II* is not binding because it conflicts with an earlier decision, *Pool v. City of Houston*, 978 F.3d 307 (5th Cir. 2020) ("*Pool I*"). Tex.Br. 42 n.4. In fact, the two decisions are compatible: *Pool I* addressed "standing and mootness," 978 F.3d at 311, while *Pool II* concerned "adversity," 87 F.4th at 733–34. Those aspects of an Article III case or controversy are distinct. *See, e.g.*, *Bond v. United States*, 564 U.S. 211, 217 (2011) (the party invoking federal jurisdiction must establish "both standing" and "concrete adverseness" (quotation marks omitted)).

any role in enforcing the Dream Act. Tex.Br. 42; *see also* LUPE.Br. 32–33. On the parties' own telling, the United States may have been adverse to Texas public universities, but it did not sue them. The United States protests that suing those institutions "would be enormously complicated." U.S.Br. 41. But Article III does not contain an efficiency exception.

Against this backdrop, the United States' reliance on *United States v. Windsor*, 570 U.S. 744 (2013), and *INS v. Chadha*, 462 U.S. 919 (1983), is misplaced. Jurisdiction existed there because the defendant "refus[ed] to give [] effect" to its agreement with the other side's legal position. *Windsor*, 570 U.S. at 756; *see also Chadha*, 462 U.S. at 939. Here, the Attorney General immediately joined the United States to secure what he later described as the "major victory" of invalidation of a Texas statute. ROA.339. Indeed, it is not clear what more the Attorney General could have done outside of litigation to give effect to his legal position, given his view (Tex.Br. 42) that the Dream Act is not enforced by his office.[2]

---

[2] Other cases approving consent judgments only underscore the anomalous collaboration between the parties here. *See Clements*, 999 F.2d at 837–40 (describing the length procedural history leading up to a proposed consent decree); *United States v. Allegheny-Ludlum Industries, Inc.*, 517 F.2d 826, 834 (5th Cir. 1975) (noting "six months of intensive, hard-fought negotiations"). And in *Allegheny-Ludlum*, the court permitted intervention before rendering a merits decision. *Id.* at 839.

This Court should recognize the case for what it is: a choreographed attempt to secure a federal-court judgment between litigants who have mutually agreed from the start on an outcome. Article III does not tolerate that, so the suit must be dismissed.

### C.    The consent judgment was entered without affording procedural protections for LUPE Intervenors.

The district court's entry of the consent judgment without any procedural protections for affected parties, such as LUPE Intervenors, is also untenable, and LUPE Intervenors are entitled to post-judgment relief. *See* LUPE.Br. 33–38. Texas wrongly suggests that LUPE Intervenors could not invoke Rule 60(b)(1) because no "judgment or other coercive relief" was entered against them. Tex.Br. 46. The parties cannot dispute, however, that LUPE Intervenors' direct and substantial interests were immediately affected by the consent judgment—and, indeed, that the parties resorted to jointly procuring a consent judgment because of its effect on non-parties. As in *Bituminous Casualty Corp. v. Garcia*, Rule 60(b)(1) relief was warranted due to "surprise" when the judgment was entered without notice to affected parties and substantially prejudiced their interests. 223 F.R.D. 308, 310, 313 (N.D. Tex. 2004).

If nothing else, vacatur is warranted because of the "extraordinary circumstances" under which the consent judgment was procured. *See* FED. R. CIV. P. 60(b)(6). Contrary to Texas's assertions (at 46), this case involves more than abstract policy disagreements. LUPE Intervenors were stripped of crucial rights

under state law through a collusively procured judgment. This is a quintessential case in which "the denial of relief will produce injustice," as well as a true "risk of undermining the public's confidence in the judicial process." *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 864 (1988).

## III.    The Parties Fail To Show That the Dream Act Is Preempted.

While the Court need not resolve the issue to reverse and vacate the judgment, the district court also misconstrued Section 1623 in finding the Dream Act preempted. Rather than engage with the plain text of the statute, the parties rely in significant part on appeals to purported congressional purpose and legislative history. Their insistence that every ambiguity in Section 1623(a) be construed to further constrain Texas's control over its own educational institutions stands the presumption against preemption on its head. *See, e.g., Greenwich Ins. Co. v. Miss. Windstorm Underwriting Ass'n*, 808 F.3d 652, 656 (5th Cir. 2015). Their approach defies basic tenets of statutory construction and creates a grave and unnecessary Tenth Amendment defect in the statute.

### A.    Section 1623 does not preempt the Dream Act.

Section 1623 constrains a State's control over its own educational policies only when several prerequisites are satisfied. The parties' showing falls short in several respects.

**1.** ***The Dream Act does not provide benefits on "the basis of residence."***

Section 1623 only restricts Texas's ability to provide benefits "on the basis of residence." As explained in our opening brief (at 39–42), the Dream Act does not implicate that prohibition for two reasons. First, "residence" is a defined term under federal law, and Texas uses a different, broader definition in determining eligibility for in-state tuition. Second, maintaining "a residence" (under the Texas, not federal definition) is just one of several prerequisites to qualifying for in-state tuition under Texas Education Code § 54.052(a)(3) and, thus, residence is not "the basis" for eligibility for in-state tuition.

Neither the United States nor Texas disputes that Section 1623(a) employs a different definition of "residence" from the one used under Texas law. U.S.Br. 27–28; Tex.Br. 15 n.1; *compare* TEX. EDUC. CODE § 54.0501(6), *with* 8 U.S.C. § 1101(a)(33). The parties minimize the differences, but they cannot escape the fact that the Texas Dream Act does not require a student to demonstrate residency in the relevant federal sense. This gap is particularly significant because the Texas definition is broader than the federal one, meaning that in at least some instances, students may qualify for in-state tuition under the Dream Act without ever having been a resident of Texas for purposes of federal law. LUPE.Br. 40–41.

The parties likewise fail to show that Texas residency is "the basis" for Dream Act eligibility. They acknowledge that maintenance of a residence is not sufficient

to qualify for in-state tuition because other requirements must be satisfied as well. Thus, residency is at most "a" basis, not "the" basis for eligibility. The parties nonetheless insist that Congress did not intend for the word "the" to carry its usual, restrictive meaning and that Section 1623 is triggered anytime residency is an eligibility requirement. In making this argument, however, the parties principally rely on the assertion that "the basis" is interchangeable with other phrases, such as "because of," as used in different statutes. *See* U.S.Br. 21 (citing cases discussing statutes using the more open-ended term "based on"); *Bostock v. Clayton Cnty.*, 590 U.S. 644, 657 (2020) (construing "because of" sex in Title VII); *see also Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 335 (2020) (construing 42 U.S.C. § 1981, which does not use any term even arguably analogous to "the basis").

The parties' indifference to the specific language selected by Congress is particularly unwarranted in the context of a statute that preempts state law. Thus, while some case law uses "the basis" as synonymous with "because of" in the context of civil rights statutes, it does not follow that a similarly expansive reading is warranted in the context of a statute that intrudes on the ability of sovereign states to manage their own educational systems.

The parties also assert that LUPE Intervenors have made an implicit concession about the scope of Section 1623 by failing to argue that undocumented

students can lawfully access in-state tuition under Texas Education Code Sections 54.052(a)(1) and (2), which provide eligibility based on the "domicile" of the student or her parent. Tex.Br. 15; U.S.Br. 23. This argument conflates "domicile" and "residence," which are separately defined terms. *Compare* TEX. EDUC. CODE § 54.0501(3) (defining "domicile" more restrictively to include an intent-based element), *with id.* § 54.0501(6) (defining "residence" as lacking that element). This conflation is particularly odd because the United States is currently arguing before the Supreme Court that individuals unlawfully present in the country are legally incapable of establishing domiciliary intent. *See* Brief for the Petitioners at 29–30, *Trump v. Barbara*, No. 25-365 (U.S. Jan. 23, 2026).

The United States also argues that Section 1623 can be too easily "evaded" if it is rendered inoperative by a state's "imposing some additional requirement" on eligibility beyond residency. U.S.Br. 23. But Congress may well have set a default rule denying benefits to undocumented immigrants, while preserving a path for states to provide benefits nonetheless, as a neighboring provision does. *See* 8 U.S.C. § 1621(d) (allowing states to extend public benefits to otherwise unqualified persons if the legislature affirmatively acts to do so).

The United States also resorts to the legislative history of an unenacted precursor to Section 1623. U.S.Br. 23. But this Court has recognized the "dubious" value of even those committee reports that (unlike the one relied upon by the United

States) accompanied ultimately enacted legislation, because the Court "cannot end-run Congress by using a committee report to amend the statute." *Deanda v. Becerra*, 96 F.4th 750, 763–64 (5th Cir. 2024). Consistent with basic principles of bicameralism and presentment, this Court should construe the statute that Congress actually enacted.

### 2. *In-state tuition is not a "postsecondary education benefit."*

The parties also fail to demonstrate that eligibility for in-state tuition is the type of public benefit that is subject to Section 1623.[3] As LUPE Intervenors explained, the provision of in-state tuition is not public largess, but rather, a self-interested decision by Texas to invest in its own future workforce. LUPE.Br. 43–44. That was the rationale on which then-Governor Perry signed the Dream Act. *See id.* It remains true today that the Dream Act is not a drain on public resources, but a driver of economic activity. *See* Brief of Amici Curiae Presidents' All. on Higher Educ. & Immigration at 20, Dkt. 126-1 (explaining that "[w]ithout the Texas Dream Act, the state will lose an estimated $461 million annually in economic activity"); Texans for Econ. Growth *et al.* Amicus Br. at 22 ("Shutting out undocumented students . . . from eligibility for in-state tuition rates and higher education will significantly hamper Texas' economic future and pose significant challenges for

---

[3] In *Young Conservatives*, this Court merely "assumed" that in-state tuition qualifies as a covered benefit. *Young Conservatives of Texas Found. v. Smatresk*, 73 F.4th 304, 313 n.3 (5th Cir. 2023).

Texas employers looking to fill jobs with college-educated workers."). And making affordable tuition available to undocumented students helps Texas schools by allowing them to obtain revenue from students who would otherwise be unable to attend. *See* Presidents' All. on Higher Educ. & Immigration Amicus Br. at 26 (estimating a loss of $81 million in tuition revenue).

The parties argue based on cherry-picked dictionary definitions that anything helpful or advantageous qualifies as a "benefit." Tex.Br. 18; U.S.Br. 16. But those generic definitions ignore the context of the statute, and the parties omit the more apposite dictionary definition of a "benefit" as "[f]inancial assistance that is received from . . . a public program (such as social security) in time of sickness, disability, or unemployment." BENEFIT, Black's Law Dictionary (12th ed. 2024). Texas makes no analogous payments to students under the Dream Act.

The more targeted definition of "postsecondary education benefit" is supported by a neighboring statutory provision, in which Congress grouped "postsecondary education" benefits with "retirement, welfare, health, disability, public or assisted housing, . . . food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided." 8 U.S.C. § 1621(c)(1)(B). The United States points out (at 18) that other provisions of Section 1621 use the term "benefit" to refer to considerations other than financial assistance,

but that does not alter the fact that Congress described "postsecondary education" benefits as a type of "payment[] or assistance."

The parties insist that in-state tuition eligibility is functionally equivalent to a direct payment from the State. *See* Tex.Br. 18; U.S.Br. 19. But while Texas certainly offers a different price to those with established ties to the state, *see* TEX. EDUC. CODE § 54.051(c)-(d), the parties offer no support for the implicit assertion that out-of-state tuition is the baseline price as would be necessary to demonstrate that in-state tuition is discounted. One could just as naturally describe in-state tuition as the baseline price and out-of-state tuition as surcharging those students who lack connection to Texas. Indeed, treating in-state tuition as the default better aligns with the Texas Higher Education Coordinating Board's statutory purposes of enabling "the State of Texas [to] achieve excellence for college education of its youth" and securing for "citizens of the state . . . the benefits of an educated populace." TEX. EDUC. CODE § 61.002(a)-(b).

### 3. *Non-resident citizens are eligible for in-state tuition.*

The strictures of Section 1623(a) are also inapplicable so long as "a citizen or national" is eligible to qualify for in-state tuition without regard to residency. The parties concede that numerous categories of non-resident citizens can receive in-state tuition in Texas. U.S.Br. 28; Tex.Br. 19–20. Yet they insist Section 1623 preempts the Dream Act because not *all* non-resident citizens are eligible. But

Congress said only that "a" citizen or national must be eligible; it did not mandate that "every," "each," or "all" citizens be eligible.

Congress also clearly expected that it would be possible under some circumstances for a non-citizen without lawful presence to be eligible for an education benefit "on the basis of residence within a State"—otherwise, the "unless" clause specifying the conditions when such eligibility would be allowed would be superfluous. Yet, on the parties' telling, a person without lawful presence can only obtain a benefit based on state residence if the benefit is provided to all citizens and nationals without regard to state residence. However, a state that provides the same tuition to all citizens and nationals regardless of state residency definitionally does not provide in-state tuition at all. It is thus ironic that Texas criticizes LUPE Intervenors' interpretation on the ground that it allows the "unless" clause to do insufficient work (Tex.Br. 22), when on Texas's own reading, the clause is effectively superfluous, offering not a "narrow exception" (Tex.Br. 21), but a meaningless one.

There is similar irony in Texas's reliance on *La Union del Pueblo Entero v. Abbott*, 151 F.4th 273 (5th Cir. 2025). In that case, this Court applied the traditional presumption against preemption and read a federal election statute so as not to encroach on a core domain of State control. *Id.* at 295. The pertinent lesson from that case is not in its construction of the word "a" in the particular election statute at

issue, but rather, its caution against reading that term in "a maximalist way that erases swaths of state . . . law." *Id.* at 292.

Texas similarly misses the mark in invoking the Dictionary Act's presumption that "words importing the singular include and apply to several persons, parties, or things." 1 U.S.C. § 1. LUPE Intervenors do not argue that "a citizen" means exactly one citizen and that the provision is unsatisfied if two or more non-resident citizens are eligible for in-state tuition. The point is merely that the "a citizen" requirement is satisfied when one or more citizens are eligible. It is the parties' approach that contravenes the Dictionary Act by reading the singular not merely to also "include . . . several persons," but to *exclude* the singular itself and to apply only when every last citizen is covered.

The United States, for its part, confusingly argues that its reading follows from Section 1623's "parallel structure," under which "an alien" can only be eligible for in-state tuition if "a citizen or national" is eligible. U.S.Br. 29. It is the United States' approach that is asymmetrical. Under their reading, not even one "alien" without lawful presence can be eligible unless every citizen or national is as well. In other words, on their reading, "an alien" refers to even a single "alien," whereas "a citizen" means every last citizen.

The United States also argues that the statute would be rendered "ineffectual" unless Section 1623's bar applies except where every citizen or national is eligible

for in-state tuition. U.S.Br. 32. But that policy argument assumes its own conclusion. The statute is only ineffectual if Congress intended to impose a sweeping restriction that dramatically intrudes on State prerogatives, rather than a more modest measure consistent with traditional respect for State sovereignty.

## B. Federalism principles confirm that the Dream Act is not preempted.

As our opening brief (at 48–53) established, two core federalism principles—the presumption against preemption and the anti-commandeering doctrine—confirm that Section 1623(a) must be construed narrowly.

**1.** The presumption against preemption applies because the parties' reading of Section 1623(a) would impinge on "Texas's historic police powers" over education and "would alter the federal-state balance of power." *La Union Del Pueblo Entero*, 151 F.4th at 291 (citing, *inter alia*, *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008)). The presumption thus reinforces the textual limits on Section 1623(a)'s scope.

Texas suggests that because Section 1623(a) contains an express preemption clause, no presumption against preemption applies. Tex.Br. 23 (citing *Young Conservatives*, 73 F.4th at 311). This argument misses the mark because the presumption helps determine the breadth of any express preemption clause contained in the statute. "Thus, when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily accept the reading that disfavors pre-emption." *Altria*, 555 U.S. at 77 (quotation marks omitted). In other words, the

presumption informs the proper interpretation of an express preemption clause's

scope. *See, e.g.*, *Greenwich Ins. Co.*, 808 F.3d at 656 (using the presumption in this

manner).[4]

The United States acknowledges this point, U.S.Br. 32, but merely disputes

whether LUPE Intervenors have offered a "plausible" interpretation of Section

1623(a). For the reasons set forth above, LUPE Intervenors have, at a minimum,

offered a plausible reading of Section 1623(a) that coheres with the Texas Dream

Act. The district court therefore erred in ignoring the presumption.

**2.** The parties' interpretation of Section 1623(a) also would violate the Tenth

Amendment's anti-commandeering principle. *See* LUPE.Br. 51–53. The

constitutional avoidance canon therefore supports a narrower interpretation.

Congress generally may regulate only "the conduct of private actors," not states

themselves. *Murphy v. NCAA*, 584 U.S. 453, 479 (2018). The parties contend

(U.S.Br. 35–37; Tex.Br. 24–25) that their interpretation of Section 1623(a) comports

with *Murphy*, but their assertions ring hollow, as they never identify the private

actors whose conduct is purportedly regulated. That is no surprise: the United

---

[4] Texas also rehashes arguments that the text and purpose of Section 1623(a)
clearly favor its position. Tex.Br. 23–24. But as explained, the statute's text does
not address laws such as the Texas Dream Act. *See supra* pp. 15–23. And Texas's
treatment of the statute's purpose mistakenly "assume[s] that any interpretation of
a law that does more to advance a statute's putative goal must be the law." *Stanley
v. City of Sanford*, 606 U.S. 46, 58 (2025).

States's decision to sue Texas, and no other defendant, makes plain its view that the State itself is the regulated entity. And Texas's briefing repeatedly confirms that, if construed as the parties submit, Section 1623(a) would regulate states directly. *See, e.g.*, Tex.Br. 6 ("Section 1623(a) bars States from conferring postsecondary education benefits on illegal aliens . . . ."); *id.* at 22 (reading the statute as "constraining a state's provision of postsecondary education benefits"); *id.* at 23 (arguing that Section 1623(a) "'limits what can properly be done' *by states*" (emphasis altered)).

To avoid this unconstitutional result, the Court should construe Section 1623(a) such that it does not purport to dictate to States how they administer their education systems. *See* LUPE Br. 53. At a minimum, the district court, in its rush to enter the consent judgment, erred in failing to consider the significant constitutional implications of the parties' positions.

## C.    The Dream Act is severable.

The parties' principal argument is that the Dream Act is preempted by Section 1623 because it incorporates elements that specifically mandate the maintenance of "a residence" in Texas for certain periods. As explained, that argument is incorrect, *see supra* pp. 15–18, but even if the Court agrees with the parties on that point, the district court still erred in enjoining portions of the Texas statute that do not include that purported defect.

Three critical points are undisputed. First, subsection 54.052(a)(3)(A) contains no reference to residence, requiring only that the person have "graduated from a public or private high school in this state or received the equivalent of a high school diploma in this state." Second, subsection (A) could operate independently, as confirmed by other states' adoption of Dream Act analogues that focus only on in-state high school attendance and graduation without regard to residence. *See, e.g.*, *Martinez v. Regents of Univ. of California*, 50 Cal. 4th 1277, 1284 (2010) (describing and then upholding California's statute); MINN. STAT. § 135A.043(a). And third, the Texas Legislature has directed that in the absence of a non-severability clause—which does not exist here—courts should not enjoin statutory provisions that "can be given effect without the invalid provision." *See* TEX. GOV'T CODE § 311.032. It follows that any remedy must be limited to Subsection 54.052(a)(3)(B).

The parties insist that striking only subsection (B) would be improper because it would run contrary to the Texas Legislature's intent, which they say sought to restrict eligibility to only those high school graduates who also satisfy a residency requirement. U.S.Br. 26; Tex.Br. 25–26. This contention is perplexing given that they separately argue that graduation from a Texas high school is "almost a perfect proxy" for residence. U.S.Br. 25. A world without subsection (B) thus far more closely approximates the result desired by the Texas Legislature than one in which the Dream Act is enjoined in its entirety.

The United States also misconceives the relevant inquiry, arguing that "[t]here is no basis, in the name of furthering Congress's effort to preclude aliens who are not lawfully present from benefitting from in-state tuition, to make it available to more such aliens." U.S.Br. 26. But the severability inquiry properly focuses on effectuating the will of the Texas Legislature to the maximum extent consistent with federal law. Here, the Texas Legislature overwhelmingly favored investing in the people who invest in Texas and in creating a facially neutral path to accessing in-state tuition. Federal courts should respect that judgment by preserving at least the viable portions of the Dream Act. If the Texas Legislature is dissatisfied with the result, it retains the "editorial freedom" to repeal the remainder of the Dream Act or to adopt additional eligibility limitations. *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 510 (2010).

## CONCLUSION

For the forgoing reasons, the denial of intervention should be reversed, the district court's consent judgment should be vacated, and the district court should be directed to dismiss the case for lack of jurisdiction. Should the Court not dismiss the case, the consent judgment should nevertheless be vacated and the case remanded for further proceedings.

Dated: February 2, 2026                    Respectfully submitted,

                                           */s/ Andrés Correa*

David Donatti                              Andrés Correa
Adriana Pinon                              Christopher Patton
Edgar Saldivar                             Yaman Desai
**ACLU FOUNDATION OF TEXAS**               Zhenmian Xu
P.O. Box 8306                              **LYNN PINKER HURST &**
Houston, TX 77288                          **SCHWEGMANN, LLP**
(713) 942-8146                             2100 Ross Avenue, Suite 2700
ddonatti@aclutx.org                        Dallas, Texas 75201
                                           (214) 981-3800 Telephone
Kassandra Gonzalez                         (214) 981-3839 Facsimile
Zachary Dolling                            acorrea@lynnllp.com
**TEXAS CIVIL RIGHTS PROJECT**
P.O. Box 17757                             Joshua M. Salzman
Austin, TX 78760                           Simon C. Brewer
(512) 474-5073 ext. 182 Telephone          Paul R.Q. Wolfson
(512) 474-0726 Facsimile                   **DEMOCRACY FORWARD**
kassandra@texascivilrightsproject.org      **FOUNDATION**
                                           P.O. Box 34553
Daniel Hatoum                              Washington, D.C. 20043
**TEXAS CIVIL RIGHTS PROJECT**             Tel: (202) 448-9090
1017 W. Hackberry Ave.                     jsalzman@democracyforward.org
Alamo, TX 78516
(512) 474-5073 ext. 182 Telephone          Efrén C. Olivares
(512) 474-0726 Facsimile                   Tanya Broder
daniel@texascivilrightsproject.org         **NATIONAL IMMIGRATION LAW**
                                           **CENTER**
                                           P.O. Box 34573
                                           Washington, DC 20005-9997
                                           (213) 674-2817 Telephone
                                           olivares@nilc.org
                                           berroa@nilc.org

**ATTORNEYS FOR APPELLANTS LA UNIÓN DEL PUEBLO ENTERO,
AUSTIN COMMUNITY COLLEGE, AND OSCAR SILVA**

## CERTIFICATE OF COMPLIANCE

This brief complies with the typeface and type-volume limitations in Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 6,472 words, excluding the accompanying documents authorized by Federal Rule of Appellate Procedure 27(a)(2)(B) and the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: February 2, 2026                          */s/ Andrés Correa*
                                                  Andrés Correa

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, I state that no Plaintiffs have any parent company and that no publicly held company has a 10% or greater ownership interest in any Plaintiffs.


Dated: February 2, 2026                    */s/ Andres Correa*
                                           Andrés Correa

**CERTIFICATE OF SERVICE**

I certify that on February 2, 2026, a true and correct copy of this Brief was filed with the Clerk for the United States Court of Appeals for the Fifth Circuit via the Court's electronic filing system, which will forward a copy to all counsel of record.


Dated: February 2, 2026                    */s/ Andrés Correa*
                                           Andrés Correa